**THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

BETHUNE-COOKMAN
UNIVERSITY, INC.,

Plaintiff,

vs.                                             Case No.  6:22-cv-0047-WWB-GJK

DR. MARY MCLEOD BETHUNE
NATIONAL ALUMNI
ASSOCIATION, INC., and
JOHNNY L. MCCRAY, JR.,
Individually,

Defendants.
_____/

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiff, Bethune-Cookman University, Inc. (the "University"), pursuant to Rule 65 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116, respectfully requests this Court to issue a preliminary injunction enjoining Defendants, Dr. Mary Mcleod Bethune National Alumni Association, Inc. (the "Former Alumni Association") and Johnny L. McCray, Jr. ("McCray") (collectively "Defendants"), from the unauthorized use of the University's registered trademarks or trade dress, and from holding itself out as associated with the University.  In support of this Motion, the University states as follows:

1

## INTRODUCTION

1.    On January 7, 2022, the University filed a multi-count complaint against the Former Alumni Association alleging violations of state and federal law due to McCray's and the Former Alumni Association's unauthorized use of the University's trademarks and its false association with the University.  [DKT No. 1].

2.    The University is entitled to an Order issuing a preliminary injunction against McCray and the Former Alumni Association because: (1) McCray and the Former Alumni Association are infringing on the University's marks and creating a false association with the University; (2) the University will succeed on its claims arising from this conduct by McCray and the Former Alumni Association; (3) irreparable harm will continue unless McCray and the Former Alumni Association are stopped; and (4) no other factors prevent issuance of a preliminary injunction.

3.    In support of this Motion and to verify the allegations contained herein, the University submits the Affidavit of Belvin Perry, Jr., attached hereto as "**Exhibit A**," and the Affidavit of Kimberly Woodard, attached hereto as "**Exhibit B**."

## BACKGROUND

## THE UNIVERSITY'S TRADEMARKS

4.    The University owns trademarks and service marks that are valid and subsisting in law, were duly and legally issued, and constitute constructive notice of the University's ownership of the marks in accordance with Sections 7(b) and 22 of

the Federal Lanham Act, 15 U.S.C. §§ 1115(a), 1057(b), and 1072, (hereinafter the "University's Marks").  *See* Exhibit A, Aff. of Belvin Perry, Jr., ¶ 6.a.-j.

5.    Since the United States Patent and Trademark Office ("USPTO") has issued a Notice of Acceptance under Section 8 of the Lanham Act,  15 U.S.C. §1058(a)(l), and Section 15 of the Lanham Act, 15 U.S.C. §1065,  for the University's Marks, the University's rights to these registrations are "incontestable" under Section 15 of the Lanham Act, 15 U.S.C. §1065.  *See also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985); *See* Exhibit A, Aff. of Belvin Perry, Jr., ¶ 6.j.

6.    The University's Marks have been used to identify the University's services and to distinguish them from the services of other educational institutions and organizations.  For example, the University prominently displays and uses these marks on school buildings, letterhead, correspondence, direct mailings, its website, and school and Alumni newsletters, among other things.  *See Id.*, ¶ 6.a.-j.

7.    The University is a tax-exempt institution and accepts contributions from numerous donors each year.  The University's Alumni represent a significant segment of the University's donor base.  The University regularly employs the University's Marks in its efforts to raise money to further the University's mission. *See* Exhibit B, Aff. of Kimberly Woodard, ¶¶ 7, 8, 9.

## THE FORMER ALUMNI ASSOCIATION'S HISTORY AND MISSION

8.    The Former Alumni Association is an independent corporation, which is not legally affiliated with the University through common ownership or otherwise. *See* Exhibit A, Aff. of Belvin Perry, Jr., ¶ 7.

9.    However, from the beginning, cooperation between the University and the Former Alumni Association was integral to the Former Alumni Association's founding and mission.  *See Id.*, ¶ 10, Exh. J.

10.    According to its April 28, 2020, Bylaws, the Former Alumni Association's purpose is to maintain intimate and continuous involvement with the University when conducting its fundraising activities and other support on behalf of the University.  *See Id.*, ¶ 9, Exh. J.

11.    The Former Alumni Association's Chapters' Assessments are to include donations to the University. *See Id.*, ¶ 9, Exh. J, Art. I, Sec. 5.

12.    Further, the Former Alumni Association's website stated that its Mission was to serve the University and its Vision was to advance the mission of the University.  *See Id.*, ¶ 10.

## ACCREDITATION IMPLICATIONS

13.    The University has achieved accreditation with the Southern Association of Colleges and Schools Commission on Colleges ("SACS").  *See Id.*, ¶ 12.

4

14.     To gain or maintain accreditation with SACS, an institution must comply with the standards contained in the *Principles of Accreditation: Foundations for Quality Enhancement* and with the policies and procedures of the Commission. *See Id.*, ¶¶ 13, 14, 15.

15.     In recent years, the SACS accreditation standards have been revised to include more stringent standards pertaining to fundraising by "institution-related entities," which are entities organized separate from the University, but whose purpose is to raise funds to support the University and its programs. *See Id.*, ¶ 14.

16.     Specifically, Section 5.3 of the SACS Accreditation Standards requires the University to exercise sufficient direction and control over the fundraising activities of institution-related entities.  The University is currently going through the SACS reaffirmation process, but failure to comply with SACS Accreditation Standards could result in loss of accreditation, which would be devastating to the University. *See Id.*, ¶¶ 15, 16.

17.     In order to comply with SACS standards and exercise direction and control over institution-related entities' fundraising for the University, the University can create a Direct Support Organization for its alumni and other donors to contribute directly to the University. *See Id.*, ¶ 22.

18.     Many Southern colleges and universities with SACS accreditation use Direct Support Organizations for this purpose, including, but not limited to the

University of Florida and Florida State University.  *See Id.*, ¶ 23.

## FORMER ALUMNI ASSOCIATION'S LOSS OF TAX-EXEMPT STATUS

19.    In addition to the issue of the University's direction and control over institution-related entities' fundraising for the University, the University has also learned that the Former Alumni Association lost its tax-exempt status with the IRS. According to public records as of the filing of this lawsuit, the Former Alumni Association has not filed its IRS Form 990 information returns since 2016— therefore, losing its tax-exempt status due to its failure to file three (3) years of IRS Form 990 information returns.  *See Id.*, ¶¶ 18, 19.

## DISPARAGEMENT BY THE FORMER ALUMNI ASSOCIATION

20.    The Former Alumni Association's leadership has a history of publicly disparaging the University and its Board of Trustees.  *See Id.*, ¶ 17.

## DISASSOCIATION FROM FORMER ALUMNI ASSOCIATION AND REVOCATION OF PERMISSION TO USE MARKS

21.    The University's Board of Trustees (the "Board") convened on September 1, 2021, and unanimously voted for the University to break ties with and disassociate from the Former Alumni Association, and to create a Direct Support Organization[1].  *See Id.*, ¶¶ 22, 24.

---

[1] Under the Direct Support Organization model, alumni will work directly with the Bethune-Cookman University Office of Alumni Affairs and Development, which allows the University to exercise sufficient direction and control over the fundraising activities for the University, as required by SACS accreditation standards, and for more direct, efficient, and effective alumni

22.     On or about September 17, 2021, the University's counsel sent a letter to the Former Alumni Association's counsel advising that in light of the resolution passed by the Board, the Former Alumni Association was not legally authorized to use the University's name, likeness, logos, or facilities, or to represent itself publicly as being associated with the University in any way.  *See Id.*, ¶ 25.

23.     After receipt of cease and desist letter(s) from the University, the Former Alumni Association, at the direction and authorization of Defendant, McCray, changed its name[2] to Dr. Mary McLeod Bethune National Alumni Association, Inc., to remove "Bethune-Cookman University" from its name while continuing to keep the University's Founder's name.  *See Id.*, ¶¶ 7, 25.

24.     Dr. Mary McLeod Bethune is inextricably associated with the University.  Dr. Bethune is the University's Founder, the University is named after her, and in addition to her statue, her home is located on the University's campus. Further, a replica of her National Statuary Hall statue will be placed in the Riverfront Park in Daytona Beach, Florida, in such a way that it is directly facing the University, because of Dr. Bethune's inextricable ties to the University.  *See Id.*, ¶ 30.

25.     In addition to using the University's Founder's name, the Former Alumni Association continued to use the University's likeness, logos, and

---

engagement.

[2] The Former Alumni Association was previously known as the "National Alumni Association of Bethune-Cookman University, Inc."

trademarks, and represent itself publicly as being associated with the University.  *See Id.*, ¶ 26.

## THE FORMER ALUMNI ASSOCIATION'S CONTINUED INFRINGEMENT AND FALSE ASSOCIATION

26.     Despite the University's clear notice of disassociation and multiple notices of infringement and demands to cease and desist, the Former Alumni Association has continued to represent that it is authorized to contact the University's alumni and solicit donations for the University, and otherwise, willfully infringe upon and dilute the University's Marks by using them without permission. *See Id.*, ¶ 27; Exhibit B, Aff. of Kimberly Woodard, ¶¶ 12, 14.

27.     The Former Alumni Association's logo as of the filing of this lawsuit contains the University's colors, an image of the University's marching band, images of the University's campus buildings and statues, and an image of the University's Founder and her home on campus.  *See* Exhibit A, Aff. of Belvin Perry, Jr., ¶ 28.

28.     The name and image of Dr. Mary McLeod Bethune, in conjunction with the University's colors and images of the University's marching band, campus buildings, and statues, constitute the University's "trade dress."  *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986).

29.     The name and image of Dr. Mary McLeod Bethune, when used with

"Alumni" and/or with the University's trade dress, is inherently distinctive and has acquired secondary meaning as it relates to the activities and purposes of the University.  Students, faculty, and alumni affectionately refer to Dr. Mary McLeod Bethune as "Mother Mary" when speaking about the University and its proud history.  *See* Exhibit A, Aff. of Belvin Perry, Jr., ¶ 30.

30.    The Former Alumni Association, knowing of the University's relationship with its distinctive Founder, adopted her likeness and image to falsely associate with and hold itself out as the University's "National Alumni Association."

31.    This unauthorized commercial use of the confusingly similar marks and trade dress, falsely associating with the University, is designed to willfully and/or intentionally trade on the goodwill of the University's Marks and trade dress, and cause confusion and deception in the marketplace among customers intending to purchase goods and services affiliated with or otherwise authorized by the University, and among donors who intend to provide funds for the benefit of the University.  *See Cyclonaire Corp. v. United States Systems, Inc.,* 209 U.S.P.Q. 310, 314 (D.Kan. 1980) ("A party with a prior relationship with the first mark has a greater duty to adopt a clearly distinguishable mark than does a mere stranger."); *see also Sicilia Di R. Biebow & Co. v. Ronald Cox,* 732 F.2d 417, at 432 (5th Cir.1984) ("We think that Cox's prior role as a distributor of Sicilia's citrus juice provides additional evidence of his intent to trade on the goodwill of Sicilia").

9

32.    The   Former   Alumni   Association's   intentional   unauthorized commercial use of the University's Marks will deceive donors and the relevant consuming public into believing, mistakenly, that the Former Alumni Association's services originate from, are associated or affiliated with, or are otherwise authorized by the University, which they are not.  Exhibit B, Aff. of Kimberly Woodard, ¶¶ 12, 13, 14.

33.    Thus, Defendants' actions are causing, and unless restrained, will continue to cause, damage and immediate irreparable harm to the University that cannot be adequately compensated with money damages.

## **ARGUMENT**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the University has a clear right to immediate injunctive relief from Defendants' unauthorized use of the University's Marks and trade dress, including any confusingly similar variants thereof.  By its very nature, trademark infringement causes irreparable harm.  *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889* F.2d 1018, 1029 (11th Cir. 1989).

Accordingly, injunctive relief is appropriate as there is no adequate remedy at law.  The Eleventh Circuit has noted that "in ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day [and the] reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks . . . ." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.,*

522 F.3d 1200, 1209 (11th Cir. 2008) (internal quotation and citations omitted). Trademark infringement, thus, harms not only the rightful owner of the trademark but the public at large as well.  *See Kason Indus., Inc. v. Component Hardware Group, Inc.,* 120F.3d 1199, 1207 (11th Cir. 1997).

This court may grant a preliminary injunction if the movant establishes:

"(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest."  Fed. R. Civ. P. 65; *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Davidoff & CIE, S.A. v. PLD Intern. Corp.,* 263 F.3d 1297, 1300 (11th Cir. 2001) (reciting such factors as applicable to a trademark infringement claim).  The University has established each of these four factors and is entitled to injunctive relief to protect its reputation and goodwill.

## I.   The University's Success on its Trademark Infringement and False Association Claims is a Virtual Certainty

The facts set forth above demonstrate that the Former Alumni Association has engaged in trademark infringement of at least those federally-registered University Marks in violation of federal law.  Section 32(a) of the Lanham Act, 15 U.S.C. §1114(1)(a), provides a vehicle by which an owner of a federally registered trademark may protect its trademark registration.  Under § 32(a) of the Lanham Act,

liability for trademark infringement occurs when a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark which is likely to cause confusion, or to cause mistake, or to deceive." *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999); *see also* 15 U.S.C. § 1114(1)(a). "Thus, to prevail, a plaintiff must demonstrate (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion."[3] *Id.* This standard applies to claims of infringement under Florida law as well. *See Great Southern Bank v. First Southern Bank*, 625 So.2d 463, 466-67 (Fla. 1993) ("[w]e also analyze [common-law trademark infringement] based on cases decided under comparable provisions of the federal Lanham Act"); *see also* § 495.181, Fla. Stat. ("construction given the [Lanham Act] should be examined as persuasive authority for interpreting and construing this chapter").

Both of these elements are present here. Indeed, in similar circumstances, federal courts have repeatedly acknowledged that an alumni association may not utilize the marks of the associated educational institution without permission. *See*

---

[3] The Eleventh Circuit and courts within it also have stated this standard with more discrete subparts, expressly listing as one or more numbered elements the statutory requirement that the infringing mark be used "in commerce." For example, "[t]hus, to prevail on a trademark infringement claim a plaintiff must demonstrate that (1) its mark has priority, (2) defendant used its mark in commerce, and (3) defendant's mark is likely to cause consumer confusion." *PetMed Express,* 336 F. Supp. 2d at 1217 (*citing Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242 (11th Cir. 2002) and *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330 (11th Cir. 1999)); *see also N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1218 (11th Cir. 2008). Regardless of how they are stated, each of these elements are satisfied in this case.

*Villanova Univ. v. Villanova Alumni Educational Foundation, Inc.,* 123 F. Supp. 2d 293, 312 (E.D. Pa. 2000) (preliminarily enjoining defendant alumni association's use of university marks)[4]. *See Oakwood University, Inc. v. Oakwood University Alumni Association*, 5:18-cv-870-MHH, 2020 WL 4732074, *22 (N.D. Ala. August 14, 2020) (preliminary injunction preventing alumni association from using university's marks or indicating association with the university).  Unless the Court enjoins the Former Alumni Association, its officers, and McCray from continuing to use the University's Marks, the University will be irreparably harmed.

### 1.    *The University's Marks are valid and have priority.*

There can be no dispute that the University's Marks are valid.  Nor can there be any dispute that the University has acquired statutory and common law rights in its Marks.  *See* ¶¶ 4, 5, above.  The right to use these Marks in conjunction with educational and entertainment services necessarily extends to use of the Marks in conjunction with fundraising to support those services.  *See Villanova*, 123 F. Supp. at 302 ("the educational activities of a non-profit educational institution inherently encompass charitable services [and thus] the U.S. Trademark registration certificates logically extend to the University's use of these marks in fundraising activities that

---

[4] *The Alumni Association of New Jersey Institute of Technology v. The Newer Jersey Institute of Technology,* 2014 WL 917051 (N.J. Super. Feb. 28, 2014) (permanently enjoining defendant alumni association's use of university marks); *see also Potomac Conference of Seventh- Day Adventists v. Takoma Academy Alumni Association, Inc.,* 2 F. Supp. 3d 758, (D. Md. 2014) (denying association's motion to dismiss finding that educational institution had properly pled that alumni group's use of the institution's marks constituted trademark infringement).

are necessary to support its education and entertainment activities"). "The certificate of registration constitutes prima facie evidence of the validity of the registered mark . . . and of the owner's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1057(b).  Further, the USPTO has issued a Notice of Acceptance under Section 8 of the Lanham Act,  15 U.S.C. §1058(a)(l) and Section 15 of the Lanham Act, 15 U.S.C. §1065  for the aforementioned trademarks and service marks. Accordingly, the University's rights to these registrations are "incontestable" under Section 15 of the Lanham Act, 15 U.S.C. §1065.

### 2. *Use of "Dr. Mary Mcleod Bethune National Alumni Association, Inc." is likely to cause confusion in the marketplace.*

The only remaining question for proving a federal trademark infringement claim is whether the Defendant's use of the University's Marks and/or its founder's name in conjunction with "National Alumni Association, Inc." and the University's trade dress is likely to cause confusion.  In assessing whether there exists a likelihood of consumer confusion, the Court considers: (1) the type of mark; (2) the similarity of the mark; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets, or trade channels, and customers; (5) the similarity of advertising media; (6) defendant's intent; and (7) actual confusion. *Frehling Enters., Inc.,* 192 F.3d at 1335; *see also J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 789 (11th Cir. 2020) (substantially similar factors used to determine whether there is a likelihood of confusion between two trade dresses).  Of these, the type of

mark and actual confusion are most important, but evidence of actual confusion is not a prerequisite to establishing a likelihood of confusion. *Frehling Enters., Inc.,* 192 F.3d at 1335, 1340.

Where the copying of a mark is intentional, as is the case here with the Former Alumni Association's use of the University's Marks in conjunction with flyers, website postings, email correspondence, and social media postings, a rebuttable presumption of the likelihood of confusion is created.  *See Bauer Lamp Co. v. Shaffer,* 941 F.2d 1165, 1172 (11th Cir. 1991).  Furthermore, the "deliberate adoption of a similar mark," such as the Former Alumni Association's use of the University's founder's name, its colors, an image of the University's marching band, images of the University's campus buildings and statues, an image of the University's Founder and her home on campus, and its representation as the "National Alumni Association," (*see* Compl. ¶ 69), "may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion." *Beer Nuts v. Clover Club Foods Co.,* 805 F.2d 920 (10th Cir. 1986).  And because the Former Alumni Association, with knowledge of the University's exclusive ownership of the University's Marks and trade dress, adopted and made use of the Marks and trade dress, the likelihood of confusion is presumed until rebutted.  The Former Alumni Association cannot rebut this presumption with competent evidence.

Notwithstanding this presumption, the evidence discussed above weighs in favor of finding a likelihood of confusion exists. *See* Exhibit B, Aff. of Kimberly Woodard.  The University's Marks and trade dress are widely recognized and highly regarded locally, nationally and, indeed, around the world.  The Former Alumni Association obviously recognizes this and thus, continues to use the name "Dr. Mary Mcleod Bethune National Alumni Association, Inc." in commerce along with the University's trade dress.  Quite simply, the use of the name of the University's Founder in conjunction with "Alumni Association" and the University's trade dress (colors, images of marching band, campus, etc.) indicates the Former Alumni Association's "intention to bolster its own reputation by trading off of the goodwill associated with the plaintiff's trade dress supports a finding of likelihood of confusion." *J-B Weld Co*., 978 F.3d at 790.

Defendant's intent to continue its use is shown by its domain name "https://www.mmbnaa.org/" as well as the name reservation of "Dr. Mary Mcleod Bethune National Alumni Association, Inc." for its corporate filing with the Florida Division of Corporations. *See* Compl. ¶ 70; *see also Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1204-05 (11th Cir. 2001) (holding that an injunction prohibiting trademark infringement defendant from using the name "Coolmail" or any similar mark in connection with e-mail or other Internet-related services, in connection with software, as part of its domain name of its website, was

neither vague nor overbroad).  On June 13, 2022, another Not for Profit Corporation was established with the name, "Mary McLeod Bethune National Alumni Association Inc.," with Defendant McCray named as President[5].

In addition to the Former Alumni Association's continued attempts to conduct commerce by trading on the University's association with its Founder, the marching band, and other University landmarks, is likely to lead to confusion where the activities the Former Alumni Association engages in overlaps with the activities of the University's Direct Support Organization. *See Villanova,* 123 F. Supp. 2d at 306 (finding likelihood of confusion where alumni group used university's marks to engage in university-related fundraising).

## II.   Without Injunctive Relief, The University Will Continue to Suffer Irreparable Injury

The Eleventh Circuit "extend[s] a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1227 (11th Cir. 2008)[6].   The presumption of irreparable injury applies here because the

---

[5]Pursuant to Florida Division of Corporations Database. https://dos.myflorida.com/sunbiz/search/
[6] *See also Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.,* 889 F.2d 1018, 1029 (11th Cir. 1989) (*quoting Processed Plastic Co. v. Warner Communications,* 675 F.2d 852, 858 (7th Cir.1982)) ("[i]t is generally recognized in trademark infringement cases that (1) there is no adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm."); *Potomac Conf. Corp. of Seventh-Day Adventists,* 2014 WL 857947 (D. Md. Mar. 4, 2014) (quoting *Prosperity Sys., Inc. v. Ali,* No. CCB-10-2024, 2010 WL 5174939, at *5 (D. Md. Dec. 15, 2010)) ("Generally, the finding of irreparable harm is automatic in a trademark infringement case where the trademark holder has demonstrated lawful use and the likelihood of consumer confusion.").

University can establish its lawful use – and the Former Alumni Association's infringement of – its trademarks.

Even absent the application of such a presumption, unless the Court enjoins the Former Alumni Association's impermissible use of the University's Marks, confusingly similar marks, and trade dress, the University will suffer immediate and irreparable injury that cannot be adequately compensated with money damages, including, but not limited to: (a) the loss of the ability to control the use of the University's Marks and trade dress in commerce, including the type, style and quality of the goods and services to which it is attached; (b) the certainty of confusion among the consuming public as to the University's affiliation with, approval of and/or sponsorship of the Former Alumni Association's goods and services, arising directly from its unauthorized use of the University's Mark and trade dress; and (c) the actual and/or imminent threatened loss to the University's valuable goodwill and reputation with the consuming public. *See* Exhibit B, Aff. of Kimberly Woodard.

Indeed, the Former Alumni Association continues to use the University's Founder's name in conjunction with "National Alumni Association" and a logo with the University's colors and an image of the University's Founder, thereby falsely suggesting to Alumni, students, donors, and the public at large that its actions are approved and supported by the University.  This also causes confusion over the

source of the University's fundraising and potential accreditation problems under SACS Standard 5.3.

The University has no adequate remedy at law for this injury because the harm it will suffer as a result of the Former Alumni Association's exploitation of the University's Marks or confusingly similar marks and trade dress is incapable of exact proof. An award of money damages simply cannot redress the University's loss of (a) control over its trademarks and the inevitable consumer confusion; (b) the attendant harm to the University's good will and reputation, and (c) the University's loss of control over the fund-raising activities and the potentially damaging ramifications of losing its SACS accreditation.

Further, the Former Alumni Association still unlawfully uses the University's trade dress and confusingly similar marks in its flyers, emails, and social media postings to Alumni for their sponsored events.  And although the Former Alumni Association will argue it has attempted to purportedly cease using the University's Marks on its website, without an injunction, nothing stops the Former Alumni Association from infringing upon the University's Marks at a later date.  *See Haynes v. Hooters of Am., LLC*, 893 F.3d 781 (11th Cir. 2018); *see also Burger King Corp. v. Weaver*, 33 F.Supp.2d 1037, 1040 (S.D. Fla. 1998) (willful violation of trademark rights and failure to cease infringement until plaintiff sought injunctive relief, injunctive relief not rendered moot); *Clayton v. Howard Johnson Franchise Sys.*

*Inc.*, 730 F.Supp. 1553, 1558 (M.D. Fla. 1988) ("[T]he mere discontinuance of infringing conduct does not render injunctive relief inappropriate. There is a cognizable danger of future violations, given the past violations by Plaintiffs"); *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 702 (2d Cir. 1961) (injunction should issue against future usage of label with close resemblance in color, scheme, and design to plaintiff's label even though defendant discontinued use 5 months prior to lawsuit since defendant denied in answer validity of plaintiff's trademark).  Thus, a temporary injunction is necessary to enjoin current and future action of the Former Alumni Association.

### III.  <u>The Balance of the Harms Weighs in the University's Favor</u>

The harm caused by the Former Alumni Association as a result of its infringement of the University's Marks and trade dress far exceeds any alleged harm caused as a result of any injunctive relief entered against Former Alumni Association and in favor of the University.

There will be no substantial hardship on the Former Alumni Association because of the requested Order.  The Former Alumni Association, despite any injunctive relief prohibiting use of the University's Marks and trade dress, would still be able to continue providing alumni networking services under a different, non-infringing name and logo, (provided any new arrangement agrees to recognize and comply with SACS Standard 5.3).  Conversely, the University would be at risk of

significant harm if injunctive relief is not granted, including, but not limited to, the potential loss of SACS accreditation as well as harm to its goodwill and reputation. Under similar circumstances, the court in *Potomac Conference Corp. of Seventh Day Adventists* determined that the balance of the equities tipped in favor of the plaintiff, stating that "a preliminary injunction [requested by the plaintiff] barring use of the marks at issue still allows Defendant [alumni association] to fundraise and host events for students and alumni." 2014 WL 857947, *21 (D. Md. March 4, 2014); *see also Villanova,* 123 F. Supp. 2d at 311 (finding infringing alumni association "can hardly claim to be harmed" by order barring continued use of university's marks and entering preliminary injunction). Ultimately, any inconvenience caused to the Former Alumni Association from any injunctive relief would be minor in comparison to the harm suffered by the University if injunctive relief is not granted. *See id.*, (noting that "Defendant [alumni association] may suffer some inconvenience from issuance of an injunction" but that such inconvenience "would not be greater than the hardship suffered by [Villanova] University through the continued loss of control over its name, marks and goodwill" particularly where the inconvenience was the "result of defendant's own conduct.").

## IV.   The Issuance of an Injunction Will Serve the Public Interest

As demonstrated by the Lanham Act, infringement of the University's Marks by the Former Alumni Association is against the public policy of the State of Florida

21

and of the United States.  A preliminary injunction issued in the University's favor will actually serve the public interest because it will minimize confusion in the marketplace[7].

## THE UNIVERSITY SHOULD NOT BE REQUIRED TO POST BOND

The University contends no bond is called for in this case, and the Court has the discretion to require no bond at all.  *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005) ("it is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all"); *see also TracFone Wireless, Inc. v. Washington*, 978 F.Supp.2d 1225, 1235 (M.D. Fla. 2013) (no bond required because high probability on succeeding on merits of Lanham Act claims and defendants have no legitimate interest in continued use of trademarks).  A bond should not be required here.

The University has shown a high probability of succeeding on the merits of its claims.  Moreover, the evidence demonstrates that Former Alumni Association's infringement is willful and that they have no legitimate interest in their continued

---

[7] *See Kason Indus., Inc. v. Component Hardware Group, Inc.,* 120 F.3d 1199, 1207 (11th Cir. 1997) (noting a strong public interest in preventing deception of consumers in the marketplace). Eliminating such confusion is "paramount." *TracFone Wireless, Inc. v. Washington,* 978 F. Supp. 2d 1225, 1234 (M.D. Fla. 2013).  Indeed, trademark infringement not only negatively impacts the right of the "trademark owner to control his products' reputation" but also "the right of the public to be free of confusion." *Id.* at 1234-35. "[T]he public interest would be served by the issuance of a preliminary injunction which prevents further consumer confusion." *Id.* at 1235.

use of the University's Marks and trade dress.  Furthermore, since the University is a non-profit organization, no bond should be required. *See Southern Appalachian Biodiversity Project v. U.S. Forest Service*, 162 F.Supp.2d 1365, 1368 (N.D. Georgia 2001) (recognizing that plaintiff was a non-profit organization, court did not require plaintiff to post a security bond); *Pass-A-Grille Beach Community Church, Inc. v. City of St. Pete Beach, Florida*, 515 F.Supp.3d 1226, 1237 (M.D. Fla. 2021) (equities weigh in favor of non-profit church for waiving bond requirement).

Accordingly, although the University stands ready and willing to post security as the Court may order, it requests that the Court require no bond or require only a nominal amount.

## **REQUEST FOR RELIEF**

For the foregoing reasons, the University respectfully requests that this Court set and conduct a Preliminary Injunction hearing at the Court's earliest opportunity, and enter an order and judgment temporarily and permanently enjoining the Former Alumni Association, McCray, the Former Alumni Association's agents, officers, servants, employees, attorneys, affiliate chapters, and all other persons who are in active concert or participation with the Former Alumni Association from:

(a)    using the University's Marks or any colorable imitations thereof, including those that are confusingly similar to or in any way similar to the University's Marks or that is likely to cause confusion, mistake, deception or public

misunderstanding as to the origin of the Former Alumni Association's goods and services, or cause the impression that the Former Alumni Association's goods and services are associated with the University;

(b)   registering, trafficking in or using any state or federal trademark or service mark that incorporates the University's Marks or any colorable imitations thereof;

(c)   displaying goods or services incorporating the University's Marks in connection with any advertisement or promotion including, without limitation, over the internet;

(d)   otherwise using any trademarks, trade dress, or tradenames that are confusingly similar to any of the University's Marks, including, but not limited to "Bethune-Cookman," "Bethune-Cookman University," "B-CU," "B-CU Alumni Association," and any variation of the name of the University's Founder, "Dr. Mary McLeod Bethune" in conjunction with "Alumni," whether alone, or in combination with other text, words, letters numbers, the University's colors, images of the University's campus and events, or images of its Founder; and

(e)   fundraising and soliciting in the name of or on behalf of the University in any manner.

Respectfully submitted July 5, 2022.



By: ___/s/ Scott W. Cichon_____
SCOTT W. CICHON, Lead Counsel
FLA. BAR NO.  440876
Primary e-mail address:
Scott.Cichon@CobbCole.com
Secondary e-mail address:
Julie.Mounts@cobbcole.com
Telephone: (386) 323-9282

HOLLY W. ZITZKA
FLA. BAR NO. 111824
Primary e-mail address:
Holly.Zitzka@CobbCole.com
Secondary e-mail address:
Lori.Dumont@CobbCole.com
Telephone: (386) 323-9204
Facsimile: (386) 248-0323
Post Office Box 2491
Daytona Beach, FL 32115-2491

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 5, 2022, a true and correct copy of the

foregoing was served electronically via the CM/ECF system on the following:

Vivian Williams, Esq.
Vivian Williams Law, LLC
P.O. Box 43682
Jacksonville, FL 32203
Email: Vivian@vwilliamslaw.com
*Attorney for Defendants*

By: /s/ Scott W. Cichon___
Attorney