1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2
                 CASE NO.:  6:22-cv-0047-WWB-RMN
3

4
    BETHUNE-COOKMAN
5   UNIVERSITY, INC.,
6           Plaintiff,
7   vs.
8   DR. MARY MCLEOD BETHUNE
    NATIONAL ALUMNI
9   ASSOCIATION, INC., MARY
    MCLEOD BETHUNE
10  NATIONAL ALUMNI
    ASSOCIATION, INC., and
11  JOHNNY L. MCCRAY, JR.,
    Individually,
12
            Defendants.
13

14
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
15
16  VIDEO-RECORDED
    DEPOSITION OF:  JOHNNY MCCRAY JR.
17
    DATE:            August 9, 2023
18
    TIME:            COMMENCED:  9:33 a.m.
19                   CONCLUDED:  6:37 p.m.
20  TAKEN BY:        Plaintiff
21  PLACE:           Via videoconference
22  REPORTED BY:     Mae Fisher, RMR, CRR
23

24

25

Page 2

```
 1      A P P E A R A N C E S:
 2  GREGORY HERBERT, ESQUIRE
    STEPHEN ANDERSON, ESQUIRE
 3  Of: Greenberg Traurig, P.A.
        450 South Orange Avenue
 4      Suite 650
        Orlando, Florida 32801
 5      Herbertg@gtlaw.com
        Andersonst@gtlaw.com
 6
    VALENCIA GALLON-STUBBS, ESQUIRE
 7  Of: Bethune Cookman University
        640 Dr. Mary McLeod Bethune Boulevard
 8      Daytona Beach, Florida 32114-3012
        (386) 481-2035
 9      Stubbsv@cookman.edu
10      Counsel for the PLAINTIFF
11  ELANA GREENWAY FANIEL, ESQUIRE
    Of: Greenway Law Firm, P.A.
12      PO Box 660
        Lutz, Florida 33548-0660
13      (813) 607-6060
        Elana@greenwayfirm.com
14
15      Counsel for the DEFENDANTS
16  DARIN WEAVER
    Videographer
17  PAULA CASTRO
    Paralegal
18
    MICHELLE ALVERSON
19  Paralegal
20
21    *All parties and court reporter appeared via
      videoconference.
22
23
24
25
```

Page 3

```
 1        I N D E X
 2  TESTIMONY OF JOHNNY MCCRAY JR.
 3     DIRECT EXAMINATION BY MR. HERBERT ........ 7
 4     CROSS-EXAMINATION BY MS. FANIEL .......... 277
 5     REDIRECT EXAMINATION BY MR. HERBERT ...... 311
 6  CERTIFICATE OF OATH ........................... 317
 7  REPORTER'S DEPOSITION CERTIFICATE ............. 318
 8
 9
       E X H I B I T S
    PLAINTIFF'S EXHIBITS
10
    Exhibit 1 - Sunbiz.org Detail by Entity Name
11       Dr. Mary McLeod Bethune National
         Alumni Association, Inc. ........... 59
12
    Exhibit 2 - Articles of Amendment to Articles
13       of Incorporation of National
         Association of Bethune-
14       Cookman College, Incorporated ...... 63
15  Exhibit 3 - Articles of Amendment to Articles
         of Incorporation of National
16       Alumni Association of Bethune-
         Cookman College, Incorporated ... 63
17
    Exhibit 4 - Electronic Articles of Incorporation
18       For Mary McLeod Bethune National
         Alumni Association, Inc. ........... 68
19
    Exhibit 5 - 2023 Florida Not For Profit
20       Corporation Annual Report
         Dr. Mary McLeod Bethune National
21       Alumni Association, Inc. ........... 88
22  Exhibit 6 - 2023 Florida Not For Profit
         Corporation Annual Report
23       Mary McLeod Bethune National
         Alumni Association, Inc. ........... 91
24
25
```

Page 4

```
 1  Exhibit 7 - 2016 Form 990
         National Alumni Association of
 2       Bethune-Cookman University,
         Incorporated ...................... 101
 3
    Exhibit 8 - 2019 Form 990
 4       National Alumni Association of
         Bethune-Cookman University,
 5       Incorporated ...................... 106
 6  Exhibit 9 - 2021 Form 990
         Dr. Mary McLeod Bethune National
 7       Alumni Association ................. 121
 8  Exhibit 10 - Letter dated 9/5/22 ............ 150
 9  Exhibit 11 - Facebook Posting - Broward County
         Chapter........................... 157
10
    Exhibit 12 - Facebook Posting - Coastal Georgia
11       Chapter ........................... 160
12  Exhibit 13 - Facebook Posting - Miami-Dade
         Chapter ........................... 164
13
    Exhibit 14 - Facebook Posting - Broward County
14       Chapter ........................... 169
15  Exhibit 15 - Facebook Posting - Broward County
         Chapter........................... 171
16
    Exhibit 16 - Facebook Posting - Miami-Dade
17       Chapter ........................... 174
18  Exhibit 17 - Facebook Posting - Coastal Georgia
         Chapter ........................... 176
19
    Exhibit 18 - Photograph ...................... 178
20
    Exhibit 19 - Spreadsheet ..................... 195
21
    Exhibit 20 - e-mail exchange ................. 247
22
    Exhibit 21 - Memorandum of Understanding ...... 261
23
    DEFENDANTS' EXHIBITS
24
    (NONE)
25
```

Page 5

```
 1        P R O C E E D I N G S
 2      THE VIDEOGRAPHER:  We're going on the record.
 3  The time is 9:33 a.m.  Today is Wednesday, August 9,
 4  2023.
 5      Please note that this deposition is being
 6  conducted virtually.  Quality of recording depends on
 7  the quality of camera and internet connection of
 8  participants.  What is seen from the witness and heard
 9  on the screen is what will be recorded.  Audio and
10  video recording will continue to take place unless all
11  parties agree to go off the record.
12      This is media unit 1 of the video-recorded
13  deposition of Johnny L. McCray, Jr., Esquire, taken by
14  the counsel for the plaintiff in the matter
15  Bethune-Cookman University, Inc., versus Dr. Mary
16  McLeod Bethune National Alumni Association, Inc., Mary
17  McLeod Bethune National Alumni Association, Inc., and
18  Johnny L. McCray, Jr., individually, filed in the
19  United States District Court for the Middle District
20  of Florida, Case No. 6:22-cv-0047-WWB-RMN.
21      This deposition is taking place via Zoom.  My
22  name is Darin Weaver.  I represent Veritext Legal
23  Solutions.  I am the videographer.  The court reporter
24  is Mae Fisher, also from Veritext Legal Solutions.
25  I'm not authorized to administer an oath.  I'm not
```

Page 6

1  related to any party in this action, nor am I
2  financially interested in the outcome.
3      If there are any objections to proceeding,
4  please state them at the time of your appearance.
5  Counsel and all present, including those remotely,
6  will now state their appearance and affiliation for
7  the record beginning with the noticing attorney.
8      MR. HERBERT:  Good morning.  My name is Gregory
9  Herbert with the law firm Greenberg Traurig.  I
10  represent the plaintiff in this matter,
11  Bethune-Cookman University, Inc.
12      And also listening in are my colleague Stephen
13  Anderson, also with Greenberg Traurig; paralegal Paula
14  Castro with Greenberg Traurig and paralegal Michelle
15  Alverson.  And our client representative is also
16  listening in; her name is Valencia Gallon-Stubbs.  She
17  is the general counsel for the plaintiff.
18      MS. FANIEL:  Good morning.  My name is Elana
19  Greenway Faniel, Greenway Law Firm.  I represent the
20  defendant Johnny L. McCray, Jr., Esquire.
21      THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness.
23      THE COURT REPORTER:  Can you raise your right
24  hand, please.
25      Do you solemnly swear or affirm that the

Page 7

1  testimony you are about to give in this cause will be
2  the truth, the whole truth, and nothing but the truth?
3      THE WITNESS:  I do, yes.
4      THE VIDEOGRAPHER:  Thank you.  Counsel, you may
5  proceed.
6      JOHNNY MCCRAY, JR.,
7  a witness herein, having been first duly sworn, was
8  examined, and testified as follows:
9      DIRECT EXAMINATION
10  BY MR. HERBERT:
11  Q.  Good morning, Mr. McCray.
12  A.  Good morning.
13  Q.  As I mentioned, my name is Greg Herbert.  I'm
14  counsel for the plaintiff, Bethune-Cookman University in
15  this matter.
16      Can you please state your name and your business
17  address for the record?
18  A.  Johnny Leonardo McCray, Jr.  My business address
19  is 400 East Atlantic Boulevard, Pompano Beach, Florida
20  33060.
21  Q.  Okay.  And can you tell me if you are employed at
22  this moment, and if so, by who?
23  A.  Yeah.  I work for the Law Office of Johnny L.
24  McCray, Jr. PA, Pompano Beach, Florida.
25  Q.  Okay.

Page 8

1  A.  I'm an attorney.
2  Q.  Okay.  That's your own law firm, right?
3  A.  That's correct.
4  Q.  Okay.  And are you -- is your title with that
5  firm partner, shareholder, owner or any particular
6  title?
7  A.  I'm the president/owner.
8  Q.  Thank you.  And do you currently hold any other
9  titles or positions?
10  A.  In relation to what?
11  Q.  Well, let's start with the defendant in this
12  case.
13  A.  I'm the president of the Mary McLeod Bethune
14  National Alumni Association.
15  Q.  Okay.  And how long have you been the president
16  of that organization?
17  A.  Since July 1st, 2020.
18  Q.  Okay.  And just in terms of nomenclature, I think
19  you understand that -- you understand that you
20  personally are a defendant in this lawsuit, correct?
21  A.  I do understand that, correct.
22  Q.  Okay.  And you understand that there are two
23  separate corporate entities that are named as defendants
24  in the lawsuit, one of them is the organization you just
25  mentioned you were the president of?

Page 9

1  A.  Yes.
2  Q.  Okay.  And there is another corporate defendant
3  named in the action, and it goes by the name of the
4  Dr. Mary McLeod Bethune National Alumni Association,
5  Inc.  You're familiar with that entity?
6  A.  I am.  Yes.
7  Q.  Okay.  So for simplicity, what I'd like to do,
8  rather than throw out a bunch of initials and list the
9  full name each time, is since the Dr. Mary McLeod
10  Bethune National Alumni Association, Inc., is the first
11  named defendant, I would like to refer to them as NAA1
12  and then the second named organization of which you said
13  you're the president, the Mary McLeod Bethune National
14  Alumni Association, Inc., I would like to refer to that
15  as NAA2.
16      If I use that nickname, will you understand what
17  I'm talking about?
18  A.  I will but let me just clarify.  The Dr. Mary
19  McLeod Bethune National Alumni Association, that was our
20  initial name after we changed from the National Alumni
21  Association of Bethune-Cookman University.  I'm listed
22  as the president of that organization also.  But our
23  treasurer changed the name to the Mary McLeod Bethune
24  National Alumni Association.  She thought it was best.
25  And -- and actually, we went back before our board

3 (Pages 6 - 9)

Page 10

1 because she basically did it in a sense, you know, kind
2 of sua sponte on her own, because the immediate past
3 treasurer, Sharon Cooper, had refused to give us various
4 documents, despite a number of requests.
5      In fact, we sent a legal -- I believe it was a
6 legal letter or threat of hiring a law firm to represent
7 us to get the documents.  And so our treasurer indicated
8 because there were so many hiccups from our lack of
9 having the documents from the last treasurer, Sharon
10 Cooper, she just started -- better to get a clean start
11 and she decided to just do the name Mary McLeod Bethune
12 and start that corporation but really they're in a sense
13 one and the same on extension.
14    Q.  Okay.  And I think we might be getting ahead of
15 ourselves a little bit.  I just -- and thank you for
16 that clarification.  I just want to make sure that we're
17 on the same page when we're talking about the two
18 entities.  So I think you -- I was calling them NAA1 and
19 NAA2, just as --
20    A.  That's fine.
21    Q.  -- a way -- okay.
22    A.  So NAA1 will be the Dr. MMBNAA, Dr. Mary McLeod
23 Bethune and NAA2 will be the Mary McLeod Bethune; is
24 that what you have indicated?
25    Q.  Right.  Let me ask you this:  Which organization

Page 11

1 is the organization that is currently active and
2 operational?
3    A.  I believe it's the Mary McLeod Bethune National
4 Alumni Association.
5    Q.  Okay.  Okay.  So that's the organization you are
6 the president of?
7    A.  I am.
8    Q.  Okay.  And when you mentioned your current
9 treasurer, is that Ms. La-Vaughn Starks?
10    A.  Ms. La-Vaughn Starks Graham, correct -- Graham
11 Starks, right.
12    Q.  Okay.  All right.  Let me ask you -- and the
13 plaintiff in this case is Bethune-Cookman University,
14 Inc.  You don't currently hold any titles or positions
15 with Bethune-Cookman University, correct?
16    A.  I don't, no, just the former trustee.
17    Q.  All right.  So before we go any further,
18 one thing I want to do is I'm going to ask my paralegal,
19 Paula, to share her screen.  So we can see the screen
20 that is being shared now, the URL or website name,
21 domain name at the top of the page is www.mmbnaa.org.
22 That is the NAA2's domain name.  And this is its home
23 splash page, correct?
24    A.  I believe so, yes.
25    Q.  Okay.  This is an organization that you are the

Page 12

1 president of, correct?
2    A.  That's correct.
3    Q.  Okay.  So if you look over on the right-hand
4 side, there's a picture of you in that document in the
5 upper right-hand corner, right?
6    A.  Yes.
7    Q.  Okay.  And that document is -- it's got a -- you
8 authorized the publication of this letter on the
9 website, correct?
10    A.  I did.
11    Q.  Okay.  And at the bottom of that letter, it is
12 signed:  Warmest regards, Johnny L. McCray, Jr.,
13 Esquire, '78 President Bethune-Cookman University,
14 correct?
15    A.  Yeah.  I saw that and I realized that after that
16 had gone out.  Oftentimes, I work 2, 3 in the morning.
17 Sometimes I work better and think better.  But I guess
18 sometimes, I get tired and I did make that mistake.  But
19 if you look at the top, it says from the desk of
20 president Johnny McCray, Mary McLeod Bethune National
21 Alumni Association, Inc.  So that was an inadvertent
22 mistake that was made by putting that there.
23      In fact, I think there was one other of these
24 that I sent out, these type letters that I sent out, I
25 had class of '81 and a few people called me saying, you

Page 13

1 know, you're getting your law school year confused.
2 You're putting that down rather than '78.  I'm actually
3 a graduate of Bethune-Cookman '78.  My law school
4 graduation year was '81, so this was a mistake, yeah.
5    Q.  Okay.  And when you say this got sent out, this
6 letter was e-mailed out by the organization, NAA2, at
7 some point last March, wasn't it?
8    A.  I don't remember the month, but it should be a
9 date somewhere on there.  And this was actually sent out
10 by our tech chief, who is Mr. Anthony Barfield III, I
11 believe, III or II.  Anthony Barfield.  He sends this
12 stuff out.  I'm not very tech savvy and so whenever I
13 send a letter out, regardless of the occasion, on behalf
14 of the association, I will always send it to him and he
15 sends out, I think he calls it Constant Contact.
16    Q.  Okay.  And so that was sent out to all of the
17 individuals that are on your Constant Contact e-mail
18 list, correct?
19    A.  That is correct.  Yes.
20    Q.  Okay.
21    A.  And, also, I believe I may have sent that to the
22 members of my board of directors.  And I think it was
23 one or two of the members of the board of directors who
24 pointed this out to me.  And I -- I slightly recall
25 asking Mr. Barfield to recall this.  I don't know if

4 (Pages 10 - 13)

Page 14

1 that actually happened. But I did see the president
2 that I had put Bethune-Cookman University on there.
3 Q. Okay. And -- but you drafted the letter
4 yourself, right, Mr. Barfield didn't draft that, right?
5 A. Oh, you're absolutely correct, I did, yes.
6 Q. Okay. And let me ask you another question. So
7 you say that some folks kind of contacted you and noted
8 that you had the wrong date of your graduation on the
9 original version of this. Did folks contact you by
10 e-mail or text message or --
11 A. No, I think I -- I'm sorry. I'm sorry. Finish
12 the question. I'm sorry.
13 Q. That's fine. You can answer.
14 A. No, I think I got a call from a couple of my
15 board members that said, hey, do you remember -- not do
16 you remember -- do you realize that you put class of '81
17 on there, rather than '78.
18 Q. Okay. Do you recall -- I'm sorry -- do you
19 recall if you got -- excuse me -- do you recall if you
20 got any e-mails --
21 A. No.
22 Q. -- putting --
23 A. No. I didn't -- not that I don't recall. I
24 didn't get any e-mails to that respect.
25 Q. Okay. And how about when folks pointed out that

Page 15

1 you had the wrong date of your graduation, did folks
2 also point out that you made a mistake in identifying
3 yourself as the president of BCU?
4 A. Yeah. I didn't get many calls. I didn't get any
5 e-mails or text messages. I just got a couple of phone
6 calls from people who were on the board. I don't
7 remember specifically who but persons who I know.
8 Q. Okay. And when you say you -- you think you
9 might have asked Mr. Barfield to correct that, did you
10 do that by e-mail or text message or in any other
11 written communication?
12 A. I'm not sure. I can -- I know I called him
13 because, you know, we talk on the phone quite
14 frequently. I don't remember if I sent him an e-mail
15 but I can do a search to see. But I know that I did
16 speak with him regarding this.
17 Q. Okay. And that's something else -- up in the
18 upper left-hand corner of this splash page, it says in
19 the very upper left-hand corner, you see it, it says:
20 Facts about the Dr. Mary McLeod Bethune National Alumni
21 Association, Inc.
22 Do you see that?
23 A. I do.
24 Q. Okay. And so that is actually not the current
25 name of the current organization of which you're the

Page 16

1 president, right, that's the old name?
2 A. I -- I believe that the current name is Mary
3 McLeod Bethune. I know that my board, we went back to
4 the board because I was a little upset that the
5 treasurer had taken it upon herself without getting
6 board approval because when we do things with the
7 association, I usually -- we go through our executive
8 committee or the board. But we have the discretion to
9 go either and usually it's easier to assemble the
10 smaller number of people.
11 But we mentioned to her that we wanted to use the
12 name that was actually voted upon. And that name was
13 the Dr. Mary McLeod Bethune and she said that she would
14 make the change. I think she was going to try to find
15 out whether it was wait to -- wait until the -- I'm
16 sorry, whether it was better or proper to wait until the
17 new taxable year or to try to do it then.
18 I honestly am not sure whether or not she
19 actually followed through with it as of this particular
20 day, but we did vote and tell her that Dr. Bethune,
21 giving her the due respect, you know, she had earned the
22 title doctor, so we wanted to keep the name that we
23 voted upon.
24 Q. Okay. Let me -- as you see down there at the
25 bottom of the screen that's being shared now, there's

Page 17

1 another graphic that says: Thank you. And it says:
2 Giving Tuesday.
3 You see that?
4 A. It's kind of blurry on my screen. I don't know
5 if you can make it a little bigger.
6 MR. HERBERT: Paula, if you're able to do that,
7 can you do that? Actually, you can scroll down a
8 little bit too if you can.
9 THE WITNESS: Oh, this. This.
10 BY MR. HERBERT:
11 Q. Yeah. You see there it says: Thank you. And
12 then to the right, it says: Giving Tuesday.
13 Do you see that?
14 A. Yeah. Thank you. Yes.
15 Q. And it says: Giving Tuesday with it, with a
16 heart in there for the V. Do you see what I'm talking
17 about there?
18 A. I do. I see it.
19 Q. Okay. So that Giving Tuesday is a Tuesday that
20 is -- is that -- is that one that's associated with the
21 Juneteenth holiday?
22 A. No. Giving Tuesday, my understanding, because I
23 have a fundraising committee that's chaired by
24 Mr. Sumner Hutcheson. Giving Tuesday is a national
25 giving day of nonprofit charitable corporations. That's

5 (Pages 14 - 17)

Page 18

1  my understanding. I've never actually participated in
2  it. But not only does Bethune but other universities
3  across the nation participate in Giving Tuesday.
4      Q. Okay.
5      A. And other nonprofit associations, not just
6  universities, but other nonprofit associations.
7      Q. Right. And that's actually the Tuesday before
8  Thanksgiving, I believe. Does that sound correct?
9      A. I believe it's in November, but I'm not sure of
10 the exact Tuesday. I think it is. I think you're
11 right.
12     Q. Okay. And then it looks like there's a couple of
13 QR codes on there by which somebody can download those
14 QR codes and then donate like through their phone? Is
15 that -- does that sound right?
16     A. Yes.
17     Q. Okay. And, also, it looks like it's got the URL,
18 the www.mmbnaa.org and there's an arrow there looking
19 like you can click on that, either -- either at the link
20 or a button that would allow you to donate as well,
21 right?
22     A. Like I said, I'm not very tech savvy but I know
23 you can pay on your phone and you can go to our website.
24 So I would conclude that that's the purpose of it,
25 you're correct.

Page 19

1      Q. Okay. And at the bottom it says the total raised
2  for scholarships, and there's a number there,
3  $26,341.18.
4          Do you see that?
5      A. Yes. That's what's represented.
6      Q. Okay. Do you know -- what does that number
7  actually represent? Is that the current amount raised
8  through this graphic, or is that current amount raised
9  to date, do you know?
10     A. I believe that that was raised -- I'm not really
11 sure. I don't want to say because I'm not sure.
12     Q. Okay. Who would be the best person to ask that
13 question?
14     A. Either La-Vaughn Starks Graham or Sumner
15 Hutcheson, who is the fundraising chairperson.
16     Q. Okay.
17         MR. HERBERT: Paula, if we can scroll back up
18 to the top of it again.
19 BY MR. HERBERT:
20     Q. All right. So just looking at the splash page,
21 the -- the colors in the upper part of the splash page,
22 those colors are -- those are maroon and gold, correct?
23     A. Yeah. I think the colors speak for themselves.
24     Q. Okay. Those are, also, that's the color scheme
25 used by Bethune-Cookman University, correct?

Page 20

1      A. Yes. And many other organizations, correct.
2      Q. Okay. Of that -- of that amount of the
3  scholarships down below, do you happen to know if
4  that -- that $26,000 number, if that's money that had
5  been paid out to students for scholarships or is that
6  money that's sitting in your account intended for
7  scholarships?
8      A. No. We've actually given scholarships, but we've
9  not given the full amount. We decided rather than
10 giving large amounts of scholarships, we would be able
11 to spread the proceeds to more than one student. So
12 we -- that would represent the general amount but we've
13 not given $26,000. We haven't given $26,000 worth of
14 scholarships. We've really only been set up, I believe,
15 about a year or so.
16     Q. Okay. Do you know in that year or so, has this
17 organization actually disbursed any scholarship money to
18 any students or prospective students?
19     A. Yes, we have.
20     Q. Okay. Do you happen to know how much money it
21 has, just first let's say this -- this calendar year?
22     A. I'm not sure. I know that we have applications
23 and a couple of kids contacted us recently and we told
24 them that the application period won't open again until
25 November. So we -- I know we gave at least, I believe

Page 21

1  it was at least two scholarships, the beginning of the
2  year, to a couple of students.
3      Q. Okay. And you mean the beginning of this
4  calendar year, 2023?
5      A. Yes. That's correct.
6      Q. Okay. Because I know that the organization, it
7  seems they have a different fiscal year that starts on
8  July 1st, it ends on July 30th. Are you aware of that?
9      A. Yeah.
10     Q. Okay.
11     A. Our fiscal year begin -- well, our fiscal year
12 is -- what is it, July 1st, I believe.
13     Q. Yes. I just want to make sure we're clear on the
14 record in terms of calendar year versus fiscal year. So
15 let me ask you, those scholarships that you gave out
16 that you mentioned you gave a couple out, does the
17 organization have a set dollar amount for scholarship?
18 Is it the same for all students or does it vary
19 according to different factors?
20     A. Well, we have a scholarship committee. I'm not
21 on that committee, although according to our bylaws, I'm
22 a member of every committee. But I kind of stay away --
23 like to stay away from the monetary-type issues. And I
24 let them do it, you know, as long as we have board
25 approval. And I believe that most of our scholarships

Page 22

1 are around $1,500, I believe.  But we have the
2 discretion to change -- to vary that.  Also, we're set
3 up to give emergency assistance to students in the --
4 let's say if someone's parents, a parent dies or
5 something like that and the kid needs to get home, we're
6 also set up to be able to assist kids -- students,
7 rather, in those type emergency circumstances.
8    Q.  Okay.  And do you know, I think you indicated
9 that to your knowledge, you're aware of two scholarships
10 that were given out in this calendar year.  Do you know
11 if those were both for $1,500 or was it a different
12 amount?
13    A.  I believe it may have been about $1,500.  I'm not
14 really sure but I think it was about $1,500.  And we
15 really only finally get -- we -- we were getting set up
16 to give out scholarships near the end of last year, the
17 calendar year.  And that's why we actually just started
18 in January.  It took us a while to get established.  But
19 we are established now and we are in the process of
20 giving more scholarships.
21    Q.  Okay.  And do you know if -- do you know as you
22 sit here today those two scholarships that you
23 mentioned, is that -- is that the total scholarships
24 that have been awarded by the organization this year or
25 you're not sure about that?

Page 23

1    A.  I'm pretty sure that the national has not.  Now,
2 we do have chapters that award scholarships.  They're
3 not big scholarships.  But we have a chapter like our
4 Duval chapter.  The MMBNAA.  And I say MMB.  And a lot
5 of times, folks conveniently leave off Dr. because, you
6 know, it's not -- you know, it's a little easier just to
7 say MMB rather than the DMMB, that we agreed to not say
8 DMMBNAA.
9       But our Duval County chapter they just had a gala
10 maybe three weeks ago and they gave out several
11 scholarships, but they were all scholarships.  And they
12 were not a part of this amount, the national's amount.
13 But they gave out, I believe, maybe about five or six
14 scholarships to students up in the area, the
15 Duval/Nassau chapter.
16       And we have other chapters who we encourage to
17 raise money and to give scholarships but what we
18 recently did -- in fact, I sent out something probably
19 about a week ago asking them to please consider sending
20 the scholarship money to the NAA and we'll make sure
21 that the chapter gets credit for it so we can kind of
22 centralize the proceeds.
23    Q.  Yeah.  Let me follow up on that a little bit.
24 First off, I think you mentioned that the scholarships
25 that the chapters give are typically not big, not as big

Page 24

1 as the $1,500 scholarships that the national
2 organization gives.  Do you know --
3    A.  I don't know if I said that.  I don't know if I
4 said that.
5    Q.  Okay.  Well, anyway --
6    A.  That's not what I meant.
7    Q.  Okay.  Do you know how much those scholarships,
8 so, for example, that were recently given by the Duval
9 County chapter, do you know how much each scholarship
10 was?
11    A.  I think I saw there may have been some 4,000,
12 some -- a couple for 1500 and maybe some for like 750.
13 Some of them are book scholarships.  But like I said,
14 the chapters don't give 10,000, $15,000 scholarships.
15 They don't, you know, raise that kind of money.  They
16 usually try to give them between 750 and I think maybe
17 $1,500.
18    Q.  Okay.  Let me ask, in terms of -- in terms of the
19 records for any scholarships given by the national
20 organization or by any of its chapters, does -- do you
21 keep a central -- you mentioned a central repository and
22 that's what I wanted to ask about.  As of now, do you --
23 do you have like one centralized recordkeeping system to
24 document and keep track of all scholarships that are
25 given out or is it disbursed between the different

Page 25

1 chapters and that's something you're trying to -- trying
2 to consolidate?
3    A.  Well, we're trying to consolidate it because as I
4 have indicated, we've not been giving out scholarships
5 for two or three years.  This is really something that
6 was finally finalized and formalized, probably, I'm
7 going to say over the last 12 months.  We really been
8 trying to get our bylaws together and which we finally
9 did and I think that we provided you a copy of those.
10 But we're working on trying to you, you know, perfect the
11 system that we're putting in place because, you know,
12 we're new at it and we want to be able to give.  And
13 that's why I sent out a letter to the Palm Beach County
14 chapter and I believe Duval County within the last week
15 asking them -- I didn't want to mandate it because I
16 didn't have the authority to do that.  I had not taken
17 that before the board.  But I do believe it will
18 probably be a more prudent and better practice for them
19 to send the money to us and let us write the check to
20 the students and we'll just make sure that they get
21 credit.  We'll put in the memo section,
22 Duval/Nassau/Palm Beach County chapter, something like
23 that.
24    Q.  Okay.  Let me ask you, for the -- for the two
25 scholarships you mentioned, that the national

7 (Pages 22 - 25)

Page 26

1 organization has awarded this year, was that -- was that
2 just recently in the last month or so or when --
3     A. I think it was probably after January. I'm not
4 sure the exact month. But it was either one or two
5 scholarships. I know one of the gentlemen was in the
6 band and I think he's from Orlando. We gave that person
7 a scholarship. Actually, we didn't have very many
8 people apply. We opened it up, and as I mentioned to
9 you, we recently got a call from a student who needed
10 $14,000, said the school said that he wouldn't be able
11 to graduate unless he comes up with that. And we told
12 him that, you know, as I said, the window period had
13 closed and only a couple people had applied. It's not
14 like we've gotten, you know, multiple individuals
15 applying. We're trying to drive the numbers up with
16 people applying so we can give out more.
17     But, yeah, I think we've given out one or two, I
18 think it was sometime after January. I don't want to
19 give you a precise date because I'm not sure of the
20 precise date.
21     Q. Okay. Thank you. Let me ask you, by any chance,
22 the student who you said you think is in the band and
23 maybe from Orlando, off the top of your head, do you
24 happen to recall his name?
25     A. No, I don't.

Page 27

1     Q. Okay.
2     A. I really just kind of monitor from afar what's
3 going on with the committee.
4     Q. Understood.
5     A. But I do know that it was a band member because
6 someone commented the other day about the person that
7 just called us within the last couple weeks. He's also
8 a band member. So, you know, someone was commenting
9 that the other guy who got the scholarship probably, you
10 know, mentioned to him that he had gotten money from the
11 MMBNAA.
12     Q. Right. And how about the other scholarship that
13 you awarded the other student, do you remember anything
14 about that other student?
15     A. No, I don't. And as I said, I believe it was two
16 students. It may have been one but I do know for a fact
17 that one person from the -- the guy from -- kid from
18 Orlando, we gave him a scholarship.
19     Q. Okay. So just, I want to go back and -- well,
20 let me ask you this: In terms of, if I wanted to -- if
21 somebody wanted to figure out what's the total number of
22 scholarships given by the national organization and any
23 of its chapters, what would be the best way to do that?
24     A. Well, I think that our treasurer clearly can give
25 you the numbers for the national. And actually, right

Page 28

1 now, given all of the acrimony that's going on with this
2 lawsuit, you know, folks just aren't giving. And we
3 don't -- a lot of our chapters have kind of died down.
4 We were really thriving before the lawsuit. A lot of
5 our chapters have really died down. So right now, we
6 only have maybe two chapters that are actually raising
7 money on their own. We're trying to do it more so on a
8 national -- national level. But Volusia County is one
9 that's giving out scholarships and they don't have large
10 scholarships. I think they're like 750, maybe a
11 thousand.
12     As I told you, Duval/Nassau and Palm Beach had an
13 event, not too long ago, they gave out small
14 scholarships. And Miami-Dade has been one of our bigger
15 chapters, but because of, you know, what's going on,
16 they aren't really raising any money as they have in the
17 past.
18     Q. Let me ask you this. What -- I know you
19 mentioned that some of the chapters aren't -- aren't
20 really active now in light of the dispute. Can you tell
21 me how many -- how many chapters are there, at least on
22 paper? How many chapters does the national organization
23 currently have, at least nominally?
24     A. That are actually functioning?
25     Q. Well, you can give me the number functioning and

Page 29

1 then the total number that, you know, exists, at least
2 according to your chapter documents or your bylaws or
3 whatever.
4     A. I am going to take an educated guess. I'm going
5 to say probably about ten that are on paper and probably
6 about five, maybe six that are functioning.
7     Q. Okay.
8     A. They're not thriving.
9     Q. And those are the ones you mentioned, sounds like
10 Volusia, Duval, Nassau, Palm Beach, and maybe
11 Miami-Dade?
12     A. Yeah. Duval/Nassau is one chapter.
13     Q. Okay.
14     A. This is not two chapters. We have Alachua
15 County, they're functioning but they haven't raised any
16 money in almost two years since this controversy
17 started. Nobody else is -- nobody's really raising
18 money. Broward County, you know, their people are
19 frustrated.
20     Q. What about Coastal Georgia -- I'm sorry to
21 interrupt you, just one came to mind, Coastal Georgia,
22 are they active?
23     A. Well, they have a couple people but they're not
24 raising any money. They're not raising any money.
25     Q. Okay. Let me ask you --

8 (Pages 26 - 29)

1       (Simultaneous speakers.)
2  BY MR. HERBERT:
3     Q.  Didn't mean to interrupt -- I want to ask you
4  about the mechanics of money coming in the chapters and
5  money going out for scholarships.  And we'll get into
6  this a little bit more detail later.  But what I'm
7  curious about is, so donations that might be made
8  through your website, like we mentioned here on this
9  splash screen with the, you know, clicking on the link
10 of the website or using the QR codes, those donations
11 would go directly to the national organization, right,
12 to --
13    A.  That's correct.  Yes.
14    Q.  And then -- and then if the national organization
15 is giving out the scholarships like these two or one or
16 two that you mentioned this year, that money would be
17 paid from -- directly from the national association to
18 the student, correct?
19    A.  That's correct.  You're right.
20    Q.  Okay.  And you -- I think you indicated that this
21 may be done by paper checks.  Do you know if that is the
22 way that -- if you're going to -- these scholarships
23 that you gave this year, for example, do you know was it
24 sent to the student by paper check?
25    A.  I believe it was done by check.  But that can

1  easily be verified because if it's coming from the
2  national, you know, that can easily be verified.
3     Q.  Okay.  And how about with the chapters when they
4  give a scholarship like the Duval/Nassau chapter you
5  mentioned you recently gave some scholarships, do you
6  know, do they also give those scholarships by paper
7  checks?
8     A.  Yeah.  My -- yeah.  They do them by check.
9  That's recommended.  Because one of the things that we
10 have recommended and I think that it's counterproductive
11 or ill-advised to give a check directly to the student
12 in the student's name.  So what we have decided to do is
13 to give the check to the student in the student's name
14 and the university's name.
15       We were just hoping that we wouldn't get pushback
16 from the university because, you know, there have been a
17 lot of kind of peculiar things done.  They don't want
18 money from us, so we don't give them money.  But we do
19 believe that we can give the money to the student and
20 add the school's name since it's going to the student's
21 account.  Everything's done by check in that way.
22    Q.  Understood.  Do you know if that has been done
23 yet or that's just something you're talking about as a
24 proposal?
25    A.  No.  I think that was done with the recent check

1  that was given.  And I believe that may have been done
2  also with Duval/Nassau because I meet with the chapter
3  presidents or -- during the meetings.  And this is what
4  I told them we need to do is to give the check to the
5  student in the student -- in the school's name or give
6  it directly to the school in the student -- in the
7  school's name.
8     Q.  Okay.  So then I guess, if you looked at the
9  copies of the checks, that -- that would tell you for
10 sure if those scholarships were written out that way or
11 not, right?
12    A.  Oh, yes, yes.
13    Q.  So let me ask you about the different chapters
14 and their fundraising activity and, you know, the
15 interaction or interrelationship with the national
16 organization and its fundraising activity.  What I'm
17 wondering about is you mentioned that let's say
18 Duval/Nassau chapter for example, they're doing some
19 fundraising on their own and they're paying out
20 scholarships out of their own funds that they raise.  Is
21 that -- was that correct for those scholarships you just
22 mentioned from them?
23    A.  Yes.  That's correct.
24    Q.  All right.  So they -- they do -- am I correct
25 that they do fundraising, generally localized

1  fundraising like this gala and they get contributions
2  and those contributions that they get through those
3  fundraising activities, that goes directly to their
4  chapter and ends up in their chapter's bank account; is
5  that right?
6     A.  Yes.  We're usually made aware of their
7  fundraising efforts.  They send us the flyers, they send
8  us the persons who are coming.  In fact, I sent out a
9  letter congratulating Duval County because I think
10 they're setting the standard in terms of their
11 commitment to Dr. Bethune's legacy of educating
12 students.  And I've encouraged the other chapters to
13 basically try to follow suit.
14    Q.  Okay.  When you -- that's what I'm -- what I want
15 to get at is, how does the national organization keep
16 track of what the local chapters are -- how much they're
17 fundraising or how they're doing it?
18    A.  Well, like I said, we really just got into the
19 business of raising money purely for scholarships or
20 having that as our principal mission.  And so we're
21 still a work in progress.  But typically, as I indicated
22 to you, I contacted the chapters recently and asked them
23 to please give us that amount.
24       Now, I know that 990s are filed.  I'm not really
25 that familiar with them.  I don't do business law.  I

Page 34

1 don't know if on a 990 form, if the chapters report how
2 much money, you know, they have raised in a particular
3 year.  I know in the past, this is kind of new to us
4 because we've only had a couple of fundraisers and
5 really, we only have a couple of fundraisers now to
6 raise scholarships.  So we've not really -- we're trying
7 to, I guess, perfect how we're doing this.  But we will
8 be, if we have not been asking the chapters to give us
9 report.
10     And you know what, I just remembered this,
11 normally at our conventions, and we've only had, I
12 think, one since this lawsuit, we have chapter reports.
13 And in the chapter reports, they normally will apprise
14 the body of what monies they have made, how many
15 scholarships they've given.  But again, like I said,
16 we're really just getting set up.
17     Q.  Okay.  So it sounds like what you're saying, as
18 of now, there's not any formal type of bookkeeping or
19 auditing control over the fundraising activities of the
20 chapters that are engaged in fundraising activity; is
21 that fair to say?
22     A.  I don't know if I'm going to agree with that.
23 You know, we encourage our chapters to keep us abreast
24 of what's going on and our treasurer will probably be
25 the better person to answer that.  But we know that we

Page 35

1 want to stay abreast of, you know, what our chapters are
2 doing fiscally, you know, in terms of raising money and
3 giving scholarships.
4     Q.  Okay.  I mean, so I assume if I asked you off the
5 top of your head do you know how much money the
6 Nassau/Duval chapter has -- has raised through its
7 fundraising activities this year, you wouldn't be able
8 tell me that?
9     A.  No, I wouldn't.
10    Q.  Okay.  But Ms. Starks might be able to?
11    A.  She might be.  I'm not sure.
12    Q.  Okay.
13    A.  I know at the end of the year at the conventions,
14 we require -- we request the chapters to give a report
15 of their activities and how much money they have made.
16    Q.  Let me ask you this.  If a student applies for a
17 scholarship, the student can apply to the national
18 organization or to the local chapter if they happen to
19 be -- you know, if they live in that county?
20    A.  Yes.  And quite often, the chapters that really
21 aren't doing anything will call and say, President
22 McCray, we have a young man here from Duval County who
23 needs X-number of dollars.  Can you help us out?  Not
24 can you, can the association help us out?  And my patent
25 response has been -- because again we were just getting

Page 36

1 set up and we get so many requests, I want to make sure
2 that, you know, we have some established policies, which
3 we do through our fundraising -- not fundraising but our
4 scholarship committee.  I want to make sure that there's
5 some parity because, you know, everybody comes owing
6 money.  Everybody's a student.  So I want to make sure
7 that we're able to differentiate so that we can be fair
8 in the process.
9     Q.  Let me ask you, step back a second, ask about
10 fundraising generally between the chapters and the
11 national organization.  So the chapters are allowed to
12 engage in their own fundraising activity for their
13 chapter and to solicit donations to be made to their own
14 separate bank accounts, separate from the national
15 organization, correct?
16    A.  Yes.  We don't prohibit that.
17    Q.  Okay.  And then the local chapters, I understand
18 they -- they -- they pay or transmit some monies to the
19 national organization on an annual basis; is that right?
20    A.  In the past, under the old, the National Alumni
21 Association of Bethune-Cookman, we had annual chapter
22 assessments.  And the assessments were predicated on the
23 size of the chapter and, you know, we got some flak from
24 some of the chapters saying that it's not fair for us to
25 pay this amount, we're really not -- because we're in

Page 37

1 Tampa, you know, it's one of the largest counties,
2 Hillsborough, that's -- you know, we don't have the
3 number of people that maybe a chapter from a smaller.
4 So we really tried to get away from that.  But we have
5 been a membership-driven organization where monies that
6 we've given to the school over the years basically have
7 come from that.
8     So in this new setup, we have not -- we've
9 decided to get away from the chapter assessments.  And
10 we're just trying to sustain ourselves through
11 membership dues.
12    Q.  Okay.  When did you make that change?
13    A.  Under our new bylaws.
14    Q.  Which were effective when?
15    A.  When we --
16    Q.  Roughly?
17    A.  Our new bylaws were effective the -- I believe in
18 November or December.
19    Q.  Of '22?
20    A.  Well, hold on.  We just had our annual meeting.
21 I think our bylaws were passed right before June.  Maybe
22 around April or May because the bylaws committee, they
23 were actually approved by the board, I believe around
24 May.
25    Q.  Okay.  So then as of now, under the new bylaws,

10 (Pages 34 - 37)

Page 38

1  the local chapters no longer have to pay an assessment
2  or dues to the national organization?  Is that correct?
3     A.  Well, they don't have to pay the assessment.
4     Q.  Okay.
5     A.  If I'm correct.
6        But we still have our membership dues, which
7  we -- the national dues are $50 a year.  The chapters
8  can set their dues anywhere from 35 to $50.  So total
9  dues would either be 85 and $50, that goes directly to
10  us and we'll send back the 35 or the other 50 to the
11  chapters.  So they are paid -- their members are paying
12  dues every year.
13     Q.  Okay.  So the -- if a member signs up as a member
14  of the Duval/Nassau chapter, then they pay the dues and
15  then essentially that -- their dues payment, some of it
16  goes to the national organization, and the chapter keeps
17  some of it?
18     A.  Yes.  And we've done well over the years with
19  life members.  But that's almost -- it came to a
20  screeching halt with this lawsuit being filed.  So, you
21  know, we're not actually making money from membership
22  dues as we were pre this lawsuit.
23     Q.  Understood.  And you say life members, as opposed
24  to people who are annual members and pay their dues on
25  an annual basis or --

Page 39

1     A.  That's correct.
2     Q.  Okay.  But you still have -- let me ask you this:
3  How many -- how many dues-paying members does the
4  organization have, the national including all the
5  chapters?
6     A.  Oh, man, Mr. Herbert, I'm really not certain
7  because I can say this.  We're not what we were on the
8  day that this lawsuit was filed.  I know when I joined
9  the organization, I believe we had about 562 members.
10  Within 90 days, we tripled the membership.  I believe we
11  were over -- just over 1,500.  And my goal was to go to
12  2,000 by the end of my first year, and we were getting
13  there.  But right now, folk aren't paying the dues as
14  they have.  We do have a faithful few following.
15        So to answer your question, if I were to make an
16  educated guess, and I'm telling you that this is an
17  educated guess, I don't know the precise number.  I
18  would probably say that we have maybe 300 members.
19     Q.  Okay.  And if I did want to get a precise number,
20  who's the best person to ask?
21     A.  Probably our treasurer.
22     Q.  Okay.  Let me back up and ask you, you mentioned
23  that when you started with the organization, it was like
24  362 and then it --
25     A.  No, 562.

Page 40

1     Q.  I'm sorry.  562 and you were able to triple it in
2  a short period of time.
3     A.  That's correct.
4     Q.  In excess of 1,500 or so, I'm assuming 1,600,
5  something like that?
6     A.  Yeah.  Give or take.
7     Q.  Okay.  What -- what in your view was responsible
8  for that, was primarily responsible with your ability to
9  triple the dues-paying members?
10     A.  Well, we are a transparent organization.  We
11  significantly increased the visibility of the
12  organization under my leadership.  And my -- I've got to
13  give the fundraising committee, we really increased the
14  interest in giving to the university.  We raised just
15  under $300,000 in 93 -- about 93 days.  And that's
16  never, to my knowledge, ever been done before by the
17  alumni association of Bethune-Cookman.  We got on the
18  phone.  I met with people.  And they readily gave like
19  never before.
20     Q.  Let me ask you, did that -- you say you increased
21  your visibility.  That also included e-mail, e-mail
22  marketing, e-mail solicitations and donations?
23     A.  Well, that and I think also what really
24  benefitted us and my mom always says that there's some
25  redeeming value in every situation.  I think that the

Page 41

1  pandemic really assisted us.  The ingenuity and the
2  creativity of some of our members is just beautiful.
3  And we had pep rallies, virtual pep rallies.  We had
4  over a thousand people on it.  Actually, we maxed out
5  with Zoom; we couldn't add any more people on.  We had a
6  couple of those.
7        We had a sit-down with the then president.  We
8  had a beautiful relationship with the president who is
9  no longer with us, our president, Chrite.  Our board had
10  agreed to give the school $10,000 towards a marketing
11  campaign but then this happened about maybe three or
12  four weeks later, you know.  That situation with the
13  board of trustees.
14        And so we really, really had folk engaged, folk
15  involved.  We -- our association raised $116,000 towards
16  the statue.  Not the school, our association.  And when
17  I say the statue, Dr. Bethune statue that's in
18  Washington, D.C.  You know, there has been a problem
19  with giving with this university because of the lack of
20  transparency and a multitude of other reasons,
21  especially with our leadership.
22     Q.  Understood.  Let me ask you --
23     A.  So --
24     Q.  Sorry to interrupt you.  I want to just break it
25  down a little bit.  In terms of the marketing that was

11 (Pages 38 - 41)

Page 42

1 done to try to help increase membership and donations,
2 your organization has social media accounts, correct?
3    A. Yeah, we have one -- I believe one social media
4 account, the MMBNAA, it's on Facebook, I think,
5 Instagram. Like I said, I'm not on Instagram. I don't
6 even know how to work it. But Mr. Barfield does that
7 and I do know that we are on social media.
8    Q. Okay. And some of the chapters have their own
9 Facebook pages as well?
10    A. That's correct. And I think when -- normally
11 when we post something, it's shared with the other
12 chapters and they normally put it on their website or
13 their Facebook page or whatever.
14    Q. Okay. And let me -- I just want to take a quick
15 look at a couple of Facebook pages if we can. I think I
16 want to share the screen, I don't know if Michelle or
17 Paula will have better ability to do that.
18        MR. HERBERT: Michelle, if you can share the
19    screen on some of the Facebook pages, go ahead and do
20    that -- or Paula. If you think we might need to go
21    off the record to give you a minute to do that or
22    better to do that later, then that's fine. Just let
23    me know.
24        MS. CASTRO: I have it up and can share right
25    now.

Page 43

1        MR. HERBERT: Okay. Go ahead.
2        MS. CASTRO: Is there a particular one you want
3    to start with?
4        MR. HERBERT: No. Whatever. Whatever you've
5    got first up.
6 BY MR. HERBERT:
7    Q. Okay. So just looking at this, Mr. McCray, this
8 appears to be Facebook page for the Broward County
9 chapter of the national organization. Does that -- does
10 that sound right to you?
11    A. I've never seen it but it says it, so I guess it
12 is.
13    Q. Okay. Is that Mr. Barfield who kind of -- that's
14 his bailiwick, to kind of work with the -- with the
15 social media accounts?
16    A. He does. He works with the various chapters to
17 make certain that they're posting certain things. I
18 don't know if he helps them set it up, their websites.
19 But he probably does. He's real good at it.
20    Q. Okay. And let me ask you, just backing up a
21 second. That letter that we mentioned that was on,
22 you're currently on the national organization's splash
23 screen page, we don't need to pull it up.
24        That letter, I think you indicated that you --
25 you mentioned to Mr. -- Mr. Barfield that -- to -- to to

Page 44

1 rectify that -- that mistake with you being identified
2 as the president of BCU, do you know if he -- if he did
3 send anything out as a follow-up to correct that or not?
4    A. Normally when I ask him to do something, he does
5 it. You know, I -- I -- again, I remember, I think I
6 remember asking him to correct that. I'm not a hundred
7 percent sure but I'm pretty sure that I did. And
8 normally when I ask him to do something, he does it.
9 You know, he's a schoolteacher and as soon as he gets a
10 break, he normally does it.
11    Q. Understood. Just going back to this Broward
12 County Facebook page.
13        MR. HERBERT: Paula, if you can scroll down a
14    little bit.
15 BY MR. HERBERT:
16    Q. Just say, look at this post here. Again, it
17 looks like it's also using the Dr. Mary McLeod Bethune
18 National Alumni Association name in the name of the page
19 and on this post there. Do you see that?
20    A. Yeah. I see Mr. Sumner Hutcheson, my fundraising
21 chairperson, that's him there speaking, promoting the
22 recent annual meeting that we held.
23        MR. HERBERT: Okay. Paula, if you can keep --
24 BY MR. HERBERT:
25    Q. And I'll just mention, the colors on these posts

Page 45

1 also are the same colors that are on that -- on your
2 splash page of your website, right? Your national
3 association website, right?
4    A. Yeah. Right. Those are our colors, right.
5    Q. All right.
6        MR. HERBERT: You can keep scrolling down a
7    little bit, Paula. Okay. Keep going down with that a
8    little bit.
9 BY MR. HERBERT:
10    Q. All right. Why don't we hold up on that for now.
11 And let me ask you.
12        MR. HERBERT: You can -- you can stop sharing
13    the screen for now, Paula.
14 BY MR. HERBERT:
15    Q. At some point after this dispute between BCU and
16 your organization arose, you did send out a letter to
17 the chapters, essentially advising them that they should
18 comply with the demand, the cease and desist demand to
19 discontinue use of the BCU's registered trademark,
20 right?
21        MS. FANIEL: Object to form.
22        THE WITNESS: Yes, ma'am. I'm sorry.
23 BY MR. HERBERT:
24    Q. You can answer. Yeah.
25    A. Yes. That's correct.

12 (Pages 42 - 45)

Page 46

```
1    Q.  Okay.  And under your bylaws, the different
2  chapters are subordinate to the national organization,
3  right?
4    A.  Yes.
5    Q.  Okay.  And the bylaws have a clause in there that
6  is entitled Supremacy and indicates that the national
7  organization essentially is superior and the chapters
8  are subordinate to the national organization, right?
9    A.  Yes.
10   Q.  Okay.  And the chapters are not separately
11 incorporated entities, right, they're all part of or
12 divisions of the national organization, correct?
13   A.  Correct.
14   Q.  Other than -- other than you, is there anybody
15 else who has sent out any communications to the chapters
16 asking them to change, you know, anything that they are
17 posting online or any marks that they might be using in
18 any of their marketing materials?
19   A.  Mr. Anthony Barfield has sent out short notes.
20 If he sees something that we don't believe is
21 appropriate, he has gotten in touch with those chapters;
22 so has Sumner Hutcheson and so has our vice president,
23 Mr. Michael Shorter.  We all kind of serve as watchdogs,
24 if you will, to try to make certain that there are no
25 slip-ups.
```

Page 47

```
1    Q.  Okay.  So those folks have all sent out e-mails
2  to the chapters on that topic?
3    A.  Well, either e-mails or sometimes we just pick up
4  the phone and call.
5    Q.  Okay.  Do you know, has there been any chapters
6  that have rejected those efforts and refused to comply
7  with the requests?
8    A.  No.  Early -- I think early on, you know, we are
9  a voluntary organization and we've been around a long
10 time.  Some of our chapters have older people who are
11 not very tech savvy.  And I'm a little older, I'm not as
12 bad as some of the other older folk.  But, you know,
13 when we first received this cease and desist, I'll call
14 it a request or demand or whatever you want to call it,
15 you know, I think a 30-day -- 30 days was -- was
16 requested and, you know, we just knew that that would
17 not be sufficient for this organization because we have
18 very small chapters and a lot of folk are not tech
19 savvy.  Some of the people who set up the websites moved
20 on, they died or what have you.  And we knew that it
21 wasn't realistic for us to be able to achieve this in
22 30 days.
23      But we called folk, we sent e-mails.  I sent out
24 letters.  I met with virtually every chapter, you know,
25 telling them the importance of us complying.  And I even
```

Page 48

```
1  developed a saying that, you know, that which we can't
2  control, let's not worry about it.  And that's why we
3  changed the name of the organization because I knew, I
4  believe the university was trademarked when I was on the
5  board, around that time.  So I knew that the university
6  had rights to that particular name.  And that's why we
7  changed the name probably within 48 to 72 hours after
8  this situation occurred.
9    Q.  Okay.  Let me ask you that.  So one thing it
10 sounds like you said was that some of the -- some of the
11 folks at some of the chapters are a little bit older and
12 so they might -- and they might not be tech savvy and so
13 they might be slow to react or slow to figure out how to
14 make some of the changes that you requested.  Is that --
15 is that fair?
16   A.  Well, you're putting it in the present tense and
17 I'm -- I'm speaking in the past.  I'm saying when this
18 situation first happened, this is what we did to try to
19 make certain that we all were on the same page.
20      We don't have very many problems right now in
21 terms of us trying to comply with the cease and desist
22 order, at least those components that we agree with.
23 But if we see something, if we see someone do a flyer
24 that doesn't have a disclaimer on it, we will
25 immediately call, let them know.  And that's -- that
```

Page 49

```
1  happened recently where I had to call a particular
2  chapter and say, hey, this isn't going to fly.  You're
3  going to -- you're going to have to change it.  And they
4  did so immediately.
5    Q.  Which chapter was that?
6    A.  It was the Volusia County chapter.  The Miss --
7  our queen had her -- the little crown on and she took
8  a -- she had a picture of herself with BCU on it.  It
9  was an older one.  But I told her, don't send that out.
10 You need to remove that.  And so she blocked that out.
11   Q.  Okay.
12   A.  That's just an example.
13   Q.  Okay.  So let me ask you one thing.  You
14 understand that the -- that Bethune-Cookman University
15 has several federally registered trademarks, that
16 it's -- that are the subject of this lawsuit, correct?
17   A.  Yeah.
18   Q.  Okay.  We'll go through them individually.  But
19 just -- just to quickly tick them off, you understand
20 that the -- the name Bethune-Cookman, Bethune, hyphen,
21 Cookman, that that is a federally registered trademark
22 of the university BCU, correct?
23   A.  Correct.
24   Q.  Okay.  The word Florida classic, you understand
25 that that's a federally registered trademark of the
```

1 university?
2    A. Well, I didn't know until this lawsuit but, yes,
3 I do know it now.
4    Q. Okay.
5    A. And I was on the board for eight -- seven or
6 eight years and I never know that Bethune-Cookman owned
7 the rights to that name but I know it now.
8    Q. Okay. And the head, heart, hand seal, which is a
9 sort of a circle with a triangle in it and some dates
10 and some names, you understand that that's a registered
11 trademark that the university owns?
12    A. I do, yes.
13    Q. Okay. And then the -- they have the wildcat
14 head, it's like a logo of the wildcat's head, you
15 understand that a federally registered trademark owned
16 by the university?
17    A. I do now, yes.
18    Q. Okay. And then you understand that there's also
19 a logo with the interlocking letters of B and C together
20 that they -- that have a federally registered trademark
21 in that logo as well?
22    A. I know that now. And let me just say this. When
23 I say I know that now, you know, for many, many years
24 and even to date, there are so many folk out there
25 who -- vendors who prepare this stuff without

1 Bethune-Cookman's permission. And over the years,
2 nothing has ever been done, even though they were
3 registered according to my knowledge now, that they're
4 registered now. But the school has never enforced that.
5 And that's one of the reasons why I didn't know that
6 some of those logos or marks, whatever you have
7 indicated to me, were actually protected. Clearly, I
8 know the name was and the head, hands and hearts, I know
9 that that was, correct.
10    Q. Okay. One thing I just want to confirm is that
11 you -- your organization isn't -- isn't claiming that it
12 owns any federally registered trademark rights in any of
13 those marks that we talked about?
14    A. Let me answer it this way. We've never made
15 application -- we've never made application to the
16 federal government to protect any of those marks.
17    Q. And the same would be true for the state
18 government, correct?
19    A. Yeah. That's correct.
20    Q. Okay. You understand some of those marks are
21 also registered with the state of Florida, right?
22    A. No, I didn't know that, but, you know, that's
23 fine.
24    Q. Okay. All right. And let me ask you, the -- I
25 know you're not very tech savvy. But I'm looking at

1 your Zoom background now. Can you see your Zoom
2 background on your --
3    A. Yes.
4    Q. Okay. And I noticed there's -- there's a logo
5 there, there's a picture that appears to be Dr. Bethune
6 with a picture of the castle in it in the -- inside the
7 letter U of the word alumni? See that?
8    A. Yeah, I see it. It's right -- it's on my
9 computer.
10    Q. Okay. And that's -- that's something that you --
11 you changed; it used to have the head, heart and hand
12 seal in there until recently, correct?
13        MS. FANIEL: Object to form.
14        THE WITNESS: Well, the head, hands and hearts
15    was a part of it. Our previous logo, which was not
16    trademarked, also had a picture of the marching -- the
17    marching band, Dr. Bethune statue and something else.
18 BY MR. HERBERT:
19    Q. And the house?
20    A. I don't remember. The house may have been in
21 there. I'm not sure. But we changed that. We changed
22 that.
23    Q. Right. We'll get into that in a second. I just
24 want to ask that, did you recently ask Mr. Barfield to
25 change your Zoom background so that it looks like it

1 currently does now?
2    A. Did I recently?
3    Q. Right.
4    A. I think he changed all of our chapter presidents,
5 I think he personally changed all of them. I don't know
6 what was going on with my computer, but he removed the
7 Bethune-Cookman but sometimes it would -- when -- if we
8 have a meeting, it would resurface. And so whatever he
9 did the last time, it seemed to have rectified that
10 problem.
11    Q. Okay. Let me -- let me step back a bit and ask a
12 little bit about -- we talked about the process of
13 advising the chapters that they should discontinue using
14 any of these marks. And some of the chapters, it took
15 them a little time because of the folks weren't all that
16 tech savvy or maybe they were a little bit older and
17 they had a little trouble following through on that
18 request.
19        What I wanted to ask you is, did -- did any of
20 the folks at any of the chapters after you made that
21 request, did they -- did they tell you that they had
22 trouble understanding why they had to make those
23 changes? Did you have to explain that to them?
24    A. Oh, yes. Oh, yes. And notwithstanding
25 explaining to them the legal rationale behind it.

Page 54

1 Individuals still don't understand why we're going
2 through this situation with the board of trustees, the
3 leadership of the school.
4     You know, people talk about this all the time and
5 I know you guys are trying to demonstrate that people
6 are confused. People are not confused. I mean, they're
7 going to say -- some of them may say that but people are
8 more frustrated and they can't understand why we're
9 going through this when this association has been so
10 beneficial to the university over the years, especially
11 under my leadership. But I know why we have this
12 lawsuit here. But, you know, we can proceed.
13    Q. Well, let me back up and ask you, so is it --
14 referring back to the letter that's on your
15 organization's home page, that letter where you signed
16 as the president of Bethune-Cookman University, is it
17 your testimony that not a single person ever contacted
18 you or asked you about that or asked you to change that
19 or inquired if you were, in fact, the president of BCU?
20    A. Mr. Herbert, let me repeat this again because
21 obviously you're not listening to me or you're not
22 understanding me. I specifically said that a couple of
23 people called me and said that they saw that. They knew
24 that that was an error. They know that I am not the
25 president of Bethune-Cookman University and those who

Page 55

1 know me know that I have absolutely no interest in being
2 the president. I don't think that I have the background
3 to be a college president, as some of the individuals
4 who have been there fairly recently, I don't think that
5 they've had the background.
6     But, so to answer your question, and so you'll
7 understand what I'm saying, I told you when you first
8 asked me that that I did receive a couple of calls. You
9 asked me if I received e-mails and I told you, I don't
10 think I got an e-mail. I received a couple calls from
11 people who told me that I had made this mistake.
12    Q. Okay. And aside from you personally, are you
13 aware if the organization generally or any other person
14 in your organization got any inquiries about that?
15    A. No. And quite frankly, Mr. Herbert, I haven't
16 heard any more about that since that particular night
17 when it was brought to my attention. Actually, it was
18 the next day, I believe, since it was brought to my
19 attention.
20    Q. And what night was that?
21    A. I don't remember, sir. If you look at -- we can
22 relate back and figure out the date that it went out.
23 It was like the next day, I believe it was. Because I
24 normally send these things out, I'll finish them usually
25 one, two, three in the morning. Mr. Barfield normally

Page 56

1 sends them out. He sets them on a timer to go out, I
2 guess maybe six or seven in the morning. So it was the
3 following day that I believe someone contacted me.
4    Q. Okay. If I told you that --
5    A. Couple people.
6    Q. -- the dates that we've got is March 13, 2023,
7 does that sound about right to you?
8    A. If that's what it says, sir, that's what it is.
9    Q. Okay. And I'm just asking when you're saying
10 somebody contacted you the next day --
11    A. It was the next day. That's correct.
12    Q. Okay. Okay. All right. What I want to do is go
13 into -- we've talked a little bit about the history of
14 your organization and the -- the prior organization. I
15 want to ask a little bit about that and kind of go
16 through some documents to try to make sure we clarify
17 that. So let's go to --
18       MR. HERBERT: Paula, if you can pull up the
19    documents, the organization documents. I think
20    they're titled 47.
21 BY MR. HERBERT:
22    Q. So let me just first ask you from memory, if you
23 know this, which you may or may not know, but the --
24 from what we can gather, the first time of one of these
25 two defendant organizations, NAA1 or NAA2, was actually

Page 57

1 formed as a Florida corporation was in 1971.
2     Do you know that off the top of your head if
3 that's right?
4    A. That's probably about right. Yeah. But the
5 organization is older, much older than that, but yeah.
6 I think that it was somewhere in the '70s. That's when
7 I was in high school, though.
8    Q. Got it. I got it. So looking at this, the
9 screen that is being shared here, that is a document
10 from the Florida Division of Corporations on Sunbiz.org.
11 And that indicates that this entity was -- the filing
12 date to incorporate the company was -- it looks like the
13 day it was filed is September 17th of 1971.
14      Do you see that?
15    A. Yeah, I see that.
16    Q. Okay. And I want to just go to the upper part
17 above that date. It's got the -- says the FEI/EIN
18 number and there's an EIN number there.
19      Do you see that?
20    A. I do.
21    Q. All right. And that EIN number for this
22 organization, I'm going to read it into the record.
23 It's 59-2344490. Did I read that correctly?
24    A. It's what's on the document that's on the screen.
25    Q. Right. And I'll just maybe refer to that as the

Page 58

1 490 EIN number going forward, if that's okay.
2    A.  That's fine.
3    Q.  So EIN number is an employer identification
4 number for tax purposes, to your understanding, right?
5    A.  Yeah.  Um-hmm.
6    Q.  Okay.  And then let me ask you this.  Without the
7 need to go into a bunch of other documents, let me ask
8 you, do you happen to know off the top of your head
9 when -- if and when this organization changed its name,
10 filed the name change papers with the state?
11    A.  Once we received the cease and desist letter, we
12 called -- I called an emergency meeting, board meeting.
13 It was well attended and we had a very, very long,
14 emotional meeting.  And it was voted upon that this is
15 the name -- several different names were given out but
16 it was voted upon that this is the name that the
17 organization would go.
18       And I believe that was -- I'm not sure what month
19 it was.  But I believe it may have been like in late
20 January or early February, a few days after we had
21 received the cease and desist letter and something from
22 my then attorney.  So --
23    Q.  Well -- I didn't mean to interrupt.  Sorry.
24    A.  Yeah.  But let me just say this.  La-Vaughn
25 Starks said that she would immediately file something

Page 59

1 with the state to change our name.  And she reported
2 back two or three days later saying that everything had
3 gone through, we were now the Dr. Mary McLeod Bethune
4 National Alumni Association.
5    Q.  All right.  Well, let me back up and ask you,
6 because there's actually -- there are actually a couple
7 name changes it appears from the document.  But let's go
8 ahead and we'll just mark this exhibit as Plaintiff's
9 Exhibit 1.
10       (Plaintiff's Exhibit No. 1 was marked for
11       identification.)
12 BY MR. HERBERT:
13    Q.  We will mark that at the end of the depo and send
14 all the exhibits to your counsel.  And let me just ask,
15 I may be wrong, but this is -- this is what is currently
16 showing on Sunbiz.org and it's showing the name listed
17 here as Dr. Mary McLeod Bethune National Alumni
18 Association, Inc.  But my understanding is that is not
19 the name that the organization was originally filed in
20 and we'll look at some other documents here later.
21       But if I represented to you that it was updated
22 here on Sunbiz, it was originally filed under the name
23 National Alumni Association of Bethune-Cookman College,
24 Inc., does that sound right to you?
25    A.  Oh, yeah.  Yeah.  That was done -- okay.  I guess

Page 60

1 I was a little confused.  Our old corporate name was
2 what you just said, the National Alumni Association of
3 Bethune-Cookman University.  That was it when I came in.
4    Q.  Right.  And before that, it was college, though,
5 because the university wasn't a university back then,
6 correct?
7    A.  Well, I'm sure you're correct with that because
8 we were not a university.  So I'm sure we had to conform
9 the name.
10       MR. HERBERT:  Okay.  Let's go to the next tab,
11    Paula, if we can.
12 BY MR. HERBERT:
13    Q.  This, for the record, this is a document that
14 also was filed with the Florida State Division of
15 Corporations.  It bears a date stamp on the first page
16 of 11/09/09.
17       Do you see that date there?
18    A.  Yes, I do.
19       MR. HERBERT:  Okay.  And go ahead and go to the
20    second page, Paula.  Okay.
21 BY MR. HERBERT:
22    Q.  So here, it indicates that the second page is
23 entitled Articles of Amendment to Articles of
24 Incorporation of, and then there's that name we
25 mentioned, National Alumni Association of

Page 61

1 Bethune-Cookman College, Incorporated.
2       Do you see that?
3    A.  I do, yes.
4    Q.  Okay.  So -- and then it, down below in the first
5 little subletter, capital A there, talks about amending
6 the name and entering the new name of the corporation.
7       Do you see that?
8    A.  I do, yes.
9    Q.  Okay.  And that new name was National Alumni
10 Association of Bethune-Cookman University, Incorporated.
11       Do you see that?
12    A.  I do.
13    Q.  Okay.  So as far as you can tell, this is the
14 document that was filed with the state to document the
15 fact that the -- the original corporate entity had a
16 name change to include the term -- going from college to
17 university, which reflected BCU's status of going from a
18 college to a university; is that right?
19    A.  Correct.
20    Q.  Okay.  And -- but as far as you know, this is the
21 same entity as the prior exhibit that we looked at with
22 the EIN ending in 490, right?
23    A.  I believe it is.
24    Q.  Okay.
25       MR. HERBERT:  And let's go ahead and go to the

16 (Pages 58 - 61)

Page 62

1  next tab.
2  BY MR. HERBERT:
3      Q.  Okay.  So the next tab, for the record, is the
4  date -- the date on this first page is kind of faint,
5  but it's actually September --
6          MR. HERBERT:  If you'll scroll down a little
7      bit further, Paula, I think it's a little clearer on
8      the file stamp below.
9  BY MR. HERBERT:
10     Q.  Okay.  There on the file stamp, it says:  2021
11 September 27.  So indicating that this was filed with
12 the state on September 27th of 2021.
13         Do you see that there?
14     A.  Yeah.  What is the document, though?
15         MR. HERBERT:  Yeah.  Go ahead and scroll to the
16     next page.
17 BY MR. HERBERT:
18     Q.  And you see --
19         MR. HERBERT:  Why don't you go to the next page
20     after that.  Okay.  And hold up there.
21 BY MR. HERBERT:
22     Q.  And there, you see that -- that page is also
23 titled Articles of Amendment to Articles of
24 Incorporation.  Do you see that?
25     A.  Yes.

Page 63

1      Q.  Okay.  And that indicates -- and then in a little
2  subsection A below that, where it references if you're
3  amending the name, enter the new name of the
4  corporation, there, it says:  Dr. Mary McLeod Bethune
5  National Alumni Association, Inc.
6          Do you see that?
7      A.  Right.  And that's -- that's what was voted upon
8  by the board with the organization.
9      Q.  Okay.
10     A.  That's the name.
11         MR. HERBERT:  And we'll go ahead and mark this
12     as -- I guess this would be -- the prior document
13     would be Exhibit 2 and then this one would be
14     Exhibit 3.
15         (Plaintiff's Exhibit Nos. 2 and 3 were marked
16     for identification.)
17 BY MR. HERBERT:
18     Q.  So this -- so the name changed from the National
19 Alumni Association of Bethune-Cookman University, Inc.,
20 to Dr. Mary McLeod Bethune National Alumni Association,
21 Inc., in July of 2021 -- July 8th of 2021.  At least that's
22 when this was filed, right?
23     A.  Well, if that's what it says, that's what it is.
24 I don't -- from my independent knowledge, I -- I don't
25 know exactly when it was.  But if that's what it says,

Page 64

1  that's when it was filed.
2      Q.  Sure.  And let me ask you, in July of 2021, what
3  was your position with the -- with the -- the -- let's
4  just say the defendant organizations?
5      A.  I was the national president of this
6  organization.
7      Q.  Okay.  And so you were the president at the time
8  in July of 2021.  And so what I just want to ask is, I
9  think you talked about it a little bit earlier but just
10 since we're looking at these documents, what was the
11 reason that the name was changed from the National
12 Alumni Association of Bethune-Cookman University to
13 Dr. Mary McLeod Bethune National Alumni Association in
14 July of 2021?
15     A.  The university sent a cease and desist letter.  I
16 can't remember if it came to me directly or to our then
17 lawyer, but I did see the letter.  And I immediately
18 called an emergency meeting with my board to explain to
19 them the legal significance of the cease and desist
20 letter.  And I mentioned to them certain things that the
21 school was demanding, and one of those things was that
22 we not use their name and the other logos that you
23 identified.  And I told them that I don't think that we
24 have a leg to stand on in terms of using the school's
25 name and those logos, the marks that you identified

Page 65

1  earlier.
2          And there were some people who were upset, you
3  know, who basically said, listen, we're graduates, blah,
4  blah, blah.  But, you know, I've done some independent
5  research and I told them that I don't like to fight
6  battles that I don't think that we have a reasonable
7  chance of winning.  And I urged them, I recommended to
8  them that we change the name.  And there was much
9  discussion and we came up with this particular name.
10     Q.  Let me back up and -- and just mention to you
11 that I think, Mr. McCray, you might be a little bit
12 confused.  And I did not --
13         MS. FANIEL:  Object to form.
14 BY MR. HERBERT:
15     Q.  I'm sorry.  And I didn't mean to confuse you.
16 But let's -- let's go ahead and look at the next
17 document.  So this was -- just to refresh your
18 recollection, this was in July of 2021.
19     A.  When you say this, you're speaking of what's on
20 the screen now?
21     Q.  No, let's back up.
22         MR. HERBERT:  Please go to the prior tab.  Give
23     me one second.  Pull up the document -- Paula, pull up
24     the document that was filed on July 8th of 2021.
25         MS. CASTRO:  I'm sorry, Greg.  I don't believe

17 (Pages 62 - 65)

Page 66

1  I have that one.
2      MS. ALVERSON: Greg, I'm sorry. That's the
3  wrong date in the notes. This is the name change
4  document in September.
5      MR. HERBERT: Okay.
6      THE VIDEOGRAPHER: Mr. Herbert, we're
7  approaching 90 minutes on this media unit.
8      MR. HERBERT: Okay. How much time is left?
9      THE VIDEOGRAPHER: About three minutes.
10     MR. HERBERT: Oh, okay. Well, we'd better take
11  a break then. All right. Let's take a break. I
12  believe ten minutes. Does anybody need any more than
13  that? You know, we might have an issue with the
14  documents. Let's make it -- let's make it 15 minutes,
15  if that's okay with everybody.
16     THE VIDEOGRAPHER: We're going off the
17  record --
18     THE WITNESS: The sooner we get back the
19  better, man.
20     MR. HERBERT: What's that?
21     THE WITNESS: I said the sooner we get back,
22  the better. I'd like to get this thing rolling.
23     MR. HERBERT: Understood. All right. Let's --
24  let's take a 15-minute break. I'll try to get back on
25  a few minutes before that if I can.

Page 67

1      THE VIDEOGRAPHER: We're going off the record.
2  The time is 11:02 a.m.
3      (A brief recess was taken.)
4      THE VIDEOGRAPHER: We're going back on the
5  record. The time is 11:19 a.m.
6      MR. HERBERT: Okay. Just backing up, for
7  housekeeping, let me make sure, I don't remember if I
8  marked that last document, the one that has a file
9  date of September 27, 2021, if I marked that as an
10  exhibit or not. If not, let's mark that as an
11  exhibit. I think that would be -- would that be
12  number 3?
13     THE COURT REPORTER: 2 and 3 were already
14  marked.
15     MS. FANIEL: Yes.
16  BY MR. HERBERT:
17  Q. Okay. Let's go to the next document in this tab.
18  Well, let me -- I'm sorry, let me back up for this. For
19  Exhibit 3.
20     So Mr. McCray, so I understand that -- yeah, that
21  kind of looks like I had some dates mixed up -- that --
22  this name change was filed with the state in September,
23  late September of 2021 after the cease and desist letter
24  went out.
25     And what -- all I wanted to ask you is, as far as

Page 68

1  I can tell, at this point, this is still the same entity
2  with the same EIN number. Is that right, the one that
3  begins at 490?
4  A. Yes, I think -- if I'm not mistaken, I think what
5  we were just going to do was change the name at that
6  time.
7  Q. Understood.
8      MR. HERBERT: All right. And then let's go to
9  the next document and I'll mark for identification as
10  Exhibit 4. And this document on the screen is also
11  filed with the -- with the state of Florida. And this
12  is dated June 13th of 2022. So that's last June.
13     (Plaintiff's Exhibit No. 4 was marked for
14  identification.)
15  BY MR. HERBERT:
16  Q. Do you see this document, Mr. McCray?
17  A. I do.
18  Q. Okay. And this is, as far as I can tell, is an
19  entirely new entity. Is this the new entity that you
20  referred to earlier when you were talking about the
21  problems you had with the former accountant or
22  bookkeeper, Ms. Cooper?
23  A. Yes. This document is the document where Ms. --
24  our current treasurer changed the name from the Dr. Mary
25  McLeod Bethune to Mary McLeod Bethune and she said

Page 69

1  basically because the previous organization, there were
2  some problems with Ms. Cooper not giving us documents.
3  We were not sure if she had given us everything. It was
4  a lot of back and forth going on before that where we
5  had threatened to get a lawyer. So she decided on her
6  own to -- she being Ms. La-Vaughn Starks to just, I
7  guess, get a fresh start. And that's when she filed
8  this and she deleted the name Dr. -- Dr. from the name.
9  Q. Okay. And --
10  A. That was not ratified by our board. In fact, our
11  board asked her to do what was necessary to change it
12  from Mary McLeod to go back to Dr.
13  Q. Okay. So let me just ask you, though, this --
14  this document relates to a new entity. This is a
15  formation of a new entity with a different EIN number,
16  correct?
17  A. Yeah. It appears that, right. She was starting
18  another organization but in actuality, it was going to
19  be, you know, the same people, same mission, same
20  everything.
21  Q. Okay. So in effect, you're saying it was maybe
22  going to be a successor entity to the previous entity
23  with the EIN ending in the 490?
24  A. I think that was her intent.
25  Q. Okay. And then I think you said that the

18 (Pages 66 - 69)

Page 70

1 national organization, did they tell her to -- to undo
2 that?
3    A. Yeah. We had a meeting several months ago and I
4 don't know if the board was aware of this. I found out
5 about it, I think I may have found out about it during
6 this lawsuit. I'm not sure. But I spoke with her and I
7 told her that I wanted to bring this to the board's
8 attention. And I believe we took action by asking her,
9 and I think it was by consensus, we told her to do what
10 was necessary to IRS to, you know, change it back to
11 Dr. Mary McLeod Bethune.
12    Q. Okay. Let me ask you, the national organization,
13 I assume it has a -- we talked earlier about it gets
14 donations and those donations through the national
15 organization go to its bank account, correct?
16    A. Yes.
17    Q. Okay. And that -- do you know that bank account?
18 Is that in the name of the original or the, let's say
19 the Dr. Mary McLeod Bethune National Alumni Association?
20    A. I'm not really sure. By constitution, I think
21 I'm supposed to be one of the signatories, but I just
22 don't like signing off on bank accounts and checks and
23 things. When I'm a president of something, I like to
24 kind of stay away from the finances.
25       But I do know that one of the bank accounts that

Page 71

1 we had when Ms. Cooper was the chairperson, we don't use
2 that bank account. We didn't close it out but we don't
3 use it. We started another bank account with the
4 association.
5    Q. Okay. And what bank account is that, that other
6 bank account?
7    A. I think it's -- it's Truist. The other bank
8 account was Wells Fargo, but we just had that bank
9 account there now. The bank account that Ms. Graham set
10 up is Truist, used to be Sun Bank.
11    Q. Okay. And when you say Ms. Graham, are you
12 saying it Ms. La-Vaughn --
13    A. Yes, that's correct.
14    Q. Graham Starks or is it Starks Graham, do you
15 know?
16    A. It's Graham Starks. Graham is her maiden name.
17    Q. Okay. And it looks like she signed this document
18 as La-Vaughn Starks there on the second page. It's --
19 actually, on the first page, too, her name appears as
20 La-Vaughn G. Starks. So that's who we're talking about,
21 right?
22    A. Yes. We're talking about the same person.
23    Q. Okay. So -- and it sounds like what you're
24 saying is, there was a bank account that was used by the
25 prior entity, the entity with the 490 EIN number, and

Page 72

1 that bank account is no longer being actively used by
2 the national organization; is that right?
3    A. Correct. You're correct.
4    Q. Okay. And is that -- does that bank account,
5 does Ms. Sharon Cooper still have access to that bank
6 account, do you know?
7    A. I don't think so. I know we had a very difficult
8 time getting her name off of it. And actually,
9 La-Vaughn and I, she drove to Pompano and we went to
10 Wells Fargo and I don't know what La-Vaughn ended up
11 having to do, but we ended up getting out of there. We
12 didn't -- and perhaps what happened, I think we just
13 stopped using that account. I don't know if we were
14 ever able to take her name off because she was not very
15 compliant with us.
16       She stepped down because she was a very ardent
17 and firm supporter of Mr. Robert Delancy who is my
18 predecessor who I handily beat when I ran against him.
19 So some of his very close friends defected from the
20 organization and, you know, they've done things to try
21 to screw us up.
22       And Sharon Cooper was the one that we really
23 wanted to be cautious with because of her feelings
24 towards the leadership and the organization. And we
25 thought that it was more prudent for us to change

Page 73

1 accounts.
2    Q. Okay. So that -- the prior bank account with the
3 prior entity, let's call it the EIN 490, that bank
4 account, I'm assuming that was set up for donations to
5 the website at that time, that went into that bank
6 account that you're talking about that Ms. Cooper had
7 control of, correct?
8    A. That -- you're probably correct. I don't want to
9 say 100 percent, you're probably correct, because when
10 Ms. Cooper was here, we were not set up as an
11 organization to principally accept scholarship
12 donations. We raised money but we have, I believe, a
13 separate account that houses our financial scholarship
14 donations. We don't comingle that with our operational
15 funds. So I'm not really sure how Sharon had it set up,
16 but I do know that that was the bank that we used.
17    Q. Okay. And again, that was a Wells Fargo bank
18 account that we're talking about that Sharon Cooper had
19 access to, correct?
20    A. That's correct. You're correct.
21    Q. All right. And -- and am I correct that you
22 don't -- you don't know one way or another whether or
23 not that account is still -- that bank account, a Wells
24 Fargo bank account, is still open?
25    A. I think it's open. But we don't use it. That's

19 (Pages 70 - 73)

Page 74

1  what was represented to me.  We only use the Truist.
2  Q.  Okay.  And was that -- who was it that
3  represented that to you?
4  A.  La-Vaughn Starks Graham, Graham Starks.
5  Q.  Okay.  Do you know one way or another if you
6  know, any -- any contributions are still going into that
7  Wells Fargo bank account?
8  A.  No.  It shouldn't be.  No.  We don't use that.
9  And when people give us -- for an example, you know, I
10 made donations to this organization and people have
11 given me, you know, checks since I've been president and
12 there's a Truist bank right down the street from me.  I
13 think I've gone down there once or twice when La-Vaughn
14 was out of town and made deposits and I'll fax -- not
15 fax but text her a copy of the deposit slip.  So any
16 monies that we get go into the Truist account.
17 Q.  All right.  Let me back up and ask one thing, and
18 that is, it sounds like -- so you're saying you don't
19 know as you sit here today whether or not that Wells
20 Fargo bank account that Ms. Cooper had access to,
21 whether it's open or closed; you can't testify to that
22 as you sit here today, right?
23      MS. FANIEL:  Object to form.
24 BY MR. HERBERT:
25 Q.  You can answer.

Page 75

1  A.  My testimony is that my understanding, the
2  account is still open but the account is not used.  We
3  don't use that account at all.
4  Q.  Okay.  But do you know or not whether, let's say
5  any auto -- automatic payments from anybody who might
6  have made a payment through their credit card are still
7  being sent to that Wells Fargo bank account?
8  A.  My understanding based upon my conversations with
9  Ms. Starks that we're not getting any monies into that
10 account.
11 Q.  And I understand you're not getting any money.
12 What I'm wondering is, you know, is there -- if that
13 account is still open, as you understand it is, do you
14 know or do you not know whether or not any contributions
15 that are intended for your organization are going into
16 that account?
17      MS. FANIEL:  Object to form.
18      THE WITNESS:  If you're asking me if I have
19  personal knowledge of that, the answer is no.
20 BY MR. HERBERT:
21 Q.  Yeah.
22 A.  Okay.  The answer is no.  I don't have any
23 personal knowledge of that.
24 Q.  And Ms. Cooper would probably be the best person
25 to have personal knowledge of that?

Page 76

1  A.  Well, I hope that she doesn't know whether any
2  money is going into that account because she's not with
3  this organization anymore.
4  Q.  She was a signatory on that account?
5  A.  Yeah, she was.
6  Q.  Okay.  And were you -- I'm assuming you were not
7  a signatory on that Wells Fargo account?
8  A.  No, since I've been with the account, and I've
9  been asked to put my name on the account, I just don't
10 like to do it.
11 Q.  Okay.  So just to clarify, you -- you were not a
12 signatory on the Wells Fargo account?
13 A.  No, I was not.
14 Q.  Okay.  Other than Ms. Cooper, was anybody else a
15 signatory on that account?
16 A.  Since I've been president?
17 Q.  Well, at any time --
18 A.  Yeah.  Well, before that, I believe -- yeah,
19 Robert Delancy was on there because I think -- I
20 remember La-Vaughn -- Robert Delancy is the -- my
21 predecessor.  Robert Delancy lives in Port St. Lucie.
22 La-Vaughn drove up there with him to go to the bank to
23 have his name removed.  So that did happen.  I'm not
24 sure if -- if Ms. -- the other -- Sharon Cooper ever did
25 that.  I'm not sure.

Page 77

1  Q.  Okay.  So your understanding is that Mr. Delancy
2  and Ms. Cooper were the only two signatories on that
3  Wells Fargo account?
4  A.  I -- I believe so.
5  Q.  Okay.  And your understanding is that Mr. Delancy
6  has since been removed, correct?
7  A.  He removed his name.  Yeah.
8  Q.  Okay.
9  A.  Yes.
10 Q.  But you don't know whether or not Ms. Cooper has
11 removed her name from that account?
12 A.  I don't think she has because she didn't give us
13 any cooperation.  I mean -- I won't say she didn't give
14 us any.  She did have sent to my law office the books, a
15 couple computers and, you know, that kind of stuff but I
16 don't know if she ever actually went to the bank to have
17 her name removed.  I'm not sure.
18 Q.  Okay.  And so you -- well, other than Ms. Cooper,
19 who else would know if any contributions are still
20 flowing into that Wells Fargo account, to your
21 knowledge?
22 A.  Ms. La-Vaughn Graham Starks.  Ms. La-Vaughn, our
23 treasurer, current treasurer.
24 Q.  Okay.  Anybody else?
25 A.  Well, actually the association would know because

20 (Pages 74 - 77)

Page 78

1 La-Vaughn gives very consistent and meticulous reports
2 at our meetings, which we have bimonthly. So -- and she
3 does tell us -- she mentions what's in each of the
4 accounts. And I have heard her say that the Wells Fargo
5 account is open but it's not being used. So La-Vaughn
6 would know. And, actually, the association would know
7 based upon the reports that she's given. I just don't
8 remember, you know, specifically at this particular
9 time.
10    Q. Okay. And when you're saying the association,
11 you mean -- you mean the national organization?
12    A. The board. Well, the board as well as -- we only
13 have a meeting with the full membership annually.
14 Usually that's the third weekend in -- in June. But we
15 typically meet the board of directors, typically we meet
16 every two months. There have been a couple of months
17 where we did meet for certain reasons.
18        But my executive committee meets, and La-Vaughn
19 will give a breakdown about finances, just as we're
20 using the screen here. She does that with the board, as
21 well as the executive committee. She gives a financial
22 report. And she specifically delineates the bank
23 accounts and she will indicate this is from Truist and
24 we do have the Wells Fargo is still sitting over here
25 but there's really nothing in it. We don't put anything

Page 79

1 in it, we don't take anything out of it.
2    Q. Okay. So what -- the Truist bank account that
3 you mentioned, who are the signatories on that account?
4    A. Actually, it's La-Vaughn. And I -- I'm telling
5 you she has actually written me, she's sent me text
6 messages saying, Johnny, you need to run right up the
7 street to Truist, and I'll tell her that I'm going to do
8 it but I just have been kind of, you know, slow about
9 doing it.
10    Q. Okay. Other than Ms. Starks, is anybody else a
11 signatory on the Truist account?
12    A. No. No.
13    Q. Okay.
14    A. No.
15    Q. And has that been true since that account was
16 open?
17    A. Yes. Um-hmm.
18    Q. Okay. So -- and while we're on the subject of
19 bank accounts, let me ask you, we're talking about the
20 Wells Fargo account, the one that Ms. Cooper was a
21 signatory on. Do you know at that time was there only
22 one bank account or were there multiple bank accounts?
23    A. I think it was one bank account. Yeah.
24    Q. Okay. And so that was the only bank account by
25 which any contributions or donations made by the members

Page 80

1 to the national organization will be going into that
2 bank account?
3    A. I believe so.
4    Q. Okay. Back --
5    A. I really -- go ahead.
6    Q. I was going to say, back then, was it also the
7 case that the chapters had their own separate bank
8 accounts when they collect -- when they do fundraising
9 locally?
10    A. Yes, I believe so. I believe so.
11    Q. Okay. And -- and that's still the case today,
12 the chapters still have their own separate bank accounts
13 if they're doing -- for local fundraising, right?
14    A. Yes, that's correct.
15    Q. Okay. So with Truist, do you know how many bank
16 accounts does the national organization have with Truist
17 currently?
18    A. I think that we have one. I'm not sure. I think
19 it's one. But I have heard La-Vaughn make mention to
20 the organization about setting the money up so that we
21 can make money on the money. When I say we, not us
22 individually, but the organization can -- can at least
23 draw greater interest on the money that's in the bank.
24 I don't know if she's done that, but that's what she's
25 talked about doing.

Page 81

1    Q. So -- so going into some type of a money market
2 account or some type of an investment vehicle money --
3    A. I have heard her say that because she has a
4 background in business. She's an accountant. She
5 worked with the large corporation doing that kind of
6 work, and she just feels as though we should be doing
7 something with our money to try to bring more money in
8 to give scholarships.
9    Q. Okay. What I wanted to ask you, it sounded like
10 before you mentioned that -- and correct me if I'm
11 wrong -- that there was a separate bank account that's
12 for the scholarships or is it all the same bank account?
13    A. I think that it's separate because I remember I
14 just said to her, hey, we want to make sure that we had
15 that money separate and apart from our general account
16 and she says, oh, it is. And La-Vaughn is a very
17 upstanding person. She's good at what she does. And,
18 you know, she represented that to me and I believe that.
19 And she also gives reports. And when she gives us a
20 report, she tell us how -- she tells us how much money
21 we have. She does that consistently when we have
22 meetings.
23    Q. So let me ask you, then, if there's a separate
24 bank account for scholarships, then what is the other --
25 and that's with Truist, also you're saying, right?

21 (Pages 78 - 81)

Page 82

1   A. I think we only bank with Truist.  Because --
2   Q. Okay.
3   A. -- they, according to La-Vaughn, they're more
4   friendly to nonprofits.
5   Q. What is the other Truist Bank account used for?
6   A. I'm not sure.  I think that we have a general
7   operational account and then we have an account just
8   with the scholarships.
9   Q. Okay.  So as far as you understand it, there are
10  two -- the national organization has two separate bank
11  accounts with Truist and that's it, not --
12  A. I believe so.  I believe so.
13  Q. Okay.  Let me ask you, you mentioned Ms. Cooper,
14  do you know what her title or position was with the
15  organization before the controversy with her?
16  A. Yes.  She actually held the position that
17  La-Vaughn was holding, but La-Vaughn defeated her for
18  treasurer.  So they --
19  Q. Okay.
20  A. -- she held the exact position that La-Vaughn
21  held.
22  Q. All right.  And this controversy, you're saying
23  that part of the reason for this controversy was
24  Ms. Cooper was -- because of her loyalty to the former
25  president, Mr. Delancy?

Page 83

1   A. That wasn't part of the reason.  That was the
2   sole reason.
3   Q. Okay.
4   A. I always -- I've been a member of the
5   organization for some years.  I've held other positions
6   in the organization.  But I actually became so-called
7   executive of the community -- I'm sorry, of the
8   organization when I became president.  And she and I,
9   we've never really known each other.  I know she was a
10  year or two ahead of me when we were in college.  We
11  didn't really know each other.  But once I defeated
12  Robert Delancy, it was a very, very -- there were some
13  people -- we're frat brothers.  Robert Delancy and I
14  were fraternity brothers.  We both really in a sense
15  were watchdogs for the alumni with the organization, you
16  know, when transparency was -- was -- was not being
17  done, we would speak our about it.  We questioned the
18  board.  And we got along fine, but when I ran against
19  Robert Delancy, there were four, five people in the
20  organization who were officers, were very upset and they
21  were very subversive to our organization trying to
22  undermine what we were trying to accomplish.  And
23  eventually those individuals left and they are now very
24  active with the school's alumni association.
25  Q. Let me back up and ask you.  So you indicated

Page 84

1   that when Ms. Cooper refused to give you access to the
2   bank accounts, you -- you took some efforts, including a
3   legal threat, to try to get her to comply with your
4   requests; is that right?
5   A. Yeah.  I wrote her a letter.  I can probably even
6   get copies of the letters.  They're in -- they're in --
7   my old e-mail was hacked so I don't have that, but I can
8   probably still pull it up.
9        I sent her a letter with the name of the lawyer
10  that was going to be representing us.  I called her.  I
11  know the person that helped get her a job with the
12  school district who's kind of like a mentor for her, I
13  called him.
14       And what -- specifically what she was refusing to
15  give us was not just the bank information but passwords
16  to what -- like Constant Contact and there was some
17  other stuff.  Like I said, I'm not that learned in those
18  things but the treasurer was saying, Johnny -- La-Vaughn
19  was saying, Johnny, we need to get this.  Because we
20  were actually talking about doing an audit because I
21  didn't want any of those individuals who I know were pro
22  Robert Delancy to do anything to undermine what we were
23  trying to do or to do anything that was underhanded,
24  whereby my credibility could be questioned because, you
25  know, since I've been running this organization we've

Page 85

1   not had any fiscal or financial issues.
2   Q. So let me ask, yeah, we would -- we would make a
3   request -- and we'll send a follow-up letter or e-mail
4   to your counsel after this for any of the documentation
5   related to the dispute with Ms. Cooper.  I believe it's
6   already been encompassed by our prior request, but we'll
7   deal with your counsel on that.  I just wanted to note
8   that for the record.
9   A. I don't know if I have those, sir.  And as I told
10  you, I will make a bona fide effort to see if I have
11  them.  But trust me, if I don't have them, she should
12  have them.
13  Q. Okay.  And let me ask you, then, so you called
14  her, you met with her, you sent her a letter --
15  A. Couple letters.
16  Q. A couple letters.
17  A. At least two.
18  Q. Did you actually hire counsel to try to address
19  that dispute?
20  A. I didn't hire counsel but I spoke to counsel.
21  Attorney Khambrel Davis, I did speak to him.  And I
22  think once I wrote the letter telling her that, you
23  know, this was the last effort, and I think I CC'd
24  Attorney Davis on that letter.  That's when she started
25  coming around.  She said she was going to send some

22 (Pages 82 - 85)

Page 86

1 things.  And I think she did get with La-Vaughn and give
2 La-Vaughn certain things but she still didn't give
3 La-Vaughn everything that we requested.
4 Q.  Do you know, did there -- do you know as you sit
5 here today, at the time of that dispute, was there --
6 was there any money in that Wells Fargo bank account?
7 A.  I'm sure it was because I don't think that we had
8 set up the Truist account at that time.
9 Q.  Do you know if she transferred any of that money
10 to the national organization?
11 MS. FANIEL:  Object to form.
12 THE WITNESS:  My response is, I don't have any
13 personal knowledge if she did.  I'm unaware of that
14 having happened.  But if it happened, you know, I'm
15 unaware of it.  I do know that there were efforts on
16 the part of the university to get our people, some of
17 our members to direct their funds to them.  But
18 whether or not she took money out of that account, I'm
19 unaware of that.  And I won't make that
20 representation.
21 BY MR. HERBERT:
22 Q.  Okay.  And so -- so you don't know as you sit
23 here today whether Ms. Cooper did or did not transfer
24 any funds that might have been left in that Wells Fargo
25 account over to your new bank account with Truist; is

Page 87

1 that fair?
2 A.  Yeah, that's fair.  I have no personal knowledge
3 of that, if that happened.
4 Q.  Okay.  All right.  So then is it your
5 understanding that this new entity that was formed,
6 which is referenced here in this exhibit that's still up
7 on the screen, Exhibit 4, that that entity's name is
8 Mary McLeod Bethune National Alumni Association, that
9 that is currently the operative corporate entity by
10 which the national association conducts its business?
11 A.  Unless La-Vaughn has effectuated what we asked
12 her to do, that is, to go back and go correct this with
13 IRS and to correct it, we wanted -- the name of our
14 organization is Dr. Mary McLeod Bethune, although many
15 of our members don't use the Dr. when they're using the
16 name of this organization.
17 Q.  And I understand --
18 A.  Sometimes I don't.
19 Q.  And I understand.  Yeah.  Actually, you're
20 talking about a name change.  But what I'm talking about
21 is the -- they're two different entities, they've got
22 two different EIN numbers, one of them has a bank
23 account with Truist.  The other one used to have a bank
24 account with Wells Fargo.  So leaving aside the name
25 change -- well, let me ask you this:  What you're

Page 88

1 talking about you asked Ms. Starks to do was to change
2 the name back to put the Dr. back into the name; is that
3 correct?
4 A.  Yes.  But I think I know what you're asking me.
5 My response is any monies that we receive will go into
6 that Truist account and I believe that Truist account is
7 set up under Mary McLeod Bethune National Alumni
8 Association, without the Dr.
9 Q.  Okay.  But you're not -- you're not sure?
10 A.  Yeah.  I'm not 100 percent sure but I'm pretty
11 sure.
12 Q.  Okay.
13 MR. HERBERT:  Let me -- speaking of the --
14 let's just go to the next -- the next document in this
15 tab which I will mark for identification purposes as
16 Exhibit No. 5.
17 (Plaintiff's Exhibit No. 5 was marked for
18 identification.)
19 BY MR. HERBERT:
20 Q.  And that -- so this is a filing from the -- with
21 the Florida Division of Corporations Secretary of State
22 made on April 23rd of this year, 2023.  And you're
23 familiar with these documents?  This is an annual report
24 or summary of the annual report?
25 A.  I'm familiar with the purpose and the nature of

Page 89

1 an annual report.  But I don't -- I saw this but I don't
2 really recall specifically, where is it -- can you slide
3 it up a little bit so I can go beneath my signature?
4 Okay.  Yes.  I see that.
5 Q.  Okay.  And so that -- it has your electronic
6 signature on there dated 4/23/23, correct?
7 A.  Um-hmm.  Yes.
8 Q.  Okay.  And so let me ask you this:  Looking at
9 this document, do you know which entity this document
10 was filed on behalf of?
11 A.  Can you slide it back?  Yes.  This says the
12 Dr. Mary McLeod Bethune National Alumni Association.
13 Q.  Okay.  And then my question is, do you know is
14 that the prior organization with the EIN number ending
15 in 490 or is that a more recently formed organization in
16 June with a different EIN number, do you know?
17 A.  I honestly don't know.  And I say that because I
18 know that we had instructed La-Vaughn what to do in
19 terms of the two organizations and the name.  So, you
20 know, I really, right now, as we sit here, I'm not
21 really sure.  But I know that we told her that we wanted
22 to operate under the Dr. Mary McLeod Bethune National
23 Alumni Association.
24 Q.  Okay.  If you look on this document, it does
25 include the FIE number.  It's just there below the

23 (Pages 86 - 89)

Page 90

1 current mailing address over on the left-hand side.
2    Do you see that?
3    A. I see that.
4    Q. Okay. And that's that -- that FIE/EIN number
5 that ends in the 490. The same EIN number as the
6 previous organization. Correct?
7    A. When you say the previous organization, you mean
8 when we use the name of the university?
9    Q. Yeah. Well, it's the entity we saw the prior
10 document that was -- that -- that changed its name to
11 officially Dr. Mary McLeod Bethune National Alumni
12 Association, right? It was the one that was originally
13 filed in 1971 with --
14    A. Okay.
15    Q. -- the name of the college and then the name
16 changed in 2009 to include the name of the university
17 and then it was changed in September 27th, '21 to
18 Dr. Mary McLeod Bethune National Alumni Association, the
19 same -- same entity, same EIN number, correct?
20    A. Yeah. Well, I mean, I don't know those numbers
21 by heart, but if that's what it says, that's what it is.
22    Q. Okay. Let me -- let's -- speaking of the EIN
23 numbers, let's take a look at the -- give me one second.
24    MR. HERBERT: Let's go to the next document
25 which we'll mark as Exhibit 6 for identification

Page 91

1 purposes.
2    (Plaintiff's Exhibit No. 6 was marked for
3 identification.)
4 BY MR. HERBERT:
5    Q. So the next document for the record, it says at
6 the top 2023 Florida not-for-profit corporation annual
7 report and it's got a file date of -- also the same
8 date, April 23, 2023. And the entity name here is
9 listed as, quote, Mary McLeod Bethune National Alumni
10 Association, close quote.
11    Do you see that?
12    A. I do, yes.
13    Q. Okay. And then going down a little bit, do you
14 see that there's an FEI number there and that's a
15 different FEI number, it ends in 364, it's not the one
16 ending in the 490, right?
17    A. Yes. Correct.
18    Q. All right. And so this document was a -- was the
19 annual report filed with the state of Florida, you know,
20 in order to keep the corporate entity existing with the
21 state of Florida last April 23rd, correct?
22    A. Yes.
23    Q. Okay. And this one, it appears to be -- you have
24 an electronic signature at the bottom of Ms. Starks,
25 correct, if you scroll down to the bottom?

Page 92

1    A. Yes, I see it. Yes.
2    Q. Okay. Okay. So from these documents, it appears
3 that both of the corporations with the two separate EIN
4 numbers are still active corporations with the state of
5 Florida, correct?
6    A. Yes, it appears that way, at least as of those
7 dates, yes.
8    Q. Okay. Okay. And then let's go -- let me ask you
9 this. I'm guessing that you don't know, but if you do,
10 let me know. Do you happen to know if an IRS Form 990
11 has been filed for this entity on Exhibit 6, the one
12 that has the EIN ending in the 364?
13    A. I don't know.
14    Q. Okay.
15    A. I really don't.
16    Q. Okay.
17    A. If -- if the deadline for doing so has not
18 passed, it may not have been done yet. La-Vaughn is
19 usually pretty good for making deadlines, so if it has
20 not passed, you know, maybe she intends on doing it. If
21 it has passed, I will be surprised if it wasn't done.
22    Q. Understood. Do you know what the -- which of
23 these entities or which EINs the -- the next 990 is
24 going to be filed on behalf of?
25    A. I don't. No.

Page 93

1    Q. Okay. All right. Let's just go back to -- look
2 at some of these -- the Form 990s. Let me just ask you
3 generally, you understand that -- you understand what an
4 IRS Form 990 is, generally speaking?
5    A. Yes.
6    Q. Okay. What's your understanding of it?
7    A. Well, there's no requirement to file normal
8 individual tax returns. But the 990, my understanding
9 is, it's a form where it shows what monies were brought
10 into that organization through contributions, donations
11 and, also, what monies went out of that organization.
12 And it's supposed to be filed annually, and I think they
13 will allow you a couple -- two or three times to be
14 delinquent and then after that, you can be penalized.
15    Q. All right. And that -- it's -- it's -- the Form
16 990 is applicable to tax-exempt organizations, right?
17    A. Yes, that's correct.
18    Q. Okay. And let me ask you in general at the
19 outset, are you aware of the national organization
20 failing to file its IRS Form 990s in -- at any time in
21 the past?
22    A. Yeah. I believe way back in 2016, the young lady
23 who was president who is a member, current member of the
24 board of trustees now, under her administration, she
25 failed or refused to file, which I was unaware of at the

24 (Pages 90 - 93)

Page 94

1  time.  I found out during Mr. Delancy's administration
2  that those things weren't done.  And so there was two
3  years, I believe, under Mr. Delancy's administration,
4  the following year, which was '18 to '20, 2018 to '20, I
5  understand that he cleaned up -- on his administration,
6  they cleared up one but they left one that was
7  outstanding, when I came in.  And Sharon Cooper
8  introduced me to the CPA and she was trying to get it
9  cleaned up and it was during the pandemic, and they
10  weren't getting any responses from IRS.
11       So anyway, Sharon, when she lost the election,
12  La-Vaughn came in and La-Vaughn, my understanding, has
13  cleared it up or cleaned that up.  And we haven't had
14  any problems with 990s since I've been president.
15   Q.  Let me ask you, when you mentioned that you --
16  you talked or met with the CPA, which CPA was that?
17   A.  Oh, man.  I can't remember her name but she's out
18  of West Palm Beach.  I can easily get the name.  But
19  it's a CPA that -- firm that was used the last few
20  years.  We don't use her now because we don't need her
21  with La-Vaughn.  But I can get the name of it because
22  she also has done our elections over the last -- well,
23  not -- we went to electronic voting, but when I defeated
24  Robert Delancy, she was being used at that time.  I can
25  get that name for you easily if -- if you want me to.

Page 95

1   Q.  Okay.  That wasn't Jennifer Adams, was it?
2   A.  Wait, when you say that, who -- who are you
3  speaking of?  Jennifer Adams was the president in 2016,
4  I believe, and it was under her leadership, I think, and
5  Glendale Johnson was the CPA.  And I don't know why
6  because I really didn't get involved with the financial
7  matters within the organization.  At that time I was the
8  alumni trustee rep, I was on the board, but I
9  represented the association.
10       Apparently, Glendale failed or refused to do the
11  990s.  I know she lost her mom and that, from what I
12  heard, had a tremendous impact on her.  I don't know if
13  that's why.  But bottom line is, when I became
14  president, the one that was outstanding, we've taken
15  care of that.  Haven't had any issues.
16   Q.  Okay.  Let me ask you, the -- so after Glendale
17  Johnson is, I guess, it sounds like the full name is
18  Glendale Johnson-Young.  Does that sound right?
19   A.  I'm not sure about the Young, but I know it's
20  Glendale Johnson is her either her maiden name or
21  previously married name.
22   Q.  Okay.  And then the -- the CPA that was utilized
23  by the national organization after Ms. Johnson, is that
24  the name you can't recall?
25   A.  Right.  I can't but I can easily get that.

Page 96

1   Q.  Okay.  And let me ask you also, in terms of these
2  issues of trying to clean up the Form 990s, you were
3  personally involved in that as well?
4   A.  Well, I was personally involved in making certain
5  that they got -- that situation was rectified because,
6  you know, I don't like anything like that, if I'm going
7  to be in charge.  And so that's why -- and La-Vaughn
8  also has that same mentality.  So La-Vaughn came in and
9  really hit the ground running, cleaning that up, and she
10  did.
11   Q.  Okay.  Other than you and Ms. Starks, who else
12  was involved in that process of trying to clean up the
13  990 filing?
14   A.  Well, when La-Vaughn joined, she basically did it
15  on her own.  But before La-Vaughn joined, it was the law
16  firm -- or not the law firm, but the accounting firm out
17  of West Palm Beach.  And I think La-Vaughn had some
18  collaboration with that accountant when she first came
19  on because she was trying to be brought up to speed.
20   Q.  Okay.  And, you know, in terms of this -- issues
21  with Ms. Glendale Johnson and then working with the new
22  CPA to try to clean up the 990 issue, I assume there
23  were some documentation of the efforts that would
24  corroborate these efforts?
25   A.  Oh, yes.  I'm sure La-Vaughn has documentation

Page 97

1  because she was also reaching out to Sharon.  I don't
2  know if she ever reached out to Glendale because
3  Glendale had been gone a while.  But yes, there should
4  be some correspondence.
5       You're not going to find any correspondence from
6  me, except I -- when I first came on, and Sharon was on,
7  but before La-Vaughn became the treasurer, before she
8  had run, I was communicating with the -- with the
9  company -- accounting company out of West Palm Beach
10  because I wanted to get that cleaned up.  I wanted to
11  get that rectified as soon as possible.
12       And she was telling me, you know, the IRS,
13  they're not answering the phones.  Because we were in
14  like the middle of the pandemic.  Everything was pretty
15  much shut down or shutting down.  And, you know, she was
16  telling me she was going to seek, what is it, the
17  forgiveness.  And I don't know if she ever did it, but
18  she, I think, got it started and La-Vaughn came through
19  and finished it up, got it done.
20   Q.  Okay.  So, again, just for the record purposes,
21  we'll request any documentation regarding any effort to
22  clean up the 990s, whether from Ms. Starks or sent to
23  Ms. Cooper or sent to the CPA.  I also believe that is
24  encompassed by our prior request but we'll just note
25  that officially for the record.  I'll follow up with

25 (Pages 94 - 97)

Page 98

1 your counsel on that.
2      So let me ask you -- let's go through some of the
3 990s that we do have.
4      MR. HERBERT:  And so, Paula, if you could pull
5 up, I think it's tab 45, which is the 990 that --
6 that's dated 2016 on the first page.  Okay.  There we
7 go.
8 BY MR. HERBERT:
9 Q. Okay.  So just looking at this document, this --
10      MR. HERBERT:  Go ahead and just scroll down
11 slowly through the first -- the first page.  All
12 right.  And let's just stop there if we could.
13 BY MR. HERBERT:
14 Q. So at the bottom there, it looks like the page --
15 where it says, paid preparer use only, that name of
16 Glendale Johnson-Young, that's Ms. Johnson who you're
17 referring to earlier as the prior CPA, correct?
18 A. Yeah.  I don't see her name.  I see Jennifer
19 Adams, President, and a signature above that.
20 Q. Okay.  It's right below that.
21      MR. HERBERT:  So maybe you need to scroll down
22 a little bit more, Paula.
23      THE WITNESS:  Where it says -- oh, where it
24 says preparer's signature?
25 BY MR. HERBERT:

Page 99

1 Q. Yeah.
2 A. Oh, yeah, yeah, I do -- I see it.  I do.  Yes.
3 Q. That's Ms. Young who you're referring to, right?
4 A. Yes, Glendale Johnson.  I didn't know her name
5 was Young, but, yes, that's her.
6 Q. Okay.  And this appears to indicate that it was
7 filed in August or dated -- well, there are two
8 different dates there.  One is August of 2018.  The
9 preparer's signature is in -- that's also August.
10 That's an 8, not a 3.  So it appears that this document
11 is dated August of 2018.
12      Do you see that date, those dates there?
13 A. Yeah.  I don't know if I was an officer in the
14 association back at that time, but yeah, I see the date,
15 August 26, 2018.
16 Q. Right.  Right.  And I understand this was not --
17 this was not prepared under your tenure as president.
18 But just going up to the top.
19      MR. HERBERT:  Paula, can you scroll back up to
20 the top.
21 BY MR. HERBERT:
22 Q. All right.  So I just want to focus on the dates
23 a little bit because when you refer to these 990s, it
24 gets a little tricky because they go by the beginning of
25 the fiscal year, as far as I can tell.  That, the date

Page 100

1 in the upper right-hand corner is 2016 and then if you
2 look at the first entry there under letter A, it says
3 that it's for the 2016-calendar year or tax year
4 beginning July 1st, 2016, and ending on June 30th of
5 2017.
6      Do you see that?
7 A. I do, yes.
8 Q. Okay.
9      MR. HERBERT:  You can probably shrink that a
10 little bit.  Yeah.
11 BY MR. HERBERT:
12 Q. All right.  So it appears that this 2000- --
13 what's labeled on the form as a 2016 Form 990 covers the
14 period ending in July of 2000 -- or June of 2017.  Is
15 that your understanding of how the 990s -- how the time
16 period is with your fiscal year being July to June?
17 A. Yes.  Yes.  Uh-huh.
18 Q. Okay.  And the EIN number appears right there in
19 the upper right-hand corner.  Do you see that under D it
20 says, Employer Identification Number, and it's that one
21 that ends in a 490 that we saw in those earlier
22 corporate documents, right?
23 A. Yeah, I see that, yes.
24 Q. Okay.  And that at the -- at this time was named
25 the National Alumni Association of Bethune-Cookman

Page 101

1 University, Inc., right?
2 A. Yes.
3      MR. HERBERT:  All right.  Let's go ahead and
4 mark this document as Exhibit -- what are we up to, 6?
5 Hearing no objection --
6      THE COURT REPORTER:  7.
7      MR. HERBERT:  7.  I'm sorry.
8      (Plaintiff's Exhibit No. 7 was marked for
9 identification.)
10 BY MR. HERBERT:
11 Q. All right.  And let me just -- let's just -- I
12 have a couple of questions about this.  I know it wasn't
13 under your tenure.  But going down to the line number 8.
14      MR. HERBERT:  If you can scroll down on this a
15 little bit, Paula.
16 BY MR. HERBERT:
17 Q. Line number 8 there, it's got, I think what you
18 were talking about earlier, it's got a line item for the
19 little box section there on the left-hand side going up
20 and down says:  Revenue.  And line item number 8 says:
21 Contributions and grants.
22      Do you see that there?
23 A. Um-hmm.
24 Q. Okay.  And then it indicates the number for
25 line 8, it's got a prior year number and it's got a

Page 102

1 current year number. You see those?
2 A. Yes, I do.
3 Q. Okay. And the prior year number is a little over
4 207,000 and then the current year number is a little
5 over 142,000.
6 Do you see that?
7 A. I do. Yes.
8 Q. Okay. And so what I want to ask you is, this --
9 this line item here that says contributions and grants,
10 and I know this one wasn't filed under your tenure but
11 there have been -- the national organization has filed
12 IRS Form 990s since you have been the president,
13 correct?
14 A. Yes. That's my understanding, yes.
15 Q. Okay. And so the contributions and grants, your
16 understanding that that is the total amount of donations
17 that were made to the organization generally speaking?
18 MS. FANIEL: Object to form.
19 THE WITNESS: I mean, I really don't know. I
20 don't -- in my area of expertise, as a lawyer, I don't
21 deal with this. In my capacity as president, I
22 don't -- I rely almost exclusively on our treasurer
23 who's also an accountant. And so I can only assume
24 that this would be what people donate to our
25 organization in grants. I don't know if we get

Page 103

1 grants, but I would assume that that would come from a
2 governmental entity or a nongovernmental entity that
3 gives that type of donation to us.
4 BY MR. HERBERT:
5 Q. Right. And that's what I was going to ask you
6 about is, it's got contributions and grants. So not
7 asking about this document, but asking about your
8 current situation, does the national organization
9 currently -- well, let's break it down.
10 It does get donations from either individuals or
11 entities, right? As a charitable donation, right?
12 A. Primarily from individuals, but we probably --
13 because when I give, I give in the name of my business.
14 So to answer your question, I'm sure people -- some
15 people give in the names of their business. But we
16 don't usually solicit contributions from your larger
17 corporations or even from your middle-sized
18 corporations. Mostly it's individuals that give us
19 money.
20 Q. Understood. And in some situations, a company or
21 an employer might match some contribution; is that --
22 are you aware of that happening?
23 A. Yeah. I think you're correct there. One of our
24 members who I know personally who loves this
25 association, I think she gives money annually because

Page 104

1 she refuses to give to the school because of what's
2 going on. She used to give to the school but she
3 doesn't. She gives to us now.
4 Q. And then let me ask you about this. So as far as
5 you know now, this line item 8 for your organization
6 currently, any -- any revenues that would fall under
7 that would just be contributions; you're not aware of
8 getting any grants from --
9 A. Yeah, you're correct. And that's going to be
10 substantially less what it used to be.
11 Q. Understood. Let me ask you, the next line item
12 is number 9. That says: Program service revenue. And
13 then for this -- for this form, it's got prior year, a
14 little over 27,000 and the current year, it's saying
15 37,000.
16 Do you see those numbers there?
17 A. Yes.
18 Q. Do you have an understanding of what that program
19 service revenue represents?
20 A. I don't, but I think I can probably take an
21 educated guess and it'll probably be right. We used to
22 have the alumni queens contest. We have a Miss Gold,
23 Miss Silver and Miss Maroon. And whoever raises the
24 largest amount of money, they would be -- I forget if
25 Miss Gold was the top and Miss Maroon was the second and

Page 105

1 the other one. And usually, we would end up raising 30
2 or 40 or $50,000 or something like that. So I am
3 assuming that that may be what that is. But maybe I
4 shouldn't have even assumed that because this was not
5 under my leadership, so I'm not really sure. But I
6 think that comes from our Miss alumni contest which is
7 how we were able to give the school money, you know,
8 every year, usually at the end of the year.
9 Q. Okay. Let me ask you, you may -- you may not
10 know this since you weren't the president then. But
11 looking at that total revenue there in line item number
12 12, it appears that from here the prior year, it was a
13 little over 235,000 and then it's saying the current
14 year it's just under, you know, 180,000.
15 Do you have any knowledge as to why the revenues
16 went down in this year?
17 A. No, I don't.
18 Q. Okay. And you are aware that --
19 MR. HERBERT: Let's scroll back up to the top
20 of this document, if you could, Paula.
21 BY MR. HERBERT:
22 Q. Under the year there, 2016, it says: Open to
23 public inspection.
24 You're aware that these documents are publicly
25 available, right?

27 (Pages 102 - 105)

1  A. Yes, I am.
2  Q. Okay. Alrighty. So let's move forward to the
3  next Form 990 that we were able to locate and that is
4  tab -- we've got it up already -- tab 11. That's a
5  2009 -- that's our 2019 in the upper right-hand corner.
6  And --
7      MR. HERBERT: If you could just scroll through
8  this slowly, Paula, if you get down to the bottom.
9  Okay. Okay. And you can stop there.
10     And for the record, this document bears Bates
11  number BCU003089, and it goes through 3117 at the end.
12  We'll go ahead and mark this as Exhibit 8, are we up
13  to?
14     THE COURT REPORTER: Yes.
15     (Plaintiff's Exhibit No. 8 was marked for
16  identification.)
17     MR. HERBERT: Okay. All right. Go back up to
18  the top, if you could.
19 BY MR. HERBERT:
20  Q. Can you see this, the name of the organization
21  there, it's a little hard to read on this document, but
22  again it looks like it is listed as the National Alumni
23  Association of Bethune-Cookman University, Incorporated.
24  Is that -- is that correct?
25  A. Yeah, that's what it says.

1  Q. Okay. And if you look in the next little box
2  there where the employer identification number is, it's
3  that same EIN ending in the 490, right?
4  A. Correct.
5  Q. Okay. And going down to the bottom, this was --
6  this was electronically signed by Ms. Starks, correct?
7  A. That's what it says, yes.
8  Q. Okay. And there she identifies herself as
9  president, right?
10  A. It does say president but I don't know if she
11  means of her company. Because that's the firm, she use
12  MPG Starks, LCC -- LLC and I think she is the president.
13  Q. Okay. All right. So Ms. Starks has never been
14  the president of the national organization that --
15  A. Not that -- not that I'm aware of.
16  Q. Okay. And then looking in the lower right-hand
17  corner, there's -- there's some text that looks like
18  it's been blacked out there.
19     Do you know anything about that or why it's
20  blacked out?
21  A. No. No. I've never seen this document that I
22  can recall. I don't know if this was presented to us in
23  a board meeting or not. But I don't have any
24  independent recollection of having seen this.
25  Q. Okay. And let me ask you that under the --

1  underneath Ms. Starks' name in the section that says
2  paid preparer use only, it's got her name and it's got
3  that company that you mentioned, MTG Starks, LLC.
4     Do you see that?
5  A. Yes.
6  Q. Okay. And you said that's Ms. Starks' company.
7  Do you know if that company is a CPA firm?
8  A. No, she's not a CPA.
9  Q. Okay. What is MTG Starks LLC, then?
10  A. It's an accounting operation. She does tax
11  preparation, bookkeeping, et cetera. It's my
12  understanding. I've never used her but that's my
13  understanding.
14  Q. Okay. Does she -- do you know, does she do tax
15  preparation, bookkeeping and accounting for other
16  entities, other than the national --
17     MS. FANIEL: Object to form.
18     THE WITNESS: Yes, I believe she does. I've
19  heard her say that she does.
20 BY MR. HERBERT:
21  Q. Okay. All right. Let's go back up to the top,
22  if we could. And again, just to clarify the time period
23  here, this is indicated as the 2019 Form 990. And in
24  section A, it indicates that it's covering fiscal year
25  starting on July 1st of 2019 and ending in June 30th of

1  2020. Is that right?
2  A. Yes. Yes. I see it here.
3  Q. Okay.
4     MR. HERBERT: And just if you can scroll down
5  to the bottom, Paula, where Ms. Starks' signature is.
6 BY MR. HERBERT:
7  Q. Okay. That indicates that this was prepared or
8  at least it was electronically signed by Ms. Starks on
9  September 19th of 2021; is that right?
10  A. Yes.
11  Q. So that is during your tenure as president,
12  correct?
13  A. Yes. 9/19/21 I was president.
14  Q. Okay. Do you -- do you know why this was filed,
15  basically filed late after the period ending June 30th
16  of 2020?
17  A. No, I can't -- if I were to answer, I'd be
18  speculating. I just know she was trying to get those
19  done in a way, and I know at one point she was having a
20  hard time reaching IRS. But I can't give you an answer
21  why.
22  Q. Okay. Ms. Starks should know the answer to that,
23  though?
24  A. Sure. She filed it, yes.
25  Q. Okay. You don't remember any conversations with

28 (Pages 106 - 109)

Page 110

1 her about the timing of filing this 990?
2    A. No. I really don't. I just would always ask her
3 how are we coming along with this, you know, are we
4 getting this done, because it was very important to me
5 as president that we clean up something that was created
6 under a prior administration. Or should have been done
7 by a prior administration.
8    Q. Understood. So that was under Mr. Delancy's
9 administration?
10    A. If it was '19, yes, because Delancy was president
11 '18 to '20. One term.
12    Q. Okay. Do you -- did you -- were you personally
13 involved in any conversations with Mr. Delancy or
14 Ms. Cooper about this -- this 2019 IRS Form 990?
15    A. Not Mr. Delancy. Mr. Delancy refuses to speak to
16 me. Ms. Cooper, all she would tell me is that she was
17 working with the accountant, the firm, the accounting
18 firm out of Palm Beach to get this cleared up. But from
19 the time that I was president until the time that she
20 lost, she was -- in that one year, she never finalized
21 it. And again, I don't know if it was because of the
22 pandemic, but I do know that that really, really slowed
23 things down with us getting this cleaned up because it
24 was important to me when I took this job that we got
25 that rectified.

Page 111

1    Q. Okay. Let me ask, other than you and Ms. Starks,
2 this issue of getting this 2019 Form 990 filed, was
3 that -- did that come up at meetings with your board or
4 with -- were other folks involved in that process?
5    A. Only the accounting firm, but Ms. Starks would be
6 very vigilant in making sure that the board of
7 directors, as well as the executive committee, that they
8 were aware that, you know, we were trying to -- this
9 situation that we inherited, that we were trying to
10 clean it up.
11    Q. Okay. So this would have been on the agenda of
12 board meetings for the organization while you were
13 president?
14    A. Yeah. It would be a part. Now, whether or not
15 she specifically mentioned the 990s, no. But when she
16 gave a report, I typically prepared the agendas. As I
17 would for each committee, I would say treasurer's
18 report. And once she gave a treasurer's report, this is
19 when she would say, well, you know, we're still working
20 to get the 990s rectified, I'm waiting to hear from IRS,
21 or whatever, you know, the situation was. She -- she'd
22 represent that to the membership -- not the membership
23 but the board of directors or the executive committee or
24 both.
25    Q. Okay. And just for the record, again, to the

Page 112

1 extent there are any documents regarding the preparation
2 or filing or timing of this 990, we'll request those for
3 the record and I do believe it's been encompassed in our
4 prior request, but I will take that up with your counsel
5 afterwards.
6       Let's move up to the section 8 again.
7       MR. HERBERT: Yeah, let's scroll up a little
8 bit if you could, Paula.
9 BY MR. HERBERT:
10    Q. Okay. Looking at this, and I assume you've
11 reviewed this Form 990 before it was finalized and --
12 and filed with the IRS, correct?
13    A. I may have. I don't remember. I review a lot of
14 documents, so I may have. I'm not sure.
15    Q. Okay. Just looking under this, you see there's a
16 section there entitled Part 1, Summary. And the first
17 item under there, number one, it says: Briefly describe
18 the organization's mission or most significant
19 activities.
20       Do you see that?
21    A. Yep, I do.
22    Q. Okay. And there it says, quote: To provide
23 support to Bethune-Cookman University while fostering
24 and enhancing a relationship between its alumni students
25 and supporters.

Page 113

1       Correct?
2    A. Yeah, I think that language may have been lifted
3 from the old bylaws.
4    Q. Okay. And let's go down to number 8 there,
5 contributions, item number 8 which is under the revenue
6 section. Again we see line item number 8, it's got
7 contributions and there's a number for prior year and
8 current year. Prior year is just under 83,000; current
9 year is showing at 50 -- just under 59,000.
10       Do you see those numbers?
11    A. I do, yes.
12    Q. Okay. Again, is it your understanding that
13 these -- those numbers, contributions and grants, that
14 that constitutes primarily donations from individuals or
15 from their -- their employers?
16       MS. FANIEL: Object to form.
17       THE WITNESS: Again, you know, since I was not
18 really involved at that time financially, I can only
19 speculate and my answer would be yes, if I speculate,
20 I do believe that deal -- that line deals with
21 contributions from donors and supporters.
22 BY MR. HERBERT:
23    Q. Okay. And just ask you, you're not aware of any
24 other -- any other form of revenues that would be
25 included in there as you sit here today?

29 (Pages 110 - 113)

Page 114

1  A. No, and I've been a member of this organization
2 for many years and we don't get monies from other --
3  Q. Sources?
4  A. -- sources, except from, you know, our alumni,
5 alumni family and friends, you know, et cetera. But
6 that's basically it.
7  Q. Understood, and do you know -- this next line is
8 program service revenue and again there's -- there's a
9 couple numbers under there. The prior year is
10 indicating it's over $88,000 and then the current year,
11 it's indicating it's over $9,000. Do you see those
12 numbers there?
13  A. I do, yes.
14  Q. Okay. And for program service revenue there that
15 number for the prior year is quite a bit larger than the
16 2016 990 that we looked at. Do you know what that
17 number, that 88,792 represents?
18  A. Let me just --
19  MS. FANIEL: Object to form.
20  THE WITNESS: Okay. Let me just be sure. So
21 this deals with the taxable year of 2019?
22  MR. HERBERT: If you can scroll up, Paula,
23 and --
24  THE WITNESS: I think it's '19.
25 BY MR. HERBERT:

Page 115

1  Q. Yeah. It's a year, it ends in June 30, 2020.
2  A. Okay. Let me tell you what I think. When
3 Mr. Delancy was the president of the organization, it
4 was widely known that he alienated so many people,
5 especially our younger alumni. And people, you know,
6 essentially stopped giving like they had been giving.
7 And so I'm assuming that's why there's such a drastic
8 drop there to 9,817. And so, I mean, that's the only
9 thing I can think about -- think of.
10  Q. Sure. And I'm asking a slightly different
11 question, which is, do you know -- and before, you
12 indicated that you had some vague understanding of what
13 the program service revenue might be based on those --
14 those programs with the -- kind of with with the pageant
15 or involved in the queen, do you happen to know for
16 either of these years if that is -- if that is the same,
17 those numbers are from that, revenues from those sources
18 or something different?
19  A. I -- I know that Mr. Delancy was not very
20 supportive of the queens program, and they're the
21 ones -- they really raised the money for this
22 organization when we had the queens contest. And he was
23 not very supportive of them. They were intimidated by
24 him and they really stopped raising money under his
25 leadership.

Page 116

1  I'm thinking, because that's the only program
2 that we have where we raise money. That's why I just
3 reached a conclusion that maybe that's dealing with our
4 queens pageant. And I'm thinking that's why that year
5 we had such a big drop, you know, in the -- in the
6 revenue.
7  Q. Okay. And let me ask you just to clarify about
8 the queens program. These are -- are they -- how does
9 the money come into the queens program? Is that also
10 contributions that are made from individuals that are
11 attending these programs?
12  A. Yeah. Well, basically what happens, we tried to
13 mandate -- well, we tried, it went under the old
14 constitution but we have implemented here, but we
15 just haven't started it because we just got our bylaws
16 together. We tried to mandate each chapter to put a
17 queen up to run for Miss Gold, Miss Maroon or -- I
18 forget the other one. There's three queens. First
19 place, second place, third place.
20  Some of the chapters opted to just pay a certain
21 amount of money, rather than raise the money because a
22 lot of the young ladies did not want to run for queen.
23 So those who ran -- I remember one year, you know, we
24 had the most money I think was raised one year by
25 Michelle Charter Scott who was a queen, former trustee,

Page 117

1 Vince Carter's mother. She raised probably 40, pushing
2 $50,000 a year she ran. So that was a big program for
3 us. But it fell under Mr. Delancy's leadership and
4 that's why I think that we have that here.
5  But what they would do is raise the money, the
6 individual chapters. And say if a chapter raised
7 $15,000, they would then present a check to the national
8 for $15,000 or whatever amount that they raised.
9 Whoever raised the largest amount, they would be, you
10 know, honored as first place queen, second place queen,
11 third place queen. And that's how we basically got our
12 money through that and our life memberships.
13  Q. Okay. So just limiting it to the queens program,
14 again, it's just -- it's just sort of a different
15 fundraising device or vehicle that people are still
16 making contributions. Generally, it's individuals
17 making contributions to --
18  A. Absolutely.
19  Q. --local at this point, right? Okay.
20  A. You're right.
21  Q. And those -- were you saying those contributions
22 generally go to the local chapter or do they go to the
23 national or they go to both in some cases?
24  A. No. They would go to the chapters but the
25 chapters would turn them over to the national alumni

30 (Pages 114 - 117)

Page 118

1 because the chapter wanted to win. They wanted their
2 queen to win. So they would give us checks made out to
3 the National Alumni Association and we would record it
4 for the respective chapter and whoever raised the larger
5 amount of money, those three queens were identified and
6 recognized and honored as the queens and they got
7 certain benefits for doing it.
8    Q. Okay. So seeing this -- this Form 990 goes
9 through the end of June of 2020, are you saying that as
10 far as you recall, that in that -- in that year ending
11 in June of 2020, that queens -- well, Mr. Delancy didn't
12 do the queens program and that's maybe why that number's
13 so low?
14    A. Well, I don't know if I said that they didn't do
15 the queens program. That's not what I said. I said
16 that there was a large reduction in money being raised
17 because morale was low with the organization and that's
18 why I was basically drafted to run for president to try
19 to save the organization. And so that year, I think we
20 may have had one or two queens raise money but it was
21 significantly less than what we're accustomed to
22 receiving.
23    Q. Okay. Understood. And let me just -- just to
24 close the loop out on this, it sounded like -- we talked
25 about contributions were made based on voting for the

Page 119

1 queen to the chapter. The chapter turned that money
2 over to the national organization. They wanted queens
3 to win. And then I thought you mentioned there was some
4 other component of -- oh, the lifetime -- let's say the
5 lifetime membership, would that fall under this program
6 service revenue, do you know?
7    A. I don't -- I'm speculating to tell you that. I
8 don't know if they put that under the top line or that
9 line. But we -- there was one year, and I believe it
10 was around 2015 when I was on the board, the alumni
11 association basically did a campaign to get new life
12 members. And they were getting board -- board of
13 directors members who didn't even graduate from Bethune
14 to -- to become life members. But we have not made
15 money like that except that was maybe one year when we
16 got so much money from our life members. We don't make
17 any money now. We're really not making any money now
18 for the organization because of this situation.
19     But our money came from three sources. I'll give
20 them to you again. Our membership dues, our life member
21 dues and the queens.
22    Q. Okay. When was the last time that you had the
23 queens program?
24    A. The last time that we actually had fundraising
25 was under Mr. Delancy.

Page 120

1    Q. Okay. Let's move ahead to the line item number
2 11, which is below that. And that says: Other revenue.
3 Right there, number 11 under revenue, it says: Other
4 revenue. And there's a number there for the prior year
5 of over $76,000. And then the current year is zero.
6     Do you know what that other revenue represents?
7     MS. FANIEL: Object to form.
8     THE WITNESS: No, I don't. I do recall it
9 being said that they -- what did they call it -- they
10 had a Giving Tuesday and there was another big giving
11 day where then the MMBNAA under Mr. Delancy -- I think
12 it was his first year, they were able to raise some
13 money. That's before, you know, things started to
14 happen under his leadership. But I don't know where
15 that comes from. But I do know that there was -- it
16 was a Giving Tuesday and it's one other big day where
17 they give. And I think that they did pretty good
18 there. I don't know if the queens included in that or
19 not. I'm not sure.
20 BY MR. HERBERT:
21    Q. Okay. Let me ask you, since this IRS Form 990
22 covers the period ending in June of 2020, then that --
23 the money that's referenced here that we've been talking
24 about, the contributions and grants, that's money that
25 should be -- should have -- that number should have come

Page 121

1 from the Wells Fargo bank account that we were talking
2 about earlier, right?
3     MS. FANIEL: Object to form.
4     THE WITNESS: I would think so.
5     MR. HERBERT: Okay. All righty. Why don't
6 we -- we already marked that as Exhibit 8; is that
7 correct, Paula, or Madam Court Reporter?
8     MS. CASTRO: Yes.
9     MR. HERBERT: Okay. Let's go ahead and go to
10 the next tab. All right. We'll mark this as number 9
11 for identification. And for the record, I will say
12 this document, the title of it is -- the first page is
13 the return status letter. Appears to be addressed to
14 MTG Starks, LLC. It bears Bates numbers DEF0006 and
15 goes through to the end of DEF000035.
16     (Plaintiff's Exhibit No. 9 was marked for
17 identification.)
18 BY MR. HERBERT:
19    Q. So if you could go to the second page of this
20 document. There, at the top it appears this is a 2021
21 IRS Form 990.
22     Do you see that, Mr. McCray?
23    A. I do.
24    Q. Okay. And this one, the name of the entity that
25 it's filed under is identified there in words as

Page 122

1 Dr. Mary McLeod Bethune National Alumni Association.
2      Do you see that?
3  A. I do.
4  Q. Okay.  And the EIN the same, ending in the 490
5 EIN.  So this 2021 Form 990, Exhibit 9, this is -- it's
6 a 990 that was formed -- that was filed during the term
7 encompassing you being the president of the national
8 organization, correct?
9  A. If it's 2021, yes.  I became president in 2020.
10  Q. Okay.
11  A. The first term.
12  Q. And the name, this reflects the name being
13 changed to the Dr. Mary McLeod Bethune National Alumni
14 Association, correct?
15  A. It does.
16  Q. Okay.  And did you review this document before it
17 was submitted to the IRS?
18  A. Can you lift it up?
19      MR. HERBERT:  Yeah, scroll down.
20      THE WITNESS:  I mean I may have.  La-Vaughn
21 gives me a lot of documents to look at.  I may have.
22 I don't want to say that I didn't.  I don't want to
23 say that I did.  But I know that she says she was
24 filing it.
25      MR. HERBERT:  Okay.  Let me just back up and go

Page 123

1 to the prior page, if you could, Paula.
2 BY MR. HERBERT:
3  Q. Do you see this is addressed -- appears to be --
4 actually, it appears to be sent by R. Mitchell.  And if
5 you go down to the bottom of the page it appears to be
6 this cover letter is signed by R. Mitchell.
7      Do you know who R. Mitchell is?
8  A. I don't know.
9  Q. Okay.  Appears to be somebody at MTG Starks, LLC,
10 according to the address at the top.  Is that your
11 understanding that somebody who works at MTG Starks,
12 LLC?
13      MS. FANIEL:  Object to form.
14      THE WITNESS:  I don't know, sir.  I don't know
15 who R. Mitchell is and I don't remember seeing this
16 name before.
17 BY MR. HERBERT:
18  Q. Understood.  All right.  Now, if you go to the
19 next page, it seems to indicate that this document was
20 dated -- go down to the bottom -- the date of the
21 signature is November 8th of 2022.  Do you see that?
22  A. Yes.
23  Q. Okay.  So it's your understanding that this
24 document was submitted to the IRS on or about that date
25 on November 2022?

Page 124

1  A. All I know is La-Vaughn indicated that the
2 necessary and appropriate documents were being sent or
3 had been sent.  Whether or not I saw this, I really
4 don't remember.  I may have.
5  Q. Okay.  So let me ask you, going back up to the
6 top of this, we see that this is dated, you know, this
7 is the 2021 Form 990 covering the period of
8 July 1st, '21 and going through June 30th of 2022.  And
9 the prior document we looked at was the 2019 Form 990.
10 We have not been able to locate and your counsel has not
11 produced the 990 -- well, that would be labeled the 2020
12 990, which would cover the period of July 2020 until
13 June -- the end of June of 2021.  *
14      Are you -- are you aware if a 2020 IRS Form 990
15 has ever been prepared for your organization?
16  A. My understanding is that we're current, and
17 you're asking about 2020?
18  Q. Right.  In other words, the Form 990 that would
19 cover the period immediately preceding this one.
20  A. My understanding is that everything has been
21 filed that's due.
22  Q. Okay.  So then your understanding is that the
23 organization, the National Alumni Association did, in
24 fact, file an IRS Form 990 that covers the period of
25 July 2020 until June of '21?

Page 125

1  A. Yeah.  My understanding is, if it's due, it's
2 been done.  That's what has been represented to me and,
3 also, the board, that we're current.  And I do think
4 that La-Vaughn, based upon the fact that I'm telling you
5 that I, you know, don't have firsthand knowledge, she
6 certainly is the proper party for you to ask that, if
7 you want to.
8  Q. Okay.  So I'll represent to you that, you know,
9 your -- the defendants in this case never produced to us
10 the 2020 IRS Form 990.  So are you saying as you sit
11 here today you know for sure that that document was
12 filed with the IRS, or you don't know?
13      MS. FANIEL:  Object to form.
14      THE WITNESS:  As I said before, my
15 understanding is -- do I have firsthand or personal
16 knowledge of it?  I don't.  But my understanding is
17 that those -- anything -- any 990s that are due have
18 been filed.  That's my understanding.
19 BY MR. HERBERT:
20  Q. Okay.  So then I -- we will -- if that is in the
21 defendant's possession, we will reiterate our request
22 for it.  I believe it has specifically been requested.
23 I will tell you it's not been produced and we were not
24 able to locate that publicly.
25      So you don't have any personal knowledge about

32 (Pages 122 - 125)

1 whether or not the 2020 Form 990 was prepared for your
2 organization; is that correct?
3   A. I don't have any --
4      MS. FANIEL: Object to form.
5      THE WITNESS: -- personal knowledge.
6 BY MR. HERBERT:
7   Q. Okay.
8   A. No personal knowledge, no.
9   Q. Okay. And the same thing would be as to whether
10 or not it was not just prepared but actually submitted
11 and filed with the IRS, you don't have personal
12 knowledge of that, right?
13   A. That's correct.
14   Q. Okay. So let's look at this, the -- I think we
15 already asked you, you can see that the EIN
16 number in the upper right-hand corner is the same, the
17 490 EIN number?
18   A. Oh, yes, yes, um-hmm.
19   Q. Okay. And so just big picture, we're now --
20 we're now in August of 2023. So I imagine that -- well,
21 let me not imagine.
22      Let me ask you, are you aware if your
23 organization is in the process of preparing its -- what
24 would be called the 2022 Form 990, which would cover the
25 period of July '22 until the end of June of this year,

1 do you know that's in the works?
2   A. Well, I can't tell you ipso facto, yes or no, but
3 I can tell you that La-Vaughn has told me that she's up
4 on what she's supposed to be and that's something that
5 she should be up on.
6   Q. Understood. So you're relying on Ms. Starks to
7 make sure that all the 990 forms are filed properly and
8 timely, correct?
9   A. Yes.
10   Q. Okay. Let me ask, other than Ms. Starks, is
11 there anybody else with the defendant's organization
12 that is involved in the preparation of the 990 --
13   A. No. No, sir.
14   Q. Okay. All right. You know, as you recall, the
15 more recently formed corporate entity which is named
16 Mary McLeod Bethune National Alumni Association, Inc.,
17 that's the one that was formed last June, that has a
18 different EIN number and again, 364. Do you remember
19 that?
20   A. Yeah. I think you showed that to me, right.
21   Q. Right. And so do you have any knowledge as to
22 whether or not the next Form 990 that is due to be filed
23 will be filed under that EIN number or under this 490
24 number?
25   A. I don't. No, I don't.

1   Q. Okay. Ms. Starks should know that, I assume,
2 correct?
3   A. Yeah.
4   Q. Okay. You didn't have any discussions with her
5 about -- about that issue of if it's a new entity, it's
6 got a new EIN number, use the Form 990 or anything like
7 that?
8   A. No, I didn't.
9   Q. Okay. Alrighty. Let's go down and ask again
10 about the revenue numbers here in section 8.
11      THE VIDEOGRAPHER: Mr. Herbert, we're
12 approaching 90 minutes again.
13      MR. HERBERT: Alrighty. Why don't we -- why
14 don't we just go ahead and stop. How many minutes do
15 we have left?
16      THE VIDEOGRAPHER: You've got five minutes.
17 You're fine.
18      MR. HERBERT: Five minutes? Okay. I'll try to
19 make this quick, Mr. McCray, to save us time here.
20 BY MR. HERBERT:
21   Q. That line number, line item number 8,
22 contributions and grants would be the same thing that
23 you told me about the prior 990 that we looked at, your
24 understanding is that's the same sources of -- of funds
25 there?

1   A. Yes.
2   Q. Okay. So primarily donations from individuals,
3 right?
4   A. Right.
5   Q. Okay. And then how about the program service
6 revenue, do you happen to know what that --
7   A. I'm not sure what that is.
8   Q. Okay. And looking at this number 8, prior year
9 and current year, the prior year is over $110,000 and
10 then the current year is just a little over $59,000. Do
11 you know -- you know, do you happen to know offhand what
12 would generally account for that -- that dropoff of
13 almost half of the contribution and grants numbers?
14   A. And again, this is '21?
15      MR. HERBERT: Go up to the top again, there,
16 Paula, if you can.
17 BY MR. HERBERT:
18   Q. Yeah. '21, so it covers the period ending in
19 June of '22.
20   A. Well, I mean, the only thing I can think of is
21 the pandemic and then we -- also, our queens program has
22 not been very operational the last few years. We're
23 working arduously to try to get it back functioning.
24   Q. Okay. Real quick, number 9, the program service
25 revenue, so this represents the current year number, the

Page 130

1 9,475, are you saying as far as you know, there was no
2 queens program for this fiscal year that's represented
3 on this 990?
4    A. Yeah. I don't think we had a queens program.
5 But again, please understand that I'm not even sure if
6 this represents monies from the queens or the other
7 ones. I'm kind of speculating, trying to make an
8 educated guess.
9    Q. Understood. Understood. Ms. Starks would be the
10 go-to person to ask those questions, right?
11    A. That's correct.
12    Q. Okay.
13       MR. HERBERT: Why don't we take a lunch break,
14 then. It's 12:48. And we will come back after -- I
15 will -- I will need at least 45 minutes for lunch
16 myself. I don't know if anybody else has any other
17 needs beyond that.
18       Court reporter, videographer, Ms. Faniel.
19       THE VIDEOGRAPHER: That's fine, sir.
20       MR. HERBERT: 45 minutes, okay.
21       MS. FANIEL: That's fine. I just want to ask
22 about how much time, you know, do you think that you
23 need to question Mr. McCray today.
24       MR. HERBERT: Why don't we go off the record
25 and we'll talk about that briefly, okay?

Page 131

1       THE VIDEOGRAPHER: We're going off the record.
2 The time is 12:49 p.m.
3       (Luncheon recess was taken.)
4       THE VIDEOGRAPHER: We're going back on the
5 record. The time is 1:36 p.m.
6 BY MR. HERBERT:
7    Q. Okay. Welcome back, Mr. McCray. I want to
8 follow up briefly on a couple points we touched on
9 before the break. One of them is, you had mentioned
10 that the organization made a contribution to the
11 statuary fund, and I assume you're referring to the fund
12 connected with the unveiling of Dr. Bethune's statue in
13 the United States Capitol. Is that right?
14    A. Right.
15    Q. Okay. Which entity did those contributions come
16 from?
17    A. I'm not really sure off the top of my head, but I
18 can tell you that Dr. Chrite was here, and that would
19 have been before this situation started. And I remember
20 one night, we were doing a -- what do you call it -- a
21 virtual sit-down with the sculptress of the -- for it.
22 And we had probably 6-, 700 people on there. And we, at
23 that time, did a fundraiser where, on that call, within
24 15 minutes, I believe we raised about $40,000. And some
25 of them consisted of pledges but everybody pretty much

Page 132

1 came through with that.
2       And some of the monies that were raised were sent
3 directly to the statuary fund. And they have announced
4 that the total amount that they received from the
5 association and members of the association totaled I
6 believe it was 116,000 and some dollars over -- since
7 they started it. That one night I think we raised about
8 30- or 40,000 dollars. But, you know, they -- we've
9 been recognized for raising that money, the association.
10 And I think some of the monies were raised before I came
11 on. But it was going towards that statuary fund.
12    Q. Okay. It sounds like from what you said, some of
13 the donations out of that roughly 116,000, some of those
14 were by your members made directly to that -- to that
15 fund, not --
16    A. That's correct. That's correct.
17    Q. Okay. Do you know what the breakdown is between
18 how much came from the organization and how much went
19 directly from its members?
20    A. No. Because I know my wife and I, for an
21 example, I think we gave 2,000 or 1,500 or something,
22 but we sent checks directly to the statuary fund. But
23 it was -- you know, we made it known that it was coming
24 from members of the MMBNAA.
25    Q. Okay. Do you know, for the funds that went

Page 133

1 directly from your organization, just to clarify for the
2 record, as you sit here today, you -- you can't say if
3 those funds came from the Wells Fargo bank account or
4 from the Truist Bank account?
5    A. No. If -- and I'm not really sure how much money
6 that we actually gave in the name of a check from the
7 association. But we were appealing to individuals to
8 give money directly to the statuary fund.
9    Q. Okay.
10    A. They were letting us -- go ahead. I'm sorry.
11    Q. I didn't mean to interrupt you.
12       I was going to say, would Ms. Starks be the best
13 person to answer that question?
14    A. Well, anything financial, Ms. Starks is going to
15 be the best person to answer the question, especially
16 when you're talking about documents.
17    Q. Okay. Let me ask you, for the funds that went
18 from your organization, do you know -- I understand
19 you -- you mentioned a fundraiser connection with the
20 statuary fund. When was that fundraiser roughly?
21    A. It was a spontaneous fundraiser, I believe we had
22 that on a September night with Nilda Comas. I was the
23 one that came up with the idea about highlighting her
24 and let's have a big evening. So it was called A
25 Sit-Down With Nilda Comas, the sculptress. It was -- I

34 (Pages 130 - 133)

Page 134

1 believe it was -- I believe it was like September 7th or
2 8th in 2000 -- I don't know if it was 2020 or '21. But
3 that particular night, she and the president of the
4 statuary fund were both -- they were our guests and they
5 were saying that they still needed money. And so we
6 made an appeal. I made an appeal. My -- the
7 chairperson of the fundraising committee who's now with
8 the university -- what's her name, I'll get it in a
9 minute. She was on and she really made a strong appeal,
10 and Nancy Lohman. So we were able to get people to give
11 and I believe we raised somewhere between 35 and $40,000
12 in maybe 15 or 20 minutes.
13    Q. Okay. Other than that fundraiser that you just
14 talked about, did your organization have any other
15 separate fundraising campaigns specifically designating
16 the statuary fund as --
17    A. No. No.
18    Q. So do you know if some of the funds that
19 were contributed by individuals generally through your
20 website were used as part of that contribution for the
21 statuary fund?
22    A. I don't think any -- and La-Vaughn can better
23 tell you, but I don't think that we actually -- as I
24 think about it, I don't know if we raised any money
25 through the association for the statue. I just think

Page 135

1 that we worked in collaboration with the statuary fund
2 asking people, urging people to give, and individuals
3 were giving money directly, because as I told you, I
4 remember my wife and I gave a sum of money so that our
5 names would be placed on the -- on the outside of the
6 statue. And we did. I did not give money through the
7 National Alumni Association. I gave money directly to
8 the statuary project.
9       But because of our efforts in really kind of
10 spurring people on to contribute to this historic event,
11 the alumni, we called upon them and they responded. And
12 so we're given credit for raising this money, and this
13 is the amount that we were told. But I don't think that
14 we gave any monies from the account, our accounts.
15    Q. Okay. So that's what I'm trying to get at.
16 Because it sounded like at first, the contribution
17 sounded as if it was coming from the organization but
18 now it sounds like you're saying, to your knowledge, the
19 contributions came from members of your organization,
20 not from the organization itself?
21    A. Well, it certainly wasn't my intent to give the
22 impression that we raised money under my leadership
23 to -- for this in terms of money coming into our account
24 and us writing a check to them. No, we were encouraging
25 individuals to give money directly to the statuary fund,

Page 136

1 and even on that event when we raised 35 to $40,000, the
2 president or the chairman of that board was there and I
3 think they told them where to send the money, how to get
4 it. And that's basically what happened.
5    Q. Okay. Okay. So then the organization itself did
6 not make any contributions to that statuary fund as far
7 as you know?
8    A. I don't -- well, again, Mr. Herbert, understand
9 what I'm saying. I've been the president since 2020.
10 The statuary fund started before I became president.
11 And the association may have given money under either
12 Robert Delancy or Jennifer's administration. But under
13 my administration, I don't recall us giving money
14 directly to that initiative under -- from our bank
15 accounts.
16    Q. Okay. And the -- the event, the -- the unveiling
17 of the statue was in July of last year, just about a
18 year ago.
19    A. That's correct. That's correct. And I can tell
20 you that under my leadership, we did not raise $116,000
21 for that initiative. That was done over probably two
22 administrations or maybe three.
23    Q. Okay. But that fundraising event you mentioned
24 with the sculptress, that was -- that was while you were
25 president, correct?

Page 137

1    A. That is correct.
2    Q. Okay. Let me ask you, do you recall the
3 organization had a -- had a watch party in connection
4 with the unveiling?
5    A. Yeah. We -- in fact, I was there at the
6 unveiling. But the chapters wanted to do something
7 special. So our chapters, various chapters, we had a
8 watch party. And I don't think any monies were raised
9 at the watch parties. It was just something in honor of
10 what was going on in Washington, D.C. with our founder.
11    Q. Okay.
12    A. So, yes, we did. I don't think it was a
13 fundraising event, though.
14    Q. Okay. You're aware that the university BCU
15 itself also was promoting its own watch party on the
16 same date for the same event?
17    A. Well, one thing I can tell you, Mr. Herbert --
18 I'll start off by answering yes. But they have a
19 history over these last couple of years when we come up
20 with an idea, they usually try to mimic it. And there
21 have -- there is documented proof that we have sent out
22 stuff, we've established dates and the next thing you
23 know, they'll do something to conflict with things that
24 we have established a setup.
25    Q. Okay. Well, that's interesting because I think

35 (Pages 134 - 137)

Page 138

1 the university's position is that you are setting your
2 dates to mirror their dates. But you're saying it's the
3 other way around.
4   A. I'm not surprised that that's their position.
5 But --
6     MS. FANIEL: Object to form.
7     THE WITNESS: I'm not surprised that that's
8   their position.
9 BY MR. HERBERT:
10   Q. Okay. Let me ask you, do you have any -- are you
11 aware of any documents or e-mails regarding that, that
12 position that you just stated about the mirroring of the
13 events, we'll call it?
14   A. Well, I can tell you we had a town hall one
15 night. Our stuff was out. And the next thing you know,
16 a few days later, we had a town hall that was set. We
17 had an event last year, a scholarship ball -- not a
18 ball, I'm sorry -- it was a scholarship boat party,
19 cruise or what have you in Ft. Lauderdale. The
20 university then set something up at the exact time that
21 we were doing that.
22     And what was so interesting, the university put
23 out a photograph of people who were at that event and in
24 that photograph, they had, I think three people who were
25 actually on the boat with us, and it made it seem like

Page 139

1 this was a -- they had a really big turnout. And I
2 understand they had six people there. And I know who
3 those people are who were on the boat with us, who had
4 purchased tickets and they were there. They were not at
5 the event as the university tried to make it seem.
6   Q. Well, let me ask you this: Will you agree with
7 me that somebody seeing promotions for the university's
8 events that also see the promotion for your event that
9 has, you know, the same title and the same date,
10 somebody might not know which event is the official one
11 sponsored by the university?
12   A. I can speculate on that. But my answer would be
13 no. People know the difference between our association.
14 We use a disclaimer when we have events. And if someone
15 claims that they were confused by something, then,
16 number one, they've been under a rock. Number two, I
17 think that they're disingenuous. Everybody affiliated
18 with Bethune-Cookman knows that our association is no
19 longer affiliated with Bethune-Cookman.
20     When I speak publicly, I say that. On the boat
21 cruise, in our boat, that we had a yacht, a big yacht
22 which was full, I spoke and the people who were our
23 bigger donors recognized that we are separate
24 organizations. In fact, one of the guys who had
25 committed to giving a 20 or $25,000 donation in

Page 140

1 perpetuity, even after his death, he rescinded it
2 because he wrote the school a letter and they wouldn't
3 even give him the courtesy of a return and he said he's
4 going to give to us. He was on the boat and he spoke
5 about that. And I spoke about the fact that we don't
6 raise money for the university; we raise money for
7 students who aspire to go to Dr. Bethune's school or
8 students who are at Bethune-Cookman.
9     So we really go through great lengths to try to
10 let individuals know that we're no longer affiliated
11 with Bethune-Cookman University officially.
12   Q. A lot of the donors to your organization are not
13 large-dollar donors, though, right? A lot of them are
14 people who send in $50 a year or something, right, or
15 less?
16   A. That's correct. And as I indicated to you,
17 historically, most of our monies have been raised from
18 the queens project, from our -- from our membership dues
19 and also, from life members.
20     But the one large initiative that we had, we had
21 four matching donors of $25,000 each to match the first
22 hundred or 150,000, I forget exactly the number. But
23 when I called on people to give 5,000, 10,000, you know,
24 Bethune isn't University of Florida or South Florida, we
25 don't have affluent -- that many affluent alumni. But

Page 141

1 when I call on them to give 5,000 or 4,000 or 3,000 or
2 whatever the case may be, oftentimes they respond if
3 they can do it. And those who don't give that amount,
4 they give what they can.
5   Q. Understood. Let me ask you, in terms of
6 donations that might have been made to the statuary
7 fund, either by members or by the organization -- well,
8 scratch that.
9     Let me ask you this: What processes does the --
10 does your organization have in place to ensure that
11 donations that are designated for a particular purpose
12 such as scholarships actually go to that purpose and not
13 to other expenses?
14   A. Well, as I indicated to you, we have an account
15 that's set up for scholarships only. And when
16 individuals give us money that is earmarked for a
17 particular purpose, that's what we use it for. We don't
18 use --
19   Q. You went on mute, Mr. McCray. I think you
20 accidentally hit mute there.
21   A. Yeah. I forget where -- what you last heard.
22     But when individuals give us monies that are
23 earmarked for, let's say, scholarships, that's what the
24 money is used for. If an individual gives us a general
25 donation, you know, we use it to benefit the

36 (Pages 138 - 141)

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 142

1 organization. But when individuals give us scholarship
2 monies and that's what we specifically hold ourselves
3 out for requesting, that money is used for the use and
4 benefit of our scholarship program.
5    Q. Let me ask, my question was, what -- what
6 controls did the organization have in place? Are you
7 aware of any?
8    A. We ask individuals to put in the memo section,
9 scholarship, the money is given to our treasurer who
10 appropriately places it in the account, proper account.
11    Q. Okay. How about that, the home page of your
12 website which had different means for contributing
13 online or through your phone, where do those
14 contributions go? Which account?
15    A. I really think that you probably -- I'm not the
16 best person to answer that. But I can tell you that
17 we've made it clear and it's understood that if any
18 donations are given for the use and benefit of
19 scholarships, that money goes into the scholarship
20 account.
21    Q. Okay.
22    A. If an individual just gives a general donation to
23 the association, then that would go into our general
24 account.
25    Q. Okay. And are you -- is there a written policy

Page 143

1 on that, that you're aware of?
2    A. No. There's no written policy, no. It's
3 understood.
4    Q. Okay. Has that been a subject that's come up at
5 any meetings with your board in terms of controlling the
6 designation of contributions, where they come from,
7 where they're supposed to be designated to go?
8    A. Yes. Our treasurer handles that. And she has
9 discussed that in not only the executive committee
10 meetings, but also in -- in some of our board meetings.
11    Q. All right. So there should be some documentation
12 regarding that, of the minutes or agenda of those
13 meetings?
14    A. Yeah, it should be. We take minutes of our
15 meetings.
16    Q. Understood. Well, then, for the record, again
17 I'll call for the production of those documents, which I
18 believe were encompassed by our prior request. I'll
19 take that up with your counsel later.
20      Let me ask you, do you know, the splash page of
21 your organization's website that we looked at, the home
22 page which has the QR codes on it, do you know if
23 somebody donates to one of those QR codes, which account
24 that money goes into?
25    A. I see the QR codes but I don't really know how

Page 144

1 they're functioned. I believe that La-Vaughn Starks is
2 the better person to answer that or Mr. Anthony
3 Barfield.
4    Q. Okay.
5    A. But then La-Vaughn can answer because they work
6 hand in hand on the financial stuff.
7    Q. Understood.
8      MR. HERBERT: Paula, could you just pull up
9    that -- that home page again, that splash page on your
10   screen, share screen with that.
11 BY MR. HERBERT:
12    Q. Okay. And so maybe -- so just looking at this,
13 if this is a -- this is a home page of the
14 organization -- your organization, right? That's the
15 URL for your organization at the top, right?
16    A. You mean where it says Dr. Mary McLeod Bethune
17 NAA and the rest is faded out?
18    Q. Yeah. Well, no. Just up at the -- the URL at
19 the very top. It says www.mmbnaa.org.
20    A. Oh, I do see that. Yeah, I do see that, right.
21    Q. Okay.
22    A. Yes.
23    Q. That's your organization's URL or website
24 address, right?
25    A. Right. Right.

Page 145

1    Q. And so this is the home page of your
2 organization, right?
3    A. Yeah. I assume -- yeah. That's our URL. I've
4 seen that many times before.
5    Q. Okay. And there you see there's that one QR code
6 up at the -- in the maroon section there under the Join
7 Us, do you know if somebody were to download that QR
8 code on their phone, where that would take the user?
9    A. No, I don't know. I mean, I would assume that it
10 would take you to membership.
11    Q. Okay.
12    A. When we say join us, that means become a member.
13    Q. Okay. And I assume Mr. Barfield might know more
14 about that?
15    A. Yeah. He's the one that I believe is responsible
16 for setting this up.
17    Q. Okay. And if somebody downloads that barcode and
18 they join and they pay, when they join you as a member,
19 that does require making a payment, I would assume; is
20 that right?
21    A. Yeah. Our national dues, as I said before, is
22 $50. If they're joining a chapter, it's going to likely
23 be an additional 50 or 35.
24    Q. Okay. And I guess what I'm asking is, with
25 respect to -- this QR code, if you join, you can't

37 (Pages 142 - 145)

1 really join until you pay a membership fee or dues or
2 whatever your -- whatever you call that payment, right?
3   A.  Well, I answer your question two ways.  In order
4 to join, you have to first pay a membership.  You have
5 to pay membership dues.  Whether or not this QR is for
6 that purpose, I'm assuming that it is because it's
7 underneath the words Join Us.
8   Q.  Okay.  Fair enough.  And you don't personally
9 know where somebody pays the membership dues, do you
10 know which bank account those membership dues go into?
11   A.  I'm sure that they go in the Truist Bank account.
12   Q.  Okay.  But you mentioned there are at least two
13 Truist Bank accounts, right?
14   A.  I believe that there are two, yeah.  One for the
15 scholarship and one for the general, which includes
16 membership.
17   Q.  Okay.
18     MR. HERBERT:  So will you scroll down a little
19   bit, Paula, on this page.
20 BY MR. HERBERT:
21   Q.  There's two more QR codes there, we talked about
22 earlier.  And then there's a button, and it looks like
23 it's a button or a link.  And I'm assuming you -- again,
24 you can't tell me -- the one on the right appears to be
25 a PayPal QR code.  Do you see that?  The PayPal logo is

1 in there.
2   A.  Yeah, I mean, I'm not familiar with PayPal, I
3 don't have an account, even with my law office, I don't
4 think.
5   Q.  Okay.  And so I would assume you don't know if
6 somebody uses that QR code to make a donation, you can't
7 tell me for sure where that goes either; is that fair
8 enough?
9     MS. FANIEL:  Object to form.
10     THE WITNESS:  No.  I can't.  I can only assume.
11   I don't want to do that.
12 BY MR. HERBERT:
13   Q.  Okay.  And then for the QR code that is on the
14 left -- and I can't read that, what that says underneath
15 there.  But it's got a green dollar sign on it that I
16 don't recognize.  But --
17     MR. HERBERT:  Paula, can you scroll down?
18     THE WITNESS:  It says dollar sign, MMBNAA, it
19   looks like.
20 BY MR. HERBERT:
21   Q.  Oh, okay.  And do you know where -- if somebody
22 uses that QR code to make a payment, do you know where
23 that money goes?
24     MS. FANIEL:  Object to form.
25     THE WITNESS:  No, I don't.

1 BY MR. HERBERT:
2   Q.  Okay.  All right.  And how about that, where that
3 arrow is, that looks like it's -- looks like it's an
4 arrow clicking to button, maybe it's button, maybe it's
5 just a link.  Do you know if somebody uses that to make
6 a payment, you don't know where that money would go
7 either, which account, I mean, in particular?
8     MS. FANIEL:  Object to form.
9     THE WITNESS:  My response is the same as it's
10   been for the other -- for the QR codes.  I can't tell
11   you with any degree of certainty.
12 BY MR. HERBERT:
13   Q.  Okay.  Great.  All right.
14     I understand the QR code on the left is a cash
15   app QR code and I would assume that doesn't help
16   illuminate the matter for you.  Fair enough?
17   A.  That's correct.
18   Q.  All right.  Let's --
19     MR. HERBERT:  You can stop sharing your screen,
20   Paula.
21 BY MR. HERBERT:
22   Q.  You mentioned that cruise.
23     MR. HERBERT:  Paula, or maybe it's Michelle, if
24   you could pull up the exhibit regarding the cruise and
25   share your screen.

1 BY MR. HERBERT:
2   Q.  While they're doing that, let me just ask you one
3 other quick question, and that is, am I correct that if
4 somebody just makes a general donation to the
5 organization, to MMBNAA, and they don't indicate
6 specifically that it's for a scholarship, do you know
7 which account that money goes to?
8   A.  I can only give you my humble opinion.  And if
9 someone gave us an amount of money, especially a small
10 amount and it's not earmarked for scholarship, we -- I
11 believe that we have the right to include that in our
12 general account, if it's not earmarked.
13   Q.  Okay.  Let me ask you, other than scholarships,
14 did your organization get donations that are earmarked
15 for other specific purposes?
16   A.  No.  Not that I'm aware of.
17   Q.  Okay.  Alrighty.  So this document that's up on
18 the screen for -- let me just identify it for the record
19 purposes.
20     MR. HERBERT:  If you can scroll up a little
21   bit, Michelle.
22     This is BCU -- the Bates numbers on this
23   document are BCU002042 and I think the next one is
24   going to be 43, and that's the end.  Let's go ahead
25   and mark this as the next exhibit, we're up to number

1 9; is that right, or 10?

2    THE COURT REPORTER: 10.

3    (Plaintiff's Exhibit No. 10 was marked for

4 identification.)

5    MR. HERBERT: All right. Maybe you can scroll

6 up to the first page of this Exhibit 10. Okay.

7 BY MR. HERBERT:

8   Q. So this document -- let me ask you, you can take

9 a look at and tell me if you recognize this document,

10 Mr. McCray. And if you need somebody to zoom in a

11 little bit more, that's fine. Just ask them.

12   A. Well, I glimpsed at it when you had it up. But I

13 do recognize, I think I sent this out as a direct

14 response about success from our cruise that we had that

15 Labor Day weekend, I believe it was.

16    MR. HERBERT: Okay. So you can scroll down a

17 little bit.

18 BY MR. HERBERT:

19   Q. So if you want to take a minute just to read

20 through this. I mean, you wrote this letter --

21   A. I'm familiar with it. I wrote it.

22   Q. Okay. Great. Great.

23    All right. And here in the third paragraph, it

24 mentions Mr. Ray Robinson and his contributions. That's

25 the gentleman I'm assuming you're talking about who made

1 a large contribution at the cruise?

2   A. First of all, you're not on the third paragraph.

3 That's not on the screen.

4   Q. I'll scroll down a little bit, then. It's on my

5 screen. I guess it didn't show up on yours, but...

6   A. Third, one, two, three.

7   Q. Okay. And this -- in the prior paragraph, it

8 indicates that -- and this relates in part to your

9 cruise that you had last Labor Day, right, a fundraising

10 cruise?

11   A. Yeah, it was that weekend.

12   Q. Okay. And this indicates that in the second

13 paragraph, you were blessed to raise over $60,000 in

14 your initial fundraising event, right?

15   A. Yeah. Can you move that over some? Because

16 this, for some reason -- move it to my right. You know,

17 maybe because I have my -- hold on.

18    MS. CASTRO: Mr. McCray, I believe that's with

19 your settings.

20    THE WITNESS: Yeah, it is, it is, it is. Okay.

21 But just pull it down so I can at least -- yeah.

22 Yeah. Uh-huh.

23 BY MR. HERBERT:

24   Q. Okay. So the organization raised over $60,000 in

25 connection with its cruise last Labor Day?

1   A. Well, I mean that was gross. I think we actually

2 netted, when you take out some of the expenses, it was

3 like 40-something-thousand, I believe.

4   Q. Okay. How did that square with your earlier

5 statement that, you know, you're not making any money

6 anymore?

7    MS. FANIEL: Object to form.

8    THE WITNESS: That we're not making any money

9 anymore?

10 BY MR. HERBERT:

11   Q. Earlier, you testified that we don't -- we don't

12 make much money --

13   A. Yeah, we don't. I mean, that was the -- that's

14 been the only fundraiser that we've actually had for

15 scholarships for the national since I've been president,

16 if I recall correctly, because of the $40,000, I think I

17 put in 10,000, and that was help to secure a boat.

18 Larry Handfield, who's my classmate, law school

19 classmate, roommate and college classmate, I think he

20 gave 5. Joyce Moorehead gave, I believe, 10 or 15. And

21 so this was really the only -- only fundraiser that

22 we've had to -- for scholarships since I've -- since

23 I've been president.

24    I mean, some of the local chapters have done

25 stuff on a smaller scale, but this is it. We don't have

1 the Miss -- Miss Alumni anymore. So yeah, this is what

2 we've done. And I don't think we've raised any money

3 since then. Even though Ray -- you know, Ray gave us, I

4 think, 20- or 25,000 dollars in connection with this.

5   Q. All right.

6   A. Ray's a very good friend of Ms. Starks. And

7 that's how -- she's the one that introduced him to the

8 university. And he had initially agreed to give the

9 university the monies. But, you know, he changed his

10 mind and he stated publicly on the cruise why he was

11 doing it and why he was now supporting the organization.

12   Q. Understood. Let me ask you, do you know this

13 money that Mr. Robinson donated in connection with this

14 cruise, do you know which account that went into?

15   A. I believe that went -- I know that -- well, I'm

16 cautious about saying I know, but -- I didn't see it but

17 my understanding is it went into the scholarship

18 account.

19   Q. Okay. And how did that amount that was

20 contributed, do you know how much of that has been paid

21 out in any scholarships to any students or prospective

22 students?

23   A. No. As I told you, we finally finished setting

24 up because we had a committee of about 20 or 22

25 individuals, principals, assistant principals, other

1 educators, and we were really trying to finish
2 establishing the criteria so that there would certainly
3 be equity and consistency in us giving out the money.
4 So we -- I think -- as I told you before, I think we've
5 only given out one or two scholarships.
6     MR. HERBERT: Okay. Alrighty. You can stop
7 sharing the screen, Michelle, on that one.
8 BY MR. HERBERT:
9 Q. Let me -- changing topics briefly, let me ask
10 you, in the time that you were associated with the
11 university as a trustee, were you aware of its
12 arrangement with a licensing organization called -- used
13 to be called CLC, Collegiate License Incorporation, I
14 believe and now it's called Learfield?
15 A. Never heard of it before.
16 Q. Okay. All right.
17 A. And I wasn't aware of any type of licensing
18 arrangement that the school had. I'm not saying that
19 one didn't exist. But I do know that it was well known
20 that individuals were making shirts, outfits, and what
21 happened -- you know, what have you, on the streets and
22 Bethune-Cookman really didn't enforce that.
23     I am aware of, I think, one person who ran into a
24 problem with Bethune-Cookman in later years, Mr. Aaron,
25 whatever his name, out of Jacksonville. But, you know,

1 I'm not aware of any licensing arrangements. Lynn
2 Thompson was the athletic director back then, and, you
3 know, he talked about trying to get control over some of
4 that stuff but I don't know what happened.
5 Q. All right. Have you -- have you learned that
6 certain licensing documents with Learfield, CLC have
7 been produced in response to the organization's
8 discovery requests in this case?
9 A. No. I haven't.
10     MS. FANIEL: Object to form.
11 BY MR. HERBERT:
12 Q. And if I were to represent to you that university
13 does have licensing agreements with that organization,
14 you don't have any facts to dispute that, correct?
15 A. I don't have any facts to dispute it and I think
16 that that should be welcomed.
17     MR. HERBERT: All right. Changing the subject
18 then, let's go to -- Paula, you've got the -- let's
19 start with tab 37, if we could.
20 BY MR. HERBERT:
21 Q. Okay. For purposes of the record, this document
22 that is being shared on the screen is Bates numbered
23 BCU003168. This is a document that was produced in the
24 course of this litigation. You -- you see that this
25 appears to be a posting, if you look at the upper

1 left-hand side, from the Broward County chapter of the
2 Dr. Mary McLeod Bethune National Alumni Association.
3     Do you see that there?
4 A. Oh, you're over to the left, yeah, where it says
5 Bethune National -- Dr. -- yes.
6 Q. Okay. Broward County is a current chapter of the
7 national organization, correct?
8 A. Yes. It's not doing a lot of functioning, but
9 yes.
10 Q. Okay. And you see this appears to be a post that
11 was posted by somebody named Alex J. Knighton. Do you
12 see that?
13 A. Yes, I know who he is.
14 Q. Okay. Who is he?
15 A. He's a Bethune graduate. Actually, when my son
16 played football at Bethune, he was a team manager or
17 something. And I know his mom. I don't really know him
18 that well but he knows me and I know who he is. He's
19 not a member of our organization right now, I don't
20 believe. Word is that he joined the school's direct
21 service organization. But I do know who he is. He
22 lives in the same hometown where I live, Pompano Beach.
23 Q. Okay. And this post appears to have been made on
24 March 13th of 2022. Do you see that under his name
25 there?

1 A. Yes, sir, I do.
2 Q. Okay. And as far as you know, he was a member of
3 the Broward County chapter of the organization in March
4 of last year?
5 A. I don't know. I really don't know. I'm not
6 active in the Broward County chapter. As with all of
7 the chapters, if they invite me to a meeting to give any
8 updates on the lawsuit or just anything that's going on
9 with the association, I will make an appearance just to
10 do that and then I log off. So I don't know if he's a
11 member or if he did someone a favor by posting that. I
12 really don't know.
13 Q. Okay. Let's -- I think I forgot to mark this.
14 I'll mark it as Exhibit No. 11.
15     MR. HERBERT: We're up to 11 now, right?
16     MS. CASTRO: Yes.
17     (Plaintiff's Exhibit No. 11 was marked for
18 identification.)
19 BY MR. HERBERT:
20 Q. Okay. So the Broward County chapter of your
21 organization does still have a -- its Facebook page,
22 correct?
23 A. I've never gone on it but it seems as though they
24 do. And some of the other -- some of -- I don't know
25 most of them but many of the chapters do have Facebook

Page 158

1 pages so I wouldn't be surprised if they do.
2 Q. Okay. Who is it whose responsibility it is to
3 monitor who's posted on your chapter's Facebook pages,
4 if anybody?
5 A. Well, we try to educate the presidents of the
6 chapters -- excuse me. We educate the presidents of the
7 chapters. And I know the president of this chapter is a
8 lady by the name of Jackie Shorter. And Mr. Anthony
9 Barfield also speaks with persons about sharing stuff.
10 And, you know, if that was something that I had seen, I
11 certainly would have told him to take it down. But I
12 didn't -- I didn't see that.
13 Q. Okay. And the reason you would have told him to
14 take it down is because it displays the head, heart,
15 hand seal that is the registered trademark of BCU,
16 correct?
17 A. Well, I honestly didn't see that. So I'm saying
18 to that, that's not my reason for saying that. It's
19 because it has the name Bethune-Cookman. I believe I
20 thought I saw Bethune-Cookman University on there.
21 Q. Yeah, it's in the head, heart, hand seal. You
22 see that there, the --
23 A. Yeah. Yeah. Well, it's for the same reason, you
24 know, because it's Bethune and I certainly don't want
25 to -- they said that they don't want us raising money

Page 159

1 for them and, you know, that's what it is.
2 Q. All right. So that's something that should not
3 have been posted in March '22 which is seven months
4 after the lawsuit was filed, correct?
5 A. Yeah. I mean, I've basically given edicts to the
6 chapters and for the most part they're compliant. But
7 sometimes people slip. Sometimes -- there have been
8 times when I've called our attorney and asked what do
9 you think of this, and, you know, I'll get the response
10 that I get. There's some people, you know, a lot of
11 folk are not lawyers and, you know, they sometimes, you
12 know, they'll do this. And, you know, this is why I've
13 asked anytime you're posting something to at least run
14 it by me, Mr. Barfield or our fundraising chair who is
15 Sumner Hutcheson.
16 Q. All right. I'm assuming you don't recall anybody
17 running this by you because you wouldn't have approved?
18 A. I don't. I don't.
19 Q. And you don't recall -- you don't know of anybody
20 else in the organization who this was run by before it
21 was posted?
22 A. No, I don't. I would assume it was run by
23 their -- by the chapter president. I'm not sure.
24 Q. Okay. And you mentioned Ms. -- Mrs. Shorter,
25 correct, is the chapter president of Broward currently?

Page 160

1 A. That's correct.
2 Q. Okay. And is she related to Michael Shorter?
3 A. Yes, she's the spouse of Michael Shorter.
4 MR. HERBERT: Okay. All right. Let's pull up
5 the next one, tab 38. And, all right. For the
6 record, tab 38 is the document that's Bates numbered
7 BCU 3169 and we'll go ahead and mark this as the next
8 exhibit, which I believe is 12.
9 (Plaintiff's Exhibit No. 12 was marked for
10 identification.)
11 BY MR. HERBERT:
12 Q. So, Mr. McCray, you're aware there's a Coastal
13 Georgia chapter of your organization, correct?
14 A. Yes.
15 Q. Okay. You know the person who's the head of that
16 chapter currently?
17 A. Yeah. Her name is -- I can't pronounce -- I
18 think Ms. Dunston or something like that. But let me
19 just tell you, she raised a question fairly recently at
20 one of our meetings. Actually, she sent the question in
21 to our convention. She's not happy about what's going
22 on. And she believes that you can be -- you should be a
23 member of both organizations or you should have the
24 right to be a member of both organizations. And I don't
25 know if she did this out of ignorance or she did this

Page 161

1 out of defiance.
2 I can tell you my response when -- because
3 there's some folk who were saying that if you are a
4 member of the school's organization, the DSO, they don't
5 want those persons to be in our organization. And my
6 response has been that that has to be voted upon, you
7 know, democratically.
8 I did give an opinion that I don't -- I think
9 that we have individuals who can be faithful to our
10 organization as well as to the school's DSO. But I did
11 express some caution while this litigation is going on
12 that there are some people who have various aversive
13 attitudes, they want to see us fail, they like to set us
14 up, if you will. And I don't want those individuals to
15 creep into this organization to, you know, to cause our
16 demise.
17 So this young lady who I don't know personally
18 but she's been on a few of the meetings, she's not happy
19 with what's going on. And, you know, she believes that
20 you should be a member of both organizations. She likes
21 both organizations and perhaps this is why this was
22 done. But this is my first time seeing this.
23 Q. Okay. So this was not run by you for your
24 approval, then?
25 A. No.

41 (Pages 158 - 161)

Page 162

1  Q.  And as far as you know, it wasn't run by any of
2  the other members of your board?
3  A.  I can't tell you that.  I can't speak for anybody
4  else.
5  Q.  Okay.  But to your knowledge, you don't remember
6  anybody mentioning this to you or sharing this -- this
7  post with you?
8  A.  I haven't.  No.  This is my first time seeing or
9  hearing about this.
10  Q.  Okay.  And just in terms of the date, this
11  appears this was posted on April 24th of 2022.  Do you
12  see that, under the name Coastal Georgia alumni chapter
13  there at the top of the post?
14  A.  I do see it, right.
15  Q.  Okay.  And again, you wouldn't approve this
16  because it's using the university seal, also known as
17  the head, heart, hand logo and the name Bethune-Cookman
18  University in there, correct?
19  A.  Yes.  Correct.  Yes.
20  Q.  The name Bethune-Cookman University appears in
21  the seal and then it also appears there below, right
22  next to the seal, correct?
23  A.  I think the document speaks for itself.  The
24  answer is yes.
25  Q.  Okay.  And then right below that, it says:

Page 163

1  Donate.  And it's got your URL there, right, of your
2  organization, the mmbnaa.org above the word donate,
3  MMBNAA, right?
4  A.  I can't see that.
5  MR. HERBERT:  Scroll down a little bit there,
6  Paula.
7  THE WITNESS:  And it's probably because I
8  can't -- hold on.  Let me go to standard here.  Okay.
9  Now I can see it.  Okay.  I see it.  Wait.  The URL, I
10  don't see it but if it says -- if it says the
11  www.mmbnaa, that's our URL.
12  BY MR. HERBERT:
13  Q.  And the word donate appears right below that,
14  correct?
15  A.  Honestly, I haven't seen it and I'm still looking
16  for it.
17  Q.  Okay.  My paralegal just highlighted the URL.
18  It's at the bottom and it's kind of in the center of
19  the -- of the image.
20  A.  If it's there, then, you know, it --
21  Q.  It's little bigger there now.  You see that now?
22  A.  Yeah, make your tax deductible donation, right,
23  in a secure and convenient way.  Yes, I see this.
24  MR. HERBERT:  Okay.  All right.  Let's go to
25  the next one.  Let's see.  This is, for the record,

Page 164

1  I'll identify -- let's go ahead and mark this as
2  Exhibit 13.  And for the record, Exhibit 13 is a
3  document bearing BCU003170.  And this appears to be a
4  post from the Miami-Dade chapter of the Dr. Mary
5  McLeod Bethune National Alumni Association.
6  (Plaintiff's Exhibit No. 13 was marked for
7  identification.)
8  BY MR. HERBERT:
9  Q.  Do you see that indication in the upper left-hand
10  corner?
11  A.  Yes.
12  Q.  Okay.  And this appears to be a post from
13  somebody named Keecha Brown-Tate; do you see that?
14  A.  Yes.
15  Q.  Okay.  And the date below that is April 19th; do
16  you see that?
17  A.  I do.
18  Q.  All right.  I understand that this was posted
19  April 19th of this year.  Is that -- is that your
20  understanding?
21  A.  I've never seen this before.  But I can tell you
22  that there has been some discord in the Miami-Dade
23  chapter.  That's one of our older chapters.  That's the
24  chapter where Ms. Sharon Cooper is a prominent person in
25  that chapter.  And I think I mentioned to you that there

Page 165

1  is an individual that helped her get a job who is
2  probably the most prominent and influential person in
3  that chapter.  They're Robert Delancy supporters, and
4  they've done things notwithstanding a direct --
5  directive from me on behalf of the association, telling
6  them that we can't do certain things with the school.
7  And I'll give you an example.  Notwithstanding
8  the fact that we're not raising money for the school, we
9  had a couple people in that chapter send, I believe it
10  was $30,000 to the university.  The university contacted
11  them and said that they wouldn't -- they couldn't
12  receive the money.  It took them about four months, but
13  they sent the money back.
14  It was well known, well understood, that they
15  weren't supposed to do this.  But there's a guy, John
16  Williams, who is very unhappy about what's going on.
17  He's not a supporter of MMBNAA.  In fact, he's recently
18  left.  He was the one that was responsible for sending
19  that money off to the schools.
20  So there have been individuals within this
21  organization, either through an effort to just, you
22  know, defy what I have told them this organization must
23  do or can or cannot do and then I think that there's
24  some other organizations who have made honest, you know,
25  mistakes in doing stuff because they didn't remember or

42 (Pages 162 - 165)

Page 166

1  in their mind there was a gray area.
2      But yeah.  So I've never seen this before.  But I
3  am aware of examples where people have
4  notwithstanding -- there's been a few, not a whole lot,
5  but there's been a few where folk have still wanted to
6  send money to the school, notwithstanding the situation.
7      Q.  But just to clarify that, when you're saying
8  money was sent to the school, that money that you
9  mentioned, was that money that went directly from the
10 chapter itself or that was --
11     A.  Yes.  From the chapter.  From the Miami-Dade
12 chapter.  Individuals just sent the money but the money
13 was sent back.  And, you know --
14     Q.  And I'm sorry to interrupt you, I just want to
15 make sure I'm clear on that, that the money was money
16 that came from the account of the Miami-Dade chapter or
17 from individual members of the chapter?
18     A.  From the chapter.  The money came from the
19 chapter.  It was a check written by the Miami-Dade
20 chapter of the MMBNAA.
21     Q.  Okay.  And that was -- that was something that
22 you had already given a directive that they were not
23 supposed to do, correct?
24     A.  Oh, yes.  I met with Miami-Dade and, you know, it
25 was -- I won't say it was an acrimonious meeting, but it

Page 167

1  was a meeting where some folk on there weren't happy
2  with what was going on.  I was telling them that you
3  cannot give money to the school.
4      In fact, I can tell you there was one chapter,
5  West Palm Beach, Robert Delancy's chief fundraiser, a
6  young lady by the name of Maxine DuPont, she called me a
7  liar when I told the folk that we cannot raise money for
8  the school.  We cannot give money to the school.  Our
9  organization cannot do that.  She called me a liar.  And
10 this meeting was well attended, saying that the school
11 has never told me that.
12     And this was shortly after we received the
13 lawsuit papers.  And I asked her, you know, maybe you
14 should read before you start casting those type of
15 aspersions.
16     But -- so we've had some people not been
17 receptive to the directives that I've given them.  And
18 we've had some people who I think in good faith may not
19 have understood or they just, you know -- but anyway,
20 we've had a couple of mishaps.
21     Q.  Okay.  And then let me ask you this.  This post,
22 this Exhibit 13 that we're talking about, again we see
23 the post has the picture of the head, heart, hand seal,
24 the registered mark owned by the university on -- in the
25 picture; you see that there?

Page 168

1      A.  Yeah.  Apparently this is a picture of
2  Bethune-Cookman that was -- this was a picture taken by
3  Bethune-Cookman because I see Sean Lyn in the middle
4  there with the BCC shirt on.  So this is a
5  Bethune-Cookman photograph.  And apparently, it looks as
6  though the chapter posted the picture on its website.
7      Q.  Right.  Or they reposted a picture from
8  somewhere?
9      A.  Yeah, reposted, right, right, right.
10     Q.  Do you know this Keecha Brown-Tate personally?
11     A.  Yes, Keecha, I know her personally.  Keecha is
12 the recently elected president of the chapter.  And when
13 I came in, Keecha was the secretary of the chapter.
14     Q.  Okay.  And Ms. Brown-Tate, I'm assuming, did not
15 run this by you for your approval before posting it?
16     A.  No.  She didn't run it by me, no.
17     Q.  Okay.  You're not aware of her running it by
18 anybody else?
19     A.  I can't tell you whether she did or didn't.  I
20 don't know.  I know she didn't run it by me.
21     Q.  Okay.  Let me ask you about this.  So this --
22 this appears to relate to this kind of a Home Depot
23 competition.  That Home Depot competition that's
24 referenced there, that's competition that was organized
25 by -- officially by the university, by BCU, right?

Page 169

1      A.  I don't know that.  I have no firsthand knowledge
2  of that.  This competition, I think it's to any school
3  that wants to participate or any alumni that want to
4  participate.
5      And so if you want to give, and I know the school
6  needs the money desperately, I do know that they were
7  trying to get people to give because I don't think I
8  received anything from the school, but I've heard people
9  say, and I know in the past the school has sent out
10 stuff encouraging people to give to this Home Depot
11 competition.
12     Q.  Understood.  And my question is that your
13 organization didn't have anything to do with that Home
14 Depot competition, correct?
15     A.  No.  No.
16     Q.  Okay.
17     A.  We weren't supposed to, but no.
18     Q.  Okay.
19         MR. HERBERT:  Let's go to the next tab.  Which
20 we'll mark as -- mark that as Exhibit 14.  And for the
21 record, that bears Bates number BCU003171.
22         (Plaintiff's Exhibit No. 14 was marked for
23 identification.)
24 BY MR. HERBERT:
25     Q.  And this appears to be a post from the Broward

43 (Pages 166 - 169)

Page 170

1  County chapter of your organization.  Do you see that in
2  the upper left-hand corner?
3       A.  I do.
4       Q.  Okay.  And it appears to be a post that was
5  posted by somebody named Alex J. Knighton.  Do you see
6  that?
7       A.  Yes.
8       Q.  And do you know Alex Knighton?
9       A.  As I told you before, Alex lives in Pompano.  I
10 don't know him that well.  I know his mother.  She's in
11 my age group, Alex is my -- maybe a year or so older
12 than my youngest son.  They were in school together.
13      And Alex is no longer a part of us.  I think Alex
14 is with the DSO.  And, you know, I don't know if this
15 was done, you know, in an effort to, you know, impact us
16 adversely or -- he didn't run this by me and I don't
17 know if he ran it by Jackie or what.  I don't know.  I
18 don't want to speculate.  But I do know Alex, to answer
19 your question.  I knew him.  He calls me Mr. McCray and
20 I call him Alex but we've never socialized or, you know,
21 been in any events at the same time.
22      Q.  Understood.  And now I remember that you
23 mentioned that and I'd forgotten his name in particular.
24 We've got a lot of names you're going through and you're
25 more familiar with him than I am, so apologies for that.

Page 171

1       This event, this DJ Live session or this set it
2  off -- set it off Saturday, that -- that wasn't a --
3  that wasn't an event that was posted or hosted or put on
4  by your organization, correct?
5       A.  No.  It seems like it was his class.  Because I
6  think my son was 2014 and Alex was a year ahead of him.
7  So this was -- he was doing this to benefit his class.
8       Q.  Okay.
9       A.  It appears -- it seems to me as though he was
10 using the alumni association website to try to reach
11 people to raise money for his class.
12      Q.  Okay.  And let me -- let me ask you -- this -- I
13 assume this was not run by you for your approval or
14 anybody on your board as far as you know?
15      A.  I believe I stated that already, that's correct.
16      Q.  Okay.
17      MR. HERBERT:  Let's go ahead and go to the next
18 one, which, for the record the next one will be marked
19 as Exhibit 15.  And for the record, that Exhibit 15
20 bears Bates number BCU003172.
21      (Plaintiff's Exhibit No. 15 was marked for
22 identification.)
23 BY MR. HERBERT:
24      Q.  And this, you see in the upper left-hand corner,
25 it appears to be posts on the Facebook page of the

Page 172

1  Broward County chapter again of the -- of your
2  organization; is that correct?
3       A.  Yes, I see that, yes.
4       Q.  Okay.  And it looks like the post was made by Mac
5  McDougle.  Do you see that?
6       A.  I see the name, yes.
7       Q.  Okay.  Do you know Mr. McDougle?
8       A.  Never heard of him before.
9       Q.  Okay.  And I assume this Exhibit 15 was not run
10 by you or anybody on your board for approval, to your
11 knowledge?
12      A.  No.  I don't know -- I didn't even know Broward
13 had a Facebook page, but, you know, I see now.
14      Q.  Okay.  And you see this -- the post uses the name
15 Bethune-Cookman University there, it appears to be a
16 repost of an ad from somewhere else.  Do you see that?
17      A.  Yeah.  The Marching Wildcats of Bethune-Cookman
18 University, yeah, I see that.
19      Q.  Okay.  And then it's got a picture of the band
20 members, the Marching Wildcats themselves there.  You
21 see that picture that's included as part of this Exhibit
22 15?
23      A.  I see the drum majors, correct.
24      Q.  Okay.  Drum majors, that's right.  Thank you.  I
25 wasn't in band and I get those players confused.

Page 173

1       A.  I wasn't either.  Yeah.
2       Q.  Okay.  Yeah, you're more knowledgeable about it
3  than I am.
4       But on the --
5       MR. HERBERT:  If you can zoom in just a little
6  bit on this exhibit, Paula, that -- on the -- and just
7  scroll down.  Skip the drum majors and focus a little
8  bit more.
9  BY MR. HERBERT:
10      Q.  On the hat of the drum majors there, that's
11 the -- that's the Wildcat logo that we talked about
12 earlier, correct?
13      A.  Yeah.  Um-hmm.
14      Q.  So this is something if it had been run by your
15 approval, you would not have approved it, correct?
16      A.  Yeah.  I would not have.
17      MR. HERBERT:  And just scroll up a little bit.
18      THE WITNESS:  Even though I don't think it's
19 fundraising but, yeah, I would not have.
20 BY MR. HERBERT:
21      Q.  This appears that it was posted May 27th of this
22 year, if you see the date under the name Mr. McDougle.
23 Does that -- does that sound right to you?
24      A.  I mean, you're asking me if it sounds right that
25 it appeared on that date?

44 (Pages 170 - 173)

Page 174

1        MS. FANIEL:  Object to form.
2  BY MR. HERBERT:
3    Q.  Do you know or do you have any facts to the
4  contrary?
5    A.  No, I don't -- I don't have any facts to the
6  contrary or facts to support it.
7    Q.  Understood.
8    A.  I just see what's there.  I see it says the 27th.
9  But, you know, I didn't do it and I don't know.  I've
10  never seen this before.
11        MR. HERBERT:  Let's go to the next exhibit.  So
12  we'll mark this as Exhibit No. 16, which, for the
13  record, is Bates labeled BCU003173.  This appears to
14  be a post made by, again, Ms. Keecha Brown-Tate or
15  Mrs. Keecha Brown-Tate.
16        (Plaintiff's Exhibit No. 16 was marked for
17  identification.)
18  BY MR. HERBERT:
19    Q.  On the page of the Miami-Dade chapter, the
20  Facebook page of the Miami-Dade chapter of the
21  organization.
22    A.  Um-hmm.
23    Q.  Do you see that in the upper left-hand corner?
24    A.  Yes.
25    Q.  Okay.  And you see the post appears to have been

Page 175

1  made on July 7th by Ms. Brown-Tate, correct?
2    A.  Yeah.  It says July 7th.
3    Q.  Okay.  And then looking at the photographs that
4  are part of this post, we'll see the photograph in the
5  lower middle, there's sort of, I think it's five
6  different images divided up, the one that's in the lower
7  middle, you see that photograph contains the -- a
8  picture of the interlocking B and C logo, which is a
9  registered trademark of the university, right?
10    A.  Yeah.  I think this -- these flyers were done by
11  the HBCU picnic group, which is a conglomeration of
12  HBCUs from all over the country.
13    Q.  Understood.  It appears it was reposted by
14  Ms. Tate on the -- on the Miami-Date chapter's Facebook
15  page?
16    A.  Yeah.  It does appear that way, yes.
17    Q.  Okay.  Was your organization involved in this
18  HBCU picnic?
19    A.  I wasn't.  The Miami-Dade chapter was involved,
20  but from my understanding, they had a tent, as many of
21  the different universities from across the United
22  States, the HBCUs have a tent.  You know, typically
23  before all of this happened, we would have had a tent
24  that reflected Bethune-Cookman University but this year
25  they had a tent that did not have an insignia on it.

Page 176

1        And, you know, you had many of the members of the
2  MMBNAA there and many members of just, I don't know -- I
3  don't know if the DNA [sic] has many members but we had
4  other alumni who may not have been members there also.
5    Q.  Okay.  And was -- did your organization do any
6  fundraising at that event?
7    A.  No, no, no.  This isn't a fundraising event.
8  It's just a fund event -- a fun event.
9    Q.  Got it.  Got it.
10        MR. HERBERT:  All right.  Let's go to the next
11  exhibit.  So for the record, the next exhibit bears
12  Bates number BCU003174.  We'll mark this as
13  Exhibit No. 17.
14        (Plaintiff's Exhibit No. 17 was marked for
15  identification.)
16  BY MR. HERBERT:
17    Q.  So this appears to be the home page of the
18  Coastal Georgia alumni chapter of your organization.  Is
19  that right?
20    A.  Well, it says here Coastal Georgia alumni
21  chapter, but it also has Bethune-Cookman Coastal Georgia
22  alumni chapter.  And if you remember, that's the lady to
23  my -- if you're looking at this, you look to my right,
24  that's the president of the chapter.  I think her name
25  is Ms. Dunston.  She's the one who doesn't agree with

Page 177

1  what's going on.
2        So here, you know, she's holding up a
3  Bethune-Cookman University chapter.  Doesn't say
4  anything about MMBNAA, it has the Enter to Learn, Depart
5  to Serve.  And I don't think that those words are
6  trademarked because I've seen them elsewhere.  But it's
7  clear that she's advertising here the university but she
8  has Coastal Georgia alumni underneath.
9    Q.  And, yeah, if you look down, About in the middle
10  of the page right where it says the about, there's a
11  word About over in the left-hand lower corner and then
12  going across the dividing line there, it says About
13  Coastal Georgia alumni chapter.  You go down just a
14  little bit, there it says:  Coastal Georgia alumni
15  chapter of Dr. Mary McLeod Bethune National Alumni
16  Association, right?
17    A.  I do see that, yes.  And that's her name there.
18  It's Petula Gomillion, Gomillion.
19    Q.  Okay.  She's the lady on the right in the red and
20  white striped shirt?
21    A.  Yes.
22    Q.  Okay.  I assume that she or this chapter did not
23  run this by you for your approval either?
24    A.  Absolutely not.  I think it's obvious I would not
25  have approved this.

45 (Pages 174 - 177)

1   Q. Let me ask you -- well, let's go -- let's go to
2 the -- the next exhibit.
3   A. What's the date of this?
4   Q. You know, I would tell you but I think it doesn't
5 have a date but I believe I will represent to you that
6 my understanding of that is a current home page, current
7 Facebook page of that chapter. As are all the other
8 exhibits we've gone through. So I think because it's a
9 current page, it's not a separate post, it doesn't have
10 a specific date showing on the -- on the exhibit.
11      MR. HERBERT: Let's look at the next one, which
12 for the record is Bates number BCU002068. And we'll
13 mark that as Exhibit No. 18.
14      (Plaintiff's Exhibit No. 18 was marked for
15 identification.)
16 BY MR. HERBERT:
17   Q. And let me ask you, do you recognize this as --
18 this is some images; do you recognize this -- these
19 images?
20   A. This is the Volusia County chapter. This is
21 our -- what we call our mother pearl chapter. This is
22 Volusia County because I see the president and several
23 other people from Volusia County.
24   Q. Okay. Is that gentleman in the forefront, in the
25 center of that picture, is he the president or is it

1 somebody else?
2   A. No, no, no, no, no. The gentleman, you mean with
3 the gold stripe running across his shoulder?
4   Q. Yeah. Well, why don't you tell me which -- which
5 one of those folks is the president?
6   A. If you look to his right, it's a lady two persons
7 down. That's his wife. There's a lady next to him with
8 the maroon hat on.
9   Q. Got it.
10   A. But the lady next to her, that's Ms. Carmen
11 Williamson.
12   Q. Got it.
13   A. And that's her husband who's the first guy there,
14 Mr. Percy Williamson.
15   Q. Got it. And Ms. Williamson is the current
16 president of the Volusia County chapter?
17   A. Yeah. And she's a former vice president of the
18 National Alumni Association.
19   Q. Okay. And just looking at the logo at the top
20 here, the image that is there, it has a picture of
21 Dr. Bethune in there, you see that?
22   A. Yep. I see it. I'm familiar with this.
23   Q. Great. And then the -- the house to the right,
24 that's a picture of Dr. Bethune's house on the
25 university grounds?

1   A. That's correct.
2   Q. Okay. And then above Dr. Bethune's head to the
3 upper left, that's a picture of the marching band or the
4 Wildcats -- the Marching Wild --
5   A. That's correct. Yes.
6   Q. Okay. Alrighty. And then there's two pictures
7 of the statue, it looks like one of them is the statue
8 that's in the Capitol, the other one is the statue
9 that's over there in Daytona. Is that right? Or Orange
10 City.
11   A. The -- the picture of Dr. Bethune that -- the big
12 statue, I don't know if that's the one in Washington or
13 the one that's on campus. And I see something in the
14 background that's gold. I don't know what that is.
15   Q. Okay. Yeah, it's a little hard to see, but --
16   A. Yeah. But this is our former logo. And where
17 you see that blank there, that's where the head, hands
18 and heart was located.
19   Q. Right. And that -- and so that is blank there
20 because at least in this instance, that logo was removed
21 as a result of the request of the university, right?
22   A. The cease and desist letter, correct. And, also,
23 what's the date of this?
24   Q. You know, I cannot tell you that. I do think
25 it's recent, but I'm not sure. I think it may be

1 current but I can't -- I can't represent that.
2   A. Okay. And it may not be current, also. Is that
3 what you're saying?
4   Q. Might not be, correct. Yeah.
5   A. All right.
6   Q. But the question I had is, so that -- that logo,
7 this image that's in this oval-shaped logo here, that
8 was modified to -- to attempt to avoid any infringement
9 of the university's head, heart, hand seal registered
10 trademark, correct?
11      MS. FANIEL: Object to form.
12      THE WITNESS: This -- the seal should not be
13 used and that's why I'm wondering what's the date of
14 this. Because we were -- I directed everyone not to
15 use that because it was too much of Bethune-Cookman --
16 I don't care about the house. I don't think it's --
17 you know, that's Dr. Bethune's house. But the
18 marching band in the back, I saw issues with that and
19 it looks to be a building of the school behind
20 Dr. Bethune's image there. And so it was just so
21 much. I just said, let's not use that. And my
22 understanding, this is my first time seeing this or --
23 because no one is supposed to be using this.
24      MR. HERBERT: Okay. All right.
25      Why don't we take a short break now. I imagine

Page 182

1  we're probably come up against the 90 minutes.  We can
2  take a ten-minute break, if that works for everyone.
3       You can stop sharing your screen there, Paula.
4       THE WITNESS:  If you guys want to continue on,
5  I'm okay with that, rather than taking these breaks.
6       MR. HERBERT:  Understood.  I do need a comfort
7  break myself, unfortunately.  I guess I should say
8  that off the record.  We can go off the record.  We'll
9  make it eight minutes if you want to get back quicker.
10      THE WITNESS:  That's fine.
11      THE VIDEOGRAPHER:  We're going off the record.
12 The time is 2:47 p.m.
13      (A brief recess was taken.)
14      THE VIDEOGRAPHER:  We're going back on the
15 record.  The time is 2:58 p.m.
16 BY MR. HERBERT:
17      Q.  Okay.  Mr. McCray, let me just ask one follow-up
18 question on something we talked about earlier.  You
19 understand that in this -- in this litigation, the
20 university has made requests for bank statements
21 generally that would reflect financial dealings of your
22 organization and its chapters, right?
23      A.  I know that you made requests for bank
24 statements.
25      Q.  Okay.

Page 183

1      A.  We don't have many accounts.  I think we have one
2  or two accounts.  So we've given you what we have.
3      Q.  And I believe that we were -- we were told that
4  the national organization made requests to some of the
5  chapters, but the chapters did not respond to those
6  requests.  Is that your understanding?
7      A.  Yes.
8      MS. FANIEL:  Object to form.
9      THE WITNESS:  Yeah, that is true.  We did make
10 requests to those chapters, and I believe, because I
11 think Mr. Anthony Barfield used what they call a
12 Dropbox or something for them to put it in.  And
13 they've been very, very slow to respond.
14      And as I indicated, you know, the chapters that
15 we have, the chapters that we had basically are
16 inactive except for maybe four, you know, maybe four,
17 five max.
18 BY MR. HERBERT:
19      Q.  Do you know how many of those chapters have bank
20 accounts that are still open and how many do not?
21      A.  I don't know.  I don't know.
22      Q.  Okay.
23      A.  If that's something I need to find out, I will.
24      Q.  And the four chapters that you mentioned that
25 were active were the ones we talked about before, I

Page 184

1  think it was four or five that you mentioned early on in
2  the deposition?
3      A.  Do they have bank accounts?
4      Q.  Well --
5      A.  I'm sure they do.
6      Q.  Yeah.  If they're active, you're assuming they
7  have bank accounts, right?
8      A.  Yeah, I'm sure that they do.  And I would be
9  surprised if we didn't get a response from Duval.
10 Channell Jones is usually pretty responsive.  Volusia
11 is.  Palm Beach, their president just stepped down and
12 so we just had someone appointed to stand in as
13 president.  And Broward is kind of dormant.  And Miami,
14 I would be surprised, we haven't gotten anything from
15 them.  Tampa, Hillsborough is struggling.  And Alachua
16 is definitely struggling.  They don't have very many
17 members anyway.  They haven't raised money now in a
18 couple years.
19      Q.  Okay.  So do you know which of the chapters were
20 not responsive to the requests for their bank records?
21      A.  Not off the top of my head, no, I don't.
22      Q.  Okay.  My understanding, I'll represent to you is
23 that the only bank records we got from any chapter was
24 from the Broward chapter.  So I would assume you don't
25 have any information to the contrary.  You're not aware

Page 185

1  of getting bank records from any other chapter other
2  than Broward?
3      A.  No, but I do know that I can make a phone call,
4  and I'll do that, to those four or five chapter
5  presidents.  I have good relationships with them.  And
6  typically, if I ask them to do something, they make a
7  good-faith effort to do it.
8      Q.  Okay.  Great.  And for the record, we will
9  reiterate that request again.  Again, we believe that is
10 covered by our prior request, and we'd ask that, through
11 your counsel, that you get back to us on that and
12 produce anything that you're able to gather as a result
13 of that request.
14      A.  Yeah.  Before we go further, when we broke, we
15 were -- you put up a photograph and I told you it was
16 the Volusia County chapter -- some clarity on that,
17 because I don't think that -- at least I don't think
18 that we had finished discussing that because as with all
19 of the other ones that you posted, I'm asking, number
20 one, what is that?  Is that something from Facebook,
21 something you got off of a website, when was that?
22 Because I'm really not clear on that.
23      Q.  Well, I'll tell you that that -- that last
24 exhibit was attached to the complaint in this case.
25 It's Exhibit Q9 to the complaint.  It was filed with the

47 (Pages 182 - 185)

Page 186

1  Court on October 5th of last year. So that is a
2  one-page exhibit that is attached to the complaint. And
3  it's referenced in the complaint. And we're actually
4  going to -- just about to go through the complaint and
5  some of those exhibits there. So we can follow up on
6  some additional questions regarding the other exhibits
7  to the complaint.
8        But do you remember, speaking of that exhibit,
9  one that you -- you thought might be from the Volusia
10 chapter, do you know if you or a member of the board
11 specifically directed that that be taken down,
12 because --
13    A. I don't know if I -- I don't know if I -- first
14 of all, I don't know if I've ever seen that. And you
15 say taken down, that presupposes that it was up. I
16 don't know what that is. I know who the people are and
17 it looks like the Volusia County chapter. But to ask
18 me, did I ask anybody to take something down, I'm not
19 sure that it was up. I don't know, you know, when it
20 was, what that is. I just know I recognize some of the
21 people on it and they're members of the Volusia County
22 chapter.
23    Q. Okay. You know, I'm not -- I'm just asking if
24 you remember any communications at all regarding that --
25 you know, that modified logo and you ever communicating

Page 187

1  to the Volusia chapter that they should not be using
2  that logo.
3     A. I've never told them not to use that logo. I
4  told all the chapters not to use -- well, yes, I told
5  all the chapters not to use that logo. And, actually,
6  it was my understanding that it was understood that from
7  the inception of the cease and desist when we changed
8  our name, that we would remove that little oval logo
9  until we got our own. And that's what you see behind me
10 there. That's our logo that we came up with some months
11 later. We had a contest.
12    Q. Right. Let me -- let me back up just a second
13 and ask, regarding the bank accounts, do you know those
14 bank accounts for the chapters, let's just say for the
15 four or the five you mentioned that are -- that are
16 active now, are those bank accounts, are they held in
17 the name of the local chapter itself or the national
18 organization or something else?
19    A. I'm not sure, but --
20       MS. FANIEL: Object to form.
21       THE WITNESS: -- I can tell you that we have
22    been given -- I have given specific directions and
23    directives to the organization that we're not to use,
24    you know, anything with the logos or names on it. So
25    if anybody's doing that, you know, then they're -- you

Page 188

1  know, they're going against what we have told them not
2  to do.
3  BY MR. HERBERT:
4     Q. Okay. And just -- I'm actually asking a
5  different question on the bank accounts and the name of
6  the account holder in the chapter bank accounts. That's
7  what I was really asking about.
8        Do you know the name of the account holders,
9  let's say the Broward chapter, for instance, do you
10 happen to know the bank account -- who's listed as the
11 account holder on that bank account?
12       MS. FANIEL: Object to form.
13       THE WITNESS: You mean -- when you say who's
14    listed as the account holder, you mean the name of the
15    group?
16 BY MR. HERBERT:
17    Q. Yeah. The name of the entity that is -- whose
18 account it is.
19    A. No. No. I don't know that, sir. But I do know
20 that everyone has been directed that we're not supposed
21 to use those names or logos, even in connection with the
22 bank account in light of what's going on.
23    Q. Understood. Do you know if those bank accounts
24 are open under the same EIN as the -- either of the EINs
25 that we referred to earlier for the --

Page 189

1     A. I don't know. I don't know. I know that we
2  are -- I believe we're set up where we are the --
3  there's inferior organizations that we're superior and
4  they use our tax-exempt number or something but, you
5  know, I'm not sure.
6     Q. Okay. Ms. Starks would know that, though, or
7  should know that?
8     A. Yes.
9     Q. Okay. Do you know if any of the chapters --
10 well, let me back up.
11       It appears that from your website, it indicates
12 that there -- it names about two dozen chapters of your
13 organization. And so what I want to ask is, I know you
14 mentioned that it's about four or five that are active.
15 Do you know for sure if the others of that two dozen
16 listed on your website, are they -- are they -- are they
17 actually completely defunct or do they still exist and
18 they're just dormant or if those aren't the correct
19 terms, you can tell me how you would describe that. And
20 that wasn't a very good question. Let me rephrase it.
21       MS. FANIEL: Object to form.
22       MR. HERBERT: Yeah, I'll strike that question.
23 BY MR. HERBERT:
24    Q. Your website indicates about two dozen chapters
25 listed on there. You've indicated that only about four

48 (Pages 186 - 189)

1 or five are active. Do you -- do you have -- do you
2 know what the status is of the others that are listed on
3 your website?
4    A. Those organizations outside of the four or five
5 that I mentioned, when we have meetings we -- there are
6 many chapters where they haven't been to a meeting in
7 over a year. There are chapters that have told us that
8 they're no longer operating or working with us. I'll
9 give you a good example. Like the Washington, D.C.
10 chapter. Their president was very, very, very close to
11 Mr. Delancy and Mr. Delancy's girlfriend. So she became
12 estranged to the organization. So they have gone with
13 the DSO.
14       Our Brevard chapter, same thing with them. They
15 haven't been to a meeting in God knows how long but I do
16 know that the young lady that is president of that
17 organization is very close to Mr. Delancy and his
18 girlfriend. There are other organizations like that.
19       So the organizations that don't respond, that
20 don't attend meetings, that don't submit reports, you
21 know, we have concluded that they're no longer with us.
22 We're not getting anything from them, nothing.
23    Q. Understood. So are you saying that the DC
24 chapter or the former DC chapter now has essentially --
25 those members or that chapter is now all part of the

1 university's DSO?
2    A. Yeah. That's my understanding.
3    Q. Okay. And is the same true for the Brevard
4 chapter?
5    A. Yeah. It's a very small chapter anyway, but
6 they're not with us. Ms. Poole, she was very bothered
7 by the fact that Robert Delancy didn't win and we've
8 not -- I've not spoken to her in, what, almost three
9 years.
10    Q. Okay. Are there any other chapters or former
11 chapters that you know that have potentially been
12 transferred to the university's DSO?
13    A. I don't know if they're transferred or they
14 just -- I know that they're not with us. And there are
15 several other chapters. Houston has started organizing
16 under my leadership. They were really growing because
17 of what happened. And I do know that the immediate
18 past -- the immediate past interim president was out
19 there and met with them. And I had heard that they were
20 going with the school and not going to be rejoining us.
21 I've not heard from those individuals. I don't send
22 them notice of our meetings anymore.
23       The Chicago president, that chapter isn't doing
24 anything. I don't send them notice anymore. The
25 Atlanta chapter president stepped down because she's

1 having family problems, but they're still in existence
2 but they're not doing anything. I talked to the new
3 president the other day and, you know, he really has no
4 experience running an organization. But he's trying to
5 do what he can.
6       Tampa, they are still in existence. But a lot of
7 people stepped back. And a lot of people didn't leave
8 because they're joining the DSO. They're just tired of
9 the foolishness that's going on. And so Tampa is still
10 functioning.
11       In fact, they didn't have a fundraiser but they
12 had some type of event at a museum over there with
13 Betty -- with Ms. Castor, who is a state rep or
14 either -- she's a state legislator. But they don't have
15 large numbers so we don't really have any chapters now
16 with large numbers.
17       Nassau -- Duval/Nassau is probably our biggest.
18 Miami was our biggest but a lot of people have basically
19 just taken a step back to wait until this -- the dust
20 clears in this situation.
21    Q. Okay. Are you aware of any of those chapters
22 that -- let's say the ones that have just become
23 inactive in your organization, are you aware, did any of
24 them have any balances in their bank account that they
25 transferred over to your organization?

1    A. I'm not aware. I do know that the university,
2 when this thing first happened, you know, they told us
3 they didn't want us raising money, but they were
4 appealing to many of those presidents to give them
5 money.
6       In fact, a letter was sent out by Hiram Powell
7 who is two interim presidents removed, maybe two or
8 maybe three. He actually sent a letter out, asking them
9 to give money from their account to the school,
10 notwithstanding the fact that they told us that they
11 didn't want us raising money. So the attorney that we
12 had on the case at the time wrote the school a cease and
13 desist letter, asking them to refrain from doing that.
14 School didn't respond to him, but I think they stopped
15 asking them to give them the monies in our account to
16 them.
17       Now, whether or not any of those chapters gave
18 money to the school when they made that request, I don't
19 know. But I did tell them and this was part of my
20 presentation to them, that any monies that you hold in
21 your account belongs to the MMBNAA, to the national
22 organization, because you-all come under us. We're the
23 umbrella organization. And that I told them that if
24 they give the money to the school, number one, the
25 school is being hypocritical. They said that they don't

Page 194

1 want us to give them -- raise money. And this money
2 does not belong to the school, that I would consider
3 bringing the appropriate legal action against those
4 chapters and the chapters' leadership.
5    Q. Okay. Do you know, did any of those chapters
6 then transfer any funds to your organization?
7    A. No. No. None of the chapters gave us any money
8 as a result of what I said.
9    Q. Okay. All right. Let's -- I want to ask some
10 questions about the first amended complaint filed in
11 this case. But before we do that, actually, I want to
12 bring up one other thing. And that is you -- you
13 mentioned earlier that your organization utilizes
14 Constant Contact to send out e-mail communications,
15 correct?
16    A. Yeah. When we're trying to reach the masses, the
17 members and even nonsupporters -- I'm sorry, not
18 nonsupporters -- nonmembers who may be interested in
19 supporting, our tech team under the leadership of
20 Mr. Anthony Barfield will send things out on Constant
21 Contact. He always talks about Constant Contact.
22    Q. So you understand that's -- Constant Contact
23 is a vendor you use to communicate with either your
24 members or potential members or former members that are
25 in that e-mail list that Constant Contact has access to,

Page 195

1 right?
2    A. Yes, I learned that after I became president, I
3 had never heard of Constant Contact.
4    Q. Okay. I hear their ads on the radio a lot so I'm
5 aware of them. But let me --
6      MR. HERBERT: Let's turn to tab number 32,
7 Paula, if you can pull that up. That's a spreadsheet,
8 it might be a little bit difficult to pull that up on
9 the screen, but that might take you a couple minutes
10 but let's try to pull that up and just talk briefly
11 about that. This might take a little minute because I
12 think it's a larger document.
13      Okay. So we're looking at the screen, I'm
14 going to mark this exhibit as the next deposition
15 exhibit. And I forget, are we up to 20 or --
16      THE COURT REPORTER: I believe 19.
17      MS. CASTRO: Yes.
18      (Plaintiff's Exhibit No. 19 was marked for
19 identification.)
20      MR. HERBERT: Thank you.
21 BY MR. HERBERT:
22    Q. Mr. McCray, what I've marked as Exhibit 19 is a
23 document that was produced by your counsel in this case.
24 Let me just ask you, have you seen this document before?
25    A. I don't think I have.

Page 196

1    Q. Okay.
2    A. I do know it was requested of Mr. Barfield. No,
3 I've never seen this before. It's kind of interesting.
4    Q. Okay. And I'll represent this is a document that
5 was produced by your counsel which I represent is a
6 spreadsheet that reflects e-mails that Constant Contact
7 sent out on behalf of your organization.
8      I want to ask you, just for example, going down
9 the left-hand side of the first page of this, if you
10 look at the date, that is -- I guess it's not on the
11 first page. But it's -- I'm sorry. Can't scroll up.
12 2023 and it's 3/13 of 2023. Okay. Those are not listed
13 chronologically, I guess. Is it reverse chron? Let's
14 see, there it is. Okay. Thank you. All right.
15      So my paralegal has highlighted that date there,
16 that March 13th of this year, 2023. And it has the
17 timestamp of 11:59 p.m. I believe we actually have a
18 copy of that message separately. And I can show you
19 that. But is that -- I know you said you tend to send
20 some things out late at night, and this indicates it's a
21 message from President Johnny L. McCray, Jr., Esquire.
22      Does that appear to be a record of the letter
23 that we looked at early on on your organization's home
24 page that is signed by you as president of
25 Bethune-Cookman University?

Page 197

1    A. Yeah. 11:59 --
2      MS. FANIEL: Object to form.
3      THE WITNESS: I'm sorry -- 11:59 is very
4 well -- it's possible that that's the letter, but some
5 of my letters have gone out later than that. But
6 yeah, that -- that more likely than not is the letter,
7 yeah.
8 BY MR. HERBERT:
9    Q. Okay. And if you see the next column over, going
10 across the top, there's titles of the different columns
11 and the one is called Send and that one, it appears that
12 that column indicates that that -- that e-mail was sent
13 out to 3,913 separate e-mail addresses.
14      Let me ask you, do you know -- and different
15 e-mails have different send numbers on them, do you
16 happen to know what the total number of e-mail addresses
17 that Constant Contact has the ability to send e-mails to
18 on your organization's behalf?
19    A. No, I don't.
20    Q. Okay. And that's something Mr. Barfield would
21 know?
22    A. Yeah, oh, definitely.
23    Q. Okay. How about Mr. Shorter, is he involved in
24 the e-mail campaigns at all?
25    A. No. Some -- I was going to say one or two times,

50 (Pages 194 - 197)

Page 198

1  I've sent him a letter to proofread, but anything that I
2  need to go out to the masses, those things go through
3  the tech committee, which is led by Anthony Barfield.
4      Q.  Okay.  And that number in the send column there
5  is 3,913, and then as you look down below that, the
6  number goes up to 4,000 for some of these on this page.
7      Does that number sound about right to you in
8  terms of the number of folks whose e-mail addresses you
9  have that you send out in a blast e-mail messages like
10  that letter that we saw earlier or is that the low or
11  high or something else?
12      MS. FANIEL:  Object to form.
13      THE WITNESS:  Mr. Herbert, I think I've already
14  stated to you but I understand you probably have to
15  ask these questions, but I've answered you that I
16  don't really know how many people are on Constant
17  Contact.  I know that we normally collect names and we
18  have -- a lot of these names came from when we --
19  during the pandemic, when we were having the big
20  events, social events on the -- virtually and we
21  got -- we collected a lot of names for our databank.
22  But I can't tell you whether it's 1,000 versus 4,000.
23  I don't know.
24  BY MR. HERBERT:
25      Q.  Going across that row there, it looks like the

Page 199

1  next column is a column that says open, which would
2  appear to indicate how many of the recipients opened
3  that e-mail and that number there appears to be 1668.
4  I'm guessing you don't have any information personally
5  about how many people opened your e-mail with your
6  letter in it?
7      A.  I don't.  I've often wondered.
8      Q.  Okay.  And then there's some other numbers there,
9  the mobile open rate, the desktop open rate, appears to
10  be a lot higher.  And the number of clicks, the click
11  rate, the bounces, bounce rate, unsubscribes, and then
12  the unsubscribe rate.
13      Let me ask you this.  This appears to indicate
14  that 1668 people opened that e-mail.  Do you recall
15  getting any specific e-mails -- or let's ask, does
16  this -- does this document refresh your recollection
17  about you getting any e-mails in response to that letter
18  that we mentioned earlier?
19      A.  Oh, I get a few responses.  Some of the responses
20  are automatic responses, if somebody's out or something,
21  on vacation, I'll immediate get -- I'm sorry,
22  immediately get something back saying that the person is
23  out.
24      But yes, I have gotten responses, most of them
25  are positive.  But I have gotten a few responses where

Page 200

1  people say, hey, you know, take me off of your list or
2  something like that.  And then I have -- we've gone in
3  and purged some names, some individuals.  And there are
4  a couple of other individuals who I asked them to purge
5  because I know that they don't mean the organization
6  well.
7      So to answer your question, yes, I have gotten
8  responses from people and probably 99.9 percent of them
9  have been positive, about things that I've written.
10      Q.  Okay.
11      A.  I don't just write -- I don't just write people
12  asking for money.  You know, we had an affirmative
13  action decision that came down, we had something about
14  student loans when it was first -- a lawsuit was filed.
15  I write about things of interest to HBCU alumni.
16      Q.  Okay.  Yeah, I saw that one about the affirmative
17  action decision that's indicated on this spreadsheet at
18  some point, I believe.
19      But you recall getting responses to that e-mail
20  about the affirmative action ruling?
21      A.  Oh, I got a few where people agreed.  I mean,
22  nobody really writes anything in great detail.  But, you
23  know, I'll get something like, hey, great message.  I've
24  gotten, you're doing a great job, you know, keep -- keep
25  up the fight, keep the faith, you know, things like

Page 201

1  that.  And like I told you, I think I may have gotten
2  one or maybe two where individuals have said, please
3  remove my name from your list or something like that.
4      Q.  Okay.  And you understand that we've requested
5  the actual e-mails for all of those e-mails that are
6  reflected on this spreadsheet, right?  You're aware of
7  that?
8      A.  You mean every e-mail that I've ever received in
9  response to 3,000, 4,000?  That's what you're saying you
10  requested?
11      Q.  Well, let's -- I'll deal with your counsel on
12  that but I just want to say that this -- as far as you
13  know, this exhibit, the Constant Contact spreadsheet,
14  that is an accurate reflection of e-mails that you or
15  your organization have sent out to recipients on the
16  e-mail list that Constant Contact has; is that fair
17  enough?
18      A.  Yeah.  I understand that.  Yeah.
19      Q.  Okay.  Okay.  And we'll renew our request for all
20  the e-mails that were requested in our document request,
21  something I'll take up with your counsel after the
22  deposition.
23      So let's go to the complaint.  The first amended
24  complaint filed in this action, which I don't think we
25  need to mark that as an exhibit.  It is in the Court's

51 (Pages 198 - 201)

Page 202

1 docket, that docket entry number 33. You can see on the
2 screen, docket entry -- Document 33 which is filed on
3 October 5th of 2022. And it's quite long.
4      I just want to go through this quickly and ask a
5 few questions. Let's just move to -- first, if you can
6 go to page 6 of this, of this -- of the complaint.
7 Page 6, you see the reference there is to the word
8 trademark Bethune-Cookman, which is in quotes and all
9 caps, that's in paragraph 23.
10     You see that?
11 A. Now I can, yes.
12 Q. Okay. And you -- you understand that that is a
13 registered trademark owned by the university, correct?
14 A. Yeah. I was on the -- this was shortly before I
15 went on the board, yes, um-hmm.
16 Q. Okay. And then let's go to the next page,
17 page 7. Looking at paragraph 27. There, the word -- it
18 indicates that university owns the service mark Florida
19 Classic.
20     You see that there?
21 A. I do.
22 Q. Okay. And that's -- your organization is not
23 contending that it has any rights either in the
24 trademark Bethune-Cookman or the trademark Florida
25 Classic, correct?

Page 203

1 A. No. We're not.
2 Q. Okay.
3 A. I told you that we refrain from using the name
4 Florida Classic once that became clear to us. I think
5 earlier on when I didn't know it, and I told you I was
6 on the board and actually I was on the Florida Classic
7 committee representing the school, I didn't know that it
8 was trademarked, the school owned rights to us. And
9 once it was told to us, you know, we stopped. At least
10 I think everybody was directed to stop. Right.
11 Q. And compliance hasn't been -- hasn't been
12 100 percent perfect, right?
13 A. I don't know if we had any issues with the
14 Florida Classic. I do know that I think it was used
15 shortly after this letter was sent out and that's when
16 nobody knew that Florida Classic was owned by
17 Bethune-Cookman or FAMU, the name. And so once that was
18 told to us, I don't think we've had any issues with
19 that.
20 Q. Okay. Let's move ahead to the next page. It's
21 page -- we can just go to page 9, which has the seal.
22     So on page 9, you recognize that as the -- what I
23 call the university seal or which is also referred to as
24 the head, heart, hand logo, right?
25 A. Yep. You're right.

Page 204

1 Q. And your organization is not claiming that it
2 owns any rights in that logo, correct?
3 A. No, sir.
4 Q. Okay. Move ahead to page 10, which has the
5 wildcat head logo. Same thing there. You recognize
6 that as a registered trademark logo owned by the
7 university?
8 A. Yeah, I do now, yes.
9 Q. And your organization is not claiming any rights
10 of ownership in that logo, correct?
11 A. Absolutely not. We're not.
12 Q. All right. And then going to the next page, 11,
13 do you see that's what we call an interlocking BC logo?
14 A. Um-hmm.
15 Q. Do you recognize that as a registered trademark
16 of the university?
17 A. I do.
18 Q. Okay. And you're not claiming that your
19 organization owns any rights in that logo, correct?
20 A. No, we're not.
21 Q. Okay. Let's go to Exhibit K, which is all the
22 way down at page 155 of 266 of this exhibit. I'm sorry,
23 it starts at page 154, I guess.
24     So this document which is Exhibit K to the
25 amended complaint starts at page 154 of Docket 33, which

Page 205

1 is a little hard to read at the top there. But you
2 recognize this as your organization's 2020 bylaws,
3 correct?
4 A. Well, that's the cover sheet, yes.
5 Q. Yeah. And we can scroll through the rest of it
6 to -- I mean, this was attached as an exhibit to the
7 complaint that your organization was served with. Just
8 want to -- this was in -- in 2020, the bylaws at that
9 time, too, they did include the -- the supremacy section
10 that says that -- and that's on -- that's on page 159 of
11 this document, section 4, Supremacy. That clause there,
12 Supremacy, which says, quote: All chapters shall be a
13 constituent and subordinate unit of the association
14 subject to the general authority and jurisdiction of the
15 board of directors of the association.
16     That is still in the bylaws of your organization,
17 correct?
18 A. Yes. That's correct.
19 Q. That's the concept we talked about earlier, that
20 the national organization had supremacy and the chapters
21 are subordinate to it and essentially need to follow the
22 directions of the national organization; fair enough?
23 A. That's correct. Fair.
24 Q. Okay. Let's just go down a little bit below to
25 section 8, which is entitled Audit Committee there.

52 (Pages 202 - 205)

Page 206

1 That indicates that the -- the audit committee shall
2 conduct an annual audit.
3     Do you see that there?
4 A. I see it.
5 Q. Okay. Do you know, is the national organization,
6 does it currently have an audit committee?
7 A. No, we don't. I don't think we do.
8 Q. Okay. Do you know when the last audit was
9 conducted, if at all?
10 A. We had an audit committee and each of those
11 persons were pro Delancy and they're gone. And we --
12 think the last time they may have done an audit, what
13 they call an audit, was my first year, which would have
14 been 2020, I believe. And they went to certain
15 chapters.
16 Q. Okay. So those members who were on the audit
17 committee are no longer a part of your organization?
18 A. No, they're not. And actually we don't have an
19 audit committee. But La-Vaughn basically is the one
20 who's charged with the responsibility of reviewing any
21 internal controls or coming up with ideas proposing
22 internal controls.
23 Q. Okay. Do you -- is there any type of audit
24 report that has been generated since you've been the
25 president?

Page 207

1 A. I don't think so. I don't think so. La-Vaughn
2 would probably be best suited to answer that, but I
3 don't -- I don't think so. I've never ordered one and I
4 don't think the committee has ordered one.
5 Q. Okay. In the second section of the section 8,
6 there's a subsection B. And that says that, quote: The
7 failure of the chapter through its audit committee to
8 submit a timely audit may result in the chapter losing
9 its right to solicit money using the name or tax number
10 of the association.
11     Do you see that?
12 A. I do.
13 Q. Okay. Are you aware of any chapter losing its
14 right to solicit money as a result of its failure to
15 comply with these audit provisions?
16 A. Under my leadership, no, because we were only
17 under this for, I guess a year or so, give or take,
18 before all of this happened. Under prior presidents, I
19 don't know.
20 Q. Okay. And is that audit committee bylaw, is that
21 currently a part of your -- your current controlling
22 bylaws?
23 A. I don't think that we included that in there.
24 I'm not sure. I don't think we did. But I know we
25 require reports of each chapter at the annual meeting

Page 208

1 indicating, you know, how much money they brought in,
2 how much they donated, et cetera. I believe that's in
3 the new bylaws.
4 Q. Okay. And when you say reports, those would be
5 written reports?
6 A. Yes.
7 Q. Okay. And as far as you know, have the chapters
8 provided you with those written reports in the last two
9 years?
10 A. Well, this year -- our bylaws were only
11 finalized, I think in -- a month before the convention.
12 So we really didn't have any chapter reports this time.
13 And during the pandemic, I think some chapters gave
14 reports and some didn't. Things were -- and the year
15 before this situation was going on, so we really, really
16 had a dropoff with chapters giving reports and actually
17 even being active.
18 Q. Okay. Can you recall a particular chapter or can
19 you recall what the most recent chapter report or audit
20 report that you got from one of your chapters was?
21 A. No, I can't. La-Vaughn may be better suited to
22 answer that. We may not have gotten any or we may have.
23 I don't know.
24 Q. Okay. And for the record, I will request any --
25 any chapter reports or audit reports that went to that

Page 209

1 provision.
2     I'll just represent to you that it looks like
3 that audit committee is now section 10 of your current
4 bylaws, and it appears to be the same provision word for
5 word. We can pull that up separately. But I'm assuming
6 that -- that wouldn't surprise you that that same
7 provision was carried over here into your current
8 bylaws, would it?
9 A. Well, I don't know whether it surprises me or
10 not. But I didn't remember that it was in there. But
11 if it's there, it's there. We had a committee of
12 probably eight to draw up the bylaws and some of the
13 provisions from the old bylaws we adopted and some of
14 them we didn't because they wouldn't really be
15 appropriate now with some of the restrictions that we
16 have. So, you know, if it's there, that means that it
17 was brought into the -- brought into it.
18 Q. Okay. Understood. As far as you know now, there
19 are no members on the audit committee currently?
20 A. No, no, no, no. Actually, our numbers are so low
21 in terms of membership, it's really hard to feel the
22 committees because we have the same people doing so much
23 work. So, you know, with this lawsuit going on, it's --
24 it's -- it's really, you know, impacted our growth
25 engagement also.

53 (Pages 206 - 209)

Page 210

1  Q. Understood. Let's move on to the exhibit --
2 Exhibit M to the amended complaint, which appears at
3 page 180 of 266. All right.
4      And I assume you are familiar with this Exhibit
5 M, which is a cease and desist letter from counsel for
6 the university?
7  A. Yes, I am familiar with this letter. I haven't
8 looked at it in a while, but I'm familiar with it.
9  Q. Okay. And this -- Mr. Willie Walker, Esquire,
10 who this letter is addressed to, he was counsel for your
11 organization in September of 2021?
12  A. Correct.
13  Q. Okay. And I assume this letter was shared with
14 the board of your organization at the time that you
15 received it?
16  A. Oh, absolutely.
17  Q. Okay. And you understood this to be a demand
18 that your organization discontinue any further use of
19 the name Bethune-Cookman or any of its registered
20 trademarks, correct?
21  A. Yeah. That's what it said, yeah.
22  Q. And then upon receipt of this letter, you took
23 steps to start the process of discontinuing the use of
24 the university's trademarks, correct?
25  A. Yes, sir. I did.

Page 211

1  Q. Okay. All right. And then if you see the next
2 exhibit, Exhibit N, that is a letter dated September 29,
3 2021. And that is from different counsel for the
4 university. And again, also addressed to your
5 organization in care of Mr. Willie Walker. You're
6 here -- you've seen this cease and desist letter,
7 correct?
8  A. Yes, sir, I did.
9  Q. Okay. And this letter is a follow-up -- this
10 Exhibit N is a follow-up letter following up on the
11 prior Exhibit M, which is referenced there in the first
12 paragraph of the letter, correct?
13  A. You're asking me if this --
14  MS. FANIEL: Object to form.
15  THE WITNESS: You're asking me if this
16 September 29th letter is a follow-up?
17 BY MR. HERBERT:
18  Q. Yeah. Do you see that there in the first
19 paragraph, it indicates that you had received a letter
20 dated September 17, 2021, which -- that makes reference
21 to Exhibit M, correct?
22  A. Yeah. It does make reference to the previous
23 letter that you presented to me, yes.
24  Q. Okay. So this letter indicates that it's
25 repeating or reiterating its request that you

Page 212

1 immediately cease and desist from any representation
2 that your organization is associated with BCU or
3 Dr. Bethune, correct?
4  A. It does.
5  MS. FANIEL: Object to form.
6  THE WITNESS: I'm sorry.
7 BY MR. HERBERT:
8  Q. Yeah. And I'm looking at the second -- well, I
9 guess it's technically the third-to-the-last paragraph,
10 which is on -- it's on the following page. I'm sorry.
11 It's on 183, the second full paragraph there. You see
12 there that the university is, again, demanding an
13 immediate cease and desist of any public representation
14 that NAA is associated with BCU or its founder,
15 Ms. Bethune, and refrain from any fundraising or other
16 activity indicating a relationship with the university.
17 And it specifically mentions upcoming homecoming events.
18      You see that, right?
19  A. I see that, yes.
20  Q. Okay. And you received this letter at the time
21 that it was sent?
22  A. Yeah. It was presented to me by I believe it was
23 Attorney Walker.
24  Q. Okay. And he represented you at that time,
25 correct?

Page 213

1  A. Yes. That's correct. That's correct.
2  Q. Does Mr. Walker still represent the organization
3 or not?
4  A. I don't know why that's relevant, but on an
5 as-needed basis, if we need Mr. Walker or any other
6 attorney, we'll go in, you know, pursue their services.
7  Q. Okay. And then the next exhibit is Exhibit O.
8 And that is a letter from Mr. Walker back to counsel for
9 the university, correct?
10  A. Yes, sir. I remember this letter.
11  Q. Okay. So you saw this letter and approved it
12 before it was sent out to the university's counsel?
13  A. Yes.
14  MS. FANIEL: Form.
15 BY MR. HERBERT:
16  Q. Okay. And this letter, it doesn't have a date on
17 its face, but it appears from the next exhibit that it
18 was sent on October 5th of 2021. I don't expect you to
19 remember that off of the top of your head, unless you
20 might -- you might happen to. It's referenced in the
21 next exhibit, which we'll get to.
22      But does that date sound correct to you?
23  A. Well, I know this letter followed I believe that
24 second letter that we received. But I can't tell you
25 the exact date, but it followed it and was direct -- and

Page 214

1  it was in direct response to that letter.
2      Q.  Okay.  And so in this letter, Mr. Walker
3  indicates in the first paragraph that in the -- I think
4  it's the second sentence, the organization has been --
5  and I'm paraphrasing -- has been working over the past
6  several weeks to disengage from the university as
7  requested by the university.  Correct?
8      A.  Yeah, that's what it says, yeah.
9      Q.  Okay.  And then potentially, Mr. Walker indicates
10  in here that the expectation is that you will be able to
11  disengage by the end of October of 2021.  Right?
12      A.  Yes.  It says by the end of -- right.  October.
13  Correct.
14      Q.  Okay.  And it says by the end of October, the
15  expectation is that the National Alumni Association will
16  have been completely disassociated from the university
17  by the end of October.  Right?
18      A.  Yeah.  That's what he wrote, correct.
19      Q.  Okay.  And your organization wasn't able to
20  accomplish that; is that, you know, a fair statement?
21          MS. FANIEL:  Object to form.
22          THE WITNESS:  That we completely disassociate?
23  BY MR. HERBERT:
24      Q.  By the end of October 2021.
25      A.  Well, I think that we -- actually, I think that

Page 215

1  we needed more time than that.  That's kind of a
2  difficult question to answer because when you say
3  completely, part and parcel of what you request -- what
4  your client requested was that we disassociate from
5  Dr. Mary McLeod Bethune's name and that's I think a
6  pivotal issue in this case.  We believe that we do have
7  the right to make use of that.  So we've not
8  accomplished that.  We've not tried to accomplish that
9  because we don't think that we are duty bound to
10  disassociate with her name.
11          In terms of us trying to remove the different
12  logos, the things from the websites, we made a
13  good-faith effort to do so.  And I think by and large,
14  we were successful.  There were a couple of chapters
15  that we had hard time reaching folk.  But we started
16  setting up meetings.  And, you know, we can't -- it was
17  difficult for me to do more than one meeting in one
18  night because most people get off work around 5 or 6:00
19  and we would start these meetings by 7.  And when we
20  would have a meeting, starting at 7 or 7:30, sometimes
21  we'd be on those meetings until 9:30 because emotions
22  were high.  So it's kind of hard to reach all the
23  chapters to have that sit-down meeting with them within
24  a short time frame.  But we made an effort to do what we
25  could to respond as best we knew how and as best that we

Page 216

1  thought we were legally obligated to do.
2          As I told you, we changed the name pretty fast.
3  And then we were unclear on some things that we had to
4  do or things that we didn't have to do.  But in terms of
5  those -- those logos that you showed previously in the
6  complaint, everybody was directed to stop using those,
7  to remove those, et cetera.
8      Q.  All right.  And just to clarify, those prior
9  exhibits that we went through which were -- some of
10  which were posted on social media just in the last few
11  months, those were not exhibits from the complaint.
12  Those are posting that -- or posted long after this
13  complaint was filed, just to clarify that.
14          So in light of that, my question is, given the
15  nature of your organization, it's a national chapter, a
16  national organization and the multiple sub-chapters out
17  there, isn't it fair to say that it was difficult to get
18  immediate compliance -- leave aside the name, Mary
19  McLeod Bethune, Dr. Mary McLeod Bethune, but other than
20  that, it was difficult to effectuate compliance with the
21  university's demand to discontinue using its trademark
22  and logos, despite your good-faith efforts; is that a
23  fair statement?
24          MS. FANIEL:  Object to form.
25          THE WITNESS:  Yeah.  Within the 30-day period

Page 217

1  that they requested and I think even October -- I do
2  think that we substantially complied.  But if there
3  was 100 percent compliance, I'm not sure that we were
4  able to accomplish that in a short period of time.
5  But I do believe that there was substantial
6  compliance, and more than substantial effort to
7  achieve this, to achieve compliance.
8  BY MR. HERBERT:
9      Q.  Isn't it true that in a given day with the
10  different posts we saw on social media, that isn't it
11  fair to say it's still difficult to effectuate
12  compliance with the removal or discontinuance of the use
13  of the university's trademarks and logos?  Isn't that --
14          MS. FANIEL:  Object to form.
15          THE WITNESS:  Well, I don't think that it's
16  difficult.  I do -- sometimes I believe that there are
17  individuals who are defiant, persons who may not be in
18  favor of this organization.  But, you know, like the
19  young lady in South Georgia, I didn't know that that
20  was -- I didn't know that that was going on but I do
21  know that I told her.
22          Also, the Miami-Dade chapter.  You know,
23  sometimes people, you know, they're confused.  I
24  remember when this cease and desist happened, our
25  baseball team was playing in Miami.  And my

55 (Pages 214 - 217)

Page 218

1  understanding is that someone from the baseball team
2  contacted the Miami-Dade to fix meals for the players
3  because it would save the school money. And folk were
4  calling me, asking me what -- President McCray, what
5  should we do in this situation, you know, we want to
6  support these kids because the school doesn't have
7  much money anyway. And I told them, and they didn't
8  like my response, but I told them that we can't do
9  that. We can't do it.
10     So I think what happened, some individuals in
11 their private capacities may have fed the
12 basketball -- I'm sorry, the baseball team. But that
13 happens. People want to be involved. They want to
14 support this organization because the founder started
15 it. That's my understanding. And folk want to
16 support the schools. So when you tell them that they
17 can't as part of this organization, you know, a few of
18 them, a handful of them sometimes I guess find it
19 difficult not to. But I don't think it's a problem
20 with us in terms of compliance. And now that I know
21 what you've presented to me today, that will be taken
22 care of.
23 BY MR. HERBERT:
24    Q. All right. You're not -- you're not testifying
25 that everybody who posted stuff for the logo like Alex

Page 219

1  Knighton, who you know personally, that they have a
2  malicious intent towards your organization, are you?
3     A. I don't know what they have. I mean, I can't
4  tell you. I do know that there's some people out there
5  who are capable of doing that and some people who I know
6  would do it if they get an opportunity to. I know. And
7  we'll see that coming forward, I'm sure, with some of
8  your -- with Ms. Castro sending out correspondence to
9  people, asking them are they confused. I'm sure
10 Mr. Delancy and the board chair can get some people to
11 say that they are. So we'll deal with that.
12    Q. Let me ask you this: Have you -- have you ever,
13 you personally, confronted anybody that you contend is
14 posting the university's trademarks or logos on your
15 organization's social media pages about this --
16    A. No.
17    Q. Okay.
18    A. No, I've not personally approached anyone. But
19 I've certainly said that in the meetings that we've got
20 to be vigilant, you know, about information that's
21 shared. We've got to be vigilant about individuals not
22 doing things to sabotage this organization.
23    Q. Okay. And you have any documentation, any
24 e-mails or letters you sent out communicating that
25 sentiment?

Page 220

1     A. I don't know if I do. I can check, but I do know
2  that I have been at meetings and I've said that. I
3  don't bite my tongue when I speak. Well, I don't mean
4  it like that. I'm not a -- what's the word -- brash,
5  rash, whatever you call it. But I do try to speak, you
6  know, what I feel and what I see.
7     Q. All right. You don't -- you don't have any
8  evidence of anybody coming out and supposedly admitting
9  that they did any of that content with an intent to hurt
10 your organization, do you?
11    A. No, I don't think anybody's going to admit that
12 to me.
13    Q. All right. Let's move forward to the next
14 exhibit, which is Exhibit P, which starts at page 185 of
15 the docket entry number 33. And just briefly, this is a
16 letter dated October 12, 2021, from counsel for the
17 university addressed to Mr. Walker. Mr. Walker was
18 representing your organization in October of '21,
19 correct?
20    A. Yes.
21    Q. Okay. And I assume you've seen this, this
22 letter, Exhibit P, and its attachment, correct?
23    A. Yes, I did.
24    Q. Okay. And just for reference, this indicates
25 responding to Mr. Walker that this lawyer is in receipt

Page 221

1  of correspondence from Mr. Walker dated October 5, 2021,
2  so that's where that date comes from. But this
3  Exhibit P, this is the third letter from the university
4  counsel with a cease and desist demand to your
5  organization, correct?
6     A. Yeah. I think -- yeah, this is in response to
7  Mr. Walker's letter. So I believe this would be the
8  third letter.
9     Q. Okay. And it says -- the re line of this or
10 subject line, it ended with, quote: Final demand for
11 cease and desist.
12       You see that?
13    A. Yeah, I see that.
14    Q. Okay. And again so upon receipt of this letter,
15 you and your organization continued to take steps to
16 attempt to discontinue from any use of the university's
17 registered trademarks or logos, correct?
18    A. Yeah. Are you asking -- yeah. We were making
19 the continuance efforts to do that, yes.
20    Q. Okay. And then it appears there's certain things
21 attached to this Exhibit P, which follow it starting
22 at -- looks like page 187. And then the next page --
23 let's go to the next page, 188.
24       MR. HERBERT: Maybe you can zoom in on that one a
25 little bit.

56 (Pages 218 - 221)

Page 222

BY MR. HERBERT:

 2   Q. So this one, you see this one, it has that logo
 3 that you talked about in the upper left-hand corner.
 4 You see that with the picture of Dr. Bethune and some
 5 images from the university's campus, the statue and then
 6 the head, heart, hand seal.
 7     Do you see that?
 8   A. I do.
 9   Q. Okay. And so this was -- this is a flyer or an
10 advertisement that was published online or sent out by
11 your organization in or about October of 2021. Correct?
12   A. I'm very familiar with this, correct.
13   Q. Okay. And it also uses the interlocking BCU logo
14 down there on the left-hand side, correct?
15   A. Yeah. When I say I'm familiar with this, I don't
16 think that I saw this flyer until later. But when I say
17 I'm familiar, I actually went to this event that we had
18 in -- that's when Dion Sanders took over Jackson State
19 University and everybody was, you know, on a high. And
20 so we went to that. And we had a hotel. We didn't
21 raise money, but, you know, we just networked. Went to
22 the game together.
23   Q. Okay. I was going to ask about that. That
24 little -- that little oval logo there in the upper
25 left-hand corner, so that was -- that was a logo that --

Page 223

 1 was that logo one that your organization created after
 2 the -- after the first cease and desist letter that you
 3 got in mid September of '21, or was that --
 4   A. Where you see the heart -- head, hands and heart?
 5     MR. HERBERT: Zoom in a little bit there,
 6   Paula, if you could, in the upper left-hand corner.
 7 BY MR. HERBERT:
 8   Q. Well, first, let me ask, that logo is the same as
 9 the one we saw in that other exhibit except it had --
10 the one you thought was from Volusia County except it
11 had that -- the circle with the university seal removed,
12 right? Otherwise it's the same?
13   A. Yeah. This is our -- the logo that's been with
14 the National Alumni Association for -- probably since
15 probably the early '90s.
16   Q. Okay.
17   A. I don't know if I was active at that time but
18 that's the logo and -- that's the logo that we said we
19 would not use. I can tell you in October of -- this is
20 what, 2022 or 2021?
21   Q. '21.
22   A. 2021.
23     MR. HERBERT: You can zoom out.
24     THE WITNESS: Yeah. That's when everything was
25 kind of fresh, you know, the cease and desist letter,

Page 224

 1 the divide between the university and the alumni
 2 association. So individuals still were kind of
 3 unclear as to what they could and could not do. And
 4 this -- we got the cease and desist, the first letter
 5 in September. This was now October.
 6     And so, you know, when I saw this, and I did
 7 see this later on, I was concerned about it. And
 8 after that, I don't think that we had any more -- any
 9 actual functions that were sponsored by the national
10 when we had this happen.
11 BY MR. HERBERT:
12   Q. Okay. And you understand that your organization
13 should not be distributing any flyers or advertisements
14 with that logo in the upper left-hand corner or with
15 interlocking BCU -- BC logo there in the lower left-hand
16 corner, right?
17   A. Yeah. I understand that. Yes.
18   Q. Okay. And, also, this references the name of the
19 university which is a registered trademark,
20 Bethune-Cookman University, there right below that BCU
21 logo and also up in the top center of the title of the
22 flyer, right?
23   A. Yeah. And I agree. I think right after this
24 cease and desist letter, during the time when things
25 were kind of unsettled, unclear, I think we made

Page 225

 1 reference to the Florida Classic and that's when we were
 2 told that we couldn't do it, we haven't done it since
 3 that I'm aware of. And the same thing here. Things
 4 were kind of still up in the air with a lot of
 5 individuals. A lot of folk couldn't understand,
 6 couldn't comprehend, digest that we couldn't use the
 7 logo symbols, you know, but they did it because they
 8 weren't really clear. And so now we really don't have
 9 that problem now. I mean, time has passed and we've
10 really emphasized it.
11   Q. Okay. Let's go ahead and look at the next page,
12 which is page number 191 of docket entry number 33.
13     This document, you recognize this as a flyer that
14 was e-mailed out by Constant Contact on behalf of your
15 organization? Go down to the bottom of the -- scroll
16 down a little bit.
17   A. Yeah. This must have been a while back. If we
18 have NAABCU there, that must have been in 2021, shortly
19 after that letter had come out. But we don't do this
20 now.
21   Q. Okay. You see this uses the wildcat head logo
22 there under the Join Us Now.
23   A. Yeah. I see that and I see everything else in
24 there. I see the band. I see -- yeah, I see the
25 wildcat head, I see the band. I don't know if I see the

57 (Pages 222 - 225)

Page 226

1  name of the school.  Yeah.  But I see that.  Yeah.  I
2  see NAABCU, I see that there.  Right.  That was right a
3  month after the cease and desist letter, we were still
4  kind of not -- not we but -- I wasn't but a lot of folk
5  weren't clear and didn't understand.
6      Q.  And let's go to the next page, which is page 192,
7  although it's going to be a little hard to read there.
8  If you scroll down to the bottom.
9      Now, this is a separate exhibit to the complaint,
10 this is Q-1, you can see at the bottom there.  And at
11 the top, it's got that modified logo that we talked
12 about before, which still has the pictures of the campus
13 and the band and Dr. Bethune's home which is on campus.
14 But it's got the head, heart, hand seal removed.
15     Do you see that there?
16     A.  I do, yes.
17     Q.  Okay.  And looking at this down below, this -- do
18 you recognize this document, first off?
19     A.  No, I don't think I would.  Actually, the young
20 lady there with the gold top on, I've seen that.  That
21 may have been on our website even before I became
22 president.  I've never seen the dollar bill, the $100
23 bill, the 53rd annual convention, I don't know if I was
24 president then or not.  I may have been.  I don't know.
25 But I've seen this before, at least the young lady on

Page 227

1  the website.
2      Q.  Okay.  This is attached to the complaint.  I
3  believe this was -- so this was -- I believe this is the
4  home -- the home page, the splash page of the website,
5  which is attached to Exhibit Q-1, that logo at the top,
6  the one with the -- with the -- sort of the empty circle
7  for the head, heart, hand.  Scroll up there a little
8  bit.  For that, you or your organization have
9  directed -- directed the organization and its chapters
10 to discontinue using that logo, correct?
11     A.  Yes, sir.  That's correct.
12     Q.  Okay.  All right.  Let's move ahead a little bit,
13 go to page Q-2, which is at page 195.  It's Exhibit Q-2
14 to the complaint.
15     Scroll down so we can see the exhibit number down
16 there.  Q-2.  Up ahead.  This was -- this was a page on
17 your organization's website for one of the pages by
18 which donations to your organization could be made.
19 Correct?
20     A.  Yes.
21     Q.  Okay.  And that has been since modified to
22 discontinue the use of that logo, correct?
23     A.  That's correct.
24     Q.  Okay.  Going to the second -- let's go to the
25 third page of this, which is page 197.  There at the

Page 228

1  top, you'll see it says:  Your generosity and dedication
2  to Bethune-Cookman University.
3      Do you see that up there?
4      A.  Yes.
5      Q.  Okay.  And that -- so that reference to
6  Bethune-Cookman University on your donation page has
7  been modified as a result of the university's claims in
8  this case, right?
9      A.  Yeah.  There shouldn't be any reference
10 whatsoever to Bethune-Cookman University on our website.
11     Q.  And in particular on a donation page, right?
12     A.  Yeah.  In particular, especially raising money,
13 correct.
14     Q.  And then take a look at the next page is Exhibit
15 Q -- well, Q-3 and Q-4.  Q-3 is the 2020 bylaws, we
16 already talked about that.  Let's go to Q-4.
17     Q-4, you recognize this, this is a National
18 Alumni Association Manual of Operational Procedures.
19 You recognize that as coming from your website in or
20 about October of 2022?
21     A.  I know that this is our MOPAC.  Whether or not
22 it's on the website, I don't know.  I don't really go on
23 that website.  But I did go on it to make sure that we
24 had removed all references to the alumni association.
25 But I recognize this document as our MOPAC.

Page 229

1      Q.  Okay.  Which is short for manual of operational
2  procedures?
3      A.  That's correct.  Yes.
4      Q.  Okay.  And so your MOPAC has been modified to
5  remove that logo that we talked about, right?
6      A.  Yeah.  Actually, we don't even use the MOPAC now.
7  We're in the process of just redoing it because it's so
8  outdated.  Those things were promulgated, I believe, in
9  the late '70s.  If you look at the letters in there,
10 they're so outdated I don't even think they made
11 references to computers.
12     Q.  Okay.  Let's go to the next sub-exhibit, which is
13 Exhibit Q-6, page 203.  Looking at this page 203.
14     MR. HERBERT:  And why don't we scroll down a
15 little bit.  Okay.  That's good.
16 BY MR. HERBERT:
17     Q.  So on this page, Q-6, do you recognize this page
18 or this document?
19     A.  You mean that says Legacy?
20     Q.  Yeah.  Well, there's something in the top that
21 has no logo, we talked about --
22     A.  Oh, yes.  Yes.
23     Q.  -- that says Legacy.
24     Okay.  Can you tell me what this document is?
25     A.  The -- that's the logo that we talked about

58 (Pages 226 - 229)

Page 230

1 earlier. And you're talking about what's under that
2 where it says Legacy?
3    Q. Yeah. Yeah. Tell me about that.
4    A. Well, that's a magazine that I -- I won't say I
5 started, but I restarted. I campaigned on starting --
6 we had a magazine called the Legacy magazine which was
7 pretty good. And I campaigned on restarting the Legacy
8 and not having the chapter having the use of any of its
9 money. So I single-handedly would raise 8 to 10,000,
10 sometimes a little over so we can do this magazine and
11 not have to go into our coffers with the organization.
12    So this was our second edition here. This was
13 Joyce Moorehead who was on there. She's served on the
14 board with me. And one of the dorms is named after she
15 and her husband. You know, they've done very well for
16 themselves. They own several -- well, they owned
17 numerous car dealerships.
18    So, you know, I've been instrumental in giving
19 her -- getting her to give to this association. And so
20 we recognize her there.
21    I'm looking -- the school actually helped --
22 they -- they bought a full-page ad and we had a
23 president's page for the university in there; we feature
24 the band, we talked about the statue. But we don't do
25 this magazine any longer while this situation is going

Page 231

1 on.
2    Q. Okay. When this -- on that -- on this image of
3 the Legacy magazine, the front page, that appears to say
4 spring 2021. And then let me ask you, when was the
5 last -- that Legacy magazine, that was a paper magazine
6 that was distributed by your organization?
7    A. Yeah. It was a paper booklet, probably about, I
8 guess, 20 pages. And it was also on the website. I
9 think you could go on the website and actually look at
10 it digitally.
11    Q. Got it. Yeah. This looks to be like the first
12 page of the online version of that Legacy magazine.
13 Does that sound right?
14    A. Right. Right.
15    Q. Okay. And that magazine, you said that was --
16 that was published in conjunction with the university
17 before the split between your organization and --
18    A. I don't really know what you mean, published in
19 conjunction with. They supported my vision of having
20 this organization, having a booklet where we would
21 highlight alumni who have done well, who supported the
22 school.
23    And they knew that it would cost money so I
24 actually, for example, I solicited money from the
25 sheriff's office here in Broward County. Their ad was

Page 232

1 $2,000 or $2,500. The school's ad was I think 1500 or
2 $2,000. And I had several persons to buy ads totaling
3 10 to 12,000 -- I would say 10 to $12,000.
4    So the school supported us in the sense that they
5 took out an ad and, also, the then president actually
6 wrote a greetings in the very -- I think he may have
7 been on the first or second page.
8    Q. I understand. So this -- so this is spring of
9 '21, this -- this edition or issue of this Legacy
10 magazine, that was published with the authorization of
11 the university?
12    A. I'm not going to say that it was published with
13 the authorization. You mean -- so are you asking if
14 this was done within -- after the cease and desist
15 letter?
16    Q. No. What I'm asking is, you're saying that the
17 university bought an ad, someone at the university wrote
18 a blurb in there, the greeting or something like that.
19 So this was something that was done in coordination with
20 the university before the cease and desist letter,
21 right?
22    A. Yeah, they supported us in this. Actually, the
23 school wanted us to do this because it brought positive
24 attention to the university.
25    Q. Understood. And let me ask you -- let's just go

Page 233

1 to the next page, which this will be a different cover
2 of a different edition of that same magazine. You see
3 that page with, looks like Mr. Frederick Ingram on the
4 cover?
5    A. Um-hmm. Yeah.
6    Q. That's winter --
7    A. That was the first magazine.
8    Q. Okay. So same thing, did the university support
9 this publication as well?
10    A. Oh, they were very supportive. We worked lock
11 and step with the school in raising money and getting
12 our name out there so we could position ourselves to
13 raise money to give to the school.
14    Q. Understood. Were there -- were there any other
15 publications that the -- before the cease and desist
16 letter, that the -- that you're aware of that your
17 organization ever published, you know, with the consent
18 or permission of the university? Let me strike that.
19 That's not a good question. Let me ask you, any
20 other -- any other alumni publications before the cease
21 and desist letter that your organization was involved in
22 that you know of, even before your time? I saw some
23 reference to publication called the Clarion. Does this
24 sound familiar?
25    A. I'm familiar with the Clarion and the -- there

59 (Pages 230 - 233)

Page 234

1  was something called the B-CEAN, B-C-E-A-N.  But now,
2  whether that was put out by the alumni or the
3  university, I don't know.  I know my mom and dad
4  graduated from Bethune-Cookman and they used to
5  receive -- when I was a kid I think they received called
6  the B-CEAN or the B-CEAN.  But I don't know if that came
7  from the university or the alumni.
8     Q.  Okay.  Was this Legacy magazine, is that the only
9  hard copy publication that you're aware of going out
10 from the -- your organization while -- while you were
11 president?
12    A.  That is the only thing that was sent out like
13 that.  I do -- I like to write.  In fact, I write
14 commentaries for newspapers sometimes and I will send
15 letters of interest out, as you've seen, you know, to
16 our membership and our supporters as coming from the
17 association.  So I do that.  I do that sometimes also.
18 But this is the only thing that comes from the
19 organization -- that came from the organization.  We
20 don't do it now.  We had started one.  We were
21 75 percent done or maybe 80 percent done but we pulled
22 back and we still had to pay the printer, the publisher
23 and the guy that wrote the articles for us.  I told him
24 that we -- I was hoping that we didn't have to pay.  We
25 couldn't send it out now because of the restrictions but

Page 235

1  they still wanted to be paid so we did it.  So these are
2  the only two.  We haven't did it since.
3     Q.  Okay.  Let me just correct myself.  So this
4  amended complaint is dated October 5th of 2022.  So this
5  is over a year after the cease and desist letter went
6  out.  Were you aware that this -- these -- this
7  document, looks like 2/6 with the cover of the Legacy
8  magazine and then the second page of that with the
9  convey of the other edition of the Legacy magazine were
10 on the organization's website in October of 2022?
11    A.  I don't recall.  I may -- I probably don't know
12 that.  I probably didn't know that because I would have
13 said to take it down, especially -- I'm not even
14 concerned about the statues in the background.  I'm
15 talking about the head, hands and heart there, I
16 probably would have just said take it down.
17       But, you know, quite honestly, although I'm a
18 lawyer, I'm not learned in intellectual property.  You
19 know, I just -- I've wondered to myself inasmuch as the
20 school, in a sense, partnered with us with these
21 magazines before the cease and desist letters, why would
22 we have to take it down?  But, you know, I've wondered
23 that after the fact and I don't know if that's --
24    Q.  I understand.
25    A.  -- an answer to the question.  All right.

Page 236

1     Q.  I understand.  And then the same thing holds true
2  for the MOPAC, which is the prior exhibit, and the
3  bylaws which was on your website in October of 2022,
4  both bearing the head, heart, hand seal, that's Exhibit
5  Q-3, Q-4, and, also, the other -- the other images from
6  the campus of the university.
7        So my question is, I understand that you
8  personally had involvement in trying to -- trying to get
9  compliance with your organization and its chapters.  But
10 did you ever hire any vendor or third party to attempt
11 to police your website or your chapter's use of the
12 logos and --
13    A.  No.
14    Q.  -- trademarks?
15    A.  No.  I used the tech team to do that.
16       And going back to this Legacy magazine, I think
17 that there's material difference between this magazine
18 and, say, our bylaws.  Here, the university actually
19 paid for us to do this, to assist us in doing this.  But
20 anyway, that's neither here nor there.
21       But, no, we did not hire a vendor.
22    Q.  Okay.  Well, you're not maintaining that the
23 organization was still entitled to display this on its
24 website with the seal over a year after the university
25 sent the cease and desist letter demanding it, demanding

Page 237

1  that those symbols be taken down, are you?
2     A.  I don't know.  That seems to be a legal
3  question.  But I don't know.  I didn't -- I don't recall
4  seeing this on there.  But if I had seen it, I just
5  wonder if I would have thought this was a big to-do
6  inasmuch as the university actually assisted us in
7  producing this magazine.
8     Q.  Okay.  You understand that the lawsuit was filed
9  in January of 2022, ten months before the date of this
10 exhibit?
11    A.  Sir, I understand exactly what you're saying and
12 you asked me that before.  And my answer remains the
13 same.
14    Q.  Okay.  Let's move ahead just to Q-8, the next
15 one.  That's on page 208.  Docket entry 33.
16       So you're familiar with this document that's at
17 Exhibit Q-8 to the complaint?
18    A.  Let me see what this is.  September 23rd.  That
19 was the same month of the -- I remember we did have a
20 town hall meeting and I think we were having that to
21 discuss what was going on, current status of the NAA,
22 what's going -- how will we get there and reappoint
23 and -- yes.  I remember this.
24    Q.  Okay.  And who -- who created this document?  Was
25 that your marketing team or --

60 (Pages 234 - 237)

Page 238

1 A. Yeah. Yeah. I never create this. I have no
2 experience or know-how in doing this, so normally we
3 leave this to the marketing team. And there are a
4 couple persons who work with them who's real good with
5 doing flyers, these type things. So I leave that to
6 them.
7 Q. Okay. You see here in the middle of it, there's
8 the -- below the words town hall meeting, there's some
9 writing in kind of like a cursive script or font there,
10 and it says: Bethune-Cookman belongs to all of us.
11 You see that?
12 A. Yeah, I see that and I think the reason why that
13 was put there is because you -- that was one of the
14 clarity points that I thought that people were not
15 really informed about. You know, you had many people
16 believing that since they agree -- I'm sorry, since they
17 graduated from Bethune-Cookman, they give money to the
18 school, have children go there, et cetera. They felt as
19 though the board and whoever else should not be able to
20 take some of the rights away. And even this issue was
21 new to me. And I did not know what the limitations
22 were. And so that's what we were trying to become more
23 educated on so that we could properly respond so that we
24 could know what our rights and what our limitations
25 were.

Page 239

1 Q. Understood. And then but since then, you or your
2 organization have directed that this flyer be removed
3 from your website, correct?
4 A. Anything that had Bethune's name on it,
5 especially as relates to fundraising, this is what we
6 ask. That's correct.
7 Q. Okay. I think the next exhibit we already talked
8 about. Let's try to speed things up a little bit here.
9 THE VIDEOGRAPHER: Mr. Herbert, we're
10 approaching 90 minutes again.
11 MR. HERBERT: Okay. How many minutes left?
12 THE VIDEOGRAPHER: Seven.
13 MR. HERBERT: Okay.
14 All right. Let's just go to Exhibit No. Q-13,
15 which is at page 215. So taking a look at this --
16 maybe just zoom in a little bit on this one.
17 BY MR. HERBERT:
18 Q. So this appears to be dated November -- it
19 references an event November 29th there above the
20 photograph.
21 A. What year?
22 Q. Appears to be 2021. This was filed with the
23 Court in October of 2022. So this appears that it's
24 late November of '21. You're familiar with this? This
25 was an exhibit to the amended complaint filed with the

Page 240

1 court in October of last year.
2 A. I think I saw that in the complaint but I wasn't
3 familiar with it. That's Mr. Barfield, our tech person,
4 who we've called his name several times. That's him in
5 this photograph. But I'm not familiar with this
6 particular photograph and article.
7 Q. Okay. You see there at the bottom --
8 MR. HERBERT: Let's scroll down just a little
9 bit there, Paula, the middle there.
10 BY MR. HERBERT:
11 Q. See there's a sign with the words Florida Classic
12 and -- and looks like maybe a wildcat head logo on
13 there, that's a little hard to see. But do you see the
14 words Florida Classic behind Mr. Barfield's head there?
15 A. Yes, sir, I do.
16 MR. HERBERT: Okay. All right. It sounds like
17 we need to take a break. So let's go off the record
18 for ten minutes and then I'll come back and I'll try
19 to wrap things up hopefully soon.
20 THE VIDEOGRAPHER: We're going off the record.
21 The time is 4:23 p.m.
22 (A brief recess was taken.)
23 THE VIDEOGRAPHER: We're going back on the
24 record. The time is 4:36 p.m.
25 MR. HERBERT: Okay. Welcome back. Let's go

Page 241

1 briefly to tab 28, if we can bring that up on the
2 screen, Paula.
3 BY MR. HERBERT:
4 Q. Okay. For the record, tab 28 includes documents
5 that were produced by your counsel in this action. The
6 first Bates number appearing in the upper right-hand
7 corner of the first page of this document is DEF000453.
8 And that document that's the first page includes an
9 e-mail, it appears to be an e-mail from you dated
10 October 1st, 2021. Appears to be an e-mail to the -- to
11 your chapter presidents.
12 Do you recognize this document?
13 You're on mute, Mr. McCray.
14 A. Yeah, I'm sorry.
15 Yeah, this actually is to the board of directors,
16 which consists of chapter presidents. So the chapter
17 president's in here, but it's many more individuals. I
18 sent this out, I think shortly after this situation
19 happened. Yeah, I remember.
20 Q. Okay. And then it appears that -- I want to
21 understand, if you look at the next few pages, that, I
22 believe, is an attachment -- you see this page, Bates
23 numbered 454, it looks like it references two
24 attachments and then the next page appears to be one of
25 the attachments. And that looks like it's a -- it's a

61 (Pages 238 - 241)

Page 242

1 letter or a memo written by you, if you go down to the
2 next page. Okay. You can stop there.
3      So am I correct that this document that we just
4 went through with those Bates numbers, that's an e-mail
5 that you sent out to chapter presidents and to the other
6 people you mentioned relating to -- in part to the cease
7 and desist letter that you got from the university,
8 correct?
9 A. Yes, that's correct.
10 Q. Okay. And on page -- the previous page of
11 that -- that page, this reflects you reminding the
12 chapter presidents that they are subordinate to the
13 national organization and it appears to be citing a
14 particular section of the internal revenue code.
15      Do you see that?
16 A. Yes.
17 Q. Okay. And this was something about which you
18 were reminding the various chapters that they are
19 subordinate to the national organization and should be
20 following the direction and control of the national
21 organization, correct?
22 A. Yeah. And, also, I believe this may have been
23 referencing them giving monies that they had in their
24 accounts to the university. It's been a while since
25 I've seen this.

Page 243

1 Q. Right.
2 A. Funds brought into the NAA by its chapters must
3 be properly recorded and reported to the -- yeah. Yeah.
4 I remember this letter.
5 Q. Okay. And so I want to ask you, do you -- does
6 this -- and I'll tell you that I forget what your answer
7 was, but I seem to recall -- so I'll ask you again,
8 forgive me. But do you recall if any of the chapters
9 did, in fact, transmit any funds to the national
10 organization, to your organization, as a result of this
11 letter?
12 A. No. And I don't think that we were asking them
13 to transmit any monies to us. Only if it were a
14 situation where they were tempted to give money to the
15 school, we were telling them to give the money -- that
16 the money belongs to us, to the organization, the
17 national.
18 Q. Okay. So the purpose of this was to just try to
19 prevent any of the chapters from transferring any of
20 their money in their accounts to the university?
21 A. Yes. For the reason that I just said, and also,
22 the other reason, I thought the school was being
23 hypocritical, telling us that they don't want money but
24 then Hiram Powell was trying to take over our chapters,
25 he was the president -- interim president then, telling

Page 244

1 them to give them the monies, I guess, that they had.
2 Q. Okay. If we just go back up to the first page of
3 this exhibit. Just the -- the signature there, at that
4 point, this is October 1st, you're still using that
5 logo, the oval logo that has the head, heart, hand seal
6 in it in your signature block, right?
7 A. It's there, so obviously, yes, it was there.
8 Q. Okay. And at some point, you understood that you
9 should discontinue the use of that logo there on that
10 page, right?
11 A. That's correct.
12 Q. Okay. Moving forward to the page 459, DEF459
13 Bates number. So this is -- the body underneath appears
14 to be an e-mail from you dated October 5th of 2021. Do
15 you see that?
16 A. I do. I remember this letter.
17 Q. Okay. Can you briefly summarize the purpose of
18 this -- this e-mail?
19 A. Oh, you're asking me to summarize it?
20 Q. Yeah, please. I want you to --
21 A. Yeah. I remember this. We had homecoming coming
22 up, either that week or the following week. I knew
23 sometime in October. And our queens are very passionate
24 about the university, they're very passionate about what
25 they've done for the university in terms of raising

Page 245

1 monies. And as a show of our genuine affection and
2 appreciation to them, what we've done over the years, at
3 homecoming, the queens get to go on the field and it's
4 usually about 10 to 13,000 people, they usually set
5 on -- sit on one of the first two rows in the stadium
6 with their thing on their head, the crown and their
7 little thing that goes across saying what the title is.
8 But now that was being taken away.
9      And also, another big thing for them is to be
10 able to participate in the parade. We normally rent a
11 car, get a float or something and they get to wave and
12 it's a lot of people. Well, that was being taken away
13 from the association. They didn't understand it. They
14 were angry. They were angry at me. We had some who
15 indicated that they were going to be defiant and get in
16 any way. And I think I may even reference that here.
17      So what I did, and Julie Holiday and Margaret,
18 they're like over the queens, they were very upset with
19 me. And so I wrote them a letter and I also sent it to
20 La-Vaughn, who's the treasurer, and she's a former
21 queen. Michael Shorter is the vice president. And in
22 this letter, I explained to them, I said, listen, you
23 know, I'm sorry. We cannot do it. And we're not going
24 to do it. And I put in bold a portion of the cease and
25 desist letter. And I -- if you look at the -- I believe

Page 246

1 this may be the last paragraph on my thing. I can't
2 push it up. It says: Lastly, I appreciate -- boy --
3 lastly, I appreciate, I guess, it may be difficult to
4 accept but I'm urging all members to honor the
5 university's request as they have a right to make such a
6 request, whether it's good or bad. I look forward to
7 the queens fellowshipping and partying at the rooftop
8 party. There we expect to honor and recognize our
9 queens.
10     And that's what we decided to do. We came up
11 with an alternate plan to recognize these young ladies
12 because they raise money for the university. And I
13 said: I also understand that you also planned a few
14 other events for the queens. As the popular quote of
15 unknown origin goes, this too shall pass. This quote is
16 a reminder for -- and it goes on.
17     But I did everything in my power to try to get
18 these people to -- I hate to refer to them as these
19 people -- our members to understand what was going on
20 because some of them still don't understand what's going
21 on. And, you know, this is what we did. And they bowed
22 out gracefully from participating but they were actually
23 going to crash the homecoming parade. And I averted
24 that.
25     Q. Okay. Understood. And you indicate there that

Page 247

1 the university has the right to make the request.
2 That's referring to the request that the national --
3 that your organization no longer make any use of its
4 registered trademarks or logos, correct?
5     A. Well, yeah. Yeah. I mean, we've -- I thought
6 that we had established that but I'm being even more
7 specific here. They wanted to know does that preclude
8 them as alumni in being queens of this association from
9 participating in the parade? And I told them my
10 understanding, my interpretation was that it does.
11     Q. Okay. Understood.
12     MR. HERBERT: Let me -- let me do this. Let's
13 mark -- I'm going to go ahead and mark this whole
14 document. I'm going to go through it by Bates number.
15 But just so I don't forget, we're at Exhibit No. 20, I
16 believe. Is that right?
17     THE COURT REPORTER: Yes.
18     MR. HERBERT: Okay. We'll mark this as
19 Exhibit 20.
20     (Plaintiff's Exhibit No. 20 was marked for
21 identification.)
22 BY MR. HERBERT:
23     Q. And let me just go through. This goes through
24 the Bates numbers continuing -- I think the copy I'm
25 working from may be different. So can you scroll down

Page 248

1 to the last document and see, and I think these Bates
2 numbers might not be in the same order because I think
3 this was out of chronological order.
4     A. Mr. Herbert, just one second. Going back to that
5 other letter that I sent out. And as I looked at it, it
6 refreshed my recollection. I also took this issue to my
7 executive committee. And I explained to them. And I
8 received their blessings on this before I sent this
9 letter out.
10     Q. Understood. And when you say took it to the
11 executive committee, I assume there would be documents
12 such as agenda, meeting agenda or minutes that reflect
13 that?
14     A. It should be. I'm not sure. It should be.
15     Q. Okay. We'll -- we'll request those for the
16 record.
17     What I want to get through is that this -- this
18 exhibit that I marked as number 20, these are all the
19 e-mails that we have from you that have been, actually,
20 I think the only e-mails at all that have been produced
21 by the defendant in this case. And so I think that you
22 know that -- are you -- do you know -- do you happen to
23 know, and maybe you don't, but do you happen to know why
24 these e-mails were the only e-mails that were produced
25 in response to our document request in this case? Is

Page 249

1 there any reason --
2     MS. FANIEL: Object to form.
3     MR. HERBERT: I'm sorry. Just to -- I
4 understand you've got an objection to form.
5 BY MR. HERBERT:
6     Q. What I'm asking you, Mr. McCray, if you know
7 anything in particular about these, I think it's eight
8 e-mails total, that resulted in them being produced
9 whereas -- as the only e-mails that we've got produced
10 in this case?
11     A. Well, the only thing that I recall --
12     MS. FANIEL: Object to form.
13     THE WITNESS: I'm sorry. The only thing that I
14 can recall is, these are the e-mails that talked about
15 the use or the prohibition against the use of the
16 logos where I was explaining to the alumni, where I
17 was also showing that they -- some didn't agree, some
18 didn't understand. And these are the ones that I
19 believe I produced. I really don't recall. I just
20 know that we assembled those. And I did searches and
21 this is what we came up with.
22 BY MR. HERBERT:
23     Q. Okay. So as far as you know, these are the only
24 e-mails of that nature that you sent out regarding the
25 requests to discontinue the use of the trademarks and

Page 250

1 the logos?
2 A. Yes. That's all that I have. And if there's
3 anything else, I'm unaware of it. But I've gone back.
4 I send out letters but I did more phone calls and
5 virtual meetings with these, not only the members but,
6 also, the chapter leadership. I did that really trying
7 to get everybody to understand.
8 Q. Understood.
9 MR. HERBERT: Let's scroll down to the page
10 that is DEF449, if you could, please, Paula.
11 BY MR. HERBERT:
12 Q. So looking at this document, this appears to be
13 an e-mail that was dated -- the body of the main e-mail
14 is dated Sunday, November 7, 2021. Do you see that?
15 A. Yes. Yes, I do, yes.
16 Q. Okay. So this is an e-mail that you sent out
17 to -- the body appears to be addressed to NAA chapter
18 presidents and members. Is that right?
19 A. Actually, it's board members.
20 Q. Okay. So those people in the -- all those names
21 up there in the e-mail in the To line, those are --
22 those are either chapter presidents or board members of
23 your organization or they were at that time?
24 A. Right. I do see a couple of other individuals
25 who are members but they're not officers or on the

Page 251

1 board. Like, for an example I had someone working on
2 a -- what do you call it, a three-year plan. Oh, God.
3 Q. CapEx?
4 A. Strategic plan. I had -- I see the two people
5 there. And I also, if you look at one of the previous
6 letters I sent out, I said I had put together another
7 team to deal with the website, to deal with greater
8 transparency. I also CC'd that to the chair of that
9 person who's not on the board. So by and large,
10 probably 99.5 percent of these people were on the board,
11 but I did invite a few other people who were doing some
12 things for the organization to that meeting.
13 Q. Okay. So this -- this e-mail, this -- that we're
14 referring to here as DEF 449, this -- you didn't send it
15 out to every single member of your organization, right?
16 A. I don't think that I did. No.
17 Q. Okay.
18 A. But the things that are here, every chapter was
19 given notice that I would be contacting them or if they
20 wanted me to do a virtual visit with them and these are
21 the questions plus more that we discussed, once I went
22 on those calls.
23 Q. Okay. Let's look at the body of this letter,
24 from the first sentence of the body right below the Dear
25 NAA chapter presidents and members. The first line

Page 252

1 there says: I have received several communications from
2 chapter presidents and members alike raising questions
3 about the decision -- I'm paraphrasing -- it says the
4 decision to terminate the relationship with your
5 organization.
6 Does that refer to e-mail communications? Did
7 you receive e-mail communications from chapter
8 presidents and members on that topic?
9 A. I know I received a lot of phone calls. And I
10 think that I received -- more so phone calls, but also,
11 I think I may have received some e-mails on that.
12 Q. Okay. And we will renew our request for those
13 e-mails.
14 And let me go to the -- so you summarize this --
15 part of -- part of this e-mail and the reason that you
16 sent it out to these folks was, this is a part of
17 your -- your attempt to comply with -- for your
18 organization to comply with the university's request
19 that your organization discontinue use of the
20 university's registered trademarks and logos. Correct?
21 A. I think my reasons for doing this was twofold.
22 That's one of the reasons. But the other reason, you
23 had many people who were angry, many people who were
24 confused, and when I say confused, about why the
25 university was taking such a hard line. And individuals

Page 253

1 who wanted to know the dos and don'ts and the ins and
2 outs. So I was receiving -- wherever I go, I would run
3 into alumni, people were calling, asking me questions,
4 text messages. And so I just said it would be easier if
5 I just put this together and I send out.
6 So, yes, I was trying to comply. And, also, I
7 was trying to answer some of the many questions that
8 people had.
9 Q. Okay. Like turning to the next page, which is
10 450, DEF450. Down near the bottom of it, there's a
11 question. This is -- you wrote this in a
12 question-and-answer format to try to help address some
13 of these questions that had been communicated to you by
14 chapter presidents and members, right?
15 A. Yeah. These were what I call FAQs and based upon
16 the recurring questions. And, also, questions that I
17 anticipated would come to fruition, that I anticipated
18 would be asked. I tried to deal with as many of those
19 as possible.
20 Q. Understood. So let me look at this. The one --
21 the last question on this page says, question, quote:
22 Has the university taken over the NAA or can it do so?
23 And you've got a response there essentially saying no to
24 answer those questions. Right?
25 A. Well, it would have to be no because that's the

1 truth. They had not taken over the NAA. And they
2 couldn't do so.
3 Q. So you're here, you're attempting to address some
4 questions that you received from either members or
5 chapter presidents about whether or not the university
6 had taken over the organization. Correct?
7 A. Right. Because some people actually thought
8 that.
9 Q. Got it. Do you remember anybody who communicated
10 that to you specifically?
11 A. Sir, I have dealt with so many people, I'm not
12 talking about 100 or 200. I've dealt with so many
13 people dealing with these things, I can go to a Miami
14 Heat basketball game and I'm going to run into some
15 alumni and they want to talk about this. So to answer
16 your question, I don't remember anybody in particular.
17 Q. Understood. Do you remember when was the last
18 time somebody asked you that question?
19 A. Whether or not they've taken over us?
20 Q. Or words to that effect.
21 A. No, I don't get that question now.
22 Q. And do you remember the last time you did?
23 A. I can't. I don't know if it's been a year, less
24 or more. I'm not sure. But I don't get questioned
25 whether or not they've been taken -- whether or not

1 they've taken over us.
2 Q. Got it.
3 A. People want to know why the university took this
4 action and why this lawsuit. I get that all the time.
5 I've gotten it as recently as yesterday.
6 Q. Let's go to the next page, which is 451. It's
7 the last -- kind of the last few lines of this e-mail.
8 In there, you indicate that your organization is
9 prepared to take legal action, if necessary, if the
10 chapters violate your mandates.
11 And I might have asked you this before, but does
12 this refresh your recollection as to whether or not your
13 organization did, in fact, ever take any legal action
14 against any of its chapters?
15 A. No, we haven't taken any legal action against
16 anybody. We actually didn't find the need to do so.
17 Q. Got it. And let me ask you that. This --
18 that -- this portion of this e-mail appears to be
19 related to the transfer-of-the-money question or raising
20 money. But I want to expand the question and ask, the
21 same thing is true with respect to the compliance or
22 noncompliance with your demands that the chapters and
23 the members discontinue the use of the trademarks or
24 logos, you're not aware of the national organization
25 taking any legal action against any chapter or any

1 member, correct?
2 A. No, we --
3 MS. FANIEL: Object to form.
4 THE WITNESS: -- since I've been president, we
5 haven't taken any legal action against anybody for
6 anything. We threatened legal action in some
7 instances. I have called and chastised people. And
8 most of these individuals I think were making good
9 faith mistakes by not including the disclaimer or
10 putting something there that they should not happen.
11 I will tell them, you know, you're going to create a
12 problem for us. You're going to get us in trouble,
13 I'll say things like that. And usually everybody is,
14 you know, receptive to that.
15 BY MR. HERBERT:
16 Q. Okay. Let me ask you specifically, do you recall
17 if the organization ever sent out a normal cease and
18 desist demand or letter to any chapter or any member
19 along those lines?
20 A. I think I've done the functional equivalent of
21 that. I have sent letters out saying that, you know,
22 you guys have got to stop this. If someone has done --
23 not that that -- not that that person or chapter has
24 done it before. But I'm looking at all the chapters. I
25 have sent correspondence out and I think I've sent what

1 I've given to these individuals. But I've also picked
2 up the phone and I've called individuals.
3 I recently spoke with a chapter about something
4 that was about to be sent out but it was sent to either
5 me or Tony Barfield and I called him back and I said,
6 no, this can't go out.
7 And I told you about one of the queens from
8 Daytona, from Volusia County had something on with
9 Bethune, it was an older picture, but she had to fade it
10 out if she was going to use it. So I have not sent out
11 something designated cease and desist but I believe that
12 I've sent out the functional equivalent of a cease and
13 desist.
14 Q. Okay. And I'll represent to you that no such
15 documents have been produced to us in this case. So --
16 MS. FANIEL: Object to form. That's not a
17 question.
18 BY MR. HERBERT:
19 Q. I'm making a request on the record. And
20 Mr. McCray, you don't have any problem attempting to
21 locate those and produce those in this case if your
22 counsel approves that, do you?
23 A. Oh, I don't have a problem with that. But as I
24 indicated to you before, much of my communication, when
25 I see something, typically I'll pick up the phone,

65 (Pages 254 - 257)

Page 258

1 because I have the chapter presidents' numbers. I'll
2 typically pick up the phone because I believe I can be
3 more emphatic when a person can hear my voice. So I'll
4 double-check to make sure that there are no additional
5 e-mails.
6      But I can tell you that I have called individuals
7 and Tony has called on a few occasions and even
8 Mr. Sumner Hutcheson has called on one or two occasions.
9 He is not as involved as Tony, but we have really tried
10 to make certain these people understand that this is
11 serious business.
12   Q. Okay. And I understand that. And I understand
13 that often you'll make phone calls. But I believe you
14 did testify that you had sent out the functional
15 equivalent of cease and desist letters. So I'm assuming
16 that you're referring to e-mails or letters or something
17 written?
18   A. If -- if I sent anything out for sure it would be
19 e-mails. It wouldn't be letters. You know, I'll send
20 something in letter form and e-mail it out. But I'll
21 double-check on that. But I think that I've given you
22 what I have and perhaps that's what I'm thinking about
23 because in those letters, I told people that they are
24 not to do this.
25   Q. Let me ask you, other than that situation with

Page 259

1 the Volusia County queen, can you -- can you -- will you
2 recall any other chapter or any other member who you
3 sent out one of those communications to?
4   A. I think I sent something out recently. I'm
5 talking about within the last 10 to 14 days. I sent
6 something out to Duval County, the one that I was
7 telling about. The one with Daytona, Volusia County,
8 that's been in the last couple of weeks. I know I
9 placed a call there but I may have even sent an e-mail
10 out. And I would have those because those are recent.
11   Q. Okay. And let me back up because you mentioned
12 Duval County first and then you mentioned Volusia
13 County.
14      The Duval County situation, what was -- what was
15 the problem or the issue there that you were
16 communicating about?
17   A. It was just that I felt like the cease and
18 desist, I don't know if it wasn't on there. I think it
19 may not have been on the flyer because they had a
20 fundraiser. I don't know if it was on there or I just
21 thought it should be a little more visible.
22   Q. You mean the disclaimer?
23   A. Yeah, that. Also, I got a call and I think I may
24 have responded. The lady who was actually chairing that
25 called me very, very disturbed and upset about a week

Page 260

1 and a half, two weeks ago. We had four or five
2 students -- when I said we, the chapter -- four or five
3 students who were going to act as hosts and hostesses.
4 And the university had told those individuals that if
5 they participate with us, they were subject to losing
6 their positions as queen, as whatever office they were
7 holding. And I was called and asked if the university
8 could do that.
9      And, you know, I gave them my answer. I did tell
10 them if these people were coming out, just as students,
11 and they weren't being identified as, you know,
12 whatever, Bethune-Cookman queens or whatever, I don't
13 see a problem with them coming to an event. They were
14 not coming representing Bethune-Cookman. I think I may
15 have sent something out on that. I know I placed a
16 phone call and I talked to the young lady about them.
17   Q. And, I'm sorry, was that to a particular chapter
18 or that was just a potential member?
19   A. Yeah. Yeah. That was to Duval because they just
20 had their gala maybe three, three-and-a-half weeks ago.
21   Q. Okay. Okay. We would want to get a copy of
22 those communications.
23      Alrighty. Let's move on to --
24      MR. HERBERT: Paula, can you pull up tab 27,
25 please.

Page 261

1      All right. So let's go ahead and mark this as
2 Exhibit 21, is that what we're up to?
3      MS. CASTRO: Correct.
4      (Plaintiff's Exhibit No. 21 was marked for
5 identification.)
6 BY MR. HERBERT:
7   Q. Okay. We'll mark this as Exhibit 21. And for
8 the record, this document bears Bates numbers BCU002196
9 through 2199. And it is entitled Memorandum of
10 Understanding Between Bethune-Cookman College and
11 Bethune-Cookman College National Alumni Association.
12      Mr. McCray, do you recognize this as the
13 memorandum of understanding that existed between your
14 organization and the university at one point in time?
15   A. Well, let me say this. I saw this, I don't know
16 if it was around maybe '07 or '08, somewhere back in the
17 mid 2000s. I don't think I've ever seen a signed copy.
18 Is this signed and dated?
19   Q. Let's take a look at the last page.
20   A. Every one that I've seen, I've never seen a date
21 on it. Because Ray Brinson -- yeah, I know it was
22 around '06, '07. Yeah. And Dr. Reed put -- I've never
23 seen these signatures and the dates on it. The ones
24 that I've seen, they've always been blank.
25   Q. Okay. So -- but you've seen this document, just

66 (Pages 258 - 261)

Page 262

1 haven't seen it, this version with these electronic
2 signatures and the dates on it; is that right?
3   A. And I'm not going to sit here and tell you that
4 I've seen this document and the other one that I've
5 seen. I never really read through all of it but I read
6 through a portion of it. But I'm familiar with an MOU
7 as it relates to the relationship between a university
8 and an alumni association.
9   Q. Okay. Understood. Thank you.
10     IH there at the end appears to be like an
11 electronic initial. Do you know whose initials that is?
12   A. No, I don't.
13   Q. Okay. But --
14   A. I don't even know -- yeah. Yeah. I think in
15 '07, I really didn't get very involved on the national
16 level. I can't remember exactly when. But I ran for
17 alumni trustee rep, I believe in '07. And -- but I saw
18 this -- I don't know if this -- I saw a memorandum that
19 was unsigned sometime probably around 2010. But I've
20 never seen a signed one.
21   Q. Okay. What context did you see the unsigned
22 version of this? Was it presented to you in a meeting
23 or in a communication?
24   A. No. Ray Brinson was the then president. And Ray
25 served on the board for 20-some-odd years, not, you

Page 263

1 know, in succession. He rotated off, come back on. And
2 I was kind of the de facto attorney for the National
3 Alumni Association when he was president. I agreed to
4 look over documents. And I think he showed that to me.
5 But it was unsigned. And, you know, I never knew if
6 there was a signed document. But he did show that to
7 me. That probably would have been around '10, 2010.
8   Q. Okay. Was that -- was he asking for your input
9 on the legal implications of this document?
10   A. I really don't remember, sir. I don't remember.
11   Q. All right. Well, you see this at the preamble
12 going back to the first paragraph there. What it says
13 is, it begins, quote: This memorandum of understanding
14 is a good faith agreement between Bethune-Cookman
15 College and the Bethune-Cookman College National Alumni
16 Association (NAA), for the purpose of delineating the
17 responsibilities of the college and the National Alumni
18 Association for their mutual benefit.
19     Did I read that first sentence correctly?
20   A. I mean, it's right there before us. I mean, I'm
21 not familiar with the language of this agreement, but,
22 yeah, I mean, you can read. That's what it says.
23   Q. Okay. And it says -- the next sentence says:
24 This agreement defines the relationship between
25 Bethune-Cookman College and the Bethune-Cookman College

Page 264

1 National Alumni Association.
2   A. Hold on one second. One second, somebody's at my
3 door.
4     (Pause in proceedings.)
5     THE VIDEOGRAPHER: Sir, do you want to go off
6 the record?
7     MR. HERBERT: Well, he said one second, so why
8 don't we give it a few seconds and see --
9     THE VIDEOGRAPHER: Okay.
10     MR. HERBERT: -- if he comes back.
11     (Pause in proceedings.)
12     THE WITNESS: I scheduled clients to come in at
13 5:00, I thought I'd be through with this. The people
14 are here. But I'm going to have them sit out front,
15 at least for a short while. And they're going to be
16 coming -- it's a couple of elderly people. They're
17 coming in in a few minutes now. I need to escort them
18 out front. So we can go until that time. And then
19 I'll just come right back and we could start.
20     Go ahead. I'm sorry.
21 BY MR. HERBERT:
22   Q. Okay. Yeah. I mean, if you just want to -- if
23 you need a break for a few minutes. I will tell you,
24 this is the last exhibit I'm going to ask you about.
25 After this, I'm just going to look through my notes and

Page 265

1 see if there's anything else that I need to clean up
2 that I overlooked.
3   A. Okay.
4   Q. So we should be done.
5   A. Hold on one second. They're here. Just start
6 looking through your notes. I'll be back in...
7     (Pause in proceedings.)
8     MR. HERBERT: Why don't we go off the record so
9 that I'm not wasting any record time.
10     THE VIDEOGRAPHER: Sure. We're going off the
11 record. The time is 5:11 p.m.
12     (A brief recess was taken.)
13     THE VIDEOGRAPHER: We're going back on the
14 record. The time is 5:12 p.m.
15 BY MR. HERBERT:
16   Q. Okay. Let me ask you, Mr. McCray, this -- this
17 Exhibit 21, a memorandum of understanding, this in part
18 memorializes at least some portion of the relationship
19 between the previously named Bethune-Cookman College
20 National Alumni Association and Bethune-Cookman College
21 as it was called at that time?
22   A. Yeah. What I see here -- and I do remember this
23 part here -- again, I haven't read through this whole
24 thing ever before. And I haven't read through this
25 document. But I remember the first part because it's in

Page 266

1 the beginning where it said that this was not a legal
2 binding agreement. But basically the document was to
3 try to show that efforts were being made to foster a
4 strong and positive lifelong partnership. So I am
5 familiar with that part of this but I didn't read the
6 whole thing. And this appears to be a document that was
7 drafted up by and between the two entities, the
8 university and the alumni association.
9    Q. Right. Let's go down to the third paragraph
10 there. Okay. This paragraph, you see the first part of
11 the third paragraph makes reference to a college
12 providing a college-owned house for the -- we'll call it
13 at this point the National Alumni Association, to make
14 use of.
15       You're aware that -- it's got an address there,
16 558 Oak Street. Your organization did make use of that
17 house at that address at some point, correct?
18    A. Yeah. One of our members actually donated that
19 house to the university. And the university was the
20 owner of the -- the house. And we were allowed to use
21 it for several years. And once -- shortly after the
22 cease and desist letter, we were told to vacate and we
23 did.
24    Q. Okay. And this indicates that essentially the
25 association would be able to use the house with no --

Page 267

1 with no rent fee, because the lease fee will be waived.
2 Is that correct? Is that what happened there?
3    A. Yes. Yes, sir. That's correct.
4    Q. Got it. It also says that the college is going
5 to -- well, will renovate the house, for moving in and
6 will provide regular maintenance to the exterior
7 portions including the grounds.
8       Did the university do that?
9    A. Yes, they did. There were a couple times when
10 something would come up and we'd make the request. And
11 typically, they responded. There were a couple of times
12 it was -- they were a little slow. But I being on the
13 board as the alumni trustee, I knew the person in charge
14 and we usually got it done pretty well -- pretty fast.
15    Q. Okay. And it also makes reference to the college
16 at the time paying 50 percent of the utility bills, the
17 electric, specifically. Did that occur while you were
18 with the organization?
19    A. I don't know about that. I wasn't involved with
20 that. So I don't know if they gave effect to that part
21 of this document. I don't know.
22    Q. Okay. After that, it says that the organization
23 has to cover the phone and the cleaning expenses.
24       Do you know if your organization covered that
25 while you were with the organization?

Page 268

1    A. Well, I don't know about there being any cleaning
2 expenses. We had individuals in the local chapter that
3 really did a marvelous job taking care of that place.
4 So we took care of keeping it clean and also keeping it
5 safe.
6    Q. Okay. And then just going down, go down to the
7 office of alumni relations there in that section. That
8 generally summarizes the efforts of the college and the
9 association to coordinate and collaborate, it looks like
10 there with the unity of purpose. Is that -- that
11 what -- does that describe the relationship with the
12 university before for the cease and desist letter and
13 the --
14    A. Oh, we had a magnificent relationship with the
15 university. We've never had any complaints about the
16 association bringing reproach upon the organization's
17 name -- I'm sorry, of the university's name. The
18 university was always very consistent with trying to get
19 the association to raise money for it. They normally
20 had people -- somebody from the office of alumni
21 relations at our meetings whenever we were talking about
22 fundraising endeavors. And when we raised the $300,000
23 under my leadership, almost at every meeting, that was
24 discussed -- Sean, I forget his name, the guy that was
25 in the picture earlier, he was at the meeting or the

Page 269

1 young lady who was there a year or two ago. We did
2 everything basically in conjunction with the university.
3       We made -- we had people give money directly to
4 the school, not to us, but we wanted them to put in the
5 memo section National Alumni, we call it the Class Act.
6 That was done with the office of the alumni
7 association's blessings. We never raised any money for
8 the school without the blessings of the university.
9    Q. Understood. And just scrolling down a little bit
10 further, a few more bullet points down, see there's
11 the one, two, three, four -- the fourth bullet point
12 from the bottom. It says: Seek input from the National
13 Alumni Association for college publications. I believe
14 you mentioned that. The one publication was that Legacy
15 magazine. I understand that was an association
16 publication. But do you recall was there any other
17 publications that the university sought input from the
18 alumni association on any publications it was sending
19 out to alumni?
20    A. Not that I'm aware of. I know the university --
21 one of the things that the university -- and I'm looking
22 up here on my wall, the university was a member of the
23 MEAC. The Mid-Eastern Athletic Conference. And at each
24 year, during the basketball playoffs, the MEAC would
25 give an award to each of the member's schools, to a

68 (Pages 266 - 269)

Page 270

1 member of the -- who they considered a distinguished
2 alum.  And so the school would send something out, I
3 think announcing who this recipient was.  I remember in
4 2011, I received that from the MEAC.  And I think the
5 school would promote whatever alumni member that
6 received that award.  I got it that year.
7      So that's one example of the alumni association
8 asking -- I'm sorry, the university asking the alumni
9 association to give them a recommendation or some
10 recommendations of individuals who would be befitting of
11 that award.
12   Q.  Understood.  And then let's go to the next page
13 there, the bullet points at the top of the page.  Stop
14 there, if you can.  The third bullet point there,
15 that's -- I mentioned that earlier.  That makes
16 reference to a publication called the Clarion.  And it
17 indicates that the college and the association are going
18 to jointly fund and support the publication of the
19 Clarion.  And I don't -- I don't recall if you -- what
20 you said about that you remembered the Clarion
21 publication actually ever going out at this time period.
22   A.  No, no, no, no.  That's not what I said.  I am
23 familiar with the Clarion.  I'm familiar with something
24 even older called the B-CEAN.  The Clarion used to go
25 out.  But you were asking me basically who was

Page 271

1 responsible for that and I couldn't tell whether it was
2 university or whether it was the National Alumni
3 Association.  But there was a Clarion.  But for some
4 reason, I don't -- you know, I don't know, it stopped
5 coming out.  And so when Ray Brinson became president, I
6 believe around '10, 2010, Ray says, we got to get a
7 publication.  There's nothing out there.
8      So Ray started the Legacy.  He was president for
9 two terms, which is four years.  And we had a couple
10 other presidents, they didn't do anything.  So when I
11 came in, I resurrected the Legacy magazine.
12   Q.  Okay.  Well, let me back up.  And, sorry, I
13 didn't remember your earlier testimony.  But the B-CEAN
14 was that a publication that the college put out or the
15 alumni association?
16   A.  That's what I just told you.  Same thing with the
17 Clarion.  It was something that was put out but I am not
18 sure if that was done by the alumni association back
19 many years ago because I think the B-CEAN was out before
20 I went to college.  My mother finished Bethune I think
21 in maybe '62.  And my dad finished in '67.  That's when
22 the B-CEAN, I think was coming out.  And as a kid, I
23 used to see it come to my house.
24      In later years, there was this magazine, a
25 newsletter or magazine, I'm not sure which one it was

Page 272

1 but it was called the Clarion.  But they stopped that.
2 I don't know why.  I don't know what the circumstances
3 were.  But around 2010, that's when Ray Brinson started
4 the Legacy magazine.  And then it stopped after he left
5 office and I resurrected it several years later.
6   Q.  Okay.  And for the court reporter's benefit, can
7 you spell the B-CEAN, if you remember?
8   A.  Yes.  It's B-CEAN.  And I don't know what that
9 E-A-N stands for but it's B-CEAN.
10   Q.  Somebody wants to be seen, right?
11   A.  Yes.  I guess it's like if you're from Florida,
12 you're Floridian.  So if you're a BCU graduate or BCC,
13 you're B-CEAN.  And that's what -- that's what it was
14 called.
15   Q.  I got it.  Just going down to the next paragraph
16 there, you see it says that the mission of the National
17 Alumni Association of Bethune-Cookman College was to
18 support the college in fundraising activities and
19 recruitment of students by the local alumni chapter.
20      Is that your understanding of the correct part of
21 the mission of the organization at the time this
22 document was signed?
23   A.  Yeah.  That was the mission.  And then also we
24 even took it further.  We actually recruited for the
25 university.  We marketed the university.  You know, I've

Page 273

1 always -- I coach high school basketball.  And a couple
2 of my players, we've always had a good team historically
3 at the school where I coach.  I made sure that students
4 attend Bethune-Cookman, that they got scholarships.
5 This is going back, you know, when I first -- shortly
6 after I started practicing law.
7   Q.  Okay.  Let's drop down to the last section where
8 it says National Alumni Association and then there's
9 some various bullet points there.  Just kind of
10 paraphrasing and summarizing, looks like this indicates
11 that National Alumni Association and the college were
12 going to coordinate and collaborate in a manner
13 consistent with the college's goals and missions,
14 coordinate with fundraising and other types of
15 encouragement, support, coordination and collaboration.
16      This -- as far as you know, this is an accurate
17 summary of the relationship between those two entities
18 at that time?
19   A.  Yes.
20   Q.  Okay.  And it kind of continues further down the
21 next page, kind of more of the same.  Collaborate and --
22   A.  If there's a page 4, can you slide it up?
23 Because mine stops.  Okay.  There you go.
24   Q.  There we go.
25   A.  Yes, thank you.

69 (Pages 270 - 273)

1 Q. Okay. And again, it looks like: Coordinating,
2 collaborating. This in part reflects the positive
3 relationship between the National Alumni Association and
4 the college at that time, correct?
5 A. That is correct.
6 MR. HERBERT: Okay. Okay. So I think that --
7 that's all the documents that I want to ask about.
8 Let me just take a five-minute break.
9 Oh, I do have one other follow-up question from
10 my notes here.
11 BY MR. HERBERT:
12 Q. I believe you -- you mentioned earlier that you
13 hold regular meetings where the local chapters, at least
14 the ones that are active, will provide you with some
15 type of report regarding their financial status. Is
16 that -- is that correct?
17 A. No, that's not what I said.
18 Q. Okay.
19 A. I said that we request them to provide reports at
20 our annual meeting, at our national convention.
21 La-Vaughn Starks Graham normally provides a -- I'll call
22 it a PowerPoint presentation -- the thing that you're
23 doing here on the screen, she does that at the meetings
24 basically telling us where we are financially, what we
25 brought in, what we've taken out. That's typically what

1 she does. Because we meet virtually. She does not send
2 out reports. She'll normally just present it on the
3 screen.
4 Q. Okay. So that's -- the PowerPoint or slides are
5 something that Ms. Starks prepares and then displays at
6 these meetings to -- to the attendees of the meetings,
7 right?
8 A. Yes, to keep us abreast of where we are
9 financially.
10 Q. Okay. And just for the record, I will indicate
11 that I believe prior request encompassed those
12 documents, so we would reiterate that request.
13 Let me ask you, that's something that your
14 organization has, those slides or presentations in its
15 files, I'm assuming?
16 A. Well, we should. And if -- yeah, she should have
17 those also. She prepared them. I don't have them. I
18 don't keep them. But she should have them. Yes.
19 Q. She has them, she's keeping them on behalf of
20 your organization, right, not her personal use?
21 A. Yes. I would hope so. She's keeping them for
22 the organization.
23 Q. Those are reports done at the direction and for
24 the benefit of the -- your organization, right?
25 A. Well, they're done for the organization's benefit

1 but she's the treasurer. And I think it is inherent in
2 her duties that she provides us with this information.
3 She doesn't have to put it in our hands, but she
4 provides it and she answers any questions if there are
5 any questions.
6 Q. Got it.
7 MR. HERBERT: Okay. I think that I'm done.
8 Give me just five minutes, and I will -- let's go off
9 the record for five minutes, come back and hopefully
10 that will be -- I'll tell everybody goodbye, okay?
11 THE VIDEOGRAPHER: We're going off the record.
12 The time is 5:28 p.m.
13 (A brief recess was taken.)
14 THE VIDEOGRAPHER: We're going back on the
15 record. The time is 5:33 p.m.
16 MR. HERBERT: Okay. Well, Mr. McCray that
17 concludes my questions for today. I am going to say
18 that as I noted on the record several times, I believe
19 that we are owed a substantial amount of documents
20 that haven't been produced. So I am going to reserve
21 my right to recall you, Mr. McCray, as a witness if I
22 deem necessary. And I'll know if that's necessary
23 once we get these additional documents. I will talk
24 to your counsel about that.
25 Ms. Faniel, if we can talk off the record after

1 this about your schedule and the witness's and the
2 declaration of Mr. Shorter that you sent me today, I'd
3 like to do that if you have a few minutes, okay?
4 MS. FANIEL: Sounds good. I have a couple of
5 questions for Mr. McCray.
6 MR. HERBERT: Okay.
7 CROSS-EXAMINATION
8 BY MS. FANIEL:
9 Q. All right, Mr. McCray. And thank you for sitting
10 for this time period. I know it's been a long day and I
11 promise not to hold you long.
12 All right. So I wanted to first go back to the
13 beginning of what you've discussed or what Attorney
14 Herbert was asking you about your background. And one
15 of the questions that, if I recall correctly, asked was
16 whether you held any titles in any other organizations.
17 What other titles do you hold in any other
18 organizations currently?
19 A. Well, I'm an assistant volunteer basketball coach
20 at Boyd Anderson High School. I'm a member of -- I'm a
21 steward in my church, which is tantamount to a deacon in
22 the AME African-American -- I'm sorry, the African
23 Methodist Episcopal church. Boy, my mind just went
24 blank. I don't know if I hold any more titles at
25 present. I really scaled back because I'm a former

70 (Pages 274 - 277)

Page 278

1 legal counsel for the NAACP. I stepped back from that.
2    I'm not sure if I hold any offices in any
3 positions in any of the other organizations. But if I
4 think of something while you question, I'll bring it up.
5    Q. Sounds good. What year did you graduate from
6 Bethune-Cookman University?
7    A. 1978.
8    Q. And what has been your involvement with the
9 university since you graduated?
10    MR. HERBERT: Object to the form. But you can
11 answer.
12    THE WITNESS: I've been very involved with
13 the -- with the university. I was a chapter president
14 in Broward County for maybe three terms. I think I
15 exceeded what the constitution allowed because I was
16 wanted to -- I was asked to continue on. So I served
17 there.
18    I then became active on the national level with
19 the alumni association and I won overwhelmingly the
20 first time I ran, when I ran for alumni trustee
21 representative, I served on the board. And then I ran
22 on the polls the second time and then I was appointed
23 to, as a regular member of the board.
24    And on the board, I held several positions. I
25 actually chaired the athletic -- I'm sorry, the

Page 279

1 football -- the head football -- we needed a head
2 coach. Brian -- I forget his last name -- was the --
3 we brought him in and he turned the program around the
4 first year. He came from Rutgers University. I was
5 responsible for bringing him in.
6    I chaired the student life committee while I
7 was on the board for several years. I was on the
8 bylaws committee. I single-handedly drew up the
9 bylaws when I was on the board, basically by myself.
10    I was on the legal review board committee for
11 the alumni association. I recruited many, many
12 students to the university, athletes and nonathletes
13 alike. You know, I've been asked to go to funerals to
14 speak on behalf of the university when the university
15 couldn't send anybody.
16    So I've done a lot with the university because
17 my mother and father finished Bethune. I sent all
18 three of my kids -- I'm sorry, two of my three kids to
19 Bethune. My daughter went to FAMU, our rival, because
20 her mom is a graduate of Bethune-Cookman nursing
21 program and she's a nurse also.
22    So I've been very, very instrumental in trying
23 to raise money. I have an endowment. My wife and I
24 started an endowment with the university somewhere
25 around 2010 or '8. Somewhere around that.

Page 280

1    I've donated to the football team over the
2 years, buying food for the team on Sundays because the
3 cafeteria closes early and they were practicing late.
4 When -- Brian Jenkins was his name. Brian Jenkins was
5 there in the -- when we raised the $300,000, my wife
6 and I donated $25,000. I was one of the matching --
7 four matching donors. I've helped students out who
8 were short of money by giving money over the years.
9    So I've done a lot for the university. Been
10 very much involved with the university.
11    Basically been a protector of the university
12 with some of the stuff that's gone on there. And, you
13 know, we have some people who don't like it. But
14 that's just too bad. And that's why we're in this
15 situation right now.
16 BY MS. FANIEL:
17    Q. Understood. You mentioned before that you were
18 chapter president three terms for Broward. That was
19 chapter president for Broward for which organization?
20    A. For the National -- for the Bethune-Cookman --
21 for the National Alumni Association of Bethune-Cookman
22 University before this situation.
23    Q. And you also mentioned that you've donated
24 money -- you and your wife have donated money. Was that
25 through the National Alumni Association or was that

Page 281

1 you-all as individuals?
2    A. No. The endowment, that was directly with the
3 university. This was, like I said, I believe around '07
4 or 2010. And the $25,000 that I gave to the school, it
5 was directly to the school, but it was in the memo
6 section to improve the giving rate. And that's why the
7 giving rate went up with this university as fast as it
8 did because the monies that we raised under my
9 leadership. We raised the exact amount, I believe it
10 was like 281,000, but round it off $300,000. We told
11 the donors don't write the checks to the MMBNAA. Write
12 the check to the university.
13    Because one of the things I campaigned on was
14 raising the giving rate for Bethune because it is --
15 historically has been deplorable and we raised the
16 giving rate.
17    Q. Okay. So that 25,000 that you're referencing
18 that was something that was given by you individually or
19 it was something donated --
20    A. It was given -- it was given by me and my wife.
21 My wife and I gave $25,000 to make up that $300,000 that
22 we raised in 93 days.
23    Q. So you're including that 25,000 amount in the
24 $300,000 that the alumni association raised for the
25 school?

71 (Pages 278 - 281)

Page 282

1   A. Yes. That's correct. The check was made out to
2   Bethune-Cookman University.
3   Q. You also -- thank you, Mr. McCray.
4       You also mentioned before, testified before that
5   there was a point or maybe you do this now, that you did
6   not want -- you did not want scholarship checks to be
7   written out to students alone. What was the reason for
8   that?
9   A. Oh, I -- a very good reason. I'm a member of a
10  particular fraternity, but another fraternity, Kappa
11  Alpha Psi, I'm not in that fraternity, but I remember
12  several years ago, they raised money for a particular
13  young lady to go to college. It wasn't to
14  Bethune-Cookman, but this was kind of news in Broward
15  County, in Pompano where I live. The girl, young lady
16  was a good basketball player but I think she was going
17  to a D2 school, where she's -- Division 2 school where
18  she needed money. And they wrote this young lady a
19  check. The fraternity did, the Pompano Beach chapter.
20  I believe it was for 3 or $4,000. The young lady took
21  the money, she got pregnant, she never went to school
22  and the fraternity never got their money back.
23      So as a precautionary measure, one of the things
24  that the committee of the alumni decided was that we
25  would not write checks to individuals in their names

Page 283

1   only. We would either write a check and deposit it,
2   give it to the school in their name or put it in both
3   their names, the school and the individual's name so it
4   could go to the student's account.
5   Q. And which committee are you referring to when you
6   said the committee decided to write the check --
7   A. The scholarship committee.
8   Q. Okay. So I know we talked about the history of
9   the organization and went through when it was founded
10  and name changes and things of that nature. But to your
11  knowledge, who founded the alumni association?
12  A. It's widely known that Dr. Bethune started and
13  founded this organization. There have been some books,
14  several books that have been written and one of the
15  persons who is probably the leading historian on
16  Dr. Bethune is a young lady, her name is Dr. Sheila
17  Fleming. And she's written a couple books. And she
18  indicated in the books that from research, Dr. Bethune
19  started this organization back in 1932. And one of her
20  employees, Mr. Rodriguez, was the one that was actually
21  running the organization. He was an employee at
22  Bethune-Cookman. That was around 1932, around that
23  time.
24      MR. HERBERT: I'm sorry. I just want to
25  interpose an objection to the extent it called for

Page 284

1   a -- and the response elicited hearsay. I just want
2   to note that for the record.
3   BY MS. FANIEL:
4   Q. Okay. And how is the -- how is the National
5   Alumni Association currently structured? To be more
6   specific, what officer roles you have, what committees
7   are in place, and any other kind of -- kind of roles
8   within the organization?
9       MR. HERBERT: Object to form.
10      THE WITNESS: We're set up with a governing
11  board, board of directors are members of the
12  organization and they consist of chapter presidents,
13  officers. We have a president, vice president,
14  treasurers, recording secretary, recording financial
15  secretary, parliamentarian, and maybe -- it's one
16  more. But they're the officers that are actually
17  voted in.
18      And we have several committees. We have a
19  fundraising committee. We had a homecoming committee,
20  but I think we did away with that with the new bylaws
21  because of this -- because of this situation that
22  we're in with this lawsuit.
23      We have the Miss Alumni group. I was kind of
24  against it, but I don't make unilateral decisions.
25  The young ladies are very passionate. This was our

Page 285

1   largest fundraising vehicle. And so a vote was taken
2   and it was decided that we would keep the Miss Alumni.
3   I just thought it would be so difficult. We don't
4   really have any place for them to showcase what they
5   do, you know, at the games and whatnot.
6       We have -- we have pro -- what do you call
7   them -- ad hoc committees as necessary. But
8   basically, we're run by -- and we have an executive
9   committee, which pretty much has the same powers as
10  the board of directors. We use them, it's a smaller
11  group of the officers. I think it's seven or eight
12  people and we use them instead of calling a meeting of
13  so many of the members at one time. And we will
14  report back to them any actions that we take at the
15  next regular call meeting.
16      But that's how we're run.
17  BY MS. FANIEL:
18  Q. Understood. And so you mentioned the fundraising
19  committee, the alumni group, ad hoc committees, and the
20  executive committee. Are there any other committees
21  that the organization has?
22  A. I know it's -- I'm missing probably one or two.
23  But they're in the bylaws. And I think we had eight
24  under our old bylaws but I think it's reduced to seven
25  now.

72 (Pages 282 - 285)

Page 286

1    We also have a historian who is Dr. Jacob Gordon.
2  We have a parliamentarian.  Well, we don't have a
3  parliamentarian now.  He had to step down.  And I have
4  to appoint somebody.
5    I can't.  But they're listed in the -- in our
6  bylaws, in the new bylaws what our committees are.  I
7  think we have about seven.
8    Q.  Understood.  What is the role and duties of the
9  fundraising committee?
10    A.  The fundraising committee, which is chaired by
11  Sumner Hutcheson to come up with ideas now for
12  scholarship purposes.  Before, it was, you know,
13  included basically raising money for the school.
14    Sumner Hutcheson is a professional, has been a
15  professional at this for many years.  He was -- worked
16  in advancement at FIU for several years.  He worked for
17  Bethune-Cookman for several years.  And basically, he
18  comes up with ideas about raising money.  Anytime
19  someone else comes up, we will run it through his
20  committee, we'll sit down, we'll talk about it.  We'll
21  take a vote.  And we will decide, just like the
22  scholarship committee --  I'm sorry, the scholarship
23  cruise.  That was something that was voted upon after
24  due discussion.  And we went forward with it.
25    But typically, that's what he does.  He oversees

Page 287

1  it.  He makes sure that we're doing what we're supposed
2  to do, when flyers go out, he oftentimes will look at it
3  and say, hey, we probably -- you know, this is
4  questionable, because a couple times, he's raised
5  something that I wasn't sure about and I'll call you and
6  you'll give me your legal opinion on it.
7    Q.  Understood.  You also -- you also previously
8  testified that the National Alumni Association was new
9  to this in reference -- in reference to providing
10  scholarships.  Is that correct?
11    A.  We're new to this as that being our principal
12  mission.  We've always given some scholarships or we've
13  given school -- money for the school for them to give
14  scholarships.  But our primary mission for being in
15  existence is to promote Dr. Bethune's Legacy and part of
16  her last will and testament, she left us a
17  responsibility to our kids.  So -- to our young people.
18    And so we interpret that to mean, you know,
19  helping provide monetary support for our students.  And
20  we don't have millions of dollars.  We're a small
21  organization.  We don't raise millions of dollars.
22  Sometimes we'll raise 30- or 40,000 dollars over a year
23  or so, at least we were when we had the queens.  But we
24  are raising money.  And that's basically -- that's
25  primarily what we're doing now, since we are kind of

Page 288

1  hampered from doing anything for the university.
2    Q.  Understood.  Can you summarize what services the
3  National Alumni Association provides at this time?
4    A.  Well, we are raising money.  We have given, I
5  believe, at least one or two scholarships.  And although
6  this situation has been going on, this lawsuit was filed
7  I believe in January of '21, I believe, it's taken us a
8  while to really get the scholarship policies, rules and
9  what have you formalized and finalized because we don't
10  have as many people working as we once did.  So even
11  though this has been going on a long time, we really
12  just started giving scholarships, actually probably the
13  beginning of this year.  And we had our first
14  scholarship fundraiser, I believe with the cruise in --
15  in September of last year.
16    So we provide the service of scholarships.  We're
17  positioning ourselves to be able to help students out in
18  emergency situations because we get calls all the time.
19  We -- we don't -- we can't recruit as an association.
20  And I tell people all the time, if you want to do it on
21  your own, you can but you can't do it on the color of
22  this organization.  And so primarily, what we're
23  doing -- and we network.  I don't know if that's a
24  service.  But we network.  And I think that's so
25  essential with alumni associations, are networking so

Page 289

1  that we can stay in touch with each other.  And we do
2  that and we plan to continue to do that.
3    Q.  Understood.  Does the -- does the organization
4  sell any merchandise?
5    A.  No.  No.  We had some shirts made up called the
6  MMBNAA.  And, you know, it wasn't a whole lot.  Probably
7  about 15, just for, you know, the people that's on the
8  committee.  I have one and I've never worn it.  But
9  that's it.  We don't sell any merchandise.  We don't
10  have any hats.  We don't have any -- what do they call
11  it -- sweatsuits.  We don't have any of that.  One
12  person made some shirts up, because she make shirts.
13  And it just -- it's in glitter, it says MMBNAA.  And
14  they were given; they weren't sold.  We've never sold
15  anything to the public, any of our stuff.  We don't
16  really have any stuff.  I have that one shirt and I
17  haven't worn it before.
18    Q.  That's the glitter shirt?
19    A.  Yeah.  The one that -- and to me, glitter looks
20  feminine, and I'm not feminine at all and I won't wear
21  it.
22    Q.  Understood.  Okay.  You said those shirts that
23  have the MMBNAA were given out.  Who were they given out
24  to?
25    A.  Vanessa Lloyd, who's actually chaired the bylaws.

73 (Pages 286 - 289)

1  She gratuitously made those shirts and she gave them out
2  to the officers and the other people that, you know,
3  were really involved with the association.  I think she
4  made maybe 10 of them, maybe -- no more than 15.
5     Q.  And who to your knowledge did she give them out
6  to?
7     A.  I know she gave one to Claire, who was our
8  recording secretary.  They're very, very good friends.
9  I think she gave one to Carmen Williamson.  Basically
10  the people in her chapter there in Daytona Beach.  And
11  she gave one to me because I'm the president.  We're
12  classmates from college.
13    Q.  How does the organization, how does the National
14  Alumni Association advertise those services that you
15  mentioned?
16    A.  Website, Facebook.  I understand we have
17  Instagram, but I've never, ever used or seen anybody's
18  Instagram before.  But I've never seen that.  I send
19  things out in Constant Contact.  I think that you-all
20  have seen those.  Send letters out.
21       We have people on Facebook who are members of
22  this organization.  And they post things in their
23  individual capacities.  Not at my direction.  So the
24  word gets out about this organization.  Contrary to what
25  the university has alleged that I have such control over

1  people, I don't.  People respect me.  Not all people
2  like me, but I don't know too many people that don't
3  respect me.  But people also respect this organization.
4  They respect its longevity.  They expect what it stands
5  for -- respect what it stands for.  And they write about
6  it.
7       The university's written cease and desist letters
8  to them because they talk about how unfairly this
9  organization is being treated.  They talk about, you
10  know, just the lack of leadership with the
11  association -- not the association, but with the
12  university, and why are you trying to destroy this
13  organization when we've done so well.  And under my
14  leadership -- and I'm not trying to take credit for it,
15  but we've had some people that joined the organization
16  who hadn't been in this organization for many years, and
17  people were giving who had not given in many years.  And
18  we saw the ascension of the organization.  And then to
19  have this happen, which I knew it was about to happen
20  anyway.  Because we had a representative on the board.
21  It was really, you know, an affront to the university
22  and an affront to us as members of the alumni.
23    Q.  Okay.  And how does the organization advertise
24  and market its -- its scholarships, its scholarships --
25    A.  Everything -- everything basically is done by

1  social media.  Even the local chapters, they send things
2  out social media.  We don't send direct mailings to
3  anybody.  Everything is basically done social media.  We
4  don't have a large database.  I mean, you saw what we
5  used in our Constant Contact, and many of those people
6  are not necessarily members -- or they're not alumni.
7  They're not members of the association.  But we get
8  things out the best way that we can.  We don't have the
9  database that the university has.  Even when we were
10  partners with them, if we needed to send something out,
11  we didn't have a problem.  They would send it out.  They
12  never gave us the database.  And, you know, I understand
13  why.
14    Q.  Understood.  So the chapters, as well as
15  national, would advertise or market the scholarship
16  programs via social media?
17    A.  Yes, ma'am.  Yes.
18    Q.  Is there any other way that they would advertise
19  or market the scholarships?
20    A.  Word of mouth, you know, we -- I know
21  historically, members of this association have known --
22  have known, for an example, I know the guidance
23  counselor at various schools in Broward County.  So I
24  can easily pick up the phone and say, hey, if you know
25  somebody who's interested in going to Bethune-Cookman,

1  we may be able to give them $2,500 or $1,500, something
2  like that.  Word of mouth is so pervasive with the
3  organization.  We use that a lot.
4       But in terms of put -- in the magazine that we
5  had, we weren't focusing on scholarships as we do now.
6  But we don't -- we're not even using our magazine right
7  now.  My dream is to kind of jump start the magazine
8  again but we've got to be strategic since we, you know,
9  can't use the school's name or can't use the school's
10  logo.  I certainly don't want to run -- don't want to
11  run afoul of that.
12    Q.  Okay.  You mentioned before about the
13  organization's relationship with past presidents.  Can
14  you tell me about the organization's relationship with
15  the university's past president at the beginning of your
16  tenure?
17    A.  Yes.  Yeah.  We had a wonderful relationship.
18  Unfortunately, the board chair and the assistant board
19  chair did not think very well of that particular
20  president.  In fact, the board chair put his name in to
21  try to become president, unbeknownst to the board.  And
22  there was some bad feelings between the immediate past
23  president who really did a remarkable job.  The school
24  was on academic probation.  The prior president was
25  responsible for this very, very fraudulent and

Page 294

1 questionable dorm deal, which cost the school millions
2 of dollars that it didn't have.
3      And Dr. Chrite came in to get us off probation.
4 And he got us off probation in a matter of -- I believe
5 in a matter of months.  He caught hell from our board
6 chair.  He caught hell from our board chair.  And the
7 relationship between the university and the president
8 and what he was trying to do, we were all on the same
9 page.  What we were trying to get him to do was to tell
10 his story.  Because there had been so much stuff in the
11 press about the board being lackluster about this money
12 that was -- this dorm deal that they signed off on.  So
13 he came in to try to, you know, clear up the image.
14      And we were trying to -- I and other members of
15 my cabinet were trying to get the president to tell your
16 story, talk about the great things you're doing.  And so
17 we talked to him about getting someone, I forget what --
18 the professional who could promote the image of the
19 school.  And they looked into it and it was going to
20 cost about $20,000.  And so they came back to me as
21 president to ask me if we would assist him with that.
22 And I said I can't make that decision but let me go back
23 to the board and I took it to the board.  They approved
24 us giving the university 10,000 to help market the
25 positive things that were happening.

Page 295

1      But within three weeks, I believe, after that,
2 three to four weeks, the president end up stepping down.
3 We didn't give them the money.  And after that, things
4 started to happen where the association called for a
5 vote of no confidence against the board chair and
6 assistant board chair, and here we are.
7      MR. HERBERT:  And let me just interpose an
8 objection.  I'm sorry.  But object to the question to
9 the extent it calls for narrative response and
10 elicited a narrative response well beyond the scope of
11 the question.  Anyway, that's just for the record.  Go
12 ahead.
13 BY MS. FANIEL:
14      Q.  Understood.  Who was the president -- who was the
15 president of the university at the start of your tenure
16 as president of the National Alumni Association?
17      A.  Oh, Dr. Brent Chrite, C-H-R-I-T-E.  Brent is
18 B-R-E-N-T.
19      Q.  And so how did Dr. Chrite work with the --
20 specifically work with the organization -- with the
21 National Alumni Association --
22      A.  We --
23      Q.  -- to accomplish the National Alumni
24 Association's purpose?
25      A.  We have a beautiful relationship.  And when I say

Page 296

1 we, I'm speaking of the organization with Dr. Chrite,
2 with the advancement department, because they actually
3 came to our meetings.  We would give them the mic for
4 the first 15 or 20 minutes, say whatever it is they need
5 to say.  We work really well.
6      And we actually had a couple fundraisers.  The
7 Class Act was the big one that we raised the $300,000
8 that had never been done before.  Dr. Chrite was there
9 when we started that.  And I believe he was there when
10 we finished that.  When we actually -- he was gone, we
11 actually gave them the check but we had concluded.  He
12 was very much in favor of that.  He was very
13 complimentary to us whenever he would speak.  He came to
14 our alumni events.
15      We had a really big event in Palm Beach, West
16 Palm Beach.  He came.  And that's where the gentleman
17 made the pledge to give 20 -- 20- or 25,000 dollars in
18 perpetuity.  And he did give the $20,000, his first
19 $20,000 at that event.  Dr. Chrite worked very, very
20 well with us.
21      He and I talked a lot about improving the giving
22 rate.  And that's why when we came up with the Class
23 Act, the initiative that we came up with, we
24 specifically said, as I had campaigned on that, I would
25 not raise money for soft donations.  Meaning that give

Page 297

1 us the money and we'll write one big check.  That's not
2 going to move the needle on the giving rate.
3      So that's why we had checks written out to the
4 university.  And they kept the record of it.  And we met
5 with them where we were getting running tabs.  And
6 that's when we raised the giving rate.  According to the
7 school, the giving rate went up to I believe like
8 14 percent and we started out like at either 4 or 6
9 percent when I was president.  Where now it's gone down
10 to 1 percent, since this lawsuit has been filed.  That's
11 what was reported by the immediate past interim
12 president.
13      Q.  And when did the National Alumni Association's
14 relationship end with Dr. Chrite?
15      A.  Well, it didn't end with Dr. Chrite.  It ended
16 after Dr. Chrite left.
17      Q.  When did he leave?
18      A.  I believe it was March 10th or March 7th of --
19 was it '21 or '20?  It was -- what year was the cease
20 and desist?  Was that '21?  It was the same year of the
21 cease and desist but it was either in late February or
22 early March when he left.
23      Q.  Okay.  Understood.
24      And how would you describe the National Alumni
25 Association's relationship with the current president or

75 (Pages 294 - 297)

Page 298

1  interim president of the university?
2  A.  Well, to be honest with you, I don't even --
3     MR. HERBERT:  Object to form.  Go ahead.
4     THE WITNESS:  -- know.  I don't -- we really
5  don't even know the gentleman.  I believe his name is
6  Mr. Berry.  I've never seen him before.  Never heard
7  of him.  Most people in the association have never
8  heard of him.  And I saw an article in the news
9  journal.
10    Hold one second, please.  Hold.
11    (Pause in proceedings.)
12    THE WITNESS:  Okay.  I just rescheduled that
13 appointment so we don't have to worry about.  I forgot
14 where we were.  I forgot what the question was.  Can
15 somebody read it back?
16    MS. FANIEL:  Madam Court Reporter, can you read
17 the last question?
18    (The record was read back as requested by the
19 court reporter.)
20    MR. HERBERT:  Reiterate my objection to form.
21 But you can answer.
22    THE WITNESS:  Yeah.  I don't know who the
23 gentleman is.  I only know what I read about him
24 recently in an article in the news journal, or the
25 news journal made it known that there's a new interim

Page 299

1  president who had not been -- hadn't even been
2  announced by the university.  And Dr. Drake's name was
3  still on the website the evening when this was
4  learned.  You would see his name.  But they took it
5  off the website almost immediately.  That was in the
6  article also.
7     So I don't have a relationship with the
8  gentleman.  And quite frankly, I probably wouldn't try
9  to establish a relationship with him because of what's
10 going on.
11 BY MS. FANIEL:
12 Q.  Sure.  Who was the interim president of the
13 university at the time the -- at the time the National
14 Alumni Association received that September 2021 cease
15 and desist letter?
16 A.  It was actually Dr. Hiram Powell who went to
17 school with me at Bethune-Cookman.  He may have been a
18 year or maybe two years ahead of me.  But he was.
19 Q.  Was Dr. Hiram Powell as active in -- or strike
20 that.
21    Did Dr. Hiram Powell collaborate with the
22 National Alumni Association in a same or similar way
23 that Dr. Chrite did?
24 A.  He started out.  He wanted to, but he was
25 prohibited by the board.  We had a representative --

Page 300

1  Q.  What board are you referring to?
2  A.  The board of trustees.  This was before the cease
3  and desist because Dr. Powell actually is a life member
4  of the organization and before he became interim
5  president, he was just a regular instructor at Bethune,
6  held a couple of positions under one of the other
7  presidents.  But he would always come to our
8  conventions, to at least a luncheon, because we used to
9  have a really, really powerful convention.
10    And he -- because I talked to him.  He thought
11 that it was essential for us to clean up this mess
12 because he felt as though it was essential for him --
13 for his success to have a successful relationship with
14 the organization.  And that's what he wanted and that's
15 what he sought.
16    But his efforts were shot down by the leadership
17 of the board.
18 Q.  You mentioned clean up his mess.  What mess are
19 you referring to?
20 A.  His --
21    MR. HERBERT:  I'm sorry, Ms. Faniel, let me
22 just interject on the grounds of hearsay.
23    You can answer.
24    THE WITNESS:  I'm speaking of this lawsuit.
25 And let me just tell you the basis of my position.

Page 301

1     If you look at that MOU, we were -- it was
2  understood that at our conventions, we would always
3  invite the -- always invite the president to give a
4  state of the university message.  We've always done
5  that.
6     When Hiram Powell came in after Dr. Chrite
7  left, we had our meeting.  And Hiram Powell was
8  invited, but he was told that he couldn't come.  When
9  we made the $300,000 -- when we actually gave the
10 money to the school, we had one of those big symbolic
11 checks.  And I talked to Hiram and he had agreed to
12 meet me in West Palm Beach and I was going to have
13 chapter presidents from over the state meet us here.
14 I forgot what holiday it was.  I think it was Memorial
15 Day, around that time.  He was going to meet us there
16 because he was going to be down here anyway
17 recruiting.  And he said he would confirm.
18    Well, Hiram didn't -- never called me back.  So
19 the school never -- we never did a photo op about this
20 money that these people had given to us in large
21 droves to the school.  So what we did, the school
22 didn't want to participate because we hadn't gotten
23 the cease and desist letter then but they had been
24 given a mandate by the leadership of the board of
25 trustees.  We convened in Orlando at the Rosen hotel

76 (Pages 298 - 301)

Page 302

1  and we took a big picture of a check made out to
2  Bethune-Cookman in the amount of $281 and some-odd
3  cents. And the school never said thank you to us
4  until finally, they received so much flak at, I
5  believe it was homecoming. They mentioned it at
6  pregame, when people aren't even in the stadium.
7  Everybody's out tailgating. They said thank you at
8  that time when nobody really heard it.
9        But Dr. Powell was there and he was alienated
10  from us, even though he's always had a tremendous
11  relationship with the National Alumni Association. So
12  he backed away from us, so we didn't bother to, you
13  know, bother him anymore.
14  BY MS. FANIEL:
15    Q. Understood. Besides attending the alumni
16  association's conventions and collaborating on
17  fundraising, did Mr. Hiram Powell or any other president
18  that you've worked with during your tenure ever express
19  the need for the president to oversee the fundraising
20  activities of the National Alumni Association?
21    A. Oh, never. We've never had any problems. We've
22  never had any reason for that to happen. We've never
23  had any accusations that I'm aware of, of any type of
24  fiscal mismanagement or any theft. There's never, ever
25  been any discussion about the university having a need

Page 303

1  for its best interests to take over. No. This came as
2  a direct result of a few things that happened that were
3  not financial -- of a financial nature.
4    Q. Understood. I know I said I wouldn't take long.
5  I apologize for --
6    A. Take as long as you want because I've got rid of
7  the clients.
8    Q. Sure. So I want to switch gears to the social
9  media marketing that you mentioned before. Who monitors
10  and manages the National Alumni Association's Facebook
11  page?
12    A. Anthony Barfield. I think you all saw a picture
13  of him in one of those exhibits that Counsel put
14  forward. But Anthony Barfield is the person who's over
15  our tech team and he does.
16    Q. Do you know whether he manages or monitors the
17  Facebook pages of any of your chapters?
18    A. I think he does, and, also, Sumner Hutcheson
19  looks at them because oftentimes he will call me when
20  he -- if he's not -- when I say often, it's not like
21  every week. But there have been times when he's called
22  me and he said, Johnny, did you see such and such, I
23  think we need to maybe look at that. Sumner Hutcheson
24  has done that on a few occasions also. Michael Shorter
25  has done it on a few occasions, but by and large,

Page 304

1  Anthony Barfield is charged with that responsibility.
2    Q. So I should have broken up that question.
3  Does -- does Mr. Barfield manage any of the Facebook
4  pages of the chapters to your knowledge?
5    A. I think he does.
6    Q. Okay. Do you know which chapter's --
7    A. I don't.
8    Q. -- Facebook pages he manages?
9    A. I really don't. I don't. No.
10    Q. And so who actually monitors the chapter's
11  Facebook pages?
12    A. I think Anthony does and I think Sumner Hutcheson
13  has done it also.
14    Q. As far as any marketing materials, specifically
15  e-mails that you send out of Constant Contact, how are
16  those created, reviewed and then ultimately distributed?
17        MR. HERBERT: Object to form.
18        THE WITNESS: Any letters that I send, I create
19  the letters. I proof them. My son, who's a lawyer,
20  also -- and a police officer, he's real good at
21  proofing. Sometimes I'll let him read them or I'll
22  send them on to Anthony and Anthony will look at them
23  and if he sees something that doesn't sound right or
24  something that doesn't look right, he'll bring it to
25  my attention.

Page 305

1        Once we've kind of cleaned it up, he'll usually
2  tell me, well, President McCray, I'm going to time
3  this to go out at 7:00 in the morning or sometimes I'm
4  very anxious, sometimes to get things out. I'll say,
5  well, I don't want to wait until seven. I'd like to
6  send it out tonight before you go to bed if you're not
7  too busy, because this is a volunteer job. And he
8  will normally do that. Because I sometimes say, well,
9  when people wake up, I want them to see this waiting
10  for them.
11        So he normally will send things out once I
12  proof them and he'll look over it and I may get
13  somebody else, dependent upon the gravity of what I'm
14  writing. We have a couple of really good proofreaders
15  in the organization. Some who we've used with the
16  magazine, I'll have them look at some of my letters.
17  BY MS. FANIEL:
18    Q. For those e-mails that do not contain letters
19  written by you, what does that process of creating,
20  reviewing and ultimately distributing those materials
21  look like?
22    A. Tony is responsible for getting -- if you're
23  talking about some of the flyers, several flyers that
24  we've seen. If anything is sent out, typically it goes
25  to Mr. Barfield and he'll make certain that it goes out.

77 (Pages 302 - 305)

Page 306

1  He will look at it to see if it has a disclaimer on it,
2  to see if it has, you know, anything that should not be
3  on there.  And if he has a question, you know, he'll
4  call me.  If he's not sure of something, he'll typically
5  call me and ask me what are my thoughts on this.  But he
6  normally gets out flyers that are put on the -- you
7  know, from the website, he takes care of the website and
8  social media.
9     Q.  Do you know who creates those flyers that Anthony
10 ultimately reviews and distributes?
11    A.  Yeah.  There's a young lady who's really good.
12 Her name is Chandra Simmons.  She's really, really good
13 at doing those flyers.  And that's who we rely very
14 heavily on.  There's a young lady that we used to use
15 but she's no longer with us.  But we use her.
16    When I first became president, I have a couple of
17 members who knew some other folk, I've never met them
18 but they are good at flyers, but we would use them.  But
19 since we have someone internally, we try to use that
20 person or those persons.  Tony's not real good at
21 drafting flyers.
22    Q.  Okay.  So he, kind of -- he stays in his lane?
23    A.  Yes.
24    Q.  So there's been plenty of times today that you've
25 mentioned a disclaimer.  Can you explain what the

Page 307

1  purpose of that disclaimer is and, also, then, what the
2  content of that disclaimer is?
3     MR. HERBERT:  Object to form.
4     THE WITNESS:  The -- there is a disclaimer.
5  And essentially, the disclaimer disclaims any
6  relationship or any notion of a relationship that
7  exists between the university and the alumni
8  association.  I can only paraphrase, you know,
9  essentially we say that the MMBNAA is an independent
10 organization.  We don't raise money for the
11 university.  We can't raise money, something along
12 those lines.
13    But our intent is to give the reader
14 information that if you are giving us money, please
15 know that we're not raising money for the university.
16 We are an independent group, and we are not affiliated
17 with Bethune-Cookman University.
18 BY MS. FANIEL:
19    Q.  Understood.  When did you start, to your
20 knowledge, when did you start -- or the organization
21 start using that disclaimer in its marketing materials?
22    A.  Oh, man.  It was a while ago because I'm familiar
23 with the Oakwood decision.  I read that decision early
24 on.  I think I may have even read it once I knew that
25 this cease and desist stuff was coming down the pike

Page 308

1  because as I said, I knew it was coming.  I just did not
2  know the exact date.  But I started reading that.  And
3  I -- we came up with that language, which I think
4  substantially complies with the order in the case of
5  Oakwood.  That was a while ago.  I think that may have
6  even -- I'm not -- I don't want to speculate but it's
7  been a while ago.  We've been doing this now for well
8  over a year, I believe.
9     Q.  So we talked a lot about the treasurer, La-Vaughn
10 Starks.  What is your understanding of the roles and the
11 duties, essentially of the treasurer role within the
12 National Alumni Association?
13    A.  Well, the treasurer role is to collect the
14 monies, to deposit them in the appropriate financial
15 institution, to keep the fiscal records of the
16 organization.  And although it's not written out that,
17 you know, she's supposed to clean up 990s from all the
18 administrations, I think we all feel as though it's
19 inherent in that role for her to do that.  So she does
20 the 990s.  She's very -- sometimes difficult to deal
21 with when it comes to us spending money because she's
22 very kind of frugal.  And she talks about budgets,
23 living by the budget and this type thing.  But that's
24 her role, to make sure that we remain fiscally sound and
25 keep us apprised of where we are financially.  Make

Page 309

1  deposits in the bank.
2     Q.  Have you ever had to take on any of the roles
3  that were meant for the treasurer during your tenure as
4  president?
5     A.  No.  Except one time, I think I said this
6  earlier.  La-Vaughn was away and during the cruise, I
7  made a deposit of a check that I had written.  And I
8  think Larry Handfield gave us whatever amount, 2 or
9  $3,000.  So I went to Truist, which is actually four
10 blocks down from the office on the same street, and I
11 made the deposit and I took a picture of the receipt and
12 sent to her.  But I've never carried out any function of
13 the treasurer, except that, if you want to call it that.
14    MS. FANIEL:  I've asked all my questions.
15 Thank you, Mr. McCray.
16    MR. HERBERT:  Okay.  I have a couple quick
17 follow-ups.
18    MS. FANIEL:  I'm not -- sorry.  Sorry.  Greg, I
19 just have, I think, one more question.
20    MR. HERBERT:  Sorry.
21 BY MS. FANIEL:
22    Q.  So when you were talking about the e-mails that
23 go out from Constant Contact, you mentioned that you get
24 replies of those e-mails that are sent out.  How -- what
25 is your understanding of how you get those replies to

78 (Pages 306 - 309)

Page 310

1 those e-mails through Constant Contact?
2     A. I don't know because I don't send them out. I
3 don't know. And most of the replies are out of the
4 office or something like that. It's an automatic reply.
5 And like I said, probably I average maybe one response,
6 one-liner saying, hey, you know, great letter, sorely
7 needed or something like that. But I haven't gotten any
8 other responses from anybody except I do know it's one
9 guy over a year ago said take my name off of Constant
10 Contacts. Well, they don't -- he didn't say Constant
11 Contact. Just take my name -- don't send me anything
12 else. And I gave that to Tony. This was a while ago.
13 But I think that may have been the only person that said
14 that.
15     But I don't get too many responses from
16 individuals. You know, sometimes people will call me
17 and say, hey, that was a great letter. Gina Sanders is
18 one of my officers and she's a very serious proofreader
19 and sometimes she says, well, Pres, I think you could
20 have written that a little tighter than what you did.
21 But I don't typically get responses from people except
22 what I've told you already.
23     Q. Do you know if anyone else receives replies from
24 those e-mails that are sent out automatically?
25     A. I don't know. I don't know. I've never even

Page 311

1 told Tony that I get the replies, except when I told him
2 that some guy wrote back saying, don't send me anything
3 else, you know, and I told him that so, you know, I
4 figured he knows anyway.
5     I don't know how it's set up for me to get
6 replies because I'm not sending it out.
7     Q. Yeah, I think it can be -- it can be programmed
8 for any number of people to get the replies. But that's
9 all of my questions. Thank you.
10         REDIRECT EXAMINATION
11 BY MR. HERBERT:
12     Q. Okay. I just have a very minor point.
13     Mr. McCray, you testified that your organization
14 never -- never sold t-shirts but they just gave them
15 away. But you don't really have any personal knowledge
16 about whether or not your 990 forms indicate revenues
17 from the sale of t-shirts, do you?
18     A. Well, what time frame are you speaking of? My
19 990s shouldn't say anything about revenues from selling
20 shirts because we don't sell shirts.
21     MR. HERBERT: All right. Well, let's just pull
22 up -- it was Exhibit No. 9, I think, Paula. Number 9,
23 which is a 2021, December 2022 990. If you can share
24 your screen with that.
25     And let's go to Bates number DEF15, go to that

Page 312

1 page. Okay. You can stop there.
2 BY MR. HERBERT:
3     Q. Let's just look in here at the -- sort of the
4 second -- second column or second table or row section
5 that says: Program service revenue. Do you see that
6 there, program service revenue to the left right there,
7 in the -- sort of the second large row?
8     A. Where it says: Sell t-shirts?
9     Q. Yes.
10     A. Yeah, I see that.
11     Q. Okay. And you see it says total revenue, $870,
12 it appears to indicate, right?
13     A. I'm totally unfamiliar with that. You know, if
14 it's something that I knew and forgotten, but I don't
15 ever remember us selling shirts since I've been
16 president. Now, what's happened before me, I don't know
17 but I don't remember us ever selling shirts. Basically
18 making almost $1,000. Unless the queens did something
19 and maybe I was just unaware of it, I don't know. But
20 I'm just telling you that I'm unaware of that. I've
21 never -- I'm not aware of that.
22     Q. Understood. Let me ask you about the -- some of
23 the other numbers, going up above that -- that row
24 there, there -- looks like there is some other breakdown
25 here of the revenue, the first kind of row there, the 1A

Page 313

1 through H. That section is entitled contributions,
2 gifts, grants and other similar amounts. And there's a
3 breakdown there showing 1B, membership dues of $50,200.
4 And again, this 990 goes from June of '21 to -- I'm
5 sorry, July of '21 to June of '22. That wasn't the term
6 during which you were president, correct?
7     A. July '21?
8     Q. Right.
9     A. Yeah. I became president July 1st -- wait,
10 July 1, 2020.
11     Q. Right.
12     A. Yes. So --
13     Q. You were still president through the end --
14 through July of '22, correct?
15     A. Oh, yes. Yes. Yes. Yes.
16     Q. Okay. So what I'm just asking here is this
17 number indicates that your membership dues revenues was
18 a little over $50,000.
19     A. We -- I don't know how much we raised for
20 membership. But remember, I told you we virtually
21 tripled our membership. And we also got some life --
22 life members join also. We were really, really
23 impressing people, you know, with our visibility, with
24 our message, and people were joining.
25     Q. Okay. And so the number below that, it says

79 (Pages 310 - 313)

Page 314

1 fundraising events, 9,220. So do you recall off the top
2 of your head what fundraising events you would have
3 raised that money from in that time period of July '21?
4   A. No.
5   Q. Basically a year ago?
6   A. Yeah. I think La-Vaughn is probably the proper
7 person to ask that. I don't know off the top of my
8 head.
9   Q. Got it. And then looking down a little bit
10 lower, the Legacy magazine, I see there's revenue there
11 of $7,000. Those are advertisements that were taken out
12 of the Legacy magazine?
13   A. Yes. That's correct.
14   Q. Got it. And the rooftop event, right above that,
15 what does that refer to?
16   A. I don't know if that was right before homecoming
17 or not. But we had planned this before all of this
18 foolishness jumped off with the university. We had
19 planned a rooftop event at the Hard Rock. And so we had
20 a party that night. And we -- it was a pretty good
21 turnout but it was a lot of stuff going on that night so
22 it wasn't as big as we hoped. But that's -- it was a
23 rooftop dance, where we had a DJ, music, you know,
24 everybody was, you know, having a good time. And that
25 was it. It was from maybe eight until 11:30 or 12.

Page 315

1   Q. Is that the Hard Rock Hotel in Daytona or a
2 different city?
3   A. Yeah, in Daytona, yes.
4   Q. Okay. So at that event, that was a party but you
5 also conducted fundraising for the -- for the national
6 organization then; that's what that number reflects,
7 money contributed to the national organization at that
8 party?
9   A. If it's there, it was. Now, what someone
10 mentioned to me and I honestly don't remember, because I
11 was trying to reflect to this rooftop event, I remember
12 the event. But it just -- the nuances of, you know, how
13 everything went down, I don't know if there was a class.
14 I think there may have been a class that was having a
15 reunion in the hotel and they may have partnered with
16 us. I don't believe that per se, but someone mentioned
17 that that may have happened. I don't remember that
18 happening.
19   I do know that there was a reunion going on and I
20 think some of them may have come to our party. But I
21 think we had that by ourselves. And we charged an
22 amount where we could make a few dollars and we did.
23   Q. Okay. So that would be charges for admissions to
24 the party, not for donations that were solicited --
25   A. Oh, no, no, no, no, no, no, no. We didn't --

Page 316

1 weren't asking people to give money for scholarships or
2 anything. That was just admission.
3   Q. Got it. Okay.
4     MR. HERBERT: I have no further questions.
5 Thank you very much. Again, I do reserve my right to
6 recall this witness. But that's all the questions I
7 have for now. So I think we're done, unless
8 Ms. Faniel has any other follow-up.
9     MS. FANIEL: No, nothing else for me. Thank
10 you.
11     MR. HERBERT: Okay. Thank you very much for
12 your time, Mr. McCray. I think we can go off the
13 record.
14     Elana, I can just call you separately if you
15 want or we can just stay on this line if you'd like.
16 Let's go off the record first, okay?
17     THE VIDEOGRAPHER: We're going off the record.
18 The time is 6:37 p.m. This concludes today's
19 testimony by Johnny McCray, Jr. The total number of
20 media units is six and will be retained by Veritext
21 Legal Solutions.
22     (The deposition was concluded at 6:37 p.m.)
23
24
25

Page 317

1     CERTIFICATE OF OATH
2
  STATE OF FLORIDA)
3 COUNTY OF ORANGE)
4
5   I, MAE FISHER, Registered Merit Reporter,
6 Certified Realtime Reporter and Notary Public, State of
7 Florida, certify that JOHNNY MCCRAY JR. personally
8 appeared before me via videoconference on August 9,
9 2023, and was duly sworn/affirmed and produced a
10 driver's license as identification.
11
12   WITNESS my hand and official seal this 14th day
13 of August, 2023.
14
15
16
17   MAE FISHER, RMR, CRR
     Notary Public - State of Florida
18   Commission GG 913201
     Expires: January 8, 2024
19
20
21
22
23
24
25

80 (Pages 314 - 317)

Page 318

```
 1        TRANSCRIPT CERTIFICATE
 2  STATE OF FLORIDA)
    COUNTY OF ORANGE)
 3
 4       I, MAE FISHER, Registered Merit Reporter,
    Certified Realtime Reporter and Notary Public, State of
 5  Florida, certify that I was authorized to and did
    stenographically report the deposition of Johnny McCray
 6  Jr.; that a review of the transcript was not requested;
    and the foregoing transcript, pages 5 through 316, is a
 7  true record of my stenographic notes.
 8       I FURTHER CERTIFY that I am not a relative,
    employee, attorney, or counsel of any of the parties,
 9  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
10  financially interested in the action.
11
         DATED this 14th day of August, 2023, at Orlando,
12  Orange County, Florida.
13
14
15
16
17
         
         MAE FISHER, Notary Public
18       State of Florida
19
20
21
22
23
24
25
```

Veritext Legal Solutions

800-726-7007                                                                305-376-8800