Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.:  6:22-cv-0047-WWB-RMN

BETHUNE-COOKMAN
UNIVERSITY, INC.,
            Plaintiff,
vs.
DR. MARY MCLEOD BETHUNE
NATIONAL ALUMNI
ASSOCIATION, INC., MARY
MCLEOD BETHUNE
NATIONAL ALUMNI
ASSOCIATION, INC., and
JOHNNY L. MCCRAY, JR.,
Individually,

            Defendants.


    * * * * * * * * * * * * * * * *


VIDEO-RECORDED
DEPOSITION OF:  ANTHONY BARFIELD II

DATE:            November 21, 2023

TIME:            COMMENCED:  9:02 a.m.
                 CONCLUDED:  4:15 p.m.
TAKEN BY:        Plaintiff
PLACE:           Via videoconference
REPORTED BY:     Mae Fisher, RMR, CRR

Page 2

```
 1        A P P E A R A N C E S:
 2  GREGORY HERBERT, ESQUIRE
    STEPHEN ANDERSON, ESQUIRE
 3  Of:  Greenberg Traurig, P.A.
          450 South Orange Avenue
 4        Suite 650
          Orlando, Florida 32801
 5        Herbertg@gtlaw.com
          Andersonst@gtlaw.com
 6
    VALENCIA GALLON-STUBBS, ESQUIRE
 7  Of:  Bethune Cookman University
          640 Dr. Mary McLeod Bethune Boulevard
 8        Daytona Beach, Florida 32114-3012
          (386) 481-2035
 9        Stubbsv@cookman.edu
10        Counsel for the PLAINTIFF
11  ELANA GREENWAY FANIEL, ESQUIRE
    Of:  Greenway Law Firm, P.A.
12        PO Box 660
          Lutz, Florida 33548-0660
13        (813) 607-6060
          Elana@greenwayfirm.com
14
          Counsel for the DEFENDANTS
15
    DARIN WEAVER
16  Videographer
17  PAULA CASTRO
    Paralegal
18
    MICHELLE ALVERSON
19  Paralegal
20
21      *All parties and court reporter appeared via
    videoconference.
22
23
24
25
```

Page 3

```
 1             I N D E X
 2  TESTIMONY OF ANTHONY BARFIELD
 3    DIRECT EXAMINATION BY MR. ANDERSON ....... 6
 4  CERTIFICATE OF OATH ........................... 246
 5  REPORTER'S DEPOSITION CERTIFICATE ............. 247
 6        E X H I B I T S
 7  PLAINTIFF'S EXHIBITS
 8  Exhibit 1 ...................................... 32
 9  Exhibit 2 ...................................... 39
10  Exhibit 3 ...................................... 60
11  Exhibit 4 ...................................... 62
12  Exhibit 5 ...................................... 95
13  Exhibit 6 ...................................... 65
14  Exhibit 7 ...................................... 73
15  Exhibit 8 ...................................... 76
16  Exhibit 9 ...................................... 88
17  Exhibit 10 ..................................... 109
18  Exhibit 11 ..................................... 111
19  Exhibit 12 ..................................... 112
20  Exhibit 13 ..................................... 114
21  Exhibit 14 ..................................... 119
22  Exhibit 15 ..................................... 120
23  Exhibit 16 ..................................... 126
24  Exhibit 17 ..................................... 127
25  Exhibit 18 ..................................... 129
```

Page 4

```
 1  Exhibit 19 ..................................... 129
 2  Exhibit 20 ..................................... 130
 3  Exhibit 21 ..................................... 130
 4  Exhibit 22 ..................................... 130
 5  Exhibit 23 ..................................... 131
 6  Exhibit 24 ..................................... 139
 7  Exhibit 25 ..................................... 151
 8  Exhibit 26 ..................................... 152
 9  Exhibit 27 ..................................... 155
10  Exhibit 28 ..................................... 164
11  Exhibit 29 ..................................... 167
12  Exhibit 30 ..................................... 175
13  Exhibit 31 ..................................... 188
14  Exhibit 32 ..................................... 213
15  Exhibit 33 ..................................... 214
16  Exhibit 34 ..................................... 216
17  Exhibit 35 ..................................... 219
18  Exhibit 36 ..................................... 219
19  Exhibit 37 ..................................... 225
20  Exhibit 38 ..................................... 228
21  Exhibit 39 ..................................... 241
22  Exhibit 40 ..................................... 242
23  DEFENDANTS' EXHIBITS
24  (NONE)
25      *REPORTER'S NOTE:  The exhibits were not provided to
        the court reporter.
```

Page 5

```
 1           P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We're going on the record.
 3  The time is 9:02 a.m.  Today is Tuesday, November 21,
 4  2023.  Please note that this deposition is being
 5  conducted virtually.  Quality of recording depends on
 6  the quality of camera and internet connection of
 7  participants.  What is seen from the witness and heard
 8  on the screen is what will be recorded.  Audio and
 9  video recording will continue to take place unless all
10  parties agree to go off the record.
11        This is media unit 1 of the video-recorded
12  deposition of Anthony Barfield taken by the counsel
13  for the plaintiff in the matter of Bethune-Cookman
14  University, Inc., versus Dr. Mary McLeod Bethune
15  National Alumni Association, Inc., Mary McLeod Bethune
16  National Alumni Association Inc., and Johnny L. McCray
17  Jr. individually, filed in the United States District
18  Court for the Middle District of Florida, Case No.
19  6:22-cv-0047-WWB-RMN.
20        This deposition is taking place via Zoom.  My
21  name is Darin Weaver.  I represent Veritext Legal
22  Solutions.  I am the videographer.  The court reporter
23  is Mae Fisher, also from Veritext Legal Solutions.
24        I'm not authorized to -- pardon me -- I'm not
25  authorized to administer an oath; I'm not related to
```

any parties in this action, nor am I financially interested in the outcome.

Will the court reporter please swear in the witness.

THE COURT REPORTER: Can you raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do. I swear.

THE VIDEOGRAPHER: Thank you. Counsel, you may proceed.

ANTHONY BARFIELD II,

a witness herein, having been first duly sworn, was examined, and testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Thank you. Good morning, Mr. Barfield. My name is Stephen Anderson. I'm with the law firm Greenberg Traurig. We represent Bethune-Cookman University, Inc. in connection with this case. Joining me today are Valencia Gallon-Stubbs, the general counsel of the university, Gregory Herbert, colleague of mine at Greenberg Traurig, and Ms. Paula Castro, who is a paralegal on our team.

How are you doing this morning?

A. I'm good. I'm trying -- I want to make sure I see who I'm talking to but I'm on spotlight. Does the spotlight have to be on?

THE VIDEOGRAPHER: Yes, sir. Yes, sir. The spotlight has to be on to record properly. If you go to the right-hand corner of your screen --

THE WITNESS: Oh, there it is, okay. Thank you.

THE VIDEOGRAPHER: -- there's an icon that says view. Switch it to gallery.

THE WITNESS: Thank you. Got it. Got it. Got it. Yep. All right.

BY MR. ANDERSON:

Q. Mr. Barfield, would you please state your full name and address for the record, please.

A. Full name and address, meaning my home address?

Q. Yes, please.

A. Okay. Anthony D. Barfield II. My home address is 11 -- actually -- yes, 11966 Southwest Coral Cove Parkway, Port St. Lucie, Florida 34987.

Q. Thank you. And you understand that you've been designated by the corporate defendants in this case to be a representative and answer questions on topics listed in a 30(b)(6) notice of deposition; is that

correct?

A. I've been made aware, yes.

Q. And that the corporate defendants here are the Dr. Mary McLeod Bethune National Alumni Association, Inc. and the Mary McLeod Bethune National Alumni Association, Inc., correct?

A. Yes.

Q. So I'm going to -- when I refer to you or your in this deposition, you understand that I'll be referring collectively to these two corporate entities, correct?

A. Correct.

Q. And I'll sometimes refer to them collectively as the organization. Is that okay with you?

A. You will be referring to which party as the organization?

Q. Both of them collectively as the organization.

A. Correct. I understand.

Q. I want to go through a couple of sort of ground rules before we get started. Ms. Fisher is transcribing everything that you and I say or that everyone says on the record, and she can't transcribe us both at the same time. So it's important -- it's important that we don't speak over one another. Is that okay with you?

A. I'm sorry, I was coughing. Say it one more time.

Q. I just wanted to point out that it's important so

that Ms. Fisher can get an accurate record of the deposition that you and I not speak over one another; is that okay?

A. Yes, definitely. Prefer that conversation to be like that.

Q. Great. And you understand that from time to time, Ms. Faniel, as counsel for the defendants in this case, may object to a question; and when she does that, we can leave her time to state her objection but then you still must answer the question that I've asked. Is that okay?

A. I understand.

Q. And it's important that all your responses be verbal. The court reporter cannot take down nods or shrugs or -- you know, yeses or noes. So if you could just make sure that your responses are verbal, that would be great. Is that okay?

A. Understand. Yes.

Q. If any of my questions are unclear, please ask me to clarify them. I'm happy to rephrase the question to the extent you don't understand what I'm asking. If you need a break at any time, feel free to let me know. I'm going to try to get us out of here as soon as possible. So if you need a break, feel free to just, you know, raise your hand, say you need a few minutes and we can

Page 10

1 go off the record. Is that okay?
2    A. Yes, sir. Yes, sir.
3    Q. What is your current position with the
4 organization?
5    A. I am the committee chair of the technology
6 committee.
7    Q. And how long have you held that position?
8    A. I was appointed that position in 2022, summer of
9 2022.
10    Q. And were you associated with the organization
11 before the summer of 2022?
12    A. Yes.
13    Q. And did you hold a title with the organization at
14 that time?
15    A. No.
16    Q. The first title you've held with the organization
17 since joining in summer of 2022 is the chair of the
18 technology committee; is that correct?
19    A. No.
20    Q. What was the first title that you held when you
21 joined the organization?
22    A. Vice president of the Palm Beach Chapter.
23    Q. And you understand when I refer to the
24 organization, I'm referring collectively to the national
25 organization but, also, the respective chapters,

Page 11

1 correct?
2    A. Correct. Yeah. Correct.
3    Q. Understand that the chapters are all part of the
4 same organization?
5    A. Correct. Yes.
6    Q. Your position as committee chair, is that an
7 elected position?
8    A. Elected position?
9    Q. Were you elected to that position or were you
10 appointed to that position?
11    A. I was appointed to that position.
12    Q. And your position as vice president of the Palm
13 Beach County Chapter, were you elected to that position?
14    A. Elected.
15    Q. And how long were you affiliated with the Palm
16 Beach County Chapter?
17    A. 2007, I believe.
18    Q. You joined that chapter in 2007, correct?
19    A. Yes.
20    Q. And when you joined that chapter, were you -- did
21 you have a title of the chapter at that time, in 2007?
22    A. No. Just part of committees.
23    Q. Part of committees?
24    A. Yes, sir.
25    Q. And which committees were you a part of when you

Page 12

1 joined in 2007?
2    A. Membership, college send-off, fundraising. No,
3 no, not fundraising. No, I'm sorry, that was -- what
4 was the name of that? Okay, yeah. Those were the only
5 two. Only one I -- only one that I helped out at the
6 current time was when a member of our chapter was, I
7 think, running for Miss National Alumni and there was a
8 committee for that, but yeah, those were the three.
9    Q. Okay. So as a member of the membership
10 committee, what were your responsibilities with the
11 organization?
12    A. To help and assist with the chair of the
13 membership committee.
14    Q. And who was the chair of the membership committee
15 at that time, do you recall?
16    A. Good question. I want to say Sylvia Gibson,
17 Sylvia Gibbs.
18    Q. Sylvia Gibbs?
19    A. I could be mistaken, yes.
20    Q. And as the member of the college send-off
21 committee, what were your responsibilities there?
22    A. To help the chair of the college send-off
23 committee, to assist and support.
24    Q. And who was the chair of the college send-off
25 committee?

Page 13

1    A. I do not recall the chair of the college send-off
2 committee on that date.
3    Q. Okay. So between 2007 and the summer of 2022,
4 you've consistently been a member of the organization?
5    A. No.
6    Q. Did you leave the organization at some point in
7 time?
8    A. No.
9    Q. Did you cease to become a member at some point in
10 time?
11    A. No.
12    Q. So you've been a member consistently since 2007
13 with the organization?
14    A. No.
15    Q. So at some point, you were not a member of the
16 organization, correct?
17    A. I'm trying to really understand that question
18 because my affiliation has always been there, against my
19 commitment to the work. For personal reasons, I had to
20 take maybe some breaks, but I've never really
21 disassociated myself, I would say, with the
22 organization.
23    Q. All right. So it sounds like you're making a
24 distinction between your affiliation with the
25 organization and being a member of the organization. Is

4 (Pages 10 - 13)

Page 14

1 that correct?
2   A. Correct. So --
3   Q. And what's the distinction between -- sorry, go
4 ahead. I'll let you finish.
5   A. So if you want to be, I guess, real technical or
6 distinct about it, my -- my affiliation has been
7 consistent. My activeness probably has taken a
8 couple-years hiatus. But my affiliation has been
9 consistent. Financial membership has maybe taken a
10 break, but being a member and being supportive has been
11 consistent.
12   Q. Okay. Understood. So there was a probably a
13 period of time in which maybe you stopped paying dues as
14 a paying member? Is that the distinction between
15 affiliation and member in your mind?
16   A. I have to say yes and no because I wouldn't --
17   Q. Okay.
18   A. -- I wouldn't distinct that as my affiliation.
19 So, you know, if I wasn't a paying member, I would still
20 sometimes support.
21   Q. Got it. And before 2007, were you a student at
22 Bethune-Cookman University?
23   A. Yes. And I say that --
24   Q. And when did you -- sorry, go ahead.
25   A. Yes, I'm going to say yes because you're going

Page 15

1 to -- go ahead.
2   Q. When did you graduate from Bethune-Cookman
3 University?
4   A. 2003.
5   Q. 2003. So you -- in the period of time between
6 2003 and 2007, you didn't have any affiliation with the
7 organization; is that right?
8   A. Correct.
9   Q. Okay. And when you graduated from
10 Bethune-Cookman in 2003, did you obtain a bachelor's
11 degree at that time?
12   A. Yes.
13   Q. And what was the degree in?
14   A. Music education.
15   Q. Jumping ahead to your current role as the chair
16 of the technology committee, what are your
17 responsibilities with the organization as the chair of
18 the technology committee?
19   A. To provide technical, audio and visual support to
20 the association at large.
21   Q. When you say technical support, what do you mean?
22   A. Well, it's -- from the pandemic was -- there was
23 support and making sure that each videoconferences was
24 available, social media, website upkeep and updates,
25 information as far as e-mail and -- e-mail support and

Page 16

1 e-mail contact is established, has been established. So
2 yeah, I think that's everything.
3   Q. So when you say websites, you're referring to the
4 organization's website at mmbnaa.org?
5   A. Yes, sir.
6   Q. And when you say social media, are you referring
7 to the organization's Facebook page?
8   A. Yes.
9   Q. And are you referring to the organization's
10 Instagram page?
11   A. Yes.
12   Q. And are you referring to the organization's
13 Twitter page?
14   A. No.
15   Q. And when you say no, what do you mean?
16   A. I do not update the Twitter page. I have not --
17   Q. But you understand -- understood. And you
18 understand that the organization has a Twitter page,
19 correct?
20   A. I've been made aware, yes.
21   Q. And when did you become aware of the
22 organization's Twitter page?
23   A. When I was appointed, and then I was made aware
24 to try to activate or reactivate or find out who has
25 access to that.

Page 17

1   Q. And were you able to find out who has access to
2 the organization's Twitter page?
3   A. No, unfortunately.
4   Q. But the Twitter page is still publicly available,
5 correct?
6   A. I believe so. I just haven't -- yeah, I'm pretty
7 sure. It should be.
8   Q. Do you recall the last time you looked at the
9 organization's Twitter page?
10   A. No.
11   Q. When you say you're in charge of the website,
12 what do you mean?
13   A. Meaning that the -- whenever there is any updates
14 that need to be made on each specific page or just a
15 fresh look, the committee as a whole -- the technology
16 committee as a whole, we come together and see how we
17 can keep it updated, maintained or see what other new
18 pages that needs to be added or edited.
19   Q. Okay. And when you need to add something to the
20 website or edit something on the website, you use a
21 third-party vendor called WIX, W-I-X?
22   A. Yes.
23   Q. And what is WIX?
24   A. A third-party --
25   Q. What do you understand WIX to be? Yeah, just a

Page 18

1 third-party vendor?
2   A. Yeah.  Yeah.  Third-party vendor.
3   Q. And so --
4   A. I understand it to be an online platform that
5 allows you to create websites.
6   Q. And so you can go into maybe a user or customer
7 portal on the WIX website and make changes to the
8 organization's website; is that right?
9   A. Yes.
10   Q. And you're the person at the organization who
11 makes those changes to the website?
12   A. No.
13   Q. Who is the person at the organization who makes
14 changes to the website?
15   A. There are a few people on the committee chair,
16 including myself, who does.
17   Q. So you do sometimes go in and make changes to the
18 website, correct?
19   A. Yes.
20   Q. And who else is on the technology committee?
21   A. Names or just numbers?
22   Q. Names, please.
23   A. Chandra Simmons, Stephan Holmes, LaVaughn Starks,
24 Lanita Paris.  I'm giving names --
25   Q. So just to make -- go ahead.

Page 19

1   A. I'm giving names of people who either have access
2 or have made -- have contributed to the addition or
3 editing of the website.
4   Q. Okay.  So that's you, Simmons, Holmes, Paris and
5 Starks?
6   A. Starks.  LaVaughn Starks.
7   Q. Starks, right.  Anyone else on the tech
8 committee?
9   A. That has access or has made additions to or edits
10 to the website, no.
11   Q. Is there anyone else on the tech committee who
12 hasn't made changes to the website?
13   A. Yes.
14   Q. Who is that?
15   A. Joy Eleby.
16   Q. How do you spell Eleby?
17   A. E-L-E-B-Y.
18   Q. So the people on the tech committee, you,
19 Simmons, Holmes, Paris and Starks, have a user name and
20 password to access the WIX account, correct?
21   A. My apologies.  I'm here at my school and the bell
22 is still ringing during this --
23   Q. No problem.
24   A. -- time.
25       That has access -- I'm sorry, can you say the

Page 20

1 question again?
2   Q. Of the people on the tech committee, which --
3 that have access to the websites, which I understand to
4 be you, Simmons, Holmes, Paris and Starks, does
5 everybody have their own user name and password to
6 access the WIX portal for modifying the website?
7   A. Yes.  They have their own user name and password
8 to access their portion of the website.
9   Q. Of the people who have access to the website, who
10 would you say makes the most changes to the website?
11   A. Me.
12   Q. Can you guess maybe what percentage of the
13 changes to the website are made by you?
14   A. The majority, because I'm familiar with wix.com,
15 anything that is asked of me or we, as a tech committee,
16 agree to make additions or modifications or edits, I'll
17 go and make the changes or additions.
18   Q. Okay.  So fair to say you make almost all of the
19 changes to the website, fair?
20       MS. FANIEL:  Object to form.
21 BY MR. ANDERSON:
22   Q. You can answer.  Fair to say you make --
23       MS. FANIEL:  Go ahead and answer the question.
24       THE WITNESS:  Okay.  It's fair to assess that
25 the good majority of the additions and edits are made

Page 21

1 by me from the standpoint of me collectively going to
2 agree what needs to be changed from the committee or
3 from the E-board.
4 BY MR. ANDERSON:
5   Q. Okay.  So if the committee decides that a change
6 needs to be made, a change will be made; is that how it
7 typically works?
8   A. Once we agree on what changes or what has been
9 given us, an assignment to change, we first submit for
10 approval to the E-board or president and then we make
11 the final changes, or we make the additions or edits and
12 we submit it for approval before it is published.
13   Q. I understand.  So the E-board, when you say
14 E-board, you're referring to the executive board?
15   A. Yes, sir.
16   Q. And when you refer to the president, you're
17 referring to Johnny McCray; is that right?
18   A. Johnny L. McCray Jr., yes, sir.
19   Q. And so any changes to the website need to be
20 approved by Johnny McCray; is that right?
21       MS. FANIEL:  Object to form.
22 BY MR. ANDERSON:
23   Q. You can answer.
24   A. No.
25   Q. But changes need to be approved by the executive

6 (Pages 18 - 21)

Page 22

1 board, correct?
2 A. No.
3 Q. Who approves changes to the website?
4 A. There are changes. There are multiple situations
5 where, of course, the last decision is for the
6 president. If there are other committees who have been
7 given, you know, the final approval by the president,
8 then we submit the changes to the committee.
9 Q. When you say the final approval by the president,
10 do you mean to say that the president approves all
11 changes to the website?
12 A. Yes.
13 Q. Do you recall the last time you made a change to
14 the website?
15 A. Yes.
16 Q. And when was that?
17 A. That was -- I don't know specifically the date.
18 Probably August; I believe it was in August.
19 Q. August was the last time --
20 A. Maybe --
21 Q. Sorry. Go ahead.
22 A. I'm just trying to really think back. Let me --
23 yes. I believe -- okay. It probably wasn't in August,
24 but there was a page that was added.
25 Q. What was the page that was added, do you recall?

Page 23

1 A. Yes. The Legacy Scholarship page.
2 Q. Have any pages been deleted since August from the
3 website?
4 A. None deleted.
5 Q. Have any links been modified since August on the
6 website?
7 A. Links? Meaning...
8 Q. Links to other web pages.
9 A. The pop-up. The pop-up page. That's --
10 Q. The pop-up page?
11 A. Yeah. The pop-up page, whether it will have a
12 flyer, those are -- okay. So yeah. So I would say most
13 recently as last month, the pop-up page was modified to
14 promote the current event that was taking place.
15 Q. The current event is the Showdown in O-Town; is
16 that right?
17 A. Yes, sir.
18 Q. What's the Showdown in O-Town?
19 A. The Showdown in O-Town, it is an event, an
20 event --
21 Q. What kind -- sorry. Go ahead.
22 A. Yes. It is an event for -- a sports event.
23 Q. So a football game?
24 A. Yes.
25 Q. Is that the Florida Classic in Orlando?

Page 24

1 A. It's a football event of two collegiate teams.
2 Q. And that game is the Florida Classic, correct?
3 A. That game is between universities, Florida
4 Agricultural & Mechanical University and Bethune-Cookman
5 University.
6 Q. And that game is commonly referred to as the
7 Florida Classic, correct?
8     MS. FANIEL: Object to form.
9     THE WITNESS: Actually --
10 BY MR. ANDERSON:
11 Q. That game is the Florida Classic, right?
12 A. Actually, the Showdown in O-Town is -- the
13 Showdown in O-Town was really referring to giving
14 discounts to the hotel, as well as providing
15 transportation. That's what the Showdown in O-Town
16 flyer is about.
17 Q. Right. Transportation to the football game,
18 right?
19 A. To a collegiate football game, yes, sir.
20 Q. Which is between Bethune-Cookman University and
21 FAU; is that right?
22 A. No.
23 Q. FAMU, correct?
24 A. Yes. Correct.
25 Q. Sorry. I misspoke. And that game is known as

Page 25

1 the Florida Classic, right?
2 A. Well, all -- all that event is for is to provide
3 transportation and to give discounts to local hotels.
4 So --
5 Q. Transportation to the Florida Classic, correct?
6 A. Anything that was happening in that city, that
7 was -- that was the person's choice who chose to take
8 advantage of the discounts and the -- what's happened.
9 So that's what --
10 Q. Sure.
11 A. -- Showdown in O-Town is, yeah.
12 Q. Do you know what the Florida Classic is?
13 A. Yes.
14 Q. What's the Florida Classic?
15 A. As an alumni, that's something that comes about
16 every year annually a week before Thanksgiving where two
17 teams, collegiate teams, FAMU and B-CU come to play
18 their annual football game. I think it's like the last
19 game of their season.
20 Q. And that's the game the transportation is
21 provided to by the organization, correct?
22 A. Transportation is provided to, to the street
23 address, to where the stadium is, yes.
24 Q. Where the game is played, is that the stadium?
25 A. Yes.

7 (Pages 22 - 25)

Page 26

1  Q. Thank you. I appreciate your precision in
2  answering my question.
3      So when you mentioned the flyers on the
4  organization's website, there was recently a flyer that
5  appeared that was a letter from the president of the
6  organization, Johnny McCray, correct?
7  A. Can you rephrase?
8  Q. Are you familiar with a pop-up on the website
9  that appeared to be a letter from the president of the
10 organization, Johnny McCray?
11 A. Yes, I'm familiar.
12 Q. And you -- are you the one at the organization
13 who removed that letter from the website?
14 A. Can you rephrase the question?
15 Q. Did you remove the letter from Johnny McCray from
16 the website?
17 A. There were many letters and flyers that were
18 added to a specific point in time of the year to speak
19 on different events. Once that time frame has gone,
20 then the next flyer or letter has been added or --
21 Q. And --
22 (Simultaneous speakers; reporter request for
23 clarification.)
24     THE WITNESS: Letter has been added or
25 modified.

Page 27

1 BY MR. ANDERSON:
2  Q. And when you say modified, what do you mean?
3  A. Either -- okay. Won't say modified. Either
4  another letter or a flyer that's pertinent to the next
5  event or situation is added to the pop-up screen or
6  website. So when you say deleted, it's not that, oh,
7  there was a mistake in posting that, delete it. No. It
8  was because for that time, that's what was relevant to
9  keep the website updated. But now we're moving on to
10 the next relevancy.
11 Q. Got it. Okay. And so these pop-up flyers, I'll
12 call them, I think the current one is the Showdown in
13 O-Town, do you create these flyers?
14 A. The technology committee does.
15 Q. So together, the technology committee decides
16 what should be on the flyer?
17 A. The technology committee creates the flyer with
18 the content that was given to us.
19 Q. And who gives you the content?
20 A. The committee of the event. Yeah. Whatever --
21 Q. The -- okay. And if the content was a letter
22 written by Johnny McCray, did Johnny McCray provide you
23 with that letter to put on the website?
24 A. Yes.
25 Q. Who is the person at the organization who goes

Page 28

1  into the WIX portal and changes the content of the
2  pop-up on the website?
3  A. The technology committee, whoever's available,
4  who has the access, which I've given you that
5  information, will make frequent updates or additions or
6  edits.
7  Q. And I think you said before that you make most of
8  the edits to the website. So fair to say you make most
9  of the changes to the pop-ups on the website as well?
10 A. Because I have a pretty good knowledge of how to
11 run the third-party online program portal, after the
12 agreement from the committee or the committee who needs
13 the edited or the addition, I will go make the changes.
14 Q. Okay. I mentioned before some links on the
15 website. You understand that there's a link to the
16 organization's Facebook page on the website, correct?
17 A. I am familiar.
18 Q. And you understand there's a link to the
19 organization's Instagram page on the website, correct?
20 A. I am familiar.
21 Q. And you understand that there recently was a link
22 to the organization's Twitter page on the website,
23 correct?
24 A. I am familiar.
25 Q. And you understand that that link to the

Page 29

1 organization's Twitter page was recently removed from
2 the website, correct?
3  A. Yes. I am familiar.
4  Q. And are you the person who removed that link to
5  the Twitter page from the website?
6  A. Yes. No.
7  Q. And when you --
8  A. Not removed. It was hidden. Because when you
9  remove, meaning you delete something completely, and
10 just being technical, it's still there. Just not the
11 recent post to the website, you can't see it.
12 Q. Okay. And do you recall when you -- when you hid
13 the link to the Twitter page from the website?
14 A. That was last month, I believe. Because when we
15 were still trying to --
16 Q. A few weeks ago?
17 A. Probably so.
18 Q. Probably a few weeks ago, right? Yeah.
19 A. Yeah, yeah, probably so because again, we was
20 trying -- hey, did you find -- we was always trying to
21 find the access to the Twitter page. Couldn't find it
22 so, you know, we've just got to restructure it or create
23 a new one and let's hide it until we fix that.
24 Q. So why did you remove the link to the Twitter
25 page from the website?

8 (Pages 26 - 29)

1    A.  Because the access was not available to make
2 changes.
3    Q.  The access to the Twitter page?
4    A.  Yes.  And it was outdated.
5    Q.  And up until -- understood.  And up until just a
6 few weeks ago, it was linked from the website, correct?
7    A.  You're saying it was or you're asking me?
8    Q.  It was, correct?
9    A.  Up until a few weeks -- say the question again.
10    Q.  Up until a few weeks ago, the organization's
11 Twitter page was linked from the organization's website,
12 correct?
13    A.  I'm familiar with that, yes.
14    Q.  And when you hid the link to the Twitter page,
15 did you look at the Twitter page before you did that?
16    A.  No.  Because it's been the same since we've been
17 trying -- it's been the same since -- you know, I
18 believe since I was appointed.
19    Q.  Right.
20    A.  Multiple times I've tried to access it and tried
21 to update it, which were failed, and looking to see who
22 has the access or who was updating that page.  So most
23 recently, as you stated, a few weeks ago, it was asked,
24 hey, did any -- you know, any updates on updating the
25 Twitter page?  Like, no, still can't find it.  Okay,

1 let's just hide them until we create a new one, and we
2 can work from there.  Because at that point, I was like,
3 oh, it's still there.  Me being appointed, I
4 inherited -- we, the people who I was here with, we
5 inherited everything.  So, you know, constant updates to
6 make sure that everything is, you know, all working
7 order.
8    Q.  Understood.
9        I'm going to go ahead and share my screen real
10 quick.  Oh, I shared the wrong screen.
11    A.  Um-hmm.
12    Q.  Can you see this here?
13    A.  Yes.
14    Q.  Does it appear to be a Twitter page?
15    A.  This appears to be a PDF.
16    Q.  Does it appear to be a PDF representation of a
17 Twitter page?
18    A.  Yes.
19    Q.  And have you seen this before?
20    A.  Yes.
21    Q.  And when I say Twitter, it's now understood that
22 Twitter is known as X currently, correct?
23    A.  Yeah.  I know our office is still getting used to
24 that terminology, so I just --
25    Q.  Is it okay if I refer to it as the Twitter page?

1    A.  Please.  I would prefer that.  X is --
2    Q.  It would be easier for everybody?  Thank you.
3        And this -- this is the -- it's an accurate
4 depiction of the Twitter page that was linked from the
5 organization's website, correct?
6    A.  I would say yes.  This is -- from the last time
7 I've seen this, which was probably a few years ago or --
8 no, later up until this year, yes, trying to access it,
9 yes.
10    Q.  And you see up here -- can you see up here on the
11 top corner, it has a URL, it says Twitter.com/ --
12    A.  Yes.
13    Q.  -- NAABCU_, you see that?
14    A.  Yes.  November 20, 2023, yes.
15        MR. ANDERSON:  I'd like to enter this as
16 Exhibit 1, please.
17        (Plaintiff's Exhibit No. 1 was marked for
18     identification.)
19 BY MR. ANDERSON:
20    Q.  At the top here, it says Bethune-Cookman NAA,
21 correct?
22    A.  Bethune-Cookman NAA, correct.
23    Q.  And you understand Bethune-Cookman is a
24 registered trademark of the university, correct?
25    A.  I've been made aware.

1    Q.  And you see here below where it says
2 Bethune-Cookman NAA?  There's a little circular logo;
3 it's really small.  I'll try to zoom in for you.  Can
4 you see that there?  It's a little circle.
5    A.  Yes.
6    Q.  And I can scroll down to give you a clearer
7 picture of that circle.  Here you go.  Right here in the
8 40, it says Bethune-Cookman University and a logo with
9 head, heart and hand, year 2007 at the bottom?
10    A.  Correct.  Yes, I do see that.
11    Q.  You understand that this logo here, which I'll
12 refer to as the seal, that the seal is a registered
13 trademark of the university?
14    A.  I've been made aware.
15    Q.  And you understand that up until a few weeks ago,
16 the Twitter page was linked from the organization's
17 website mmbnaa.org, correct?
18    A.  Yes, I've been made aware.
19    Q.  And you -- you removed the link to this page from
20 the website because it includes the university's
21 registered trademarks, correct?
22        MS. FANIEL:  Object to form.
23 BY MR. ANDERSON:
24    Q.  You can answer.
25    A.  No.

9 (Pages 30 - 33)

1  Q. Why did you remove the link from the website,
2  then?
3  A. The link was not deleted or removed.
4  Q. I'm sorry, you're right. You hid the link to the
5  Twitter page because it includes the university's
6  registered trademarks, correct?
7  A. I hid the --
8      MS. FANIEL: Object to form.
9  BY MR. ANDERSON:
10  Q. You can answer.
11  A. I hid the link because it was brought to my
12  attention that the Twitter page link was not updated,
13  still wasn't updated, and I wasn't able to find access
14  or find the person who had access to update it.
15  Q. Understood. And you understand that the
16  organization is prohibited from using Bethune-Cookman,
17  correct?
18  A. I've been made aware.
19  Q. And you understand that the organization is
20  prohibited from using the circular seal logo, correct?
21  A. I have been made aware since 2021.
22  Q. And you're the person -- are you the person in
23  the organization responsible for identifying uses of the
24  university's registered trademarks on the organization's
25  various websites?

1  A. Rephrase the question.
2  Q. Are you the person at the organization
3  responsible for identifying potentially infringing uses
4  of the university's registered trademarks on the
5  websites of the organization?
6  A. Identifying, meaning --
7  Q. Finding them?
8  A. I find -- I find this logo on -- I just want to
9  make sure I understand what you're saying. So you're
10  asking -- you're saying, am I the person that go look to
11  see if there are logos anywhere on the website or -- on
12  our website or --
13  Q. Yes.
14  A. -- or -- no, I'm not -- I don't think there's one
15  person that identifies it. When the organization was
16  made aware to not have the likeness of Bethune-Cookman
17  University, we all made a collective effort to make
18  those changes. So when it's come up to a situation
19  where, hey, don't forget about this, don't forget about
20  that, from anyone, you know, everyone -- everyone's had
21  a task with making sure that we adhere to what was asked
22  of -- asked the organization to do.
23  Q. Understood. And when you say, we collectively
24  looked for improper uses of the university's trademarks,
25  who are you referring to?

1  A. The association as a whole. Because the
2  association as a whole was given this action to
3  disassociate with them.
4  Q. And who communicated the requirements to not use
5  the university's registered trademarks to the
6  organization's local chapters?
7  A. When you say communicated, mean who gave the
8  order to not use it anymore?
9  Q. That's right.
10  A. That would be the lawyers for Bethune-Cookman.
11  Q. But who within the organization informed the
12  various chapters of the organization what they can and
13  cannot do with regard to the university's trademarks?
14  A. That information that was passed down from the
15  lawyers, that was given to the E-board to pass down to
16  the chapter presidents and so forth.
17  Q. And were there e-mails that were sent from the
18  E-board to the chapter presidents relating to what they
19  can and cannot do with regard to the university's
20  trademarks?
21  A. Yes.
22  Q. And did the chapter presidents, as far as you
23  know, respond to any of those e-mails by sending another
24  e-mail to the E-board or to anyone else?
25  A. Meaning replied to the E-board or just asked --

1  Q. That's right.
2  A. Or continue -- or pass down the information?
3  Which one are you talking about?
4  Q. You said that the E-board passed down the
5  information to the chapter presidents, correct?
6  A. Correct.
7  Q. Did the chapter presidents ever reply to those
8  e-mails, as far as you know, with any questions about
9  what they can and cannot do with regard to the
10  university's trademark?
11  A. I do not recall. Yeah, I think that was a
12  separate e-mail.
13  Q. When you say you think that was a separate
14  e-mail, what do you mean?
15  A. Meaning I wasn't on that e-mail blast or e-mail
16  link.
17  Q. Okay. Have you had any communications with any
18  chapter presidents regarding what they can and cannot do
19  as it relates to the university's trademarks?
20  A. Yes.
21  Q. And was that communication by e-mail?
22  A. Yes and no.
23  Q. What do you mean, yes and no?
24  A. There were communications by e-mail. There were
25  phone conversations. There were text messages.

Page 38

1   Q. So communications by e-mail, phone conversations
2 and text messages. Anything else?
3   A. No.
4   Q. Did you ever have a Zoom call with any chapter
5 presidents regarding the university's demands that they
6 not use any of the university's trademarks on the
7 website?
8   A. Me hosting the Zoom call or has there been a Zoom
9 call, period?
10   Q. Has there been a Zoom call, period?
11   A. Yes.
12   Q. And were you present in that Zoom call?
13   A. Not all of them. No.
14   Q. Are those Zoom calls recorded?
15   A. I believe so. Yes. I can -- yes, there have
16 been Zoom calls recorded. I don't think all of them
17 were, but there have been Zoom calls that have been
18 recorded.
19   Q. And are you in possession of the recordings of
20 those Zoom calls?
21   A. It is -- it is in the Cloud-based folder, so I
22 can -- I do have access. I can possibly, yeah, have
23 access.
24   Q. Were there lawyers present in all those Zoom
25 calls?

Page 39

1   A. I'm not made aware.
2   Q. As far as you know, there weren't any lawyers
3 present in those Zoom calls?
4   A. I haven't been made aware of all the Zoom calls,
5 if there were lawyers present. The ones that I've been
6 part of, no.
7   Q. Okay. I'm going to jump around just a little bit
8 here. Can you see this document on the screen?
9   A. Yes.
10   Q. Do you see here it says -- the title is
11 Plaintiff's Fifth Amended Notice of Rule 30(b)(6)
12 deposition of Defendants, Dr. Mary McLeod Bethune
13 National Alumni Association, Inc. and Mary McLeod
14 Bethune National Alumni Association, Inc., correct?
15   A. Yes.
16   MR. ANDERSON: I'd like to enter this as
17 Exhibit 2, for the record.
18   (Plaintiff's Exhibit No. 2 was marked for
19 identification.)
20 BY MR. ANDERSON:
21   Q. Have you seen this document before?
22   A. I have been made aware of these documents, I
23 believe.
24   Q. Have you seen this document, though?
25   A. I've seen files. I cannot say if that was a

Page 40

1 specific document that I have seen, but I have -- I have
2 seen files.
3   Q. When you say you've seen files, what do you mean?
4   A. Meaning this -- can you scroll back up? Meaning
5 this copy of this case, I've seen where it starts off
6 like this and then when you scroll down, there was a lot
7 of information that was given. So there are a few
8 documents --
9   Q. Okay.
10   A. -- that are like this, yes.
11   Q. But do you recall seeing this exact document,
12 Plaintiff's Fifth Amended Notice of Rule 30(b)(6)?
13   A. I don't want to say yes and -- because, like I
14 said, I've seen many documents that look like this. So
15 it -- you know, it could be.
16   Q. You understand this is the notice of a deposition
17 that we're taking right now?
18   A. Okay.
19   Q. Correct? But no one's ever sent you this
20 document before?
21   A. This is the notice of a deposition that we're
22 taking right now. Okay. I understand.
23   Q. But as far as you know, you've never received
24 this document; is that correct?
25   A. I can't say --

Page 41

1   MS. FANIEL: Object to form.
2 BY MR. ANDERSON:
3   Q. You can answer. Have you received this document
4 before?
5   A. I can't say I've never -- well, you said, have I
6 never. I can't say I've never received it before. As
7 I've stated, this is one of the many documents that I --
8 I went over and I've seen. So if you scroll, I can
9 probably look at it and be like, okay.
10   Q. Yeah, maybe I'll give you some more information
11 here. You see here it's dated November 14, 2023?
12   A. Um-hmm.
13   Q. And down below, there's a list of deposition
14 topics, correct?
15   A. Okay. Yes. Yes.
16   Q. Have you seen these deposition topics before?
17   A. Yes.
18   Q. So the first one is your preparation for this
19 deposition, including the selection of the designated
20 individuals and his/her/their preparation to testify.
21   Correct?
22   A. Yes.
23   Q. Can you tell me what you did to prepare for
24 today's deposition?
25   A. Spoke with -- spoke with lawyer, Ms. Faniel, to

11 (Pages 38 - 41)

Page 42

1 understand what is a deposition, reason being that why I
2 was called and to familiarize myself with the topics.
3 Q. And is this the first time you've ever been
4 deposed in connection with the lawsuit?
5 A. Yes, sir.
6 Q. And did you review any documents in preparation
7 for your testimony today?
8 A. These documents that you have up now.
9 Q. When you say these documents that I have up now,
10 the deposition topics?
11 A. This and the other files that were made -- that I
12 had to be made aware of.
13 Q. When you say the other files, what files are you
14 referring to?
15 A. The deposition files, all these files that are
16 similar to like this. They all start off the same and
17 then they go in the other topics. Actions, plaintiff.
18 Q. Did you review any videos of any meetings of the
19 organization in preparation for your testimony today?
20 A. Any what, videos like this?
21 Q. Any videos of any meetings? No, any recorded
22 videos of any meetings of the organization?
23 A. No.
24 Q. No? Did you review the organization's website,
25 mmbnaa.org, in preparation for your testimony today?

Page 43

1 A. No. Last -- last edit or revision or addition
2 was for the event.
3 Q. When you say the event, you're referring to the
4 Showdown in O-Town?
5 A. Yes.
6 Q. But there was an edit sent, then, right? I
7 believe you testified earlier that you hid the link to
8 the Twitter page on the website, right?
9 A. Yeah. Yeah. I believe that was before. I
10 believe that was before.
11 Q. That was before the Showdown in O-Town flyer was
12 put up?
13 A. Yes. Because there was an edit. There was an
14 edit to -- with the verbiage to the most recent flyer.
15 Q. Okay. This third topic here, your investigation,
16 preservation, collection and production of documents and
17 information related to this action, did you do anything
18 to prepare to testify on this topic number 3?
19 A. Just read through these documentations in
20 preparation to understand, you know, my role in this
21 deposition. Yes.
22 Q. You understand that the plaintiff in this case,
23 Bethune-Cookman University, has served what are called
24 requests for production of documents on the defendants
25 in this case, correct?

Page 44

1 A. I've been made aware.
2 Q. And have you been involved in the collection of
3 documents responsive to those requests for production?
4 A. Yes.
5 Q. What was the nature of your involvement in
6 collecting documents responsive to the requests for
7 production?
8 A. To compile all of the committees or chapters into
9 one digital folder or give them access to update their
10 information to a digital folder. So that --
11 Q. And when you say -- I'm sorry. Go ahead.
12 A. So that whomever needs to view it or our lawyers,
13 we did it so it made it easier for our lawyers to
14 receive all the information.
15 Q. I'm sorry, could you repeat what you just said?
16 I didn't hear you.
17 A. I was able -- I just wanted to make it easy for
18 the association's lawyers to be able to access the
19 information.
20 Q. And so you created a digital folder for
21 individuals to put documents into, correct?
22 A. Correct.
23 Q. And was that a Dropbox folder?
24 A. No.
25 Q. What was the platform that you used to create the

Page 45

1 folder?
2 A. It was the association's e-mail address, it
3 comes -- well, in association with Google. And the
4 association has a business account with Google, which
5 gives it the Google version of Dropbox. It's called
6 Google Drive.
7 Q. Google Drive. Okay. I couldn't remember the
8 name of the Google's Dropbox equivalent, so thank you.
9     So you created a Google Drive folder and you sent
10 out a request to the local chapters to put information
11 in that folder, correct?
12 A. I created a secured shared Google Drive folder so
13 that way the individuals have access to upload their --
14 their information, private information.
15 Q. Okay. And what did you -- what did you ask the
16 individuals you sent those -- that link to, to put in
17 the folder? What did you ask them to put in the folder?
18 A. I didn't ask anything.
19 Q. What did you tell them to put in the folder?
20 A. I didn't tell them anything.
21 Q. What was the instruction that you provided
22 relating to the folder?
23 A. This is the link for you to upload information
24 that was asked of you.
25 Q. And how did they know -- as far as you know, how

12 (Pages 42 - 45)

Page 46

1 did they know what information was asked from them?
2    A. From the executive board or from the president,
3 that was asked of information from the association's
4 lawyer. That was -- that was -- what is the
5 terminology? Deposed or production. There you go.
6 That was asked -- production or request from the
7 Bethune-Cookman University's lawyers.
8    Q. So the requests for production were sent to all
9 the individual chapters in the organization?
10    A. Through that channel, from the E-board president
11 to the presidents, chapter presidents, yes.
12    Q. So Mr. McCray sent the requests for production to
13 all of the individual chapters of the organization?
14       MS. FANIEL: Object to form.
15 BY MR. ANDERSON:
16    Q. Is that correct?
17    A. He was given that information, so he disseminated
18 that information.
19    Q. And when he disseminated that information, did he
20 do it with an e-mail?
21    A. I -- yes. Yes.
22    Q. And do you recall if he said anything about the
23 requests for production in that e-mail?
24       MS. FANIEL: Object to form.
25       THE WITNESS: I'm not sure. It was asked to

Page 47

1 receive certain information and that's what he asked.
2 I don't think he used that terminology, requests for
3 production, because, you know, that's a terminology
4 that's new for me. So --
5 BY MR. ANDERSON:
6    Q. Okay. That's fair. So when he asked the
7 chapters for information, the chapters were then
8 obligated to provide that information via the link that
9 you provided, correct?
10    A. Obligated? He asked for the information and, you
11 know, they was -- they provided the information. I
12 don't know if that was an obligation or have to --
13    Q. So when you say -- when you say they provided the
14 information, are you referring to -- who are you
15 referring to when you say they?
16    A. Chapter presidents, treasurer, E-board members,
17 secretary.
18    Q. I see. So all of these individuals, the chapter
19 presidents, the E-board members, the treasurer, they
20 were all responsible for searching for documents on
21 their own and uploading them to the digital folder; is
22 that correct?
23    A. That pertained to them, yes.
24    Q. Okay. Did you search any e-mail accounts for
25 documents responsive to the requests for production in

Page 48

1 this case?
2    A. I didn't go in their -- their chapter e-mail
3 account, no, I don't think I have access to -- okay.
4 I'm trying to make sure I understand the question. Are
5 you asking me, did I go into the chapter president's
6 e-mail address to see if they -- if they -- I'm sorry.
7 Can you rephrase that question, make sure I understand?
8    Q. Yeah. Did you access the e-mail accounts of the
9 chapter presidents to search for e-mails or other
10 documents responsive to the requests for production in
11 this case?
12    A. No. I did not access their -- their appointed
13 e-mail, their chapter e-mails, their position e-mails,
14 no. I did not access that.
15    Q. Did you access anyone else's e-mail account,
16 other than your own, for documents responsive to the
17 requests for production in this case?
18    A. No.
19    Q. Did you search your own e-mail account for
20 documents responsive to the requests for production in
21 this case?
22    A. I searched the committee e-mail address that
23 was -- that came with the title, the technology e-mail
24 address, I searched that, along with the Google Drive,
25 to look for the production -- to look for the

Page 49

1 information that was required for production.
2    Q. I understand. Okay. So when you say the e-mail
3 address, you're referring to the MMBNAA e-mail address
4 for the head of the technology committee, which is you,
5 correct?
6    A. Yes.
7    Q. And what's that e-mail address?
8    A. Tech, T-E-C, @mmbnaa.org.
9    Q. And are you the only one with access to that
10 e-mail account?
11    A. Now I am, yes.
12    Q. When you say now you are, what do you mean?
13    A. Well, there were, you know, other members that
14 was either the chair or other -- they had higher -- they
15 had other positions in the technology committee before I
16 was appointed as chair. So as a collective, there was
17 more than one person that had access to the e-mail, the
18 Tec@MMBNAA e-mail address and its Google Drive.
19    Q. Okay. Do you recall working with an eDiscovery
20 vendor in connection with defendant's document
21 production in this case?
22    A. eDiscovery?
23    Q. Yeah. Have you ever heard of an eDiscovery
24 vendor?
25    A. Not -- no, I can't. I don't think I'm familiar

13 (Pages 46 - 49)

Page 50

1  with that.  But --
2    Q.  Are you --
3    A.  -- working with that company --
4    Q.  Are you familiar with any third-party company
5  that has assisted defendants in connection with the
6  production of documents in this case?
7    A.  I am not familiar with that, no.
8    Q.  So you've never been contacted by anyone outside
9  of the organization in connection with the production of
10  documents in this case?
11    A.  Other than the association's lawyers, no.
12    Q.  Have you ever heard of an organization called
13  Cloud 9?
14    A.  No.
15    Q.  Did the organization ever hire a company called
16  Cloud 9?
17    A.  I haven't been made aware of that, no.
18    Q.  Have you ever had any communications with anyone
19  by e-mail about this lawsuit?
20    A.  Yes.
21    Q.  Who have you had communications with by e-mail
22  about this lawsuit?
23    A.  Executive boards, chapter presidents,
24  association's lawyers.
25    Q.  Anyone outside of the organization?

Page 51

1    A.  That is not directly connected with the
2  organization or affiliated with?  No.
3    Q.  Any members of the organization?
4    A.  Well, yeah, those people who I named --
5       (Simultaneous speakers; Reporter request for
6  clarification.)
7       THE WITNESS:  Yes.  Those people who I've named
8  are members of the -- outside the association's
9  lawyer, those people, chapter presidents, E-boards,
10  those are members of the organization.
11  BY MR. ANDERSON:
12    Q.  Have you had communications with all of the
13  chapter presidents about this lawsuit by e-mail?
14    A.  No.
15    Q.  Do you recall which chapter presidents you
16  communicated with e-mail about the lawsuit?
17    A.  Well, it was a -- it was an e-mail blast of all
18  of the chapter presidents, so responding back and forth,
19  trying to collect documentations, flyers, you know,
20  updates, Zoom requests, you know, so it's a -- the
21  majority of time, it's an e-mail blast type of thing.
22  So --
23    Q.  Fair to say -- sorry.  Go ahead.  I'll let you
24  finish.
25    A.  So it's -- you know, I know there are other --

Page 52

1  there are certain chapters that I know I haven't had any
2  direct communications with, but the one that's probably
3  more consistent are like the Orlando Chapter, Duval
4  Chapter, Seminole County, Broward, Miami.
5    Q.  So you've had communications with all of those
6  chapters about this website -- I'm sorry -- about this
7  lawsuit?
8    A.  Okay.  I'm sorry.  When I'm thinking, I'm
9  thinking abroad as far as with Zoom is concerned or the
10  lawsuit.  But if it's just the lawsuit, I think really
11  it's just Palm Beach or Duval, Palm Beach is the
12  chapter.  Orlando --
13    Q.  Has anyone ever -- sorry.  Go ahead.  Palm Beach,
14  Orlando, any others?
15    A.  I think Orlando, yes.
16    Q.  Okay.  Do you recall the last time you had an
17  e-mail communication with the chapter president
18  regarding this lawsuit?
19    A.  About the lawsuit?  I think it was -- I think it
20  was -- I want to say Palm Beach, from the president.
21  Just wanted to make sure that --
22    Q.  How recently --
23    A.  I think that was the most recent, because, you
24  know, the president wanted to make sure that they have
25  everything that they've applied to; was there anything

Page 53

1  else that they needed to present or to give to the --
2  whatever documentation.  So yeah, I believe Palm Beach
3  County because I'm -- you know, I'm a part of the
4  chapter but in a sense I'm -- I work with the
5  association, so I have like a direct connection with
6  them, so...
7    Q.  Okay.  Did you search any computers for documents
8  responsive to the requests for production in this case?
9    A.  Other than the computer that I use for tech at
10  mmbnaa.org, no.
11    Q.  Are you aware of anyone who has searched the
12  organization's computers for documents responsive to the
13  requests for production in this case?
14       MS. FANIEL:  Object to form.
15  BY MR. ANDERSON:
16    Q.  You can answer.
17    A.  I have not been made aware.
18    Q.  When you say you searched your own computer, is
19  that a computer owned by the organization?
20    A.  No.
21    Q.  Is that your personal computer?
22    A.  My personal computer is used to access the
23  Cloud-based platform that the organization used to hold
24  and maintain documentation.
25    Q.  What's the Cloud-based platform that the

1 organization uses?
2    A. Google. Google Business.
3    Q. Google Business, you said?
4    A. Yes, sir.
5    Q. Do you know how many computers the organization
6 owns?
7    A. I have not been made aware of that.
8        Hello?
9    Q. Yes. Can you hear me?
10   A. Oh, okay. I just saw a screen, I was like -- I
11 didn't know what that was.
12   Q. Oh, I stopped sharing my screen. But can you
13 still see and hear me?
14   A. Yes.
15   Q. I'm just looking at my notes. Okay. I'm just
16 going to look at my notes here for a second.
17   A. Okay.
18       THE VIDEOGRAPHER: Mr. Anderson, we're at an
19 hour and 16 minutes. You have about 15 minutes before
20 this media unit needs to end.
21       MR. ANDERSON: Okay. We can go ahead and take
22 a ten-minute break, if that's okay with you, Ms.
23 Faniel. Does that work for you?
24       MS. FANIEL: Fine.
25       MR. ANDERSON: Okay. We'll come back at 10:30.

1        THE VIDEOGRAPHER: Okay. We're going off the
2 record. The time is 10:20 a.m.
3        (A brief recess was taken.)
4        THE VIDEOGRAPHER: We're going back on the
5 record. The time is 10:31 a.m.
6 BY MR. ANDERSON:
7    Q. Mr. Barfield, I'm going to share my screen again
8 for the deposition notice. Can you see this on your
9 screen?
10   A. Yes, sir.
11   Q. Okay. So I was running through this a little
12 quickly before, so I want to slow down and back up. You
13 see topic 3 here is your investigation, preservation,
14 collection and production of documents and information
15 related to this action, including all steps taken by you
16 to search for, collect, identify, compile and produce
17 documents and information in response to the discovery
18 requests propounded by plaintiffs including the location
19 and storage format of such documents, criteria used to
20 determine such documents were responsive, the identity
21 of the individuals possessing such documents and
22 information, any documents or information withheld, and
23 the basis for withholding such documents or information.
24       Did I read that correctly?
25   A. Yes. Yes, I see it.

1    Q. Can you explain to me what you did to prepare to
2 testify and answer questions in connection with this
3 topic number 3?
4    A. I went over the files and documents like this to
5 understand the type of questions. Preparation, that's
6 about the extent of the preparation.
7    Q. So here in A, it says: The location and storage
8 format of such documents.
9        Are you aware of the location from which all
10 documents produced by defendants in this case were
11 obtained?
12   A. Yes.
13   Q. And can you explain to me as best you can where
14 the documents were obtained from?
15   A. Where they were obtained from? I can explain to
16 you where they're stored.
17   Q. Okay.
18   A. Each person who gathered their information, I
19 can't -- I don't -- I'm not familiar with what their
20 methods were or how they copied it or retrieved it or
21 produced it. But all of the information that -- that
22 regards to this production of information is in one
23 file. As we stated before, in Google, Google Drive,
24 Google Business Drive.
25   Q. And when is the last time you reviewed that

1 folder in Google Business Drive?
2    A. Once -- once I created the link, everybody had
3 access to it. Probably -- whatever date that was that
4 it was created, that same month. Whenever an e-mail
5 from association's lawyer was sent out to -- you know,
6 we need this information, we need that information, that
7 was probably the time I've checked, so nothing that was
8 recent. But I think all of the information was given, I
9 believe.
10       But I will say this. When there was -- when
11 reading the e-mail, if there was anything that pertained
12 that I needed to come up or produce, then that's when I
13 go and make sure that information was up there. But as
14 far as, I don't remember recently me updating or looking
15 at the other folder to see if the chapter presidents
16 uploaded their information.
17   Q. Do you recall what documents you personally
18 uploaded into that shared folder?
19   A. Yes.
20   Q. What documents did you upload?
21   A. Website information, files pertaining to events,
22 listings, contacts -- not contacts, but files pertaining
23 to events as far as fundraising and information that was
24 on the website, yeah. I think that's about it.
25   Q. Any e-mails that you put into that folder?

15 (Pages 54 - 57)

1   A. I believe so.  I think it was more so giving
2 access, but yeah.
3   Q. For item B in topic number 3, is the criteria --
4 I'm sorry?
5   A. No, I'm looking.
6   Q. Okay.  Says: The criteria used to determine
7 whether documents were responsive.
8     What criteria did you use to determine whether
9 documents needed to be placed into the shared folder for
10 production in this case?
11   A. Criteria, meaning what -- how did I check to make
12 sure that the document was responsive?  Is that what you
13 mean?
14   Q. Yeah.  How did you -- how did you know what to
15 put into the shared folder?
16   A. Oh, well, there was an e-mail that was sent and
17 had a list of what was needed from the lawyers of
18 Bethune.  Not from the, but, you know, our lawyers, the
19 association's lawyers sent the e-mail stating what was
20 needed from the lawyers from Bethune.
21   Q. And when they sent that e-mail, was there an
22 attachment to the e-mail?
23   A. No.  It was --
24     MS. FANIEL:  Object to form.  Object to this
25   line of questioning regarding privileged

1   communications.
2 BY MR. ANDERSON:
3   Q. Did you see the specific requests for production
4 that were served by the university on defendants in this
5 case?
6   A. There were a list on the e-mail, actual e-mail,
7 stating what was needed from the association.
8   Q. And -- but as far as you know, you've never seen
9 the requests for production that were served in this
10 case?
11     MS. FANIEL:  Object to form.
12 BY MR. ANDERSON:
13   Q. You can answer the question.
14   A. Repeat the question.
15   Q. Have you ever seen the requests for production
16 that were served by the university on defendants in this
17 case?
18   A. Are you saying actual documentation or letter or
19 subpoena, whatever the terminology is, from the --
20   Q. I've pulled up on the screen plaintiff's first
21 requests for production.  Do you see that there?
22   A. Yes.  Okay.  Yeah.  That --
23     (Simultaneous speakers.)
24 BY MR. ANDERSON:
25   Q. I'm sorry, could you repeat that?

1   A. Yes.  These were the documents, the many
2 documents that I've reviewed in preparation.
3   Q. Okay.  I'd like to enter this as Exhibit 3.
4     (Plaintiff's Exhibit No. 3 was marked for
5   identification.)
6     THE WITNESS:  Whoa, whoa, okay.
7 BY MR. ANDERSON:
8   Q. I'm just going to scroll down -- sorry, I'm going
9 quickly -- to the specific requests.  Do you see here
10 where it says:  Document -- documents requested?
11   A. Okay.  Yeah.
12   Q. Would you -- would you please review this on the
13 screen?  What you should be able to see are requests --
14 well, let's start with request 1 through 3.  Have you
15 seen these before?
16   A. I've seen in -- not these exact terminology,
17 because I'm guessing this is the official report, but as
18 stated in the e-mail, it was listed of what -- and it's
19 similar to this, yes.
20   Q. Okay.  And as I scroll -- as I scroll down --
21   A. The tax, um-hmm, returns, uh-huh, bank
22 statements.  Uh-huh.
23   Q. 5, number 6 --
24   A. Yeah.  Maybe not exactly word for word, but yeah,
25 in the e-mail, that's where it was asked, that's what

1 was in the e-mail, yes.
2   Q. Okay.  But you've never seen this actual document
3 before?
4   A. These were --
5     MS. FANIEL:  Object to form.  Sorry.  You can
6   answer, Anthony.
7     THE WITNESS:  These were the many documents
8   that I reviewed in preparation for this deposition.
9 BY MR. ANDERSON:
10   Q. Okay.  So you reviewed this document here, the
11 first request for production, in preparation for your
12 testimony here today?
13   A. Yes.
14   Q. Did you ever see them before you began preparing
15 for your testimony today?
16   A. It might have been in the e-mail.  I can't say
17 yes, but in preparation for the deposition, that's when
18 I reviewed most of these documents.
19   Q. I'm going to pull up another document.  This is
20 plaintiff's second request for production of documents
21 to defendants.
22     Do you see that?
23   A. Yes.
24     MR. ANDERSON:  I'd like to enter this as
25   Exhibit 4.

16 (Pages 58 - 61)

Page 62

1   (Plaintiff's Exhibit No. 4 was marked for
2   identification.)
3   BY MR. ANDERSON:
4   Q.  Did you review this document in preparation for
5   your testimony today?
6   A.  This were, in whole, part of the many forms that
7   I did review in preparation for today's deposition.
8   Q.  Do you recall if you've seen this document before
9   you began preparing for your deposition today?
10  A.  I'm not familiar with this and I don't recall.
11  But this could be -- have been part of the e-mail, so I
12  can't say yes or no.
13  Q.  Sure.  I understand.  And these -- I'm going to
14  scroll down to the specific documents requested.  You
15  see there, it says:  Documents and things to be
16  produced?
17  A.  Okay.  Okay.  Huh?  Consumer surveys or market --
18  okay.
19  Q.  Have you ever seen these before?
20  A.  A lot of information, so --
21  Q.  I know.  I know.
22  A.  If I -- if I, you know, scrolled quickly through
23  them, that's probably why I'm looking at this for the --
24  some of it for the first time.
25  Q.  Can you -- can you explain to me what steps the

Page 63

1   organization took to produce documents responsive to
2   these requests?
3   A.  Once the requests from the school's lawyers were
4   given to the association's lawyer, the association's
5   lawyer -- lawyer or lawyers -- communicated it through
6   the E-board, which includes the president.  The E-board
7   then -- the E-board communicated or disseminated that
8   information or request to the chapter presidents and
9   other officers to produce these documentations, which in
10  turn, I took it upon myself to, like, okay, let's create
11  a one-document folder with sub-folders so that way all
12  of the information will be available in one place for
13  the association's lawyer to review.
14  Q.  And when you say one folder with sub-folders, do
15  you recall what the sub-folders were titled?
16  A.  The chapter, officers, yes.  Chapters, chapter
17  folders and officer folders, like tech, treasurer,
18  secretary.  I think that's all.  I'd have to look to
19  see.  I just based it off of the e-mail.
20  Q.  So there was a folder for each chapter in the
21  shared folder for the chapter presidents to upload
22  documents into; is that correct?
23  A.  There was a -- there is a secured shared folder
24  that each chapter was able to upload their private
25  information to.  Yes.

Page 64

1   Q.  Are you aware of any chapters that didn't upload
2   any information?
3   A.  I was not made aware.  I do know there are some
4   chapters that had -- that did not have any information
5   to give.
6   Q.  And how do you know they didn't have any
7   information to give?
8   A.  Well, by going to the folder and not really
9   seeing any information in there.  But just by their
10  communications that were made out to the chapter
11  presidents of them -- you know, they were stating that
12  they don't have any information, there wasn't any filing
13  or, you know, type of information that was necessary.
14  Q.  So there are e-mails from chapter presidents to
15  the national organization indicating that they don't
16  have any documents to put in the folders?
17  A.  If there has, I'm -- I wasn't on that e-mail
18  thread, if there was communication.
19  Q.  So how do you -- so is it fair to say that your
20  conclusion that the chapters didn't have any documents
21  to put in the folder is drawn from the fact that the
22  folders were empty?
23  A.  Not a conclusion because I haven't looked to see
24  which ones were emptied and which ones didn't.  Chapters
25  that reached out to me, like, hey, do -- what else do I

Page 65

1   need, how do I do this, those are the ones that I helped
2   out.  But no, I didn't go through each folder to check
3   to see who put in or put in what.  I just provided the
4   link and the rest of the communications were from the
5   E-board to the individuals of the chapters or officers.
6   Q.  You said some chapters had reached out to you
7   about -- with questions about what to put in the
8   folders; is that right?
9   A.  How to upload, you know, tech -- technical stuff,
10  you know.  So...
11  Q.  Right.  Okay.  Up on the screen, I've pulled up
12  plaintiff's fourth request for production of documents
13  to defendants.
14  Can you see that?
15  A.  Yes.
16  MR. ANDERSON:  I'd like to enter this as
17  Exhibit 6.
18  (Plaintiff's Exhibit No. 6 was marked for
19  identification.)
20  BY MR. ANDERSON:
21  Q.  Have you seen this document before?
22  A.  This was part of the many files that I have
23  reviewed in preparation for today's deposition --
24  deposition.
25  Q.  I'm going to scroll down to the specific

17 (Pages 62 - 65)

1 requests.
2    A.  Okay.  Whoa.
3    Q.  Do you recognize these requests for production?
4    A.  Oh.  Personal.  Okay.  Oh, okay.  Yeah.  I'm
5 through scrolling.  I was looking for things that were
6 pertaining to tech.  So this was probably one of the
7 information that I scrolled quickly through, so just now
8 reading it, I -- so yeah.  Okay.
9    Q.  Are you aware of any efforts by the organization
10 to produce documents responsive to these requests for
11 production?
12    A.  Have not been made aware.
13    Q.  Have you had any discussions with anyone about
14 these requests for production?
15    A.  These specific requests for production that does
16 not pertain to tech, I have not been made aware of.
17 (Inaudible.)
18        (Reporter request for clarification.)
19        THE WITNESS:  I'm sorry.  I was reading out
20    loud, the request.  My apologies.
21 BY MR. ANDERSON:
22    Q.  Do you know what Sustaining the Legacy Legal
23 Defense Fund is?
24    A.  Yes.
25    Q.  Have you had any communications with anyone at

1 Sustaining the Legacy Legal Defense Fund?
2    A.  Yes.
3    Q.  What type of communications have you had?
4    A.  What was I asked -- one of the members is an, I
5 think, officer; there was an officer who was on -- who
6 was in Palm Beach County Chapter.  She was just asking,
7 how do I upload a picture or how do I give a picture
8 that she wanted to give to the organization?  Technical
9 stuff, you know, just as far as that's concerned.  Yeah.
10 She was -- yeah.  Yeah.  She was asking about a picture.
11 I remember that now, yeah.
12    Q.  When you say she, who are you referring to?
13    A.  Margaret Chukuma.
14    Q.  And she's a member of the organization?
15    A.  The MMBNAA, yes.
16    Q.  And she's a current member of the MMBNAA,
17 correct?
18    A.  Yes.
19    Q.  And --
20    A.  And I believe at one point, she was trying to
21 upload a picture but I don't think that she was able --
22 well, I believe she tried to upload a picture to be
23 involved -- I don't know what the extent of that.  I
24 don't think she's involved with them anymore, but, you
25 know...

1    Q.  When you say she was trying to upload a
2 picture --
3    A.  E-mail --
4    Q.  -- do you recall what picture?
5    A.  -- attach her -- her profile picture.  I'm sorry
6 for cutting you off.
7    Q.  No, that's okay.  I keep cutting you off, so my
8 apologies.
9        She wanted to upload a profile picture?
10    A.  Yes.
11    Q.  And where did she want to upload that picture?
12    A.  To an e-mail, I'm guessing, yeah.
13    Q.  To an e-mail?
14    A.  Yeah.
15    Q.  And did she e-mail you about how to upload a
16 picture?
17    A.  No.  That was just a quick conversation over the
18 phone.
19    Q.  And she's associated with Sustaining the Legacy
20 Legal Defense Fund, correct?
21    A.  I believe she's an officer, I think she is, yes.
22    Q.  She's an officer of the defense fund?
23    A.  Yeah.  Member, supporter, right.
24    Q.  And, I'm sorry, I'm a little confused.  She was
25 asking you how to upload a photograph of herself

1 somewhere, right?
2    A.  She wanted a photograph.  She has a photograph,
3 she wanted to know how to upload it or attach it to an
4 e-mail.  A lot of tech -- you know, simple tech issues,
5 I'm like sort of the go-to guy or whatever, so I help
6 them out.
7    Q.  Sure.  Did she -- do you know what she wanted to
8 upload that photo for?
9    A.  I believe that was a photo that she wanted to
10 have.  They were asking for a photo of her.
11    Q.  When you say they were asking for a photo of her,
12 who was they?
13    A.  The organization we were talking about,
14 Sustaining the Legacy.
15    Q.  So Sustaining the Legacy wanted a photo of
16 Ms. Chukuma to go on their website?
17    A.  Yes.  Yeah.  That should be it, yeah.  Yeah.
18 Yeah.  Yes.
19    Q.  Okay.
20    A.  Just remembering the conversation.  Yeah.
21    Q.  And did you help her put her photo on the
22 Sustaining the Legacy website?
23    A.  No.  There was a -- remember, it was an e-mail.
24 She was like -- she was like, I want to -- I need to
25 give this, so I was like, hey, it's just like a regular

18 (Pages 66 - 69)

Page 70

1 e-mail attachment, just attach it to your e-mail.
2   Q.  And she wanted to send that photo to somebody to
3 put it on the website?
4       MS. FANIEL:  Object to form.
5 BY MR. ANDERSON:
6   Q.  Is that your understanding?
7   A.  My understanding that she wanted to put it to her
8 e-mail, yes, attach it to her e-mail.
9   Q.  Do you know -- I think you had testified that she
10 wanted to e-mail a photo of herself to Sustaining the
11 Legacy to be able to put it up on Sustaining the
12 Legacy's website, correct?
13   A.  If I can make an adjustment, just saying that she
14 e-mailed -- she called me and said, hey, I need to send
15 this e-mail.  So of course it was for that, meaning that
16 they had a conversation that they needed a profile
17 picture for.  So if I go to the website and I see her
18 picture, then okay, that's what it was for.
19      But she was asking me, how do I upload or how do
20 I put her picture on the e-mail?  And I explained to
21 her, this is a regular attachment, nothing different.
22 Just upload your -- find your picture and attach it to
23 your e-mail.
24   Q.  Did you search for any communications between
25 Sustaining the Legacy and defendants in connection with

Page 71

1 your production of documents in this case?
2   A.  No.  I just looked for things that pertained to
3 tech.
4   Q.  Are you aware of any communications between
5 Sustaining the Legacy and defendants at all?
6   A.  Other than me and Ms. Chukuma, no, I've not been
7 made aware.
8   Q.  Have you ever communicated with Percy Williamson
9 regarding Sustaining the Legacy Legal Defense Fund?
10   A.  Yes.
11   Q.  What was the nature of that communication?
12   A.  That he is the -- that he will be the officer for
13 this, for that -- and yeah, that he will be the officer
14 for it, for the legal defense fund.
15   Q.  Did you assist in creating the website for
16 Sustaining the Legacy Legal Defense Fund?
17   A.  He asked me for specific details, like WIX
18 account, the wix.com.  So I gave him information to be
19 able to -- for him to create it, as far as hobbies, WIX,
20 where to go.  He had, I think, like a couple people who
21 were supposed to be manning the website or the financial
22 part of it.
23   Q.  Um-hmm.  Did you --
24   A.  But yeah, in that regards, yes, helping, helping
25 him to get everything -- helping him, you know, as far

Page 72

1 as the information is concerned.
2   Q.  So when you say you helped him, did you actually
3 go into WIX and assist with the creation of the
4 Sustaining the Legacy Legal Defense Fund website?
5   A.  I don't -- no, not in our WIX account, no.  He
6 has -- they should have a Sustaining the Legacy separate
7 WIX account, so, you know, I was able to help him get
8 that information and get him set to get going so he
9 can -- him and his team could do what they need to do,
10 yeah.  But yeah, I mean, that's helping, yeah.
11   Q.  Did the organization pay for the creation of the
12 Sustaining the Legacy Legal Defense Fund website?
13   A.  The organization meaning the MMB?
14   Q.  Did the MMBNAA pay for the creation of the
15 Sustaining the Legacy Legal Defense Fund website?
16   A.  I haven't been made aware of that.
17   Q.  Can you see this e-mail on the screen?
18   A.  Um-hmm.  Copy of receipt of payment.
19   Q.  And this is an e-mail from tech@mmbnaa.org?
20   A.  Um-hmm.
21   Q.  To stldefensefund@gmail.com, correct?
22   A.  Yeah.
23   Q.  And that's your signature block there, Anthony
24 Barfield?
25   A.  Yes.

Page 73

1   Q.  Does this appear to be a true and accurate
2 reflection of the e-mail depicted here?
3   A.  This is an e-mail, a copy of an e-mail of a
4 receipt.  That's what it says.
5       MR. ANDERSON:  I'd like to enter this as
6 Exhibit 7.
7       (Plaintiff's Exhibit No. 7 was marked for
8 identification.)
9 BY MR. ANDERSON:
10   Q.  You sent this e-mail, correct?
11   A.  Yes.
12   Q.  And it says:  See attachment.
13   A.  Right.
14   Q.  And then it looks like there's a link here to
15 www.wix.com/premium-invoice, et cetera, right?
16   A.  Yes.
17   Q.  And the subject says:  Copy of receipt of
18 payment.
19      Do you know what this was a payment for?
20   A.  This was a payment -- it says:  Copy of receipt
21 of payment.  So this was a payment of, looks like an
22 invoice from wix.com.  Yes.  So that's what it is, yeah.
23   Q.  And it was an invoice for what?
24   A.  A premium invoice.  So I'm guessing that's part
25 of the website from WIX.  Yes.  It should be.  That's a

19 (Pages 70 - 73)

Page 74

1 premium, yeah. That's part of the website, the premium
2 package.
3    Q. So why were you sending a copy of receipt of
4 payment for the STL or Sustaining the Legacy Legal
5 Defense Fund website to sustaining -- or
6 stldefensefund@Gmail.com?
7    A. That was asked -- asked of me, to send that copy.
8    Q. Who asked you to send the copy of receipt of
9 payment?
10    A. Percy Williamson.
11    Q. Excuse me, who? Percy Williamson?
12    A. Percy Williamson. Percy Williamson, yeah.
13    Q. And then if I scroll down, it's got the
14 attachment from wix.com. It's an invoice 1062246061.
15 Does that appear --
16    A. Yes.
17    Q. -- correct to you? Yes?
18    A. Yes.
19    Q. And this is an invoice, it's identified as paid?
20    A. Uh-huh.
21    Q. And the total, $384?
22    A. Okay. Yeah.
23    Q. Correct?
24    A. Um-hmm.
25    Q. So this is indicating that you, as the chair of

Page 75

1 the tech committee for the organization, MMBNAA, paid
2 the premium plan business fee for Sustaining the Legacy
3 Legal Defense Fund's website, correct?
4       MS. FANIEL: Object to form. You can answer
5 the question.
6       THE WITNESS: No.
7 BY MR. ANDERSON:
8    Q. The organization didn't pay this invoice for
9 Sustaining the Legacy Legal Defense Fund?
10    A. No.
11    Q. Who did pay the invoice?
12    A. Percy Williamson.
13    Q. But you had the invoice?
14    A. As I stated before, I was helping him to get him
15 set up, you know, as far as understanding how to work
16 with -- so he didn't know technically how to make that
17 happen. So this was a paid -- this was him paying for
18 an account for Sustaining the Legacy. This is not from
19 the organization paying for the invoice.
20    Q. So it's your testimony that Percy Williamson paid
21 this invoice, correct?
22    A. Yes.
23    Q. So how did you come into possession of this copy
24 of this paid invoice?
25    A. From helping Percy Williamson. He didn't know

Page 76

1 how to navigate, to help to pay for it, and so to help
2 him.
3    Q. Did the organization reimburse Percy Williamson
4 for this $384 expense related to the Sustaining the
5 Legacy Legal Defense Fund website?
6    A. I have not been made aware of that.
7    Q. I'm going to pull up another document here.
8    A. Okay.
9       MR. ANDERSON: This was produced in this case
10 by defendant, it says DEF000470. I'd like to enter as
11 Exhibit 8.
12       (Plaintiff's Exhibit No. 8 was marked for
13 identification.)
14 BY MR. ANDERSON:
15    Q. Have you seen this document before?
16    A. I believe it is part of the many documents that
17 were used to review for -- in preparation for this
18 deposition, I believe.
19    Q. And have you --
20    A. That's like a financial report that's given, you
21 know, through the meeting.
22    Q. When you say through the meeting, what kind of
23 meeting are you referring to?
24    A. E-board meeting or chapter -- board of directors
25 meeting.

Page 77

1    Q. And are you typically in attendance at those
2 meetings?
3    A. Physically, no. Virtually, not most of the time.
4    Q. Not most of the time or most of the time?
5    A. Not most of the time.
6    Q. Okay.
7    A. Because that's --
8    Q. But --
9    A. Yeah. Not most of the time. I think that's
10 mostly for the members that are there, the E-board and
11 the chapter presidents.
12    Q. And those meetings are recorded, correct?
13    A. Correct. They should be.
14    Q. If I scroll down here, you see here, it says:
15 Operating account 4238 transactions?
16    A. Yes.
17    Q. And then there's a column for date, column for
18 amount and then a column for comment?
19    A. Oh, okay.
20    Q. You see on July 6, 2023, there's a Check No.
21 1023 to Percy Williamson for $384, correct?
22    A. Yes, I do.
23    Q. And it says: Reimbursement WIX-TBC. Right?
24    A. Yes. Yes.
25    Q. And that $384 is the same amount as the invoice

20 (Pages 74 - 77)

1 for the preparation of the Sustaining the Legacy Legal
2 Defense Fund website, correct?
3    A. Yes, sir.
4    Q. So defendants reimbursed Percy Williamson the
5 $384, right?
6    A. In this financial report, it's -- it is
7 documented that there has been a check that had been
8 made to Percy Williamson and this stands for
9 reimbursement.
10    Q. Stands for reimbursement WIX-TBC, right?
11    A. Reimbursement WIX-TBC.
12    Q. Have you ever had any discussions with anybody at
13 the organization about the organization paying for the
14 creation of the Sustaining the Legacy Legal Defense Fund
15 website?
16    A. No.
17    Q. Do you see down below, there's another
18 transaction, May 31, 2023?
19    A. What is that?  Pinnacle, legal defense loan?
20 What is that?  Pinnacle --
21    Q. It's a $5,000 payment to Pinnacle.  That's what
22 that looks like, right?
23    A. Okay.
24    Q. And it says:  Legal DF.
25      Does that appear to stand for Legal Defense Fund?

1    A. I can't confirm or deny that because I'm not sure
2 the verbiage of this.
3    Q. Have you ever been involved in any discussions at
4 the organization regarding the establishment of a legal
5 defense fund?
6    A. As far as Percy Williamson is concerned, that was
7 the conversation, as far as to help him navigate through
8 WIX.  But outside discussion with that, no.
9    Q. Have you ever had any discussions with any
10 members of the executive board regarding the
11 establishment of a legal defense fund other than Percy
12 Williamson?
13    A. Yes.
14    Q. Who did you have discussions with?
15    A. President.
16    Q. And by president, you mean Johnny McCray?
17    A. Yes.
18    Q. And what did you discuss regarding a legal
19 defense fund?
20    A. Just to my understanding of the support -- how
21 the legal defense fund is, what it's supposed to be, to
22 help pay for financial fees because I didn't really
23 understand it.  I think -- yeah, I think it's just me.
24 So it was just knowing that that was happening, except
25 that was something that was totally separate.  But just

1 trying to understand it.
2    Q. Did you have any discussions about whether or not
3 the organization can have its own legal defense fund?
4    A. Repeat the question.
5    Q. Did you ever have any discussions with anyone at
6 the organization about whether or not the organization,
7 MMBNAA, could establish its own legal defense fund?
8    A. No.  I think the conversation was more so, can
9 the organization pay for legal fees.
10    Q. Was there ever a plan to put a link on the
11 organization's website for people to donate to a legal
12 defense fund?
13    A. In meetings, a plan that it was discussed in
14 meetings.  I know that much.  I remember hearing that in
15 the chapter meeting, hearing about it in the chapter
16 meeting.
17    Q. Did you ever take steps to create a link on the
18 organization's website for a legal defense fund?
19    A. Yes.
20    Q. Can you explain to me what steps you took to put
21 a link to a legal defense fund on the mmbnaa.org
22 website?
23    A. When the meetings -- when the meetings were
24 established -- when the meetings were had to confirm
25 exactly what was the purpose of the legal defense fund,

1 and the website was up to say, hey, this is where you go
2 donate through.  I think there was -- there was a
3 discussion to, okay, so let's put the link out on either
4 the website or the social media.  And I don't think that
5 was able -- I don't think we ever committed to that.
6 I'm trying to remember why.  But, you know, in our
7 meetings, it was definitely asked to share the link.  So
8 immediately, of course, you know, the link was -- to me,
9 was to share to social media or to the website.
10    Q. So at one point in time, the organization planned
11 to put a link on its website for its own legal defense
12 fund, correct?
13    A. I don't think that's the correct word, for its
14 own legal defense fund.  No.  This was about -- the
15 meeting was about the legal defense fund that is
16 established now that is separate from the organization.
17 To share and support, you know, let the members know,
18 let all of the members know that, hey, this is a
19 separate organization; you can donate or support to the
20 organization -- to the legal defense fund because
21 organization is separate -- to the legal defense fund.
22      So -- because you stated the question as, did the
23 organization try to establish its own?  And that's not
24 the case.  The meeting was made about this separate
25 entity, which is the legal defense fund and what its --

21 (Pages 78 - 81)

1 and its operation.
2   Q. Did you ever personally go into the WIX portal or
3 the organization's website and take steps to establish a
4 link on the website for a legal defense fund?
5   A. Yes. There were steps that were made. I don't
6 think they were posted, but there were steps that were
7 made, yes.
8   Q. When you say you don't think they were posted,
9 what do you mean?
10   A. Okay. Okay. I don't think -- I'm trying to
11 remember, did we create a separate link -- you know, a
12 pop-up page that will take that link to the separate
13 website, you know, because the organization never had
14 its own legal defense fund, to my knowledge. You know,
15 so again, when that meeting happened, and the link, they
16 said, hey, this is what the separate organization is,
17 here's the link to the website, anyone who's willing to
18 donate or -- you know, to donate towards it, here's the
19 link.
20      So, you know, I thought that that was a link that
21 needed to be either added to the website or -- the
22 chapter websites or the chapter social medias or
23 whatever. So I don't think it was ever -- it ever was
24 posted between the technology committee. But there was
25 never -- to my knowledge, there was never a -- the

1 association's own legal defense fund, as you stated.
2   Q. When you say there was never the association's
3 own legal defense fund, do you mean that one was never
4 posted on the website?
5   A. No. One was never established. I think that's
6 what you're asking, right?
7   Q. Were steps ever taken -- were steps ever taken to
8 establish a legal defense fund page on the
9 organization's website?
10   A. Not a separate page. Just like another pop-up
11 link.
12   Q. Another pop-up link?
13   A. Yeah.
14   Q. And it was another pop-up link to what?
15   A. That -- to that link that was established, the
16 separate website.
17   Q. When you say the separate website, which one are
18 you referring to?
19      MS. FANIEL: Object to form. This has been
20   asked and answered.
21 BY MR. ANDERSON:
22   Q. You can answer.
23   A. The website that you have stated that there is.
24   Q. Which one is that?
25   A. The Sustaining the Legacy website.

1   Q. Right. I'm talking about before the Sustaining
2 the Legacy website was ever created.
3   A. Um-hmm.
4   Q. Did the organization ever take steps to provide
5 visitors to the organization's website the opportunity
6 to donate to a legal defense fund?
7   A. I don't think -- I don't think so. No. Allow me
8 to try to --
9   Q. Have you ever heard of -- go ahead. You can
10 finish. I'm sorry.
11   A. I'm just trying to think of, you know, anybody
12 who, you know, either made edits or posts or updates to
13 the website. I don't think there was -- it got to that
14 point. No.
15   Q. So you've never taken steps through the WIX
16 portal to create a means by which a visitor to the
17 website can donate to the organization's legal defense
18 fund; is that what you're saying?
19   A. You keep saying the organization's legal --
20      MS. FANIEL: Object to form.
21      Sorry, go ahead, answer.
22      THE WITNESS: Yeah. You keep saying the
23   organization's legal defense fund. But as I stated
24   before, the organization never -- to my knowledge,
25   never had their own personal or associated legal

1 defense fund. So there was no steps that were taken
2 to create.
3      There was conversations like, how can we pay?
4 But, you know, once there was -- once looking at --
5 you know, understanding that that can't be, you know,
6 there were other -- we realized that there are other
7 steps or there's a separate organization now. Well,
8 me understanding to that point, I would say there's a
9 separate organization that is able to pay for the
10 legal funds. So when you keep -- when you keep saying
11 the organization's legal defense fund, I don't know if
12 that's an accurate question to answer, you know.
13 BY MR. ANDERSON:
14   Q. Setting aside Sustaining the Legacy, right, is
15 your testimony now that the organization never took
16 steps to establish its own legal defense fund?
17   A. Yes. There was conversations as far as how to
18 pay for it, you know. But again, you know, with that
19 being said, those were conversations. So if those were
20 the steps, yes, because it was how are -- how is the
21 organization going to pay for these legal fees?
22   Q. Right. And so part of that conversation was
23 providing a way for people who visit the website to
24 donate to the legal defense fund, correct?
25   A. To donate.

22 (Pages 82 - 85)

Page 86

1    MS. FANIEL: Object to form. Sorry. Go ahead.
2    THE WITNESS: To donate. Yeah. Because that's
3  what the -- the way of trying to raise money.
4  Conversations in meetings never ever established a
5  legal defense fund, the association's legal defense
6  fund.
7  BY MR. ANDERSON:
8    Q. So your testimony is that you never went into the
9  WIX portal for modifying the organization's website and
10 established or created a page for people to donate to
11 the organization's legal defense fund; is that what
12 you're saying?
13   A. You keep saying the organization's legal defense
14 fund, so I don't -- it's like, if I say yes or say no,
15 it's like inaccurate because the organization never
16 established its own legal defense fund or made
17 directions to create its own legal -- it's -- it was
18 meetings to -- how to figure this out, you know. So the
19 only thing we know to do is to make donations, establish
20 sections to create donations. And that was just to
21 raise money, right?
22   So I guess the -- a better form of question would
23 be, you know, has the organization ever raised money or
24 tried to establish anything to raise money for the legal
25 fees? Then that could be an accurate question, line of

Page 87

1  questions to say yes, there were conversations had. But
2  to say, you know, has there been, you know, for the
3  association's legal defense fund, that's not the case.
4    Q. Has there ever -- have you ever taken steps to
5  create a link on the organization's website for somebody
6  who visits the website to be able to pay the legal fees
7  in connection with this lawsuit?
8    A. There were steps that were in communication to
9  raise money for people to come to donate to pay for
10 legal fees.
11   Q. And that involved the creation of a link on the
12 organization's website to do that, right?
13   A. It was conversations to create a donation link.
14   Q. And that donation link was -- was set up to use a
15 third-party platform for processing payments, correct?
16   A. The WIX is a third-party platform, so that's --
17 that's correct.
18   Q. What about Give Lively? Was Give Lively set up
19 through the WIX?
20   A. Give Lively is another third party. Palm Beach
21 Chapter has used Give Lively before, yes.
22   Q. And the organization once set up a link on its
23 website that utilized Give Lively for someone to provide
24 a donation for legal fees in connection with this case,
25 correct?

Page 88

1    A. That was one of the discussions, yes, to be able
2  to use that, either Give Lively or the WIX platform.
3  Those are the two main ones that were used to -- for
4  donation purposes, yes.
5    MR. ANDERSON: Okay. I'm going to pull up
6  another exhibit. I'll mark this as Exhibit 9.
7    (Plaintiff's Exhibit No. 9 was marked for
8  identification.)
9  BY MR. ANDERSON:
10   Q. Can you see this here? It appears to be an
11 excerpt from Sustaining the Legacy Legal Defense Fund
12 website?
13   A. Yes.
14   Q. Does this appear to be an accurate reflection of
15 the web page located at stl-legaldefense.com?
16   MS. FANIEL: Object to form.
17 BY MR. ANDERSON:
18   Q. You can answer the question.
19   A. This PDF appears to be a copy of the information
20 that is -- that might be still on the website, yeah.
21   Q. Yes.
22   A. I do remember seeing it.
23   Q. Do you know who wrote this?
24   A. I want to say Percy Williamson. I'm pretty sure
25 it was Percy Williamson, but --

Page 89

1    Q. Do you know for sure?
2    A. I don't want to be -- I don't want to go on
3  record and I'm wrong. But I'm pretty sure it was Percy
4  Williamson.
5    Q. Why do you think it was Percy Williamson?
6    A. Because he's the officer that -- for this, for
7  this organization.
8    Q. You had said that he needed help with WIX before,
9  right?
10   A. Um-hmm.
11   Q. What kind of help did you give him in connection
12 with the establishment of the Sustaining the Legacy
13 Legal Defense Fund website?
14   A. As I stated before, helping him navigate through
15 wix.com.
16   Q. And what do you mean by navigate through wix.com?
17   A. Meaning how to create the website, how to
18 purchase, which we went through before, purchase the --
19 what was that, the premium invoice, I think it was.
20   Q. Okay.
21   A. Yeah. And so he had information that he was
22 trying to figure out how to do, so -- and then make --
23 you know, having his team to help him or to understand
24 how this works, so yeah.
25   Q. Did you ever help him put content on the

23 (Pages 86 - 89)

1 Sustaining the Legacy Legal Defense Fund website?

2    A. Supported him, yes. Meaning this is -- this is

3 one of those information. So, like I said, I don't -- I

4 remember seeing this from him because he was like, how

5 do I do this, how do I do that? So I don't know if he

6 actually wrote this information.

7    Q. Did you put this information on this website?

8    A. I helped him. He was --

9    Q. When you say you helped him, what do you mean by

10 you helped him? What do you mean by that?

11    A. Meaning he wanted to be able to have this, you

12 know, put, so I helped him navigate through this. I

13 was -- I was right there when he was doing this. So

14 that's what I'm saying. I don't --

15    Q. When you say --

16    A. I don't know -- I'm sorry. Go ahead.

17    Q. No, I keep interrupting you. I'm sorry. It's a

18 bad habit of mine, and you go on and finish what you

19 were saying. My apologies.

20    A. Yeah. Like this information that he had, I don't

21 know if he wrote this or he got this from somebody to

22 put. He was like, hey, how can I -- how can I add this?

23 How can I do this? How can I do that? So, you know, I

24 was right there with him. He was working through it,

25 trying to, you know, help him through WIX.

1    Q. What do you mean, you were right there with him?

2    A. Meaning on the phone, helping him navigate

3 through the WIX portal.

4    Q. So it was a telephone call and not a

5 videoconference like we're having here?

6    A. Videoconference, call, because we was on the

7 phone, ended up being on a videoconference, yes.

8    Q. But you were the one who was physically

9 navigating through the WIX portal and clicking the

10 mouse, correct?

11    A. Not entirely. Him and his other two team members

12 that were there, were here, we was all trying to work

13 through this. So I was like, okay, here, this is what

14 you need to do, here it is. And of course there were

15 times where -- you know how in the Zoom feature you're

16 able to control the mouse?

17    Q. Um-hmm.

18    A. Right? Yeah, so, you know, just helping him out.

19    Q. So you controlled the mouse through Zoom?

20    A. Yeah. Either through the Zoom or he'll be like,

21 hey, how can I do this or whatever. So, yeah --

22    Q. You were with him -- go ahead.

23    A. Yeah. You know, just trying to give support and

24 whatever, to help him navigate through wix.com.

25    Q. And you were with him when he put this text on

1 the website?

2    A. Yes. This looks like it's been changed, but yes.

3    Q. Can you explain to me the process of how this

4 text arrived on the website?

5    A. Through the portals, the WIX portals. You upload

6 the information and you have to size it and, you know,

7 make it look right. It's like Microsoft Word, same

8 concept.

9    Q. Did you see Mr. Williamson type this text during

10 that videoconference?

11    A. No. This wasn't typed. This was already a

12 document. So just to copy and paste and then -- you

13 know, as I explained to him, just copy and paste it. I

14 think he was trying to just upload it as a PDF. But it

15 was just --

16    Q. Did you see -- I'm sorry. I'm the worst

17 interrupter.

18    A. No, I mean, I paused, so I -- I understand. No,

19 no problem, you know. Go ahead.

20    Q. You said you didn't see him type this; it was in

21 a document. Do you recall what kind of document it was

22 in?

23    A. I believe it was a Microsoft Word, yeah. No, he

24 didn't physically type this while I was helping him.

25 No. I think, yeah, he had this as a document.

1    Q. Do you see here this paragraph that starts with:

2 Since 2020?

3    A. Um-hmm.

4    Q. Says: Since 2020, the MMBNAA has called for

5 transparency, adherence to best practices and the

6 engagement of a national search firm to conduct a

7 presidential search. These calls for accountability led

8 the university down a legal path against the MMBNAA that

9 places us in a precarious situation.

10    Do you know who the us is in that sentence?

11    MS. FANIEL: Object to form.

12    Can we go off the record for a second, please?

13    MR. ANDERSON: I've got a question outstanding.

14 BY MR. ANDERSON:

15    Q. If you can just answer the question. Do you know

16 who the us is in that sentence?

17    A. No.

18    Q. Is it fair to say the us is referring to the

19 MMBNAA?

20    MS. FANIEL: Object to form.

21 BY MR. ANDERSON:

22    Q. You can answer the question.

23    A. Can I confirm or deny? Because I don't know.

24 I'm not really sure. I don't want to guess or

25 speculate.

Page 94

1  Q. Okay. Fair enough.
2      MR. ANDERSON: We can take a short break and go
3  off the record if that's what you want to do, Ms.
4  Faniel.
5      Before we do, though, I think I marked this as
6  Exhibit 9 but to the extent I didn't, I'd like to mark
7  this as Exhibit 9.
8      THE WITNESS: He didn't bold that in the --
9      MS. FANIEL: We don't have to take a break. I
10  just had a question.
11      Stephen, what --
12      MR. ANDERSON: Are we off the record? Hold on.
13  I don't think we're off the record yet.
14      THE VIDEOGRAPHER: No, sir, we haven't gone off
15  yet.
16      We're going off the record. The time is
17  a.m.
18      (A brief recess was taken.)
19      THE VIDEOGRAPHER: We're going back on the
20  record. The time is 11:53 a.m.
21      MR. ANDERSON: Thank you. And before we
22  proceed, it's come to my attention that I may have
23  inadvertently failed to mark Exhibit 5 on the record.
24  Exhibit 5 is our third request for production served
25  on defendants in the case.

Page 95

1      (Plaintiff's Exhibit No. 5 was marked for
2  identification.)
3  BY MR. ANDERSON:
4  Q. Mr. Barfield, I want to back up a little bit and
5  talk about your background and your experience. Apart
6  from -- from your affiliation with the organization, are
7  you otherwise employed?
8  A. Yes.
9  Q. Where are you employed?
10  A. This is okay to answer? This is relevant?
11  Q. Yeah. You can answer any question that I ask.
12      MS. FANIEL: Yes.
13      THE WITNESS: Okay. I'm a Palm Beach School
14  District employee.
15  BY MR. ANDERSON:
16  Q. And what do you do with the Palm Beach School
17  District?
18  A. I'm an educator.
19  Q. You're a teacher?
20  A. Yes, sir.
21  Q. And what do you teach?
22  A. Music.
23  Q. Do you teach music to a particular grade?
24  A. Sixth through seventh. Sixth, seventh and
25  eighth. I'm sorry.

Page 96

1  Q. Sixth, seventh and eighth. So middle school
2  music teacher; is that fair to say?
3  A. Yes. Certified K -- kindergarten through 12th
4  grade. But I currently teach middle school.
5  Q. Okay. And how long have you been teaching middle
6  school?
7  A. This is my second year in middle school, teaching
8  middle school.
9  Q. Have you been teaching more than two years?
10  A. Yes, sir.
11  Q. And what did you teach before you started
12  teaching middle school music?
13  A. Before, high school.
14  Q. And where did you teach high school music?
15  A. In Palm Beach County.
16  Q. At a particular school?
17  A. Yes. Boynton Beach Community High School.
18  Q. Okay. And how long were you there?
19  A. Before -- this is my second year in middle
20  school. But before then, I taught at Boynton Beach
21  Community High School for the previous four years.
22  Q. And then were you also a teacher before then?
23  A. Yes.
24  Q. And where were you a teacher before you were
25  teaching high school music?

Page 97

1  A. At Rolling Green Elementary.
2  Q. And you taught music there as well?
3  A. Yes.
4  Q. And how long were you at Rolling Green?
5  A. I'd say 2012 or -- '12.
6  Q. Since 2012?
7  A. Yes. Sorry. '14. 2014.
8  Q. And have you always been a music teacher since
9  you graduated from Bethune-Cookman University?
10  A. Yes.
11  Q. Did you ever hold any other jobs since you
12  graduated from Bethune-Cookman University?
13  A. Side -- side jobs. This was, of course, you
14  know, the main line of work, you would say. Yeah, so
15  other side jobs to obtain extra money, extra funds.
16  Q. What kind of side jobs?
17  A. Working at the church in the music ministry, as
18  well as the audio and visual department, working for
19  different audio and video companies for profit or
20  nonprofit events.
21  Q. You said audio and video companies for nonprofit
22  events?
23  A. Nonprofit and profit events, yes.
24  Q. What type of work would you do in that capacity
25  for audio/video companies?

25 (Pages 94 - 97)

Page 98

1  A.  Setting up and breaking --
2     (Brief interruption.)
3     THE WITNESS:  Sorry.
4  BY MR. ANDERSON:
5  Q.  That's okay.
6  A.  Setting up and breaking down events for, you
7  know, sound system, visual, as far as screens, operating
8  the content that was given to present during the events.
9  You know, musical, whether it's -- music related,
10  whether it's, you know, nonprofit events, just any type
11  of events that I'm asked for.  Some were weddings, some
12  were foundations, some were raising money, you know,
13  depending on the event.  But, you know, whatever sound
14  reinforcement was or the video reinforcement.
15  Q.  Any of the side jobs that you've held, apart from
16  music education, have those involved website
17  preparation?
18  A.  Not directly for me personally.  Like, as far as
19  I was with a company that does it, you know, and I would
20  learn.  But, I mean, I didn't have a specific job where
21  I would prepare websites.  Most of them were just
22  learning.  But most of it -- most side jobs were --
23  Q.  And you -- go ahead.  I'm sorry.  There was
24  pauses.
25  A.  I'm sorry.  Just thinking.

Page 99

1     Those side jobs were mostly audio and video --
2  video.
3  Q.  Did you ever work in the IT department of a
4  company?
5  A.  Technically, all those are, you know, considered
6  IT type of field, you know, technology-based, figuring
7  out, you know, tech support, trying to make sure things
8  that were needed get fixed.  Yeah.
9  Q.  Is it fair to say that amongst the other
10  individuals you worked with at the organization, you're
11  the most tech savvy?
12  A.  I don't think I am.  I mean, we all have our
13  level of experience, so we all kind of help each other
14  out in the -- within the organization.  That's what
15  you're asking, right, within the organization?
16  Q.  Yes.
17  A.  Yeah, so...
18  Q.  How did you come into the role of maintaining and
19  modifying the organization's website?
20  A.  That was part of the, I guess, job description
21  or -- of the tech committee.  So when I was asked to be
22  a part of the committee, I was -- I do a lot of the tech
23  role for the chapter, you know, as helping out the
24  president and the vice president who wasn't as tech
25  savvy.  So, you know, through learning, a lot of that

Page 100

1  stuff and, you know, my experiences with my side jobs
2  and everything, that was -- I was able to, you know,
3  easily help be -- help navigate through all those
4  different updates on the websites and stuff like that,
5  when I first got on the committee.
6  Q.  So when you first got on the committee, you're
7  referring to in 2022; is that right?
8  A.  No.  That's when I was appointed as the chair of
9  the committee.
10  Q.  I see.
11  A.  So I was --
12  Q.  So how long -- how long were you on the tech
13  committee before you were appointed the chair of the
14  committee?
15  A.  The previous year, '21.
16  Q.  Do you know approximately when in 2021 you joined
17  the tech committee?
18  A.  I believe it was at the top of the fiscal year.
19  Q.  So July 1, 2021?
20  A.  Right.  It was either at the top or right at the
21  end.  Wait, let me think.  This was -- you know what?
22  Okay.  2020, we were still in the pandemic, right,
23  pandemic was happening.  So that Friday the 13th.  So I
24  think this was -- this is right before the end of the
25  fiscal year.  I think we was having an annual meeting

Page 101

1  and they asked if I can help out.  And so that turned
2  into being a part of the committee going into the fiscal
3  year.  Yeah.  I think that's -- that's how it happened.
4  Q.  Did you have any involvement with the
5  organization's website before you joined the tech
6  committee?
7  A.  No.
8  Q.  So it was when you joined the tech committee at
9  the beginning of the fiscal year roughly around
10  July 2021 that you became involved with the content on
11  the organization's website?
12  A.  The ones who were -- when I joined, there were
13  other people who were responsible for handling those
14  websites.  So I would -- I was there learning, I guess,
15  so to speak, trying to understand.  Because my -- my
16  expertise coming into the committee was that of audio
17  and video -- visual.  So that was more so, you know,
18  making sure that the content is being presented, you
19  know, because we was virtually -- everything was
20  virtual, right, so handling committees, you know, with
21  the visual, when you share the screens, they're able to
22  see all the videoconference or whatever stuff like that.
23  So that was more so my expertise, so, you know, that was
24  more so me learning how the website is created, learned
25  through when I joined.

26 (Pages 98 - 101)

Page 102

1   Q. Do you know who was in charge of the website
2   before you joined the tech committee?
3   A. So there was two -- two -- more specifically,
4   yes.
5   Q. And who was in charge of the website before you
6   joined the tech committee?
7   A. The chair of the technology committee at that
8   time, Faithe. I'm not sure if I have her name -- her
9   last name. Give me a second. Faithe Clary, C-L-A-R-Y.
10  Faithe Clary. Faithe with an E at the end; Faithe with
11  an E at the end, Clary.
12  Q. And had you had any experience with the WIX
13  platform before you joined the tech committee?
14  A. Very little. The free one, because I think I was
15  trying to navigate through another platform with other
16  organizations or something like that. But, you know,
17  very little. I think most of them, I've learned, you
18  know, as -- when I joined, most of it is when I learned
19  my experience with WIX.
20  Q. Okay. And do you recall when you first met
21  Johnny McCray?
22  A. Wow. I believe -- I believe when I -- yes. I'm
23  not -- yeah. I think I met him was when he was
24  running -- when he was running for the appointed
25  position as president.

Page 103

1   Q. Do you know approximately when that was?
2   A. Was that '20 when he became president, I believe?
3   Q. Maybe 2020?
4   A. 2020, I believe, when he became president. It
5   was during the pandemic or starting of it.
6   Q. So you didn't know --
7   A. 2021?
8   Q. -- Mr. McCray -- you didn't know Mr. McCray
9   before he ran for president?
10  A. Not -- I mean, he's from the Broward Chapter so,
11  you know, we all see each other but not -- I don't think
12  there's been no conversation like, you know, we've had
13  him being president before then, no.
14  Q. Okay. And you're not related to Mr. McCray in
15  any way?
16  A. No.
17  Q. Did you have any discussions with Mr. McCray
18  about your testimony today?
19  A. No.
20  Q. No conversations about the case or being deposed
21  in the case?
22  A. As far as him preparing -- prepping for me, no.
23  As far as him letting me know that there's a deposition,
24  yes. I'm just trying to make sure I understand your
25  question. Like did he help me prepare for this? No. I

Page 104

1   haven't had no conversations with him.
2   Q. When's the last time you spoke to Johnny McCray?
3   A. I want to say it was probably last month, like --
4   or, what is this? This is November 20th, 21st. I
5   remember the last conversation was, hey, we got --
6   you've got to make sure that you give a date for your
7   deposition.
8   Q. Okay.
9   A. You know, just make -- we have to -- we have to
10  take care of this. And that was with me trying to
11  figure out different times and everything like that. He
12  didn't know that I was in communication with the
13  association's lawyers. And I gave them a date; I
14  believe it was you that gave a date. We wasn't real
15  sure. So now we're here. So that was -- that was the
16  last conversation we've had. He just wanted to make
17  sure that --
18  Q. Okay. It looks like maybe the -- oh, you're back
19  in focus now.
20  A. I just saw that, like whoa, how did that happen?
21  Q. I think maybe when you moved your hand closer, it
22  focused on that.
23      As a member of the organization, have you ever
24  received a paycheck from the organization?
25  A. No.

Page 105

1   Q. Have you ever been otherwise financially
2   compensated by the organization for the work you do on
3   the website?
4   A. No compensation.
5   Q. Are you familiar with something called the
6   Wayback Machine?
7   A. No.
8   Q. Or have you ever heard of Internet Archive?
9   A. Uh-uh. No. Is that like a Cloud backing --
10  backup or something?
11  Q. The Wayback Machine is run by a company, I
12  believe it's called the Internet Archive, and they
13  archive websites over time and they capture what they
14  appeared to be at a particular point in time. Have you
15  ever heard of that?
16  A. No.
17  Q. Okay. When you joined the technology committee
18  in 2021, is it fair to say you were familiar at that
19  time with the content of the organization's website?
20  A. No. I've just learned as I -- as I went on.
21  Q. Well, you had looked at the website when you were
22  on the tech committee, right?
23  A. Yeah. Yeah. It was -- as far as my role at that
24  point in time, it was more so just content related,
25  making sure they appeared on the Zoom and everything.

27 (Pages 102 - 105)

Page 106

1  So it wasn't --
2  Q. Okay.
3  A. -- no more of handling the website or
4  familiarizing myself with the website. Like I said,
5  that was something that I just really learned as I went
6  on. So we -- we all had specific tasks. It was -- it
7  was pretty organized with the previous chair.
8  Q. I'm going to share my screen and show you an
9  exhibit. Can you see this here?
10  A. Yes.
11  Q. You see up on the top left, it says: Internet
12  Archive Wayback Machine?
13  A. Yes.
14  Q. And on the top right, it's got a date, says
15  December 1, 2021?
16  A. Yes.
17  Q. And does this image here generally look familiar
18  to you?
19  A. Yes.
20  Q. How would you describe this oval image here?
21  A. That was the old logo that was established
22  before -- before the -- before the association was asked
23  to take away likeness.
24  Q. Right. And when the association was asked to
25  stop using the university's trademarks and likeness, you

Page 107

1  recall that was in September of 2021, correct?
2  A. Yes. Okay. So I see it now. So that was
3  December. Okay. Yeah. So still learning. And, you
4  know, I'm pretty sure you can -- or I don't know if you
5  want to agree, but, you know, when asked to do
6  something, the question is, okay, so this or that, this
7  or that? We didn't, you know, really know.
8      So it was definitely about the seal, so that's
9  why that is gone. That's -- if you see -- if you point
10  the cursor down where that -- yes, right down there.
11  The seal was right there, right?
12  Q. Um-hmm.
13  A. So we all thought that that was okay, okay? Take
14  the seal off and everything was okay. This is still
15  learning phase. We was just asked in 20-- what is
16  that, in September, right?
17  Q. Well, if you're on the top right, yeah, it says
18  December 1, 2021.
19  A. Right. So that's what I'm saying. You know,
20  December, October, November, the time to understand and
21  navigate through all this. So, you know, all of us
22  thinking, like, hey -- well, I can't speak for
23  everybody. Take the logo off; make sure there's no logo
24  on there. So there you go. That's what we thought --
25  we thought was acceptable at that time.

Page 108

1  Q. And so this space here, that -- up at the top,
2  the sort of empty white half-circle, that's where the
3  university's registered trademark used to be?
4  A. The seal, yes.
5  Q. The seal. Right. Were you the one who removed
6  the seal from this image?
7  A. I believe either I did it or -- either I did it
8  or there was someone who helped make it cleaner, one of
9  the tech people helped. I mean, I was involved in that
10  because I was there, of course, so yeah.
11  Q. Sure. Okay. And -- and I'm going to scroll
12  down. You see up here -- well, I'll scroll up a little
13  bit first. Here up at the top, this is www.mmbnaa.org,
14  right?
15  A. Yeah. Um-hmm. I mean --
16  Q. And then if I scroll down -- sorry, go ahead.
17  A. Yeah. Yeah. That's -- that's -- that's the year
18  when we -- when it was asked, we quickly -- you know, it
19  was like, hey, we need to make this change quick, so --
20  Q. Right.
21  A. You know, so we did as much as we could to try to
22  make sure that we was following what was asked of us to
23  do, you know. Of course, couple months in, that's trial
24  and error. So...
25  Q. Okay.

Page 109

1  A. If you scroll down, even -- look, scroll down,
2  you see the word -- that's when we had the annual
3  meeting. So you see BC in U, you know, there was
4  stuff -- and then down there, even in the welcome,
5  Bethune-Cookman University, stuff that was like, oh,
6  okay, that's -- you've got to do that. So, you know,
7  those are -- those are things that we wasn't highly
8  aware of trying to understand, okay, what is it that we
9  need to do, so...
10      (Simultaneous speakers; reporter request for
11  clarification.)
12      THE WITNESS: I was saying, like, you even see
13  B-CU still there, you know, so not even thinking that
14  was an issue, the actual name still being on there.
15  You know, a lot of it was trial and error, trying to
16  understand this, so yeah.
17  BY MR. ANDERSON:
18  Q. But this appears to be an accurate reflection of
19  the website as it appeared on December 1, 2021, correct?
20  A. Correct.
21      MR. ANDERSON: I'd like to mark this as
22  Exhibit 10, I believe we're at.
23      (Plaintiff's Exhibit No. 10 was marked for
24  identification.)
25  BY MR. ANDERSON:

28 (Pages 106 - 109)

Page 110

1   Q. This next page, you see on the top right,
2 December 1, 2021, correct?
3   A. Uh-huh.
4   Q. And this is mmbnaa.org/about-us-1, right, you see
5 that?
6   A. Yes.
7   Q. Does this look familiar to you?
8   A. Yes.
9   Q. Is it fair to say this appears to be an accurate
10 reflection of what the website looked like on
11 December 1, 2021?
12   A. That is definitely the content that was on the
13 website in the transition of the association changing to
14 comply with the demands of the university.
15   Q. So yes, it's an accurate reflection of the
16 website as it appeared on December 1, 2021?
17   A. That is an accurate description of the
18 association trying to comply at that date to make all
19 the demands and changes.
20   Q. So the website looked like this on December 1,
21 2021, it seems, correct?
22   A. On December 1, 2021, the website was in
23 transition.
24   Q. And it looked like this, correct?
25   A. In transition.

Page 111

1   Q. Yes or no, did the website appear substantially
2 like this on December 1, 2021, to the best of your
3 knowledge?
4   A. To the best of my -- well, no, this is -- this is
5 not to the best of my knowledge. This is exactly what
6 was happening in transition.
7   Q. Okay.
8   A. The organization was transitioning to meet the
9 demands of the school. Yeah.
10   Q. Understood.
11     MR. ANDERSON: I'd like to mark this as
12 Exhibit 11, please.
13     (Plaintiff's Exhibit No. 11 was marked for
14 identification.)
15 BY MR. ANDERSON:
16   Q. I'll just scroll down so you can see the whole
17 page.
18   A. Oh, wow, haven't seen this in forever.
19   Q. All right. I'm going to go to the next page
20 here. On the top right, again, you see December 1,
21 2021, right?
22   A. Uh-huh.
23   Q. And up here, it says: mmbnaa.org/contact.
24 Correct?
25   A. Um-hmm.

Page 112

1   Q. I'm scrolling. There's not much to this page.
2 Just want to make sure you see the whole thing. I know
3 it gets cut off and re --
4   A. Right. Right.
5   Q. Sort of put back together, but you get the gist
6 of it, correct?
7   A. Yeah. I see, Contact, Alumni House.
8   Q. This appears to be an accurate reflection of the
9 organization's website as it appeared on December 1,
10 2021?
11   A. This appears to be the transitional stage in
12 2021. The organization was transitioning to meet the
13 demands of the school.
14   Q. Understood. And the website looked like this?
15   A. The website at that date was in transition, yes,
16 sir.
17   Q. There's no reason to think this is an inaccurate
18 depiction of the website on December 1, 2021, is it?
19   A. No, there's no inaccuracy about this transition.
20 No, sir.
21   Q. Okay. Thank you.
22     MR. ANDERSON: I'd like to mark this as
23 Exhibit 12.
24     (Plaintiff's Exhibit No. 12 was marked for
25 identification.)

Page 113

1 BY MR. ANDERSON:
2   Q. Next page here is called Transparency. Can you
3 see on the top right --
4   A. Yes. December 1st.
5   Q. -- that date, December 1, 2021, and the URL here
6 mmbnaa.org/transparency. Correct?
7   A. Yes, sir.
8   Q. And I'll just scroll down through here so you can
9 see the whole thing. Does this look familiar to you?
10   A. Yes, sir. Oh --
11   Q. Does it appear to be an accurate reflection of
12 the website -- sorry, go ahead?
13   A. No, I just didn't -- I was wondering where the
14 pictures were. That's all.
15   Q. Yeah. Unfortunately, it did not seem to capture
16 the pictures. But generally speaking, does this appear
17 to be an accurate reflection of the website as it
18 appeared on December 1, 2021?
19   A. Yes. That was the information that was on the
20 website, in transitioning to meet the demand.
21   Q. Right. And there's even a timeline of events
22 here, right? September 1, 2021, the board of trustees
23 voted to sever its relationship with the National Alumni
24 Association, correct?
25   A. You're reading this -- you're reading this to me

29 (Pages 110 - 113)

Page 114

1  or --
2     Q.  Yeah.  It was clear at the time that the
3  university had voted to sever its relationship with the
4  organization?
5     A.  This is a timeline of events that was asked to be
6  put on that page, yes.
7     Q.  Okay.
8        MR. ANDERSON:  I'd like to mark this as
9  Exhibit 13.
10       (Plaintiff's Exhibit No. 13 was marked for
11  identification.)
12 BY MR. ANDERSON:
13    Q.  You see this e-mail address here,
14 transparency@mmbnaa.org.  Do you know who has access to
15 that e-mail address or e-mail account?
16    A.  Scroll down, scroll down to the names.  Go back,
17 go over --
18    Q.  Here it is.  Jayson Douglas?
19    A.  Yeah.  I think it was Jason --
20    Q.  You see that?
21    A.  Okay.  Yeah.
22    Q.  Oh, there's a lot.  Looks like there's a lot of
23 people.
24    A.  Right.  Right.  It was either Jayson Douglas --
25 I'm trying to remember the other person -- Jacari

Page 115

1  Harris, might be those two, I believe.  Scroll back up
2  towards the top.  No.  Rebecca, I don't remember but
3  Dominik, yeah.  So it was either Jayson Douglas or the
4  other individual at the bottom.
5     Q.  And you see here how that same e-mail address is
6  listed for many other people, including Sumner
7  Hutcheson, Rebecca Johnson, Dominik Whitehead, Ashanta
8  Williamson, et cetera.  Would it be your understanding
9  that each of these individuals likely had access to this
10 e-mail account, transparency@naabcu.org?
11    A.  I only remember only -- the e-mail that was sent
12 out giving that access to that e-mail, I think was just
13 directed to Jayson Douglas.  I can't remember, so I
14 don't want to speculate.  But I'm guessing they all just
15 said, okay, let's make sure all information goes to that
16 specific e-mail.
17    Q.  Do you know if this e-mail account, either
18 transparency@naabcu.org, or up here, I think it might be
19 a little different, it's transparency@mmbnaa.org, do you
20 know if these e-mail accounts were searched for
21 documents responsive to the discovery requests in this
22 case?
23    A.  I'm not made aware of that.  Me, I didn't.
24    Q.  Okay.
25    A.  So I'm not made aware if it was.  I'm just now

Page 116

1  noticing that --
2     Q.  Have you --
3     A.  -- that it says MMBNAA at the top and then NCA --
4  the other e-mail at the bottom.  I'm just noticing that.
5     Q.  Right.  I understand, the organization's website
6  used to be at naabcu.org, correct?
7     A.  Correct.
8     Q.  And that was redirected to mmbnaa.org, right?
9     A.  Yes.  Through the transition.  And as it was
10 asked of us to -- asked the organization to change, yes.
11    Q.  In terms of collecting documents responsive to
12 the discovery requests in this case, do you know of
13 anyone else at the organization who was tasked with or
14 responsible for searching e-mail accounts for responsive
15 documents?
16    A.  I don't know.
17       MR. ANDERSON:  To the extent I didn't before, I
18 want to mark this as Exhibit 13, but I think I may
19 have already.
20 BY MR. ANDERSON:
21    Q.  I'm going to jump ahead in time to the way the
22 website currently appears.
23    A.  Um-hmm.
24    Q.  Just a second.  Okay.
25       Mr. Barfield, can you see this flyer here up on

Page 117

1  that screen?
2     A.  Yes.
3     Q.  Do you see down here at the bottom of the page,
4  can you read that?  It says:  Capture timestamp
5  Thursday, 16th of November, 2023?  Do you see that
6  there?
7     A.  Yes.
8     Q.  So you understand that that reflects the time
9  which this -- this PDF capture of the website was
10 obtained, right?
11    A.  Yes.
12    Q.  And so if I scroll up, there's a flyer for the
13 Showdown in O-Town, right?
14    A.  Yes.
15    Q.  And this is November 17th through 19th, 2023.
16 That -- does that correspond to the date of the Florida
17 Classic football game in Orlando?
18    A.  That corresponds to the event that the
19 association was heading, spearheading.
20    Q.  And at the bottom, it says:  Game transportation
21 info.
22    A.  Um-hmm.
23    Q.  Right, it says:  Visit mmbna.org/event for room
24 and game transportation info?
25    A.  Right.  That was for hotel discounts and

30 (Pages 114 - 117)

1 transportation.
2 Q. And this is transportation to the football game,
3 right?
4 A. Transportation to the address that was provided.
5 Q. For the football game? That's the game referred
6 to down there, right?
7 A. Well, I mean, you know, I think this is one of
8 the first questions that we asked, so --
9 Q. That's right.
10 A. -- we have to ask again? We have to go through
11 this again?
12 Q. No. No. I think you had indicated before that
13 you recently accessed the website to change a flyer. Is
14 this the flyer that you changed?
15 A. That's the flyer that I was asked to -- to be
16 updated.
17 Q. And in what way were you asked to update it?
18 A. Hold on. Hold on. Let me go back. Because I
19 just posted it, so let me go see who updated, what was
20 the update. I have to go back.
21 Q. Okay.
22 A. So for the record, that's -- I didn't create the
23 flyer.
24 Q. Okay.
25 A. On the team or the contact was given from the

1 committee, so all I was doing was posting. Let me see.
2 Where was the update?
3 Oh, you know what? I don't think that update was
4 ever posted. That -- the updated flyer was never posted
5 on this pop-up window.
6 Q. Okay. And can you tell me what the update was
7 supposed to be?
8 A. The hotel -- hotel information, to make it
9 more clear and the disclaimer more clear.
10 Q. Okay.
11 A. So there wouldn't be no -- you know, just making
12 sure.
13 Q. And if I scroll down, does this appear to be an
14 accurate reflection of the organization's website as it
15 appeared on November 16, 2023?
16 A. Yes.
17 MR. ANDERSON: I'd like to mark this as
18 Exhibit 14, if I haven't already.
19 (Plaintiff's Exhibit No. 14 was marked for
20 identification.)
21 BY MR. ANDERSON:
22 Q. The next page appears to be the organization's
23 website's home page, correct?
24 A. Go back, go back up. Let me see what's
25 highlighted. Okay. Yeah. As you can see, it says home

1 and it's highlighted in gold. So that symbolizes that,
2 that's the home page, yes.
3 Q. Right. So home is in gold and then there's a
4 welcome message and at the bottom, the timestamp,
5 November 16, 2023, right?
6 A. 16th, 2023, yes. Okay.
7 Q. So does this appear to be an accurate reflection
8 of the website as it appeared November 16, 2023?
9 A. Keep scrolling. Let me see. Is there any more?
10 Keep scrolling.
11 Q. That's the end, sir.
12 A. That's the end? Looks like it, yeah.
13 MR. ANDERSON: Okay. I'd like to mark this as
14 Exhibit 15.
15 (Plaintiff's Exhibit No. 15 was marked for
16 identification.)
17 THE WITNESS: Yeah.
18 BY MR. ANDERSON:
19 Q. And up at the top of this page, there's a logo,
20 right? Dr. Mary McLeod Bethune National Alumni
21 Association.
22 A. 1932.
23 Q. And below that -- yeah, and below that says 1932?
24 A. Yes, sir.
25 Q. What does the 1932 represent?

1 A. I don't know. I want to say but I don't want to
2 be wrong.
3 Q. What's your best guess?
4 A. I don't want to guess. Yeah.
5 Q. Do you know what the significance of the black
6 rose is?
7 A. Yes.
8 Q. And what's the significance of the black rose?
9 A. That is Dr. Mary's -- Dr. Mary's rose that she
10 established as, she actually -- if history serves me
11 correctly, she calls her students or her people who
12 associate themselves with her, her black rose. I
13 remember reading up on some information or seeing a
14 video where she was in somewhere abroad and she saw a
15 field of roses, black roses and she was taken aback or,
16 you know, she really loved the fact of -- no, it was
17 different color roses, I think, yeah, then she saw the
18 black rose. So that's one of her symbols.
19 Q. And this is a picture of Dr. Mary McLeod Bethune
20 here in the U of Alumni, correct?
21 A. Correct.
22 Q. Is that her in front of the United States
23 capitol?
24 A. Yes.
25 Q. And Dr. Mary McLeod Bethune is a founder of the

31 (Pages 118 - 121)

Page 122

1 university, the plaintiff in this case, Bethune-Cookman
2 University, correct?
3    A. Did you just say that she's the plaintiff?
4    Q. No. She's a founder of Bethune-Cookman
5 University, correct?
6    A. Correct.
7    Q. And where it says National Alumni Association...
8    A. Yes.
9    Q. That's alumni of what?
10    A. Repeat the question or rephrase the question.
11    Q. Right. It says here that this is the web page
12 for the National Alumni Association. And my question
13 is, alumni of what?
14    A. The organization, the Dr. Mary McLeod Bethune
15 National Alumni Association.
16    Q. So it's referring to alumni of the National
17 Alumni Association?
18    A. Yes.
19    Q. But alumni are understood to be graduates of a
20 particular university, correct?
21    A. Or organization, yes.
22    Q. Are you an alumni of Bethune-Cookman University?
23    A. Yes.
24    Q. And so fair to say, as a member of this Mary
25 McLeod Bethune National Alumni Association, the alumni

Page 123

1 here refers to alumni of Bethune-Cookman University,
2 right?
3    A. It refers to alumnis who wish to organize, to
4 help raise fund for students who want to go to an HBCU.
5 That's what it refers to.
6    Q. Do you see down here where it says: Become a
7 member?
8    A. Um-hmm.
9    Q. It says: Join the National Alumni Association
10 and find your local chapter to connect with fellow
11 Wildcats.
12       Right?
13    A. Um-hmm.
14    Q. And the Wildcats are the Wildcats of
15 Bethune-Cookman University, right?
16    A. Alumnis, Wildcats, yeah.
17    Q. Well, are there any other HBCUs that are
18 Wildcats?
19    A. Yeah.
20    Q. Who?
21    A. Can't name them off the top of my head, but there
22 are -- I've seen a couple Wildcats. But anybody can
23 become a member, even if they are not a graduate of an
24 HBCU or Bethune-Cookman.
25       (Reporter request for clarification.)

Page 124

1       THE WITNESS: Or Bethune-Cookman University.
2    I'm sorry.
3 BY MR. ANDERSON:
4    Q. Bethune-Cookman University football team is known
5 as the Wildcats, right?
6    A. Yes.
7    Q. And Dr. Mary McLeod Bethune is one of the
8 founders of Bethune-Cookman University, correct?
9    A. Yes. As well as the founder of the National
10 Alumni Association.
11    Q. Do you know the Bethune-Cookman University
12 football team's colors?
13    A. Is there a different color scheme?
14    Q. Do you know the colors for the football team of
15 Bethune-Cookman University, the Wildcats?
16    A. Not maroon and gold?
17    Q. Maroon and gold, right?
18    A. Isn't it? Is there another color scheme that I
19 don't know about?
20    Q. No. I'm just making sure that it's maroon and
21 gold. That's right?
22    A. Oh, okay. Yeah, yeah.
23    Q. And the colors here on the logo around Dr. Mary
24 McLeod Bethune, those are maroon and gold as well,
25 aren't they?

Page 125

1    A. Maroon and gold with black and white. Those are
2 the colors.
3    Q. With black and white. And I believe I already
4 asked you, but this -- I think I already did ask you if
5 this is an accurate depiction of the website as it
6 appeared November 16, 2023?
7    A. Yes.
8       MR. ANDERSON: And if I failed to do so before,
9    I'd like to mark this as Exhibit 15.
10 BY MR. ANDERSON:
11    Q. The next page here also appears to be an excerpt
12 from the organization's website, right?
13    A. Yes, sir.
14    Q. And as I scroll down, get the message from the
15 president and the timestamp November 16, 2023, right?
16    A. Yeah. It look like it was cut off. That's
17 how -- that's how it appears, it's cut off?
18    Q. Well, you see it cuts it off but then it rejoins
19 it, so here's the full one here. And then to grab
20 everything, right, you see where it picks up?
21    A. Look like the same -- oh, okay. All right. All
22 right. All right.
23    Q. And this appears to be an accurate reflection of
24 the website as appeared -- as it appeared November 16,
25 2023?

32 (Pages 122 - 125)

Page 126

1  A. Yes, sir.
2     MR. ANDERSON:  I'd like to mark this as
3  Exhibit 16.
4     (Plaintiff's Exhibit No. 16 was marked for
5  identification.)
6  BY MR. ANDERSON:
7  Q. At the bottom of this page, do you see these two
8  little icons here?
9  A. Yes.
10  Q. One is for Facebook, that's Facebook, right?
11  A. Um-hmm.
12  Q. And that's Instagram?
13  A. Yes.
14  Q. And previously, there was a little Twitter bird
15  here, wasn't there?
16  A. Yes.
17  Q. And that was the link that you hid from the
18  website recently, right?
19  A. That was the link that was asked of me to try to
20  update but wasn't able to update, so yes, it was hidden.
21  Q. Great.  Thank you.
22     Next page, this appears to be an excerpt from the
23  organization's website dated November 16, 2023, correct?
24  A. Yes.
25  Q. And this is the executive board, right?

Page 127

1  A. Yes.
2  Q. Did you recently make any changes to this page?
3  A. Yes.  It was asked to --
4  Q. And what was the change --
5  A. -- make some changes.
6  Q. What was the change that you made?
7  A. The parliamentary and the alumni trustee.
8  Q. So before Mr. Walker was identified as the
9  parliamentarian, it was Mr. Percy Williamson, correct?
10  A. Yes.
11     MR. ANDERSON:  I'd like to mark this as
12  Exhibit 17.
13     (Plaintiff's Exhibit No. 17 was marked for
14  identification.)
15  BY MR. ANDERSON:
16  Q. Do you know if -- as I go through these members
17  of the executive board, do you know if any of the e-mail
18  accounts listed here, any of the members of the
19  executive board were searched for documents responsive
20  to the discovery requests in this case?
21  A. I'm not made aware of that.  Those are -- each
22  officer are responsible for their e-mail address.  So I
23  have no direct access or I have not been through it.
24  That's what you're asking me, have I been through it,
25  right?

Page 128

1  Q. Yeah.  I'm asking if either you've been through
2  their e-mail accounts or you know anybody who has
3  searched these e-mail accounts for documents responsive
4  to the discovery requests in this case?
5  A. No.
6  Q. Jump to the next page.  As I scroll through, does
7  this appear to be an accurate reflection of the website
8  as it appeared on November 16, 2023?
9  A. Yes.
10  Q. And you see here, there are listed a number of
11  e-mail addresses?
12  A. Yes.
13  Q. Including tech@mmbnaa.org, there's liaison,
14  reunion, elections, fundraising, MOPAC, budget, bylaws,
15  correct?
16  A. Yes.
17  Q. Do you know if any of these e-mail accounts were
18  searched for documents responsive to the discovery
19  requests in this case?
20  A. By me or anyone else?
21  Q. Anyone.
22  A. Only one that's related to me is the tech and
23  I've searched the tech because I have access to that
24  one.  Everyone else, I'm guessing they -- you know,
25  they've looked at their responsive title e-mail.

Page 129

1  Q. But you don't know for sure?
2  A. No, I don't.
3  Q. Okay.  Thank you.
4     MR. ANDERSON:  I'd like to mark this as
5  Exhibit 18.
6     (Plaintiff's Exhibit No. 18 was marked for
7  identification.)
8  BY MR. ANDERSON:
9  Q. Next page, I'll scroll through.  Can you tell me
10  if this is an accurate reflection of the website as it
11  appeared on November 16, 2023?
12  A. Should be.  Haven't been on that page for a
13  while, but yes, this is -- appears to be an accurate
14  description.
15     MR. ANDERSON:  I'd like to mark this as
16  Exhibit 19.
17     (Plaintiff's Exhibit No. 19 was marked for
18  identification.)
19  BY MR. ANDERSON:
20  Q. Try to go quickly through the rest of these here
21  for all of our benefit.  As I -- I think as I scroll
22  through this page, does it appear to be an accurate
23  reflection of the website as it appeared on November 16,
24  2023?
25  A. Yes.

33 (Pages 126 - 129)

Page 130

1     MR. ANDERSON: I'd like to mark this as
2 Exhibit 20.
3     (Plaintiff's Exhibit No. 20 was marked for
4 identification.)
5 BY MR. ANDERSON:
6  Q. On the next page, I'll scroll through quickly so
7 you can review it. Does this appear to be an accurate
8 reflection of the website as it appeared November 16,
9 2023?
10  A. Yes.
11     MR. ANDERSON: I'd like to mark this as
12 Exhibit 21.
13     (Plaintiff's Exhibit No. 21 was marked for
14 identification.)
15 BY MR. ANDERSON:
16  Q. If I scroll through the next page, the
17 membership, does this appear to be an accurate
18 reflection of the website as it appeared November 16,
19 2023?
20  A. Yes.
21     MR. ANDERSON: Mark this as Exhibit 22.
22     (Plaintiff's Exhibit No. 22 was marked for
23 identification.)
24 BY MR. ANDERSON:
25  Q. And one more. Dues and membership. As I scroll

Page 131

1 through this page, does it appear to be an accurate
2 reflection of the website as it appeared November 16,
3 2023?
4  A. Wait. Go back up. Oh, okay. That's the event
5 page. Okay. All right. I know what you're talking
6 about. I know where you're at now. Yes.
7  Q. Yeah. It's titled Dues and Membership.
8  A. Uh-huh. Yeah. So if you look at the URL, yeah,
9 that's on the event page. The URL at -- yeah. Now I
10 know where it's at.
11     MR. ANDERSON: I'd like to mark this as
12 Exhibit 23.
13     (Plaintiff's Exhibit No. 23 was marked for
14 identification.)
15 BY MR. ANDERSON:
16  Q. This website appears to provide a visitor with
17 the opportunity to become a member, correct?
18  A. Correct.
19  Q. And you can either become a life member for
20 $1,000 or a member of a local chapter for a lesser
21 amount, correct?
22  A. Correct.
23  Q. And so there's currently the opportunity for a
24 visitor of the website to become a member of -- I'll
25 scroll through these quickly -- the Alachua, Atlanta,

Page 132

1 Bahamas, Big Bend, Brevard, Broward, Coastal Georgia,
2 Duval-Nassau, Escambia, Fort Pierce, Grand Bahamas,
3 Hillsborough, Houston, Lake City, Marion, Miami-Dade,
4 New York, Ohio, Orange County, North Carolina, Palm
5 Beach, Polk County, Putnam-St. Johns, Seminole County,
6 Southern California, St. Pete, Volusia, Washington,
7 D.C., Tri-County, and National Dues.
8     Correct?
9  A. Correct.
10  Q. What is Tri-County? Do you know what Tri-County
11 is?
12  A. I'm guessing again. I think that's -- that was
13 the new one in -- over there near Alabama. That was
14 explained. So let me just say I'm not sure. I don't
15 want to guess.
16  Q. Okay. That's fair.
17  A. Yeah. Because I'm -- like I said, these are
18 things that I was like, hey, do we need this up? And I
19 post.
20  Q. Okay. So it's your understanding that anybody
21 can go onto the website and join any one of these
22 chapters for the indicated price, correct?
23  A. Yes, sir.
24  Q. Okay.
25     MR. ANDERSON: If I haven't already, this will

Page 133

1 be Exhibit 23.
2 BY MR. ANDERSON:
3  Q. And I'll share another document. Can you see
4 this page here?
5  A. Yes.
6  Q. Up on the top left, there's a date, November 20,
7 2023. That's yesterday, right?
8  A. Yeah.
9  Q. And as I scroll down, does this page look
10 familiar to you?
11  A. Yes.
12  Q. And down here is the URL, mmbnaa.org/about-us-1,
13 correct?
14  A. Um-hmm.
15  Q. Does this appear to be an accurate reflection of
16 a page that appeared on the organization's website as of
17 November 20, 2023?
18  A. As of November?
19  Q. As of yesterday.
20  A. I'm trying to see where is that at because I
21 don't --
22  Q. Up here on the top left, November 20, 2023.
23  A. Yes. Yes. Yes. I see that. I just don't know
24 where that's on the page. How did you get -- where is
25 that at? Because that has, like, information -- wait,

1  scroll back down.  Scroll down.
2    Q.  You asked me to go further down?
3    A.  Yes, please.  Where is that at?  I know that's an
4  "about" page.  But, like, as far as I remember, there
5  was no about page.  Where is that at?  And this was --
6  this is -- you saw this yesterday?  Not yesterday.
7  Yeah, yesterday.  Like, where did you -- how did you get
8  this?
9    Q.  You see the date up here?
10   A.  Yes.
11   Q.  Timestamped yesterday, about --
12   A.  Yeah.  So I just don't know where that's at.
13   Q.  Here's the URL down at the bottom.
14   A.  Yes.  Right.  I'm seeing the URL.  Like, how was
15  that clicked on the website, because that was just --
16   Q.  Any reason to think this isn't an accurate
17  reflection of the web page present at this URL as of
18  yesterday?
19   A.  I can't answer that question because I don't know
20  how -- where that website is, where that page is.  Like,
21  I don't remember seeing that.  I don't remember seeing
22  this information on there, on their about.  Like, if I
23  go to it now, I don't -- I don't remember seeing that.
24  I don't remember where that's at.  Like, I don't know
25  how you was able to get that about page with that old

1  information and it's still saying -- I mean, you know.
2  Like I said, this --
3    Q.  Are you familiar with Google AdWords?
4    A.  Google AdWords?
5    Q.  Yeah.
6    A.  How does that -- what is that?
7    Q.  You're not familiar with Google AdWords?
8    A.  No.
9    Q.  Are you familiar with the term Search Engine
10  Optimization?
11   A.  Okay.  Yes.  I mean, I know what it is.  I'm just
12  not -- I don't really know how that works, but I know
13  what it is.  I've heard about it.  I've seen it.
14       About us.  Is that how you clicked on it?  No.  I
15  don't see -- I don't know how that -- okay.  If this is
16  still up, which it could be, then, of course, these are
17  just things that I'm still -- that we are still trying
18  to take care of.  But, I mean, I don't see where this is
19  on the website.
20   Q.  Is there any reason to think this is an
21  accurate -- is not an accurate reflection of the web
22  page located at this URL, mmbnaa.org-about -- sorry, let
23  me back up -- mmbnaa.org/about-us-1?  Is there any
24  reason to think that this is not an accurate reflection
25  of the web page of that URL as of yesterday,

1  November 20, 2023?
2    A.  Go back up.  Let me see.  Go back up.  No, no, go
3  back to the URL, please.
4    Q.  Down here at the bottom of the page?
5    A.  Yes.
6    Q.  Are you accessing that URL right now on your
7  computer?
8    A.  Yeah.  Because I don't know how to get to it from
9  the home page.  That's --
10   Q.  But you're able to get to that page, correct?
11   A.  When I -- when I typed in that URL, yes.  But if
12  you're -- if you're someone that's coming on the website
13  for the first time -- or not even the first time, going
14  straight to the website, there's nothing on the page
15  currently that says clicking an about page.  So I guess
16  that's something that definitely has to be clear.  But,
17  you know, definitely a mistake.  I don't see how.  So I
18  can't say that's correct, the description of what the
19  current website is because there's no link on the page
20  that accessed this about page.
21   Q.  So now that you've gone to that URL and looked at
22  it, is it fair to say that this is an accurate
23  reflection of the web page located at that URL as of
24  right now?
25   A.  That's not a fair description of what the website

1  is because --
2    Q.  That's not the question.  I'm going -- I'm going
3  to be very specific with the question, and I know you
4  know the answer and we all know the answer and it's okay
5  to say the answer.  We just need you to say the answer.
6       Is this a fair depiction of the website located
7  at the URL mmbnaa.org/about-us-1 right now as you looked
8  at it on your computer?  Let's go through this.  This is
9  an accurate reflection, correct?
10   A.  That is an accurate reflection of the URL.
11   Q.  Of the web page of that URL.  Thank you.
12   A.  No, I'm not going to agree totally to your
13  statement.  I'm going to say that that is an accurate
14  description of that URL.  The website does not reflect
15  or show a link to that URL.
16   Q.  Would you agree with me that the content of
17  this --
18   A.  Unless I --
19   Q.  Would you agree with me that the content of this
20  page should not be currently posted on defendant's
21  website?
22   A.  I agree with you.  It should not.
23   Q.  Thank you.
24       Can you see this here?  It's the Google home
25  page.

1  A.  Yes.
2  Q.  And if I type in Bethune-Cookman Alumni
3 Association and I hit enter, I get these search results,
4 right?
5  A.  Wow.
6  Q.  The first link is the official Bethune-Cookman
7 University Alumni page, the second link is also an
8 official Bethune-Cookman University Alumni Association
9 page, correct?
10  A.  Uh-huh.
11  Q.  The third link, National Alumni Association
12 Bethune-Cookman, NAABCU.  Correct?
13  A.  Um-hmm.
14  Q.  And when I click on that, it takes me to that
15 page.  You see that up here, mmbnaa.org/about-us-1?
16  A.  Yes.  Now can you do this for me?  Can you open
17 another tab and type in mmbnaa.org for me, for the
18 record?  No, no, keep that -- no, no, no, go ahead, keep
19 that, just open another tab.  You don't want to, you
20 know -- wait.  Put -- put back -- I don't know, how can
21 you -- refresh.  So that way the URL --
22  Q.  Is it your position that this page that's
23 accessible from the third link on Google is not
24 accessible from the mmbnaa.org home page?
25  A.  Okay.  So refresh real quick, just so the URL can

1 pop back up.  Okay.  Can you click the tab button, a new
2 tab button, for me, please.
3  Q.  No.
4  A.  Okay.
5  Q.  If you're trying -- if you're trying to establish
6 that this isn't accessible from mmbnaa.org, I've got no
7 problem with that.  If that's your testimony, which I
8 think you stated before --
9  A.  Yes.
10  Q.  -- that's fine.  But you understand that I just
11 went to Google, searched Bethune-Cookman Alumni
12 Association and the third hit was this page.  Correct?
13  A.  Yes.
14  MR. ANDERSON:  I'd like to mark the PDF of this
15 page as Exhibit 24.
16  (Plaintiff's Exhibit No. 24 was marked for
17 identification.)
18 BY MR. ANDERSON:
19  Q.  So you had previously stated you're not familiar
20 with Google AdWords, right?
21  A.  (Shakes head.)
22  Q.  But you've heard the term Search Engine
23 Optimization, correct?
24  I think I've lost your audio.  Can you hear me?
25 You can hear me.  I can't hear you.

1  MR. ANDERSON:  Can anybody else hear the
2 witness?
3  THE VIDEOGRAPHER:  No, sir.
4  MR. ANDERSON:  No, I don't think anybody can
5 hear Mr. Barfield.
6  THE VIDEOGRAPHER:  I think the battery on his
7 mic there on his shirt probably died.
8  THE WITNESS:  Testing.  Can you hear me now?
9 BY MR. ANDERSON:
10  Q.  I can hear you now.  Yes.  Thank you.
11  A.  All right for backup.
12  Q.  So you've heard the term "Search Engine
13 Optimization" before?
14  A.  Yes.
15  Q.  What do you understand Search Engine Optimization
16 to mean?
17  A.  I -- I don't.  Those are probably things I'm
18 still learning when it comes to website design updates
19 and all that stuff.  So yeah, I've seen the words.  I've
20 seen the terminology.  So I'm guessing that's how the
21 placement is when searched, if I'm not mistaken.  So I
22 don't want to guess, so those are just terminology that
23 I'm still not familiar with.
24  Q.  As a member of the technology committee that is
25 responsible for the content of the website, have you

1 ever had any discussions with anyone on the committee
2 about Search Engine Optimization?
3  A.  No.
4  Q.  Have you ever had any discussions with anyone
5 else in the organization about Search Engine
6 Optimization?
7  A.  No.
8  Q.  Have you ever had any discussions with anyone at
9 the organization about how to get the organization's
10 website to rank higher on Google?
11  A.  No.
12  Q.  Any other search engine ranking discussions that
13 you've had?
14  A.  No.  There was -- even when I joined, there
15 was -- there was no discussion with that.  So then when
16 I was appointed, you know, a lot of just learning as I
17 go, so...
18  Q.  Fair enough.
19  When you're in the WIX portal for the website, is
20 there an opportunity to provide key words that are
21 searchable by users on the internet?
22  A.  So that's -- those are those pages, Search Engine
23 Optimization.  That -- there's -- that's me learning
24 what -- you know, how to create each page.  So when you
25 go in, there's an option that talks about it.  I don't

1 understand it but I see it, you know.
2    Q.  Okay.
3    A.  So it was a thing where -- and this was still
4 through transitioning, making sure that every -- there
5 is no logo, there's no B-CU or any -- or likeness.
6 There was still a thing where at the -- at the URL, you
7 know, there's -- sometimes there's an image that goes
8 along with the URL.  It was show -- still showing the
9 old alumni association, which of course had the logo,
10 the school's logo.
11       Just, I was -- you know, trial and error, trying
12 to figure that out, like, why is it still doing -- how
13 do I take that off?  So through clicking, that's when
14 I'm like, okay, what does this mean, search -- what is
15 it again -- Search Engine Optimization.  I see that.
16 Still don't understand what does it mean.  But I was
17 able to find where I could take that logo off of the
18 URL.  So still learning, still trying to --
19 understanding.  I think that's what that is, that about
20 page, something that I wasn't able to see through the
21 Search Engine Optimization option.  So, yeah.
22    Q.  Fair enough.  So the Search Engine Optimization
23 section and WIX, is there any opportunity to provide
24 certain terms or key words in connection with that
25 section?

1    A.  If it is, I'm not familiar with that.  I don't
2 know how to --
3    Q.  Well, you said you noticed that the little seal
4 logo maybe was in that section.  Are there any typed
5 text words in that section when you look at it?
6    A.  I've got to go back and look, seriously.  Like,
7 that's just --
8    Q.  Can you do that?
9    A.  -- through trial -- through trial and error,
10 trying to figure stuff out.  So I don't know if it's
11 there or not.  I don't know exactly, you know.
12    Q.  That's okay.  Since you're in front of your
13 computer, can you open up the WIX platform and see if
14 there are any words in there?
15    A.  Okay.  So how to get to it, all I know is I
16 remember seeing the Ss, so let me just go straight to
17 that part.  No problem at all.  Hold on.
18    Q.  Thank you.
19    A.  And for the record, this is a website that was
20 handed down, asked -- I was asked to -- so, to continue
21 it, update it or whatever.  So it's --
22    Q.  Understood.
23    A.  This is nothing that I myself or the team that I
24 have that's in the technology committee, we created.
25    Q.  Sure.  That's okay.  Yeah.  Totally understand.

1    A.  Let's see here.  Wait.  How does that work?
2 Marketing and SEO.  SEO.  Okay.  Click on that.  Okay.
3 This is -- this is different.  Let me -- let me go back
4 to where I found it.  Let me go to the edit of the home
5 page -- edit of the home page.  That's how I remember
6 coming across it.  Let me go back to that.  The back
7 office --
8    Q.  Thank you.
9    A.  -- is still kind of -- I'm still working.
10 There's stuff I don't understand.  Let me go to the
11 page.
12       Okay.  So page -- see, even the about page, it's
13 hidden.  So I don't understand why is it still popping
14 up to each page.  Settings.  Okay.  Here it says SEO
15 basic.  Okay.  So now -- here it is.  So where I was
16 able to change that logo, that everyone -- layout,
17 permission, SEO basics.  Oh, so that's what it is.  So
18 that's where it says -- that's where you see that link,
19 because it still says National Alumni Association.
20    Q.  So it says National Alumni Association?
21    A.  Yeah.  This link is hidden from the website, but
22 I guess it can still be accessed if you type that URL.
23 You just -- I just learned something.  Okay.
24    Q.  So does it say anything else in addition to
25 National Alumni Association?

1    A.  The link.  I'm looking at the URL.  So the URL,
2 MMB About Us, and it says the National Alumni
3 Association Bethune-Cookman.  The same thing that you
4 saw when you Googled.
5    Q.  Says the National Alumni Association of
6 Bethune-Cookman?
7    A.  Yeah, it does.  Even though I've hidden it from
8 the page, whatever this SEO, it still makes it present
9 in the search engine.
10       Okay.  I think I'm starting to understand.  All
11 right.  Well, I guess that's just other things that I
12 have to learn to do.
13    Q.  Understood.  Thank you for looking at that.  And
14 does it say anything else?
15    A.  Well, I don't know.  It says: About, tag, meta
16 description, which is the same information, social
17 share.  So yeah, okay, that's where it was.  The social
18 share was where I was able to change the logo, so I
19 remember doing that, and that was the only thing I
20 remember seeing.  So page information, advanced
21 settings.  Let me see.  Layouts.  Yeah, that's -- that's
22 everything.
23       So what is this about this key words?  Where do I
24 go for that?
25    Q.  Well, it sounds like you've answered my question,

37 (Pages 142 - 145)

1 so I think we're good. Thank you for looking at it,
2 though.
3    A. All right.
4    Q. I'm going to share my screen again. I've got a
5 few more exhibits. Well, let me back up.
6       Do you play any role in the posting of content on
7 any of the organization's social media pages?
8    A. The -- I don't create the content. We just post
9 it.
10   Q. You post the content, correct?
11   A. Yes. That we're asked to.
12   Q. And is that on Facebook?
13   A. Facebook and Instagram, yes. The association --
14   Q. And Instagram?
15   A. Not the chapter's, just the association's.
16   Q. Okay. Have you been involved in looking for
17 unauthorized use of the university's logos or registered
18 trademarks or other indicia of the university's likeness
19 on various chapters' social media account pages?
20   A. Checking to see if they still have it on there?
21   Q. Yeah. Looking for stuff that should be taken
22 down.
23   A. Yeah. Yeah. That was -- we tried to be vigilant
24 with that to make sure that we adhered to the rules.
25   Q. Okay.

1    A. That was, you know, from the very beginning.
2    Q. Anyone else? I mean, anyone else that you can
3 name that's been involved in that process from the
4 beginning?
5    A. Yeah. Those same names from the tech committee,
6 you know, we're pretty much -- we're friends or
7 notification of all the different social media. So
8 whenever they do a post, we see it.
9       Sumner Hutcheson, I don't think I've said his
10 name. He's the fundraising committee. Sumner, S-U-M,
11 Ner, Sumner Hutcheson III.
12   Q. Okay.
13   A. He's the fundraising chair. He's had -- he
14 definitely spearheaded the logo changing, I would say,
15 and likeness changing of the association to make sure we
16 adhere. So he would definitely, like -- okay, hey, this
17 chapter's doing this, we have to.
18      So, I mean, it's a collective effort from
19 everyone from the president on down that's been like, if
20 we see something, say something, type thing, so we can
21 make sure we --
22   Q. Okay.
23   A. -- stay in compliance.
24   Q. So if you see something, how do you say
25 something?

1    A. By going to -- either making direct calls of the
2 person, if we know who it is, or going to the page's
3 direct message, I guess. I don't know. Most of the
4 time, it's really just a call because we know each
5 other.
6    Q. Did you usually pick up the phone and call them
7 and say, hey, I found this on your Facebook page, you
8 need to take it down?
9    A. ASAP, immediately, yes.
10   Q. And do you ever send an e-mail to that effect
11 that says, hey, we found some prohibited content, we
12 need you to take it down ASAP?
13   A. I haven't because that's -- you don't know when
14 they're going to check their e-mail, so, you know, we --
15 this is -- you know, we see something, we're like, okay,
16 this needs to be done quick, fast, in a hurry because, I
17 mean -- I mean, that's the situation that we're in. So
18 it's, you know --
19   Q. Yeah.
20   A. -- other chapters, other members who post them
21 might not be privy or really have a clear understanding,
22 like, no, they can't word it that way, you can't say it,
23 so, you know.
24   Q. Okay. I'm going to share my screen here again.
25 Can you see this wildcat?

1    A. Yes. Yes. Yes, I do.
2    Q. And up on the top left, do you see the date,
3 November 16, 2023, correct?
4    A. Yes, I do.
5    Q. And as I sort of scroll down, does this appear to
6 be an excerpt from the Alachua County Chapter's Facebook
7 page?
8    A. Keep scrolling.
9    Q. This middle page might be blank.
10   A. Yeah. I would like to see the last post because
11 there are some -- we've made contact, communication with
12 most of the chapter -- well, all of the chapters, and
13 there are a few of them that say they don't have access
14 to those accounts. So I would like to see what is the
15 last post of this account because if it's --
16   Q. Sure. Understood.
17   A. -- 2017, '18, and hey, it's not active and
18 there's no way to pull it down.
19   Q. Understood. But you see here up on the top, the
20 date, November 16, 2023, it's your understanding that
21 that is the date that we captured this web page,
22 correct?
23   A. Yes.
24   Q. With that stamp on the top?
25   A. That is the date that you captured that web page.

38 (Pages 146 - 149)

Page 150

1 But again --
2    Q. Right.
3    A. -- I would like to see the last post because
4 these -- this is probably one of those social media
5 pages that's inactive and no one has access to it, just
6 like how I don't have access to the Twitter page. And
7 you saw for yourself --
8    Q. Um-hmm.
9    A. -- the last post was, what, 2000-, what, '18, on
10 the Twitter page?
11    Q. And with this wildcat here on the top, would you
12 have had a problem with this wildcat on this Facebook
13 page if you were able to contact the appropriate person
14 at the Alachua County chapter?
15    A. Yes. If there was a person who has access to
16 that page, that -- trust me. From the beginning, since
17 from 2021, we've been trying to be as vigilant as
18 possible to adhere to all demands from the school, to
19 take all likeness down. But if we don't have access to
20 the page, I don't know what else to do. We can't -- I
21 don't -- tried calling Facebook to ask them to take it
22 down. Those are just things that's almost out of our
23 control.
24    Q. Have you asked the Alachua County Chapter to
25 remove this image of a wildcat from its Facebook page?

Page 151

1    A. Those -- I believe those were a few -- those are
2 one of the chapters that were asked to make sure they
3 make those changes.
4    Q. Did you get a response to that request?
5    A. Well, it's not -- it was a -- it's a committee of
6 people. So I, myself, did not contact Alachua County.
7    Q. Have you had any discussions within the committee
8 or otherwise within the organization about this image on
9 the Alachua County Chapter web page or Facebook page?
10    A. Yes, I believe that was one of the pages -- well,
11 when you see them now, that's probably one of the pages
12 where no one has access to it.
13    MR. ANDERSON: I'd like to mark this, I think
14 we're at Exhibit 25.
15    (Plaintiff's Exhibit No. 25 was marked for
16 identification.)
17    THE VIDEOGRAPHER: Sir, we're approaching
18 90 minutes again.
19    MR. ANDERSON: How many minutes do I have left?
20    THE VIDEOGRAPHER: Three.
21    MR. ANDERSON: Three minutes.
22    THE VIDEOGRAPHER: Yep. You can go over a
23 little. It's not that big of a deal, but I've got to
24 keep it to around 90 minutes.
25    MR. ANDERSON: Okay. I can go quickly through

Page 152

1 the next two.
2 BY MR. ANDERSON:
3    Q. So I'm going to jump to the next page. This is
4 another excerpt from the Alachua County Chapter Facebook
5 page. You see up on the top left, November 16, 2023,
6 correct?
7    A. Yes.
8    Q. And as I scroll down, do you see here a post
9 dated April 5, 2022, by Rosalind Ellington Jones updated
10 the group cover photo. Correct?
11    A. Right.
12    Q. Do you see that?
13    A. Yes.
14    Q. Rosalyn Ellington Jones updated the group cover
15 photo? Right?
16    A. Yes.
17    Q. And that was on April 5, 2022, on that Facebook
18 page?
19    A. Yes. That's not this year; last year. Yes.
20    MR. ANDERSON: I'd like to mark this as
21 Exhibit 26.
22    (Plaintiff's Exhibit No. 26 was marked for
23 identification.)
24 BY MR. ANDERSON:
25    Q. Does this appear to be an accurate reflection of

Page 153

1 a post on the Alachua County Facebook page on April 5,
2 2022?
3    A. That looks like a post that was posted on 2022,
4 yes.
5    Q. And this is the wildcat logo that is prohibited
6 for use by the organization, correct?
7    A. Is that this -- the specific wildcat logo or is
8 that a picture of the wildcat?
9    Q. Well, you said before that you would not have
10 approved of the cover photo and would have asked him to
11 take it down and did ask them to take it down, right?
12    A. No. I said that we made it vigilant to make sure
13 that each chapter does. And then if they can't, that's
14 because it's probably not -- they don't have access to
15 it. So --
16    Q. Right. So --
17    (Simultaneous speakers; court reporter
18 interjection.)
19 BY MR. ANDERSON:
20    Q. So it's your understanding that they couldn't
21 remove this if they wanted to, correct?
22    A. I can't confirm or deny that. I would have to --
23 as I said, I was not in contact with Alachua, but there
24 definitely has been considerable conversations to make
25 sure that each chapter is aware of that. So if this is

39 (Pages 150 - 153)

Page 154

1  one of those situations where the Facebook doesn't have
2  access anymore, then we have to, you know, go back to it
3  and see and ask.  This is April 2022.  This is the last
4  year, over a year ago.
5      Q.  Right.  And if I -- and before I enter this as
6  Exhibit 26, one last page.  Do you recognize this
7  excerpt from the Orange County Chapter's website located
8  at mmbocac.org?
9      A.  No.  The first time looking at this, but okay.
10     Q.  You see up here on the top left, it indicates it
11 was captured November 10, 2023, correct?
12     A.  Yes.  I see that in this chapter.
13     Q.  And this says:  About MMBNAA.  Correct?
14     A.  Yes, sir.
15     Q.  Does this appear to be an accurate reflection of
16 a web page located at the URL down in the bottom left
17 corner?
18     A.  It looks it, yes.
19     Q.  You see this here?
20     A.  Okay.  Yes.
21     Q.  And about -- it's mmboca.org/about-us, right?
22     A.  Oh, okay.  I see where that -- I see how they did
23 that.  All right.  Yes.
24         MR. ANDERSON:  I'd like to enter this as
25     Exhibit 27.

Page 155

1         (Plaintiff's Exhibit No. 27 was marked for
2     identification.)
3  BY MR. ANDERSON:
4      Q.  Did you undertake any efforts at the organization
5  to produce the content of the Orange County Alumni
6  Chapter's website?
7      A.  Me, as an individual?  You're asking have I
8  helped to, what, produce this website?  That's what
9  you're asking?
10     Q.  Produce the content of this website in response
11 to the discovery requests in this case?
12     A.  I did not produce any of this content on this
13 website.
14         MR. ANDERSON:  Okay.  We can pause there to
15     change the tape and go off the record.
16         THE VIDEOGRAPHER:  We're going off the record.
17     The time is 1:26 p.m.
18         (A brief recess was taken.)
19         THE VIDEOGRAPHER:  We're going back on the
20     record.  The time is 1:41 p.m.
21 BY MR. ANDERSON:
22     Q.  Mr. Barfield, I want to go back to this Alachua
23 County Chapter Facebook page.  You had indicated that
24 you didn't personally reach out to anyone at the Alachua
25 County Chapter about this image of a wildcat on their

Page 156

1  Facebook page, correct?
2      A.  Correct.
3      Q.  Do you know who at the organization reached out
4  to the Alachua County Chapter about this image?
5      A.  No, I don't.
6      Q.  Did you undertake any efforts in preparation for
7  your testimony today to find out whether anyone had
8  reached out to the Alachua County Chapter about this
9  image?
10     A.  No.  I mean, it's pretty obvious.  No, I didn't.
11 I didn't even know it was still like -- like this.  So,
12 yeah.
13     Q.  Do you know who Rosalyn Ellington Jones is?
14     A.  No.
15     Q.  Did you undertake any efforts generally in
16 preparation for your testimony today to figure out which
17 chapters are still delinquent in removing prohibited
18 content?
19     A.  No.
20     Q.  Have you had any discussions with Johnny McCray
21 about the presence of prohibited content on chapter
22 Facebook pages?
23     A.  Yes.
24     Q.  Can you explain for us what those discussions
25 were about?

Page 157

1      A.  To make sure that we complied with the demands of
2  the school, to take any name, image or likeness of the
3  school off websites and social media.
4      Q.  Including this image on the screen of a wildcat?
5      A.  If this is the official image of the school, yes.
6  If it's not -- if it's just a wildcat, then, you know,
7  that's what they do.  But, you know, we want to
8  definitely make a clear distinction.  And through our
9  efforts, as it is posted, it's not.
10     Q.  Has anyone, as far as you know, declined to
11 remove prohibited content from their social media pages?
12     A.  No.  No.  It's really -- it's really just --
13 what's the word -- non-tech-savvy people knowing how to
14 do this type of thing.  So, you know, it's -- when they
15 think that, you know, they're not making any future
16 posts, okay, so what about the past post?  So, you know,
17 so that's just the conversation that needs to be made
18 because, you know, the ones that you'll see, we made
19 sure that, you know, in the -- or at least the past from
20 2021 or whatever, so that's all.
21         Some of them probably don't know exactly how to
22 do that or whatever or are not privy to or are just
23 thinking of it if there's anything wrong with it because
24 it doesn't directly say Bethune-Cookman University, so
25 that's just us just trying to be vigilant and help them

40 (Pages 154 - 157)

1 understand, hey, well, no, that's -- that's also part of
2 the process of making sure that we take everything down,
3 so...
4   Q. But you see here on the screen, this image was
5 actually put up after the lawsuit was initiated,
6 correct?
7   A. When was -- oh, yes. Yes. Other --
8   Q. And you have -- go ahead.
9   A. I'm sorry, that was me pausing again.
10     Again, you know, we're talking about a whole
11 organization of members that there might be some that
12 doesn't completely understand. So the ones who do
13 understand are trying to make sure that, you know, we
14 adhere to the school's demands. No one is being
15 delinquent. No one is being, you know, passive or
16 saying that no, I'm not going to do that, that rah, rah,
17 rah, type of thing. It is merely just either mistake or
18 not really sure about, okay, this is included in there.
19 So, you know, we have to do what we have to do and
20 continue to correct and update, you know, that we could
21 just have that type of, you know, awareness or whatever.
22 You know, we're doing it.
23   Q. So you had indicated previously that after the
24 university voted to disassociate from the organization,
25 there was a communication to the chapter presidents

1 relating to their -- the prohibition on the use of the
2 university's registered trademarks, correct?
3   A. Right. Correct.
4   Q. And that communication was sent out in September
5 of 2021, correct?
6   A. The communication from the school, you mean, or
7 are you talking about the communication between our
8 members?
9   Q. Between your members, the communication from
10 Johnny McCray informing the chapter presidents not to
11 use the university's trademarks or likeness?
12   A. I'm not -- I'm not sure about the actual date or
13 time. But it was sent out, yes.
14   Q. It was shortly after --
15   A. Yes. Yes. Shortly after, yeah.
16   Q. Shortly after the university voted to
17 disassociate from the organization, correct?
18   A. Yes. You know, through the -- that was the
19 transitional part time to, you know, get everything
20 down.
21   Q. But many months later, it appears the Alachua
22 County Chapter disregarded that directive from Mr.
23 McCray and posted an image of the university's
24 registered trademark on its Facebook page, which appears
25 there to this day, correct?

1   A. No. Not --
2     MS. FANIEL: Object to form.
3 BY MR. ANDERSON:
4   Q. What's incorrect about what it is I just said?
5   A. You said that they disposed Johnny's, you know,
6 demands to take it down. That's -- no, you're making it
7 sound like they're being -- you know, they're not trying
8 to adhere to the demands. No. I don't think that's
9 what it is. I don't -- I think that's just --
10   Q. Well, have you -- have you had any discussions
11 with the Alachua County Chapter about this wildcat image
12 on the screen?
13   A. No. If I would have seen that, I definitely
14 would have tried to make contact. But, you know,
15 whoever made contact, it's probably the discussion word
16 there are Facebook pages that are not accessible. And
17 this being, yes, even however many was that, five months
18 in, six -- October, November, December -- seven months
19 in, you know, that's still -- that's still a, you know,
20 big transition and still understanding, trickling down,
21 you know, you're talking about years of history to be
22 changed. So, I mean, mistakes will be made with
23 individuals but that doesn't mean that they're not
24 trying to follow the rules or anything like that.
25   Q. Is it fair to say that despite the national

1 organization's efforts, many chapters have still not
2 been able to comply with the requests to take down
3 prohibited online content?
4   A. Despite -- repeat the question again.
5   Q. Despite the national organization's efforts, many
6 chapters have still not been able to comply with the
7 requests to take down prohibited online content,
8 correct?
9   A. I don't think many. I don't think that's --
10 because that make it sound like it's the majority and
11 that make it sound like they didn't want it. So --
12   Q. We've looked at the Alachua County Chapter,
13 right?
14   A. Okay. Yes. One. Unless there's a majority of
15 information that you have, that's still one. And this
16 date is -- I mean, it's -- you know, it is what it is.
17 That's what it is. And I don't think they're trying not
18 to be compliant. I think that falls under this Facebook
19 page not being accessible. Because those were the
20 conversations -- I don't want to say recent
21 conversations, but those were the conversations once the
22 information was given to you, know, all of the chapters
23 of its members.
24   Q. You don't know that for sure, though, right? You
25 don't know if the Alachua County Chapter has access to

1 this Facebook page right now, do you?
2    A. I don't. And I don't know who this person is. I
3 don't know if this person is an officer or I don't know
4 if this person is just a member who has access to update
5 and post -- it's a lot of different variables. So --
6 but, you know, I'm left in the dark so I can't assume.
7 I mean, I don't want to assume. I don't want to confirm
8 or deny.
9    Q. Do you know who, if anyone, requested that
10 Alachua County Chapter take this image down?
11    A. Yeah, I answered that question. No, I don't.
12    Q. Hold on for one second. I'm just going to --
13 hold on for one second.
14       MS. FANIEL: You're muted, Stephen.
15       MR. ANDERSON: I'm sorry. Thank you, Ms.
16 Faniel.
17 BY MR. ANDERSON:
18    Q. Who, if anyone, was involved in communicating
19 take-down requests to the local chapters?
20    A. I think -- I believe I answered that question,
21 too, as well. E-boards, officers. Remember I said
22 Sumner Hutcheson; Sumner Hutcheson III was the spearhead
23 of that committee after the logo was established, the
24 new logo was established. He was the one who
25 spearheaded most of it. And then, of course, everyone,

1 all of us from the tech committee and then all other
2 officers, outside of the correspondence from the
3 president.
4    Q. Did you have any conversations or communications
5 with any of the people you just mentioned in preparation
6 for your testimony today on this topic?
7    A. No. Kind of looks like I should have, so we
8 can -- but, yeah.
9    Q. I'm going to bring up this next exhibit. Can you
10 see this image here on the screen, which is an excerpt
11 from the Broward County Chapter's Facebook page?
12    A. Okay. Yeah, I see it.
13    Q. And do you see this post-dated March 13, 2022, by
14 Alex Knighton?
15    A. Yes. A month before the previous post, yes.
16    Q. Do you know Alex Knighton?
17    A. No, I do not.
18    Q. And you see in this post, there's the seal logo
19 that we've talked about, which is a registered trademark
20 of Bethune-Cookman University?
21    A. Yes, sir.
22    Q. And this appears to be an accurate depiction of a
23 post from the Broward County Chapter's Facebook page,
24 correct?
25    A. It appears to be.

1       MR. ANDERSON: And this was produced in the
2 case as BCU0003168 down there at the bottom, just for
3 the record. I'd like to enter this as Exhibit 28.
4       (Plaintiff's Exhibit No. 28 was marked for
5 identification.)
6       THE WITNESS: What does -- what does that mean?
7 Is that also on the page, BCU0031 --
8 BY MR. ANDERSON:
9    Q. That's just a stamp indicating that this has been
10 produced in this case. I'm just simply stating it for
11 the record so it's clear in the transcript what we're
12 looking at.
13    A. Okay.
14    Q. If you had been aware of this Facebook post,
15 would you have insisted that it be removed?
16    A. Yes, sir.
17    Q. Have you had any discussions with anybody at the
18 Broward County Chapter about removing any prohibited
19 content from their website?
20    A. No. Not lately.
21    Q. When you say not lately, what do you mean?
22    A. Meaning there -- you know, in our efforts to make
23 sure there's no images, there was a contact with -- I
24 remember, I remember it was a contact with -- is that
25 the president or vice president? I can't remember. Of

1 the chapter. Like, hey, we've got to -- we've got to
2 take this down.
3    Q. You had a discussion with the president of the
4 Broward County about removing content from their
5 website?
6    A. Right. It was either the Broward or the -- I
7 mean, the president or the vice president.
8    Q. And was that a phone -- was that a phone
9 conversation?
10    A. Yes.
11    Q. And did they -- what was their response to your
12 request to remove the prohibited content?
13    A. Right away. We'll do it.
14    Q. Was that person you spoke with either Mr. or
15 Mrs. Shorter?
16    A. Yes.
17    Q. Was it Mr. Shorter?
18    A. Mr. Shorter, I believe it was Mr. Shorter. I
19 mean, you know, I communicated with both of them, but
20 I'm pretty sure it was Mr. Shorter.
21    Q. And did this post in particular open that
22 discussion?
23    A. No. Because this is -- they didn't -- they
24 didn't post this. Whoever this Alex J. Knighton --
25 Knighton posted this. So I was talking about the post

1 that one of them made. And it was just -- you know, I
2 don't know exactly what the post was but it was too
3 questionable, so we were like, hey, let's just take this
4 down.
5    Q. Okay. This next document I want to look at is an
6 excerpt from the Facebook page of the Coastal Georgia
7 Alumni Chapter. Does this appear to be an accurate
8 excerpt from that chapter's Facebook page?
9    A. So now -- now that I have a little bit of
10 understanding of SEO, this is what I was talking about.
11 When someone puts in the link and shares the link, this
12 image comes up. So that's what -- that's what I was
13 talking about, I had to learn how to try to change that
14 image. So someone still posted it. I guess -- I guess
15 it doesn't update after it's been posted, so that's what
16 I was talking about.
17    Q. Does this appear to be an accurate reflection of
18 a post from April 24, 2022, by the Coastal Georgia
19 Alumni Chapter on its Facebook page?
20    A. Yes. And for the record, these dates are very
21 close, March, April, in the transitional period of us
22 trying to make sure that all likeness has been taken
23 down.
24    Q. It was a good seven months after the university
25 voted to disassociate the organization, right?

1    A. Seven months versus 32 or however many years, you
2 know, it's a lot. It's a lot of information, you know,
3 to adhere to. But that doesn't -- that doesn't say that
4 we haven't been diligent to try to do so, you know --
5    Q. I'd like to enter --
6       (Simultaneous speakers; Reporter request for
7 clarification.)
8       THE WITNESS: Me?
9       THE COURT REPORTER: Yeah, I didn't hear the
10 last thing.
11 BY MR. ANDERSON:
12    Q. You can finish your answer.
13    A. I said, yeah, just got to give us a little grace.
14 We're not -- it's not like we're saying, no, we're not
15 going to. We're trying to adhere to the -- to the
16 response.
17       MR. ANDERSON: I'd like to enter this exhibit
18 as Exhibit 29, the Coastal Georgia Facebook page
19 excerpt.
20       (Plaintiff's Exhibit No. 29 was marked for
21 identification.)
22 BY MR. ANDERSON:
23    Q. If you had -- well, have you ever seen this
24 before?
25    A. No.

1    Q. This use of the seal logo on the Coastal Georgia
2 Alumni Chapter's page?
3    A. No. This was a post. Like I said, this was what
4 I was talking about with the SEO, the image of the
5 actual link with the search engine, right? Is that the
6 same thing, search engine, SEO? Okay. Yeah. So, you
7 know, that's what I was trying to explain.
8       I didn't know that there was an image when we was
9 in the transitional period of changing over the pages,
10 and you have to do that with each page. So, you know,
11 that was one of those pages that still -- that wasn't --
12 that wasn't caught. And so when they posted it, that's
13 what stuck.
14    Q. Had the organization contacted anyone at the
15 Coastal Georgia Alumni Chapter about taking this down?
16    A. I don't know that specifically has been -- I
17 can't speak for anyone else who has, so I'm not going to
18 guess. But I know that the initial --
19    Q. And --
20    A. I know that the initial communication was made
21 from the top all the way down. Now, if there are people
22 who still don't have that information, that's yet to be
23 seen.
24    Q. The link there to donate, MMBNAA, that link goes
25 to the national organization's bank account, correct?

1    A. That link goes to the website.
2    Q. And that provides the opportunity for the visitor
3 to make a donation to the organization, correct?
4    A. Yes.
5    Q. And when that person makes a donation, that goes
6 into the national organization's bank account?
7    A. When that person makes a charitable donation, it
8 goes into the account of the Dr. Mary McLeod Bethune
9 National Alumni Association.
10    Q. Thank you. You said that there was an initial
11 communication to the chapters to take down prohibited
12 content that included the university's registered
13 trademarks. Are you aware of any specific communication
14 with the Coastal Georgia Chapter relating to the
15 prohibited use of the university's registered
16 trademarks?
17    A. No, I'm not aware of any specific communications,
18 just the Coastal Georgia Alumni.
19    Q. Do you know who the president of the Coastal
20 Georgia Alumni Chapter is?
21    A. Not offhand. It is documented in our -- in our
22 sheets of updated chapters. But no, I don't know
23 offhand.
24    Q. Okay. Are you familiar with a company called
25 Constant Contact?

43 (Pages 166 - 169)

1   A.  Yes, sir.
2   Q.  What do you understand Constant Contact to be?
3   A.  A third-party web-based communication device to
4   send out e-mail blasts.
5   Q.  And your organization uses Constant Contact to
6   send out e-mail blasts, correct?
7   A.  Correct.
8   Q.  When the organization wants to send out an e-mail
9   blast, what does the -- what does the process look like
10  from start to finish?
11  A.  The organization or president or committee that
12  needs to give out information, they're asked if there
13  can be a Constant Contact post or e-mail blast.  That
14  content is given to the tech committee.  The tech
15  committee makes sure that it looks right, and then we
16  submit it to -- back to the committee or the officer or
17  the president to make sure that, you know, everything
18  looks right or grammatically is correct.  And then once
19  they approve it, we post.
20  Q.  How is -- so once it's approved, how is it sent
21  out?
22  A.  Through the Constant Contact platform.
23  Q.  And who engages with the Constant Contact
24  platform to send out the e-mail?
25  A.  Can you rephrase the question?

1   Q.  Who is responsible at the organization for
2   scheduling or otherwise sending out an e-mail via
3   Constant Contact?
4   A.  Once the technology committee submits to the
5   committee or president or whomever is asking, they
6   also -- they also give out the -- okay, we're ready to
7   post now or we're ready to schedule.
8   Q.  And so when you say, ready to post, that means
9   it's ready to be sent out to --
10  A.  Yes.
11  Q.  -- recipients?
12  A.  Yes.
13  Q.  And so how -- how is it sent out to recipients?
14  A.  Through -- through the platform, through Constant
15  Contact.
16  Q.  So there's a -- you go online to the Constant
17  Contact's website?  Is that right?
18  A.  The online -- yes.  Yeah.  Online
19  web-based platform.
20  Q.  Portal?
21  A.  A.  Portal.
22  Q.  Platform or portal?
23  A.  Portal, yes.
24  Q.  Okay.  And then you upload a flyer, for instance,
25  that you want to disseminate by e-mail to a large group

1   of people, correct?
2   A.  Yes.  Correct.
3   Q.  Who uploads the flyer to the Constant Contact
4   platform or portal?
5   A.  The technology committee.
6   Q.  And is there anyone on the technology committee
7   who typically does that?
8   A.  Me, I have.  Of course the majority of it, that
9   person's not -- let me see.  There were, you know --
10  yeah, okay.  So as of right now, anything that's post,
11  they'll give it to me, the technology committee.  Once
12  we all agree, then I post it.  Other than that, you
13  know --
14  Q.  Okay.
15  A.  -- there are other people that can post, but, you
16  know, I think it just makes it more clear, like, okay,
17  hey, once everything is approved and everything, let me
18  just go ahead and do it.  So I would say I do the
19  majority of posts when asked or when approved.
20  Q.  Got it.  And are you aware that there was a
21  discovery request in this case related to all e-mails
22  sent using the Constant Contact platform?
23  A.  Yes.
24  Q.  And were you involved in the collection and
25  production of those e-mails?

1   A.  Yes.  Yes.  Trying to figure that out, yes.
2   Q.  What did you do to collect and produce e-mails
3   sent by the organization via Constant Contact?
4   A.  There was an attempt to try to, I guess, download
5   all of the content from the dates that was asked of.  I
6   couldn't figure it out, so I didn't know how to do it.
7   So it was -- they would say, okay, I'd be like, okay,
8   here's the user name and password, maybe we can figure
9   it out or something or someone else can do it or
10  whatever.
11      I mean, no, don't have the user name and password
12  by myself, so, you know, we was all trying to do it.  I
13  know I couldn't understand how to download all of the
14  ones from -- I mean, it's there.  You can see it.  So --
15  but I'm pretty sure we didn't want screenshots or
16  anything like that.  So we just gave the user name and
17  password, so I think somebody was able to take care of
18  that.
19  Q.  Who did you give the user name and password to?
20  A.  To the association's lawyers.
21  Q.  Did you ever work with a third-party company to
22  try to collect e-mails from Constant Contact?
23  A.  No.
24  Q.  Did you ever work with a third-party company to
25  try to collect and produce social media pages and

Page 174

1  accounts in this case?
2    A.  No.  I was not made aware.
3    Q.  But you were the person primarily involved with
4  the sending of e-mails via Constant Contact, correct?
5    A.  Yes.  The majority of it, yes.
6    Q.  And nobody's ever contacted you to discuss how to
7  produce e-mails sent by the organization using Constant
8  Contact, right?
9    A.  Yes, there were discussions.
10    Q.  What were those discussions, apart from
11  discussions with counsel?
12    A.  Then no, there wasn't, because that was the only
13  discussion with counsel, with the association lawyers.
14  There was no --
15    Q.  No discussion with -- go ahead.
16    A.  No discussion with third-party vendors.  I think
17  there was supposed to be but no one -- there was no
18  contact with me or anything or anybody else.
19    Q.  I'm going to share my screen.  And can you see
20  this Excel spreadsheet?
21    A.  Yes.  That is a --
22    Q.  Have you ever --
23    A.  I think this is what I provided, I think, in the
24  Constant Contact.  Yeah.  This is what -- this is what I
25  was able to download.

Page 175

1    Q.  Okay.  So you -- you downloaded this from the
2  Constant Contact platform?
3    A.  Right.  And then I uploaded it to the Google
4  Drive for the association's lawyers to view.
5    Q.  Okay.  And you see here on the top left, there's
6  a column called Time Sent, correct?
7    A.  Um-hmm.
8    Q.  And this spans the time period from October 20,
9  2023, all the way down --
10    A.  Should be '21, yeah.
11    Q.  To September 16, 2021, correct?
12    A.  Right.  That was the date that was asked.
13    Q.  And does this appear to be the actual spreadsheet
14  that you downloaded and uploaded into the Google Drive
15  folder for production in this case?
16    A.  Yes.
17        MR. ANDERSON:  I'd like to mark this
18  spreadsheet as Exhibit 30.
19        (Plaintiff's Exhibit No. 30 was marked for
20  identification.)
21  BY MR. ANDERSON:
22    Q.  So on the left, you've got time sent and then
23  we've got campaign name.  And what is the campaign name?
24    A.  The name of -- it's like the subject, the name of
25  the actual post.

Page 176

1    Q.  Got it.  So if there's a flyer that you wanted to
2  send out, this campaign name generally describes the
3  subject matter of the flyer, correct?
4    A.  Correct.
5    Q.  And then the next column, it says Sends.  Is that
6  the number of times or the number of people that that
7  campaign was sent to?
8    A.  I believe so, yes.
9    Q.  And then Opens is how many of those people opened
10  it?
11    A.  Yes.
12    Q.  And then there's some other statistics related to
13  the percentage of people who opened it to received it.
14    A.  Right.
15    Q.  Whether it was mobile, desktop, et cetera.
16        Is there any way to tell from the spreadsheet who
17  received an e-mail?
18    A.  It tells the number of people who received it.
19    Q.  But is there any way to tell who received the
20  e-mails?
21    A.  Not from this spreadsheet, no.
22    Q.  Did you ever contact Constant Contact and request
23  copies of all of the e-mails that were sent and that are
24  on this list?
25    A.  No.  It was -- they were directing me on how to

Page 177

1  download the e-mails, and this was one of them.
2    Q.  It was directed to you how to download the
3  e-mail; is that what you said?
4    A.  Yes.  Download the -- not the e-mail addresses
5  but the post, right?  I think, because that's what was
6  asked, to produce the post and the contents of it, the
7  dates.
8    Q.  But you understand that the requests for
9  production in this case asked for the e-mails that were
10  sent via Constant Contact?
11    A.  Oh, okay.
12    Q.  Did you ever try to get that information from
13  Constant Contact?
14    A.  I don't think I was successful at trying to get
15  all the information from Constant Contact that was
16  asked, so this is what I was able to achieve myself.
17    Q.  Did you ever reach out to Constant Contact about
18  getting access to the e-mails that were sent by the
19  organization using the platform?
20    A.  Right.  The help desk -- of course, you know,
21  it's hard to speak to a person.  So the help desk, they
22  give you the written verbiage of how to do such and
23  such.  But as I stated before, it was hard for me trying
24  to get all of the information.  That's why the user name
25  and password was given to whoever can have more

45 (Pages 174 - 177)

Page 178

1 knowledge to do so.
2   Q. Did you have any discussions with anyone at the
3 organization about the production of e-mails sent using
4 Constant Contact?
5   A. Outside of the e-mail that was sent from the
6 lawyer -- association's lawyer, no.
7   Q. You never spoke to Johnny McCray about producing
8 e-mails that the organization sent via Constant Contact?
9   A. Him responding to the initial e-mail, yes, you
10 know, asking everyone to -- making sure they take care
11 of this.
12   Q. I'm not quite sure I understand the answer. Did
13 you ever have a discussion with Johnny McCray about the
14 requirement that you produce e-mails sent by the
15 organization using Constant Contact?
16   A. Johnny responded or replied all to the e-mail
17 that was sent out, which included this on the list to
18 make sure that everyone get all of the information. So
19 it wasn't a direct conversation, I don't believe, with
20 me. It was, you know, with everyone saying, hey, we
21 have to get this done; let's make sure we can take care
22 of all this.
23   Q. There was an initial e-mail that Johnny McCray
24 sent out saying, here's what the plaintiffs in the case
25 have requested; we need to make sure everybody gets all

Page 179

1 the information. Is that what you're saying?
2   A. No, no. As I stated before, the e-mail was sent
3 from the association's lawyers and to the E-board
4 officer, Johnny McCray. Then they, in turn, made sure
5 that they sent or corresponded with everyone else, as
6 far as chapter presidents and stuff to get the
7 information.
8   Q. But was there ever an effort to obtain copies of
9 the actual e-mails that were sent by the organization
10 using Constant Contact from Constant Contact?
11     MS. FANIEL: Object to form.
12 BY MR. ANDERSON:
13   Q. I'm sorry. That was a confusing question. Let
14 me restate it.
15     Did you ever ask Constant Contact for copies of
16 all the e-mails that were sent by the organization using
17 their platform?
18   A. Yeah. Remember I said there was the help desk
19 and they're trying to send me links to read on, on how
20 to do this. So as I said, was unsuccessful at trying to
21 get all of the information that was asked.
22   Q. What did the help desk tell you when you asked
23 for copies of all the actual e-mails?
24   A. Gave me directions on where to go under settings.
25 And that's how I ended up getting this, but this doesn't

Page 180

1 give all of the posts or e-mails asked for.
2   Q. Right. So, for instance, the first one on the
3 list, October 20, 2023, was sent to 303 people, correct?
4   A. Um-hmm.
5   Q. Can you tell me who those 303 people are?
6   A. The list of names are -- I can't tell you
7 specifically who they are, but those are the people who
8 either subscribed -- yeah, who subscribed to the
9 Constant Contact.
10   Q. Right. But I can't identify the identities of
11 the individuals, 303 people who received that first
12 e-mail on the list, right?
13   A. Right. So in the Constant Contact back office,
14 you can see the list. But how you download that list or
15 whatever, I don't know if that's -- you're able to do
16 that. I mean, that's like, you know, information or
17 whatever. Because it's not -- you know, I don't think
18 they -- they make it seem like -- I don't know. It's
19 something that you're not able to do, I'm guessing.
20 Like I said, I gave the user name and password, then
21 maybe somebody else could do it. This wasn't something
22 I was able to do, trying.
23   Q. Did Constant Contact ever tell you that they
24 don't keep all the e-mails that were sent using their
25 platform?

Page 181

1   A. I don't remember seeing that, but they didn't --
2   Q. Can you repeat that answer?
3   A. I don't remember seeing that. They didn't tell
4 me directly because, I mean --
5   Q. You remember seeing what? What is it that you
6 remember seeing?
7   A. Seeing Constant Contact telling me that they
8 don't keep the e-mail records. That's what -- that was
9 the question you asked.
10   Q. You never saw that?
11   A. No.
12   Q. Did Constant Contact ever tell the organization
13 that they do not keep copies of the e-mails that are
14 sent using their platform?
15   A. If it has, I wasn't aware or I didn't see it or
16 that's something I overlooked.
17   Q. Did you talk to anybody about that in preparation
18 for your testimony today?
19   A. No.
20   Q. Did you inquire with your organization whether or
21 not Constant Contact was able to provide the e-mails
22 that were sent using the platform?
23   A. No.
24   Q. Are you aware of any way to identify the 303
25 people who this first e-mail dated October 20, 2023, was

46 (Pages 178 - 181)

Page 182

1 sent to?
2    A. When you make the post, you don't see the e-mails
3 in Constant Contact. I don't know if you're aware of
4 that. When you make the post, you don't see the e-mails
5 when it's sent. It's -- I think when everybody
6 subscribes, it's in -- you know, it's on subsection.
7 So, for instance, that's Palm Beach County, so everybody
8 who clicks on that link or whatever, they're in that
9 subsection.
10      So when I make the post or when we make the post,
11 you don't see everyone. You just click on Palm Beach
12 County and that's the number of students -- not
13 students -- people who are subscribed to that particular
14 subsidiary -- yeah, chapter or group -- subgroup. There
15 you go.
16    Q. Are you aware of any way to determine who the 303
17 people are who this e-mail was sent to?
18    A. If we click on -- what is it called -- if we
19 click on, in the back office, campaign -- no, not
20 campaign -- people or members, if you click on it, you
21 can see the list of e-mails. But how do you -- how do
22 you download that? It doesn't give you a way to do
23 that. Only thing you're able to do is download this.
24 I'm still trying to figure out how to download the
25 actual post-type thing. But when you go into the

Page 183

1 members, you can see the e-mail. It's just, trying to
2 download them, I don't think you can. I don't think
3 they'd allow you to because I think that's, what -- is
4 that against the rules or something like that? I'm just
5 asking because I don't know.
6    Q. On this spreadsheet, in the sends column --
7    A. Right.
8    Q. -- you see that different e-mails are sent to
9 different numbers of people, correct?
10    A. Yes.
11    Q. Why were some e-mails sent to some people and --
12 for instance, the first one to 303 people, but then the
13 second one to 3,942 people? Why is there a difference
14 there between the number of people who the e-mail was
15 sent to?
16    A. In Constant Contact, there's a way to click on
17 who, which group of people you're able to send the
18 information to. So if you select all -- and again, it
19 doesn't show the e-mail. If you select all, then it
20 will send to all 3,000-plus contacts that's subscribed
21 in the Constant Contact group.
22      So that particular one, Palm Beach County, we
23 just clicked on the group that's in Palm Beach County,
24 which is 300-plus. So that's how those numbers are
25 different.

Page 184

1    Q. And who decides who should receive which e-mail?
2    A. The committee that wants the information sent,
3 committee officer or president who wants the information
4 sent.
5    Q. And are there certain criteria that are used to
6 determine who should receive which e-mail?
7    A. It just depends on the person, the committee.
8 You know, if it's -- if it's send this information out
9 to the board of directors, that's only to the E-board
10 and chapter president. Send this out to Orlando County,
11 okay, so we'll just click on the sub-county for Orlando
12 and make sure we don't click on anything else; no Palm
13 Beach, no Duval. So it's -- yeah, it's whoever --
14 whoever wants to create that post, whoever -- you know,
15 once a post is approved or whatever, they'll let us know
16 which section or which subgroup to send it to.
17    Q. So those different e-mail lists that you can
18 select to send an e-mail to, who manages who's on those
19 lists?
20    A. Manage?
21    Q. Who determines who's on those lists?
22    A. I believe the people who subscribe, you know.
23 Everyone who's on there is a subscriber, right?
24    Q. Fair -- the national organization -- sorry. Go
25 ahead.

Page 185

1    A. I mean, yeah, you subscribe, but if you don't
2 want no more, you click the unsubscribe and you won't
3 get no more e-mails. You know, pretty simple.
4    Q. And it's the national organization that maintains
5 or manages the e-mail distribution list, correct?
6    A. Yes. The -- wait. The national organization --
7 right. They pay for the subscription and then that's
8 the platform that's used to send out information, one of
9 the platforms.
10    Q. And who decides who gets added to and deleted
11 from -- or deleted from one of these distribution lists?
12    A. The subscribers. Like I said, they have -- they
13 can subscribe and they can unsubscribe.
14    Q. But you're able to identify who the subscribers
15 are, correct?
16    A. Yeah. You see them in the back office. If you
17 click members, you see all of them. So that's it. You
18 go and see them.
19    Q. And you can see who's on -- and you can see who's
20 on which distribution list based on what they have
21 chosen to be on?
22    A. Right. It shows the tag, shows a little tag.
23    Q. So it is possible to determine who receives each
24 of these e-mails on this spreadsheet marked as
25 Exhibit 30, correct?

47 (Pages 182 - 185)

Page 186

1    A.  Say it again.
2    Q.  It is possible for the organization to determine
3  who receives each of the e-mails listed on this
4  spreadsheet, correct?
5    A.  Yeah.  I mean, it's -- like I said, it's hard
6  to -- when people -- and this is probably me just not
7  knowing or, you know, not being aware of how to do it.
8  When someone subscribes, you see their subscription.
9  You see them, you know, like, hey, they're a part of the
10  list now, okay?  So whenever we make posts, we click
11  either all or whatever.  And it's -- you know, it's not
12  like I can go to -- I can -- you know, we create a post
13  and then I have to click each individual person that I
14  want to receive that e-mail.  So I don't -- you don't
15  see that with the platform-type thing.
16    Q.  But if we look at the first row in the
17  spreadsheet, says it was sent to 303 people.
18    A.  Uh-huh.
19    Q.  You can go into the platform and determine the
20  identities and e-mail addresses of those 303 people,
21  correct?
22    A.  Yes.  Because you can see them, yes, yes, yeah.
23    Q.  Why have defendants refused to provide that
24  information to us in this case?
25    MS. FANIEL:  Object to form.

Page 187

1  BY MR. ANDERSON:
2    Q.  You can answer that question.
3    A.  I don't know.  I can't answer that question.
4  Because I've tried to download the whole list of e-mails
5  and I can't, so I don't know how.  And it's not that the
6  defendant has refused.  It's, don't know how to.
7    Q.  Have you ever had any discussions with anybody at
8  the organization about withholding the identities of the
9  individuals who received the e-mails on this list?
10    A.  Withholding the identities?  No.  No.  That's not
11  been a discussion.  What is there to hide?
12    Q.  Have you ever had discussions with anybody at the
13  organization regarding the identities of its members in
14  connection with this case?
15    A.  No.  No.
16    Q.  When you spoke to the help desk at Constant
17  Contact, did they tell you how to identify the
18  identities of the recipients of each of the e-mails on
19  this list?
20    A.  Excuse me.  I'm sorry.  No.  I believe that the
21  help desk helped me get this specific list that was out
22  there.  And yeah, I was able to get this specific list.
23  So I don't know if they was able to -- I'm not sure if
24  they was able to get the actual e-mail because I think
25  that's what you're -- you keep asking.  So -- but I

Page 188

1  don't -- I don't know how to.  If you know how to, then,
2  you know, maybe let's do it together or whatever, you
3  know, giving up those -- I don't know how to.  Help.
4    Q.  Can you see this exhibit on the screen?
5    A.  Yes.
6    Q.  And does it appear to be an excerpt from Constant
7  Contact's website?
8    A.  Yes.  How long is reporting data saved in
9  Constant Contact?  Okay.
10    MR. ANDERSON:  I'd like to enter this as
11  Exhibit 31.
12    (Plaintiff's Exhibit No. 31 was marked for
13  identification.)
14    THE WITNESS:  Summary reporting, I think, is
15  available for your campaign.  Detailed reporting
16  information is available in your account for three
17  years.
18    Okay.
19  BY MR. ANDERSON:
20    Q.  Right.  So Constant Contact will always keep what
21  they call summary reporting data for your e-mail
22  campaigns, but detailed reporting information is
23  available for up to three years; that's what it says,
24  correct?
25    A.  Yeah.  So that's -- that's what I put.  That's

Page 189

1  what I gave.
2    Q.  And so here, there's a table.  It says:  What's
3  the difference between summary and detailed reporting
4  data?  And it's campaign type and an e-mail and what you
5  can always do and then what you can do for three years
6  after your campaign is sent.
7    Right?
8    A.  Okay.
9    Q.  And we're within three years of 2021, correct?
10    A.  I believe that they was -- I stopped at -- I
11  remember doing something, it stopped at December or
12  November, it wouldn't let me go that further up.  Do I
13  have to do that?  Slow down.  Yeah.
14    Q.  The earliest e-mail on the spreadsheet that you
15  produced --
16    A.  Oh, okay.
17    Q.  -- is September 16, 2021.
18    A.  Okay.
19    Q.  So we're within the three-year window for that
20  e-mail, correct?
21    A.  Oh, you know what?  That was Facebook.  Okay.
22  All right.  Yeah.
23    Q.  So it says here on the Constant Contact website
24  that you can view all the contacts who received your
25  e-mail, correct?

48 (Pages 186 - 189)

Page 190

1    A.  Um-hmm.
2    Q.  You can view the contacts that opened or did not
3  open your e-mail, correct?
4    A.  Right.  It says it in that report.
5    Q.  You can view the contacts that clicked a link in
6  your e-mail, right?
7    A.  Right.
8    Q.  You can view who unsubscribes; you can view
9  contacts that bounced; you can export the contacts who
10  opened, did not open, clicked or bounced an e-mail,
11  correct?
12    A.  Yes.  That's what it says.
13    Q.  So you have the ability, according to Constant
14  Contact, to export the identity of everyone who opened,
15  did not open, an e-mail, correct?
16    A.  If that's what it's saying.  All I did was
17  download that report.  I think that's the report it's
18  saying it is, and that's the report I downloaded.  So I
19  don't know if there was an extra way of doing it.
20    Q.  Well, I'd say what you downloaded appears to be
21  summary data, right?
22    A.  Okay.
23    Q.  This tells you how many contacts it was sent to.
24  You see that there?
25    A.  Okay.

Page 191

1    Q.  How many opened or did not open --
2        MS. FANIEL:  Object to form.
3  BY MR. ANDERSON:
4    Q.  -- that's on the table, right?
5        MR. ANDERSON:  What's the basis of the
6  objection?
7        MS. FANIEL:  I was objecting to your initial --
8  the question before your last reading of this page.
9        MR. ANDERSON:  What's the objection to the --
10  which question are you objecting to?
11        MS. FANIEL:  Madam Court Reporter, can you read
12  the next-to-last question that Mr. Anderson asked?
13        THE COURT REPORTER:  This tells you how many
14  contacts it was sent to.  You see that there?
15        That one?
16        MS. FANIEL:  I think the one before that.
17        THE COURT REPORTER:  Well, I'd say what you
18  downloaded appears to be summary data, right?
19        MS. FANIEL:  That was the question that I was
20  objecting to because that was not what he testified
21  to.  That's the basis of my objection.  Thank you.
22  BY MR. ANDERSON:
23    Q.  Spreadsheet, Mr. Barfield, appears to be summary
24  data.  Correct?
25    A.  Data, summary, the verbiage is not clear for me,

Page 192

1  so, I mean, yeah.  I was able to do --
2    Q.  Right.  But if we look at the spreadsheet, we can
3  see how many people it was sent to, how many people
4  opened it.  Right?
5    A.  It says -- the title of this thing says E-mail
6  Campaign Report.  So I thought I was giving the
7  information that was asked for.
8    Q.  Sure.  So it doesn't show the identities of the
9  people who received the e-mail, correct?
10    A.  Correct.
11    Q.  And on the Constant Contact web page, it says:
12  That's known as detailed reporting data.  Right?
13    A.  Where?  Okay.  Detailed reporting data.
14    Q.  Right?  You can view who actually receives it,
15  over here, right?  And in summary, what you can always
16  do is you can view how many, and that's what we can see.
17  We can see how many people it was sent to.  We can't see
18  who they were.  For some reason, defendants don't want
19  to let us know.
20        Is that right?
21        MS. FANIEL:  Object to form.
22  BY MR. ANDERSON:
23    Q.  Have you made any attempts to export the
24  identities of the individuals who received the e-mails
25  listed on the spreadsheet we were just looking at?

Page 193

1    A.  Yes.  There were attempts.  I just didn't know
2  how to.  And that's -- I don't know how many times -- I
3  don't know -- I don't know -- I mean, I just need to
4  figure out a way.  I mean, if this is something that you
5  need, it's fine.  I mean, I've just got to figure out
6  how to do it.
7    Q.  Have you ever seen this page before?
8    A.  Yes.  Reading this, I believe -- I believe so.
9  Probably not --
10    Q.  Did the help desk --
11    A.  Yeah, this is -- this is what the help desk
12  sends.  They send you information to read, to try to do
13  it yourself.
14    Q.  Right.  Okay.  And then here down below, the sort
15  of description of what summary and detailed reporting
16  data are, there's a section that says:  Where do I find
17  summary reporting for my campaigns?
18        Right?
19    A.  Um-hmm.
20    Q.  And then it shows you how you can find it in the
21  platform, right?
22    A.  No.  Where?
23    Q.  Right here.  The screenshot, which appears to be
24  from the platform's portal.
25    A.  Right.  That -- that --

49 (Pages 190 - 193)

Page 194

1  Q. Got your open rate, click rate?
2  A. Yeah. I've seen that. It shows the actual
3  posts. Right.
4  Q. You can export this data, which it appears you've
5  done, and we've got that and that's the spreadsheet,
6  right?
7  A. Okay. Uh-huh.
8  Q. And then down below, it says: How do I access
9  detailed reporting data for my campaigns?
10     And that's what we're talking about.
11  A. Okay.
12  Q. The identities of the individuals who received
13  all the e-mails.
14  A. Okay.
15  Q. And here's how you do it. How do I access
16  detailed reporting data? I go in, I click on the number
17  of opens and it gives me all the people. Right?
18  A. Okay. Go back. Go back to the verbiage at the
19  top right there. By clicking on a hyperlinked number in
20  the summary reporting. And the hyperlinked number --
21  okay. Oh, all right, I see. I'll try it.
22  Q. Have you ever attempted to access the detailed
23  reporting data as instructed here on this web page?
24  A. I've tried to access and -- I've tried, not
25  successful, but I've tried, or I thought that the

Page 195

1  information that I've given was what was necessary.
2  Q. You understand that the requests for production
3  in this case was for the actual e-mails that were sent
4  by Constant Contact, correct?
5  A. I am now understanding what the production is
6  asking for, yes. I have a clear understanding of what
7  the production is asking for.
8  Q. And the e-mails include sender, recipient, date,
9  stuff like that, right?
10  A. I understand now. Now I will try again. And --
11  Q. Thank you.
12  A. -- you know, if I'm able to do so, I'll try to
13  get it done today.
14  Q. That sounds great. Thank you.
15  A. Oh, wait a minute. Let me -- can I take a
16  screenshot of this right here or no? Am I allowed to?
17  Q. Sure. Yeah. Absolutely.
18  A. Okay. Thank you. Like I said, this is -- thank
19  you.
20  Q. Okay. I want to go back to the spreadsheet real
21  quick. In line row 44, there's an e-mail that appears
22  to have been sent March 13, 2023, correct?
23  A. Yes.
24  Q. And was in the middle of the night, 11:59 p.m.,
25  and it's called a message from president Johnny L.

Page 196

1  McCray Jr., Esquire, right?
2  A. Um-hmm.
3  Q. Do you remember sending this e-mail in the middle
4  of the night via Constant Contact?
5  A. Yeah. I mean, I'm pretty sure that there were
6  times that I communicated with him, finally going
7  through all of the revisions and, you know, hey, once
8  it's all approved, all right, let's go ahead and send it
9  out. And I would always ask the question, do you want
10  to send it out now or do you want to schedule it in the
11  morning? Sometimes it's scheduled in the morning,
12  sometimes it's sent out now.
13  Q. And this message from Johnny McCray, Mr. McCray
14  wrote that message, correct?
15  A. Yeah. Yeah. If I'm not mistaken, yeah. He
16  writes all his letters.
17  Q. And he sent it to you and asked you to post it or
18  distribute it via Constant Contact, right?
19  A. Yes.
20  Q. And it says here -- it looks like it was sent to
21  3,913 people, right?
22  A. Okay.
23  Q. Is that right?
24  A. Yeah. Yeah, that's what it says. Yeah.
25  Q. Who decided it should be sent to that many

Page 197

1  people?
2  A. That's -- I think that's what the request was, to
3  send it to the members.
4  Q. So that probably reflects everyone who signed up
5  to receive e-mails via Constant Contact from the
6  organization, right?
7  A. Yeah.
8  Q. Does this appear to be that letter?
9  A. These are one of the letters --
10  Q. Where it says -- sorry. Go ahead.
11  A. Yeah. These are one of the letters that have
12  been sent out, yes. These are on the letterhead, yeah.
13  Q. And this is --
14  A. I don't know if this particular one, that's
15  the -- the main one from 11:59. But these are similar
16  what the letters look like, yes.
17  Q. And for the record, this was produced by
18  defendants in this case as DEF001562.
19     You know, as I scroll down through this image, it
20  says it was sent by jmcray@mmbnaa.org at the bottom,
21  right?
22  A. Okay.
23  Q. That was really you sending it at his request,
24  correct?
25  A. Yes, sir.

50 (Pages 194 - 197)

Page 198

1   Q. And at the bottom of this letter, he signs it
2  Johnny L. McCray Jr. Esquire, '78 -- which I'm assuming
3  means class of '78 -- President, Bethune-Cookman
4  University, correct?
5   A. Yeah. I see where you're going.
6   Q. Yeah, he was never the president of
7  Bethune-Cookman University, right?
8   A. No. Simple mistake.
9   Q. It's a simple mistake?
10   A. Yes.
11   Q. Have you ever accidentally identified yourself as
12  the president of Bethune-Cookman University?
13   A. Have I identified him as the president?
14   Q. Yourself. Have you ever accidentally identified
15  yourself as the president of Bethune-Cookman University?
16   A. No. Because I didn't have to write or type out
17  something that could have auto-corrected or state that
18  or whatever, so no.
19   Q. Are you aware of anyone else in the history of
20  the world, as far as you know, who's ever accidentally
21  identified themselves as the president of
22  Bethune-Cookman University?
23      MS. FANIEL: Object to form.
24      MR. ANDERSON: What's the basis of the
25  objection?

Page 199

1      THE WITNESS: History of the world?
2      MS. FANIEL: You're asking him if he knows
3  anyone in the history of the world who's done
4  something? I don't think he has that knowledge.
5      MR. ANDERSON: To the best of his
6  understanding.
7  BY MR. ANDERSON:
8   Q. No, right? Because it's not a simple mistake,
9  right?
10   A. Yes, it was a simple mistake. I believe if you
11  go back to the -- to the spreadsheet, you'll see the
12  next post was probably a correction post. It was a
13  simple mistake.
14   Q. Are you testifying that says President,
15  Bethune-Cookman University as a result of an
16  auto-correct error with this document?
17   A. You're asking am I testifying that? I didn't
18  mean for me to testify it. Just, it was a simple
19  mistake that was corrected. You know, it's no --
20  there's no malice involved. There's nothing that -- I
21  don't think Johnny can -- you know, states or say that
22  he was the president of a university, college or
23  university. So again, just a simple mistake. Grace,
24  you know, we're all entitled to mistakes, so yeah.
25   Q. How does he usually sign his letters?

Page 200

1   A. I mean, it's obvious. President of MMBNAA or Dr.
2  Mary McLeod Bethune National Alumni Association.
3   Q. Right. So certainly, if he were to write
4  President, MMBNAA, his computer didn't auto-correct it
5  to Bethune-Cookman University, right?
6   A. Hey, technology is -- it happens. AI and all
7  this -- these things that -- I mean, I'm pretty sure
8  that, you know, a situation like that, a simple mistake.
9  That's -- I don't know how many times you want to harp
10  over that. It's a simple mistake.
11   Q. You understand the problem here, right?
12   A. I -- I totally understand. And trust me, I
13  believe he's kicking himself probably to this day that
14  this was sent out and -- you know, because that's all I
15  do. I just send out. What's given to me, I post out,
16  you know, because I'm thinking that everybody's already
17  checked, correct and all that good stuff, so, you know,
18  simple mistake. But I do understand the severity of it,
19  yes, sir.
20   Q. You understand that this image of this letter
21  with Mr. McCray on the top right signed President,
22  Bethune-Cookman University, was the first thing people
23  would see when they went to the organization's website
24  up to August of this year when Mr. McCray was deposed in
25  connection with this case?

Page 201

1   A. Wait, okay. State that again.
2   Q. This image here on the screen, which is a letter
3  from Johnny McCray --
4   A. Wait, wait, go back up.
5   Q. -- in which he identifies himself --
6   A. Can you scroll back up? A letter from the -- a
7  letter from the desk of the president, Dr. Mary McLeod
8  Bethune, that's the first thing that they see, yes.
9   Q. Right. And this letter in which he signed as the
10  president of Bethune-Cookman University --
11   A. No, it starts off saying that the President of
12  the Dr. Mary McLeod Bethune National Alumni Association.
13  It starts off as --
14   Q. Down at the bottom.
15   A. No, we're talking about -- I'm sorry because
16  we're not supposed to cut each other off. Go ahead.
17  I'm sorry, sir.
18   Q. This letter where at the bottom, he signs
19  President, Bethune-Cookman University, was on the
20  organization's website from the time it was sent out
21  until August of 2023, correct?
22   A. I'm -- I don't know how long it's been up.
23   Q. Are you -- are you the person who took this
24  letter off of the organization's website?
25   A. I was once asked to update, yes. So I don't know

51 (Pages 198 - 201)

Page 202

1 the exact time or date. That's -- but once --
2  Q. Fair enough.
3  A. Once it was asked to -- once the correction was
4 made, because of the horrific mistake that was made --
5 mistake, again -- then it was immediately updated.
6  Q. Within the last couple of months, right?
7  A. I don't understand what you mean, last couple of
8 months.
9  Q. That's when you updated or modified the website
10 to remove this letter, right?
11  A. Can you go back to the spreadsheet, to see those
12 dates?
13  Q. I'm talking about the website, not the e-mail.
14 This letter was on the organization's website as
15 recently as August of this year. And it was taken down
16 by you, correct?
17  A. Right. Of course. For updates. But you're
18 saying this was -- okay. Explain to me, what are you
19 saying? How long this particular letter was on the
20 website?
21  Q. It was up on the website through the date of Mr.
22 McCray's deposition in this case, which was in August of
23 2023. And you're testifying, if I understand correctly,
24 that you removed this letter from the home page of the
25 organization's website, right?

Page 203

1  A. Right, for updates, to go to the next event.
2 Yes. So I'm -- so are you saying -- okay.
3  Q. I'm getting -- I'm just asking you to
4 confirm you're the one who removed it from the website.
5  A. Updates were made to the website, yes. So this
6 was one of the things that was updated because it was
7 moving on to the next event or letter or however you --
8 yeah.
9  Q. So it wasn't -- so it wasn't removed because it
10 said President, Bethune-Cookman University?
11  A. Of course --
12  Q. It was removed because you were going to the next
13 event?
14  A. No, no, no, no. Because -- we're going --
15 jumping back and forth between the Constant Contact.
16 The Constant Contact was updated because that was a
17 mistake. Now, if this was still left on the website,
18 then that was a mere oversight because the updated
19 letter should have been on there. I think that's what
20 you're saying, right? This was on the website, it was
21 updated, a repost was sent from the Constant Contact.
22  Q. Right. But I'm talking about the website. This
23 was on the website and you removed it, right?
24  A. Yes. Yes. That was removed and updated from the
25 website to continue on. But didn't know -- probably

Page 204

1 didn't see that, that particular letter because again,
2 if that was still up there, then it was supposed to be
3 the updated letter.
4  Q. Do you have any recollection about a discussion
5 you had with Johnny McCray about this letter?
6  A. Just when he called back and said, hey, I made a
7 mistake.
8  Q. And was the mistake that you discussed at that
9 time that he put the wrong graduation date on the
10 letter?
11  A. I'm sorry?
12  Q. Was the mistake that he was talking about when
13 you spoke about this letter after it was sent out, did
14 that relate to his graduation date not being 1978?
15  A. No. It was about the -- him putting President,
16 the President of Bethune-Cookman.
17  Q. Right. Okay. Thanks.
18  A. Huh?
19  Q. That's all I wanted to know, right, is that the
20 discussion there was not about the graduation date,
21 right? It was about the fact that he put President,
22 Bethune-Cookman University on there, wasn't it?
23  A. Well, how do you get the graduation date? I
24 thought we was talking about the fact that he made a
25 mistake and put Bethune-Cookman University.

Page 205

1  Q. Right.
2  A. How did --
3  Q. It wasn't the graduation date, was it?
4  A. But where did that come from? We was just -- we
5 was talking about this mistake that was on this letter.
6  Q. Right. And the mistake was that he's not the
7 president of Bethune-Cookman University, right?
8  A. Of course. That's the big -- that was a very big
9 mistake. So how did it jump to the wrong graduation
10 date? Where did you -- where did you get that from? I
11 don't understand.
12  Q. Are you aware of him changing his signature block
13 to update the graduation date?
14  A. Huh? Okay.
15  Q. Are you ever aware of Mr. McCray updating a
16 signature block to correct the wrong graduation date?
17  A. Not -- I'm not sure. I'm not sure.
18  Q. You never had a discussion with Mr. McCray about
19 whether or not the wrong graduation date was in his
20 signature block?
21  A. Okay. So we're up to another subject, right?
22 We're not talking about the fact that he made a mistake
23 about Bethune-Cookman University; now we're on another
24 subject, saying that he's changing his dates of the
25 graduation? Just trying to see the relevancy of this.

52 (Pages 202 - 205)

Page 206

1 I mean, the big -- the bigger picture or bigger mistake
2 is the fact that he accidentally put Bethune-Cookman and
3 it was sent out, you know, but that was corrected. And
4 now, to bring it to attention, you're saying that it was
5 on the website, so that was the wrong updated letter
6 that was on the website.
7     So are we finished with that conversation and
8 we're moving on to another conversation about his
9 graduation date? That's -- I'm just trying to make sure
10 I follow you.
11    Q. Mr. McCray testified in this case that the change
12 you had to make to this letter was his graduation date.
13 That's not true, is it?
14    A. I don't remember. I mean, I'm looking at -- when
15 I'm looking at Bethune --
16    Q. You remembered a minute ago.
17    A. No. I was talking about Bethune-Cookman
18 University. You're talking about the '78. When I saw
19 that, I'm like, man, I remember that mistake, so I see
20 where you were going with this. But now you're jumping
21 to his graduation date, which I -- I don't see the
22 relevancy to understand why that's necessary or --
23    Q. You don't necessarily need to see it. The
24 question that I have for you is, did you ever have a
25 question with Mr. McCray about changing the graduation

Page 207

1 date on his letter?
2    A. Okay. So that, I don't remember. I'm -- I
3 remember the -- we've had a lot of questions, lot of
4 discussion. I remember that because that's obvious. So
5 if he did -- if he sent an updated revision of his
6 letter for me to put on this letterhead, then he's made
7 that correction as well. You know, so the bigger
8 picture is, of course, the fact of him putting the wrong
9 presidency down there. And we made -- you know, went to
10 make that correction. Yeah.
11    Can I take a break real quick to use the
12 bathroom?
13    Q. Sure. Let's take 15 minutes. Does that sound
14 good?
15    A. We don't need 15 minutes.
16    Q. Okay. Ten minutes?
17    A. We can do five, if possible.
18    THE VIDEOGRAPHER: We're going off the record.
19 The time --
20    MR. ANDERSON: Let's do five.
21    THE VIDEOGRAPHER: I'm sorry, go ahead, sir.
22    MR. ANDERSON: That's okay. We can take a
23 five-minute break.
24    THE VIDEOGRAPHER: We're going off the record.
25 The time is 3:00 p.m.

Page 208

1    (A brief recess was taken.)
2    THE VIDEOGRAPHER: We're going back on the
3 record. The time is 3:09 p.m.
4 BY MR. ANDERSON:
5    Q. Mr. Barfield, couple of last questions about this
6 letter on the screen where Mr. McCray identifies himself
7 as the president of Bethune-Cookman University. Have
8 you ever been contacted by anyone asking whether or not
9 Mr. McCray is the president of Bethune-Cookman
10 University?
11    I think you're on mute.
12    A. No.
13    Q. Have you ever had any discussions with anyone at
14 the organization about anyone contacting the
15 organization to inquire whether Mr. McCray is the
16 president of Bethune-Cookman University?
17    A. No.
18    Q. I want to go back to something we talked about a
19 little bit earlier, which was eDiscovery vendor called
20 Cloud 9. I believe you had testified that you had never
21 heard of Cloud 9; is that correct?
22    A. No.
23    Q. And so you're not aware of any efforts by a
24 company called Cloud 9 to collect defendant's Facebook
25 page and produce it in connection with this case,

Page 209

1 correct?
2    A. No.
3    Q. And you're not aware of any efforts by a company
4 called Cloud 9 to collect e-mails sent by the
5 organization using Constant Contact, correct?
6    A. I don't know if that's the -- no.
7    Q. And did you make any effort in connection with
8 this case to download and produce the content of the
9 organization's Facebook page?
10    A. Yes.
11    Q. What efforts did you undertake to produce the
12 content of the organization's Facebook page?
13    A. Same step, went through the help -- went through
14 the help to try to follow the directions. It actually
15 didn't go all the way to September 2021. And every
16 single time, I tried to download all of the posts. It
17 says it did it but it wouldn't -- it doesn't show where
18 it downloaded to. So there were efforts to, you know,
19 download all the posts and to upload it. So my -- I
20 ended up asking, hey, why don't we make it simple, to
21 make someone, whoever is going to look at it, the admin
22 and you can look -- you know, look for it yourself?
23    Q. Did you ever undertake any efforts to download
24 the Facebook pages of all of the organization's local
25 chapters?

53 (Pages 206 - 209)

Page 210

1   A. I don't have access to do so, so no.
2   Q. Are the -- as far as you know, are the
3 organization's local chapter Facebook pages publicly
4 available?
5   A. Should be. As far as I know, yeah. Anyone can
6 see. You don't have to join the chapter to see it.
7 Yeah. The --
8   Q. Did you undertake any effort -- sorry. Go ahead
9 and finish your answer.
10   A. Yeah, yeah, the group. I don't -- I think all of
11 them are open where you can see it. You don't have to
12 join the group to see the page, I believe.
13   Q. Did you ever make any effort to download the
14 organization's Instagram page and produce it in
15 connection with this case?
16   A. Did I? I'm not sure. I don't think I did. I
17 don't think I did. Because I think it was just the
18 Facebook and the Constant Contact that I was asked. I
19 don't remember seeing Instagram. But, I mean, that's --
20 if it is, okay, that's not a problem. I could try.
21 It's nothing that I'm holding anything back.
22   Q. Did you ever make any effort to download the
23 content of the organization's Twitter page and produce
24 it in connection with the discovery requests in this
25 case?

Page 211

1   A. I believe that was like at the beginning, you
2 know, when you asked that question. I have no access to
3 that.
4      No, no, okay, never mind. I'm sorry. The
5 question was to change the content of it, and I don't
6 have access to change, update or download anything.
7   Q. Are you aware of any effort by a company called
8 Cloud 9 to collect and produce any documents at all in
9 connection with this case?
10   A. No, I'm not. So I'm trying to remember e-mails.
11 I remember there was at one point a discussion that
12 there was going to be a third party to collect. So
13 maybe if that's the name of the company, I'm not sure,
14 but that never came about.
15   Q. When you said there was a discussion about a
16 third party to collect, what was the nature of that
17 discussion?
18   A. That was the initial e-mails, I believe, to get
19 all the information. That was never -- I don't think --
20 I think there was just -- the last thing was just to
21 ask, everybody from the chapter needs to produce their
22 information.
23   Q. Did you recently assist the organization in
24 collecting e-mails from Mr. Shorter's e-mail account?
25   A. No. Just provided the link so everybody could

Page 212

1 upload their information.
2   Q. Have you at any point through the course of this
3 litigation ever assisted anyone in collecting e-mails
4 from an e-mail account, other than the tech account that
5 we discussed earlier?
6   A. Palm Beach County, because I'm in direct
7 connection with that, helping to make sure that all of
8 the information was given from Palm Beach County.
9   Q. I'm going to share another document with you on
10 my screen here.
11   A. Okay.
12   Q. Can you see this?
13   A. Um-hmm.
14   Q. Does this appear to be a flyer that was sent by
15 the organization using Constant Contact?
16   A. Yes. Yeah. Trying to get everybody's update
17 information. Yeah.
18   Q. But this doesn't appear to be an e-mail in that
19 there's no sender -- or, I'm sorry, no recipients
20 identified on the face of this document, correct?
21   A. No. No. This is how the Constant Contact e-mail
22 works. Yeah.
23   Q. So this is the flyer that you would upload to
24 Constant Contact for distribution to a select
25 distribution list, right?

Page 213

1   A. Well, Constant Contact in its back office, you're
2 able to create sectionals -- sections, like flyers like
3 this. So upload the logo -- scroll down a little bit --
4 you upload the logo, you upload -- you put the link and
5 that's -- you know, that's a little JPEG of a board, of
6 a picture, whatever, put board and, you know, it was all
7 created in Constant Contact.
8   Q. Okay.
9   A. It wasn't initially a flyer like you saw with
10 previous Constant Contact.
11   Q. Got it. I see. So you were able to go into
12 Constant Contact and put this together in the system and
13 then send it out, right?
14   A. Correct.
15      MR. ANDERSON: And just for the record, I'm
16   going to mark this as Exhibit 32.
17      (Plaintiff's Exhibit No. 32 was marked for
18   identification.)
19 BY MR. ANDERSON:
20   Q. And this was produced to us in this case as Bates
21 No. DEF001697.
22      Do you see here where it says: Recap, board of
23 directors meeting, click here to view recorded meeting?
24   A. Um-hmm.
25   Q. So somebody who received this e-mail could click

54 (Pages 210 - 213)

1 the link and view a recording of defendant's board
2 meeting; is that right?
3    A.   Right.  If I'm not mistaken, it was sent or
4 should have been sent just to the board meetings, the
5 members of the board, board meeting, and not to the
6 whole Constant Contact list.
7    Q.   Okay.  And can you tell from this document when
8 it was sent?
9    A.   No.
10    Q.   But this appears to be a true and correct
11 depiction of a message that was distributed by Constant
12 Contact?
13    A.   Yes.
14    Q.   Okay.  And you were going to say something?  Go
15 ahead.
16    A.   Board member meetings are usually, I believe,
17 every other -- every other month.  Bimonthly, I believe,
18 if I'm not mistaken.
19    Q.   Okay.  And if those are monthly, I believe you
20 testified previously that they're all recorded, right?
21    A.   They should be all recorded.  Yes, sir.
22        MR. ANDERSON:  This next exhibit, we'll mark as
23    Exhibit 33.  This is produced in this case by
24    defendants as Bates No. DEF001862.
25        (Plaintiff's Exhibit No. 33 was marked for

1    identification.)
2 BY MR. ANDERSON:
3    Q.   Do you recognize this image here?
4    A.   Yeah.  Yes, sir.
5    Q.   And you understand that it refers to Florida
6 Classic, which is the football game we discussed
7 earlier, right?
8    A.   Yes, sir.
9    Q.   And you understand that Florida Classic is a
10 registered trademark, correct?
11    A.   This -- yes.  This year, clear understanding.  As
12 you can see, the date says 2021, which is in November,
13 two months -- September, October -- two months prior to
14 when the actual -- well, conversations, you know,
15 whatever you want to call it, was stating that we cannot
16 do.  So this is definitely in the transitional period of
17 figuring out or finding out that Florida Classic is also
18 a trademark of Bethune that cannot be used.
19    Q.   Well, it was also -- it was actually sent after
20 the board -- or, sorry, the university voted to
21 disassociate from the organization, correct?
22    A.   The logo of the association, yes.  In transition,
23 still trying to figure out how we can, you know,
24 navigate finding out that Florida Classic is a part of
25 that too, as well.  So, yeah.  So this is -- this is

1 that transitional period, you know, really, really
2 trying to make things work.  And, you know, so look at
3 this.  October, the month after.  This was stuff that
4 was already out.  So, you know, yeah, you're --
5    Q.   Well, let -- let me back up a little.
6    A.   Yeah.
7        MR. ANDERSON:  I'm going to mark this as
8    Exhibit 34, produced in this case as Bates No.
9    DEF001878.
10        (Plaintiff's Exhibit No. 34 was marked for
11    identification.)
12 BY MR. ANDERSON:
13    Q.   This appears to be the content of some e-mails
14 that were sent by the organization using Constant
15 Contact.  Correct?
16    A.   Correct.
17    Q.   And it includes the seal that we discussed
18 earlier, the registered trademark of the university,
19 right?
20    A.   Yes, sir.
21    Q.   And it includes the interlocking BC here down
22 below, which is also a registered trademark of the
23 university, correct?
24    A.   Yes, sir.
25    Q.   And this was sent after the university voted to

1 disassociate from the organization, right?
2    A.   The university was voted to disassociate, so
3 there were other communications after this that stated
4 that we cannot use such things as well.  So this was
5 already out.  These dates, September, October, these are
6 things that was already out.
7    Q.   So if I go back to the spreadsheet of the e-mails
8 that were sent using Constant Contact --
9    A.   Right.
10    Q.   -- can we find this e-mail in here?
11    A.   We should be able to.  Hold on.  Let me --
12 Florida Classic transportation.
13    Q.   That's probably the last one we looked at, right?
14    A.   Probably, yeah.
15    Q.   Sent November 13, 2021.
16    A.   Logo.  Yeah.  Because look --
17    Q.   Let's go back to the --
18    A.   Because, see, look.  If you look at the logo
19 contest, the logo contest was in October, so we didn't
20 even have a logo yet for whatever is trying to, you
21 know, adhere to -- JSU.  I think that's it right there.
22 JSU, at the bottom, that's October the 2nd.  So that was
23 already out.  And then there were communications from
24 the school saying, hey, you've got to change everything,
25 so here we go.  These dates coalign.  They line up.

Page 218

1  Q. Right. So all the e-mails on this spreadsheet
2  were sent after the university voted to disassociate
3  from the organization, right?
4  A. The initial, yes. Now, there were other
5  correspondence from the university saying what we can
6  and cannot do. Now, all of that goes in -- you know, in
7  between us already having stuff that's already out. So,
8  you know, when it was clear, totally clear or whatever
9  to, you know, ease out of things you cannot do
10  specifically, you see us making efforts. Look at that,
11  rebranding. That was January. And stuff like that.
12  So, you know, we're making efforts to adhere to
13  the final. Plus, they've given us, what, a date as
14  well. I can't remember exactly what that date was.
15  But, I mean, you can see the timeline. You know, just
16  needed time to get everything together.
17  Q. But it was after the university sent a cease and
18  desist letter, these e-mails on this list were sent out,
19  right?
20  A. I'm not sure. I'm not sure of the actual date of
21  the cease and desist. So, I mean, whether -- where it
22  was in the actual date of the cease and desist, I mean,
23  you can see, leading up to the following year, we're
24  making changes. You see what I'm saying?
25  MR. ANDERSON: I'm going to mark this next

Page 219

1  exhibit as Exhibit 35. This is produced in the case
2  as DEF0001880.
3  (Plaintiff's Exhibit No. 35 was marked for
4  identification.)
5  BY MR. ANDERSON:
6  Q. This appears to be an accurate reflection of
7  communications sent by the organization using Constant
8  Contact, correct?
9  A. Yes.
10  MR. ANDERSON: Next exhibit I'll mark as
11  Composite Exhibit 36, produced as DEF001882 through
12  DEF001889.
13  (Plaintiff's Exhibit No. 36 was marked for
14  identification.)
15  BY MR. ANDERSON:
16  Q. As I scroll through these images, do these appear
17  to be --
18  A. Whoa, whoa, whoa. Go back up. Go back up.
19  Let's make sure we recognize the date for the record.
20  September 21st -- or September 2021. Okay.
21  Q. These appear to be accurate depictions of
22  communications sent by the organization using Constant
23  Contact, correct?
24  A. Yes. And the very month of the disassociation
25  and the month leading afterwards of saying what can be

Page 220

1  posted, when all of these were already out, yes.
2  Q. Well, they weren't already out, right? They were
3  all sent after September 16, 2021, as indicated on the
4  spreadsheet, right?
5  A. The spreadsheet --
6  Q. I'll go back to refresh your recollection.
7  A. No, no --
8  Q. September 16, 2021, is the earliest one on here,
9  right?
10  A. That's the date of that spreadsheet. We're
11  talking about the date that -- from when the school
12  created or wanted the disassociation and after follow-up
13  correspondence of what we can and cannot do. You've got
14  to look at from September, October, November, going into
15  the new year of the organization saying, okay, now you
16  can't do this, now you can't do this, now you can't do
17  this, we don't want you using this. I mean, the
18  disassociation was the disassociation. That's -- that
19  was clear.
20  Months after that was what -- if it wasn't
21  stating or saying, okay, you can't do that. We didn't
22  find out about the classic until the classic or after
23  the classic. You can't use those verbiage. So these
24  were already stuff that was already up.
25  But, as -- like I said, as you can see in the

Page 221

1  spreadsheet, you see us making Constant Contact and
2  making strides to adhere to the school's demands.
3  Q. Were you involved in the collection and
4  production of the images here on the screen?
5  A. No. Those were flyers that were created by other
6  individuals of the association and the tech team.
7  Q. Who at the organization selected these documents
8  and produced them in this case?
9  A. Who created those documents?
10  Q. No, who collected them? Who -- who downloaded
11  them and gave them to the attorneys to give them to us?
12  A. I guess those who -- from each chapter. I don't
13  know exactly who, who uploaded those.
14  Q. But you weren't involved in any way in trying to
15  produce documents responsive to a court order requiring
16  defendants to turn over all their e-mails using Constant
17  Contact; is that what you're saying?
18  A. No, I didn't say that. You asked me who was
19  involved, and I -- I don't know who else was involved.
20  There are other factors or other, you know, officers,
21  chapter members or presidents or whatever that were
22  uploading information to the association's lawyers. So,
23  you know, whatever part that I did, I made sure to
24  upload everything that I was asked to. Facebook and
25  Constant Contact was a problem, but I did what I was

56 (Pages 218 - 221)

Page 222

1  able to do. But you today --
2  Q. You --
3  A. -- more information, to be able to get some --
4  you know, to produce more information. So I will use
5  this knowledge that I received today to be able to get
6  the other extra information that is asked.
7  Q. I believe you previously had indicated that you
8  were pretty much the primary person in the organization
9  interacting with the Constant Contact platform, right?
10  A. Yes.
11  Q. And --
12  A. But these posts -- these posts, there were a few
13  people that was involved. So, I mean, but yes.
14  Q. So who was involved in gathering these documents
15  that we're looking at now on the screen and producing
16  them in connection with this litigation?
17  A. I don't -- wait. So I'm not understanding.
18  Q. These -- everything I'm showing you here in this
19  composite exhibit was produced to us by your attorney.
20  A. Okay.
21  Q. Who at the organization put these all together
22  and gave them to the attorney?
23  A. That's a good question. I know I was able to --
24  I don't know if this was -- I know this was -- I
25  uploaded the summary. I don't know if I uploaded all of

Page 223

1  the -- these are actual flyers. These are actual -- the
2  posts, the actual posts. I don't know if that was
3  uploaded.
4       There was a few things that I had to upload
5  through there. So if this was one of them, then it was
6  just, you know, from the dates of -- from this date to
7  that date. But yeah.
8  Q. But you didn't go on to the Constant Contact
9  platform and download all of these flyers?
10  A. I downloaded everything that I was able to. So
11  these are flyers, the summary, so yeah.
12  Q. So you were able to --
13  A. I'm not -- I'm not sure if this is one I
14  downloaded. I can't -- I'm not sure. So that's -- just
15  to be honest, I'm not sure if I downloaded. There was
16  so much stuff I've downloaded, so I need to go back and
17  look. If it's in the folder, then yeah, these are one
18  of the things I downloaded, I was able to download --
19  effectively download, but not get the e-mail address
20  that you're -- that you're asking for.
21  Q. Right. But I'm just trying to figure out where
22  this came from, right? So you went into the Constant
23  Contact platform and you were able to download the
24  flyers that corresponded to all of the e-mails that are
25  listed on the spreadsheet, right?

Page 224

1  A. I believe so. I believe that's -- if these were
2  in the Google Drive, then yes, then I was the one that
3  downloaded them and uploaded them, yes.
4  Q. Okay. That's all I wanted to know. I'm trying
5  to figure out who gathered these. Sounds like it was
6  you, right?
7  A. Let me just look. Let me just look. Because, I
8  mean, you know, I'm not sure. These just look like -- I
9  thought this was the information that your -- that you
10  pulled up yourself, so that's why I'm not sure. Let me
11  go to that Google Drive, if it's okay.
12       Request for document, MMB website. No. Reports.
13  No, these are just reports. So no, that wasn't me. I'm
14  looking at a different report.
15       Okay. These are stuff that was on the website.
16  Maybe it was from the e-mail, so I'm not really sure. I
17  can't say yes or no.
18  Q. When you say maybe it was from the e-mail, what
19  do you mean?
20  A. Maybe this was sent through e-mail because it's
21  not in the Google Drive, which I was trying to, you
22  know, keep everything -- everything in one location.
23  Q. Do you have any idea who gathered the documents
24  that we're looking at now and produced them in
25  connection with this case?

Page 225

1  A. I can't -- I don't recall. I'm not sure.
2  Q. Did you ask anyone in preparation for your
3  testimony today about who gathered and collected,
4  identified, produced documents in connection with this
5  case?
6  A. No. I wasn't aware that this was going to be --
7  I wasn't -- well, I didn't know you were going to bring
8  this up.
9  Q. Okay. When identifying documents responsive to
10  the discovery requests in this case, have you ever had
11  any discussions about any search terms that were used to
12  search for documents that should be produced?
13  A. I don't understand the question.
14  Q. Did anybody ever communicate to you the types of
15  key words you should look for in your e-mail to identify
16  documents that should be produced in this case?
17  A. No.
18  Q. Did you ever perform a keyword search of your
19  e-mail account for documents that should be produced in
20  this case?
21  A. No. I don't -- no.
22  Q. Okay.
23       MR. ANDERSON: This next exhibit I'll mark as
24  Number 37 was produced to us at DEF001848.
25       (Plaintiff's Exhibit No. 37 was marked for

Page 226

1  identification.)
2  BY MR. ANDERSON:
3     Q.  Does this appear to be an e-mail or at least a
4  content that was attached to an e-mail sent by the
5  organization using Constant Contact?
6     A.  Yes.
7     Q.  And do you see that there's a notable difference
8  between this e-mail or this -- these flyers and the
9  other flyers that we've been looking at?
10    A.  What do you mean by a notable difference?
11    Q.  Well, these are black and blue, right?
12    A.  Okay.
13    Q.  And the other ones were maroon and gold, right?
14    A.  Okay.
15    Q.  Did you prepare these flyers?
16    A.  Not -- these are not flyers.  These are -- these
17  are Constant Contact posts.  If you go back --
18    Q.  Did you prepare --
19    A.  Can you go back to the -- can you go back to the
20  other tab, with the maroon?  See, this is an actual
21  flyer.
22    Q.  Um-hmm.
23    A.  No, go down.  That right there, that's the actual
24  flyer.
25    Q.  Okay.

Page 227

1     A.  So if you go up a little bit, those are just
2  things that -- like, the National Alumni Association of
3  Bethune-Cookman monthly visits, those are things that
4  you can prepare in Constant Contact.  So you can either
5  upload a flyer and just show the flyer or you can
6  prepare and type and put extra content in Constant
7  Contact.  So --
8     Q.  Okay.  So --
9     A.  So going back to the blue -- going back to the
10  background with the blue, those are just prepared
11  content that was created in Constant Contact.  I don't
12  know if you're -- you're focusing on the blue
13  background, the black background, but those are just
14  different backgrounds you can use.
15    Q.  Yeah.  Did you prepare this post using Constant
16  Contact?
17    A.  Yes.
18    Q.  And, obviously, it's using black and blue instead
19  of maroon and gold, right?
20    A.  Yes.
21    Q.  And all of the other posts -- I'll sort of thumb
22  through them here --
23    A.  They're --
24    Q.  -- with the exception of this one --
25    A.  No, that's -- it's either -- you know, it's

Page 228

1  different backgrounds that --
2     Q.  Different backgrounds.  Right.  Is there a reason
3  in particular why you chose the black and blue here when
4  traditionally, you would typically use the maroon and
5  gold?
6     A.  Well, not traditionally.  If you go back to
7  September, that was because that was the color scheme on
8  the flyers.  So, you know, but then you saw a post that
9  have -- what was that -- a board or something.  And so
10  this was just -- hey, trying something different.
11       Scroll down, let me see what else is on there.  I
12  think this is one of the -- yeah, this is one of the
13  templates that they -- that it was -- you know, it was a
14  new template.  That's what they're using, you know.
15    Q.  I think we are almost done.
16       Do you recognize this document on the screen?
17    A.  Yes.
18    Q.  And it's entitled Dr. Mary McLeod Bethune
19  National Alumni Association Brand Guide.
20       Correct?
21    A.  Correct.
22       MR. ANDERSON:  And I'd like to mark this as
23  Exhibit 38.
24       (Plaintiff's Exhibit No. 38 was marked for
25  identification.)

Page 229

1  BY MR. ANDERSON:
2     Q.  What do you understand this document to be?
3     A.  The branding scheme of one of the contestants who
4  later on became the winner of the new logo that we have
5  today.  Branding --
6     Q.  So this is -- understood.  So this is the
7  criteria by which the organization should present its
8  logos and brand, correct?
9     A.  That was the concept that that particular person,
10  Stephan Holmes, suggested, if we were to use his
11  concept.
12    Q.  And you do use his concept, right?
13    A.  Yep.  He was the winner.  We all -- the committee
14  agreed that this was a good depiction of, you know,
15  stepping into a new situation that we have, you know,
16  plus it came with the whole concept idea so we didn't
17  have to think of what else to do.  So it was a unanimous
18  decision from the committee --
19    Q.  And there was a --
20    A.  -- to use the whole concept that he presented.
21    Q.  And there was a contest to determine what the
22  organization's new logo should be, right?
23    A.  Right.  Yes, sir.
24    Q.  And do you recall how many submissions there were
25  to that contest?

1   A.  Yeah.  It was a good number.  I want to say about
2   15 to 20, maybe.
3   Q.  15 to 20?
4   A.  Yes.
5   Q.  And for somebody to participate in the contest,
6   they could go onto the organization's website and enter
7   the contest, right?
8   A.  At that time, it was on the website.  It was a
9   Constant Contact post, I think.  It was in social media
10  as well.
11  Q.  And so when people would submit their entry into
12  the contest, they would upload proposed logos for the
13  organization to use; is that right?
14  A.  I'm sorry, say the question again.
15  Q.  Yeah.  When people wanted to enter the contest,
16  they would go to the website or whatever was linked from
17  a social media page and they would upload documents in
18  connection with their submission in the contest,
19  correct?
20  A.  Correct.
21  Q.  And where would those documents go when they were
22  uploaded to the contest?
23  A.  The committee, along with the tech committee --
24  the logo committee -- the logo planning committee, along
25  with the tech committee, created a Google form to be

1   able for everyone to upload their information, their --
2   their suggestions, and so that way we can keep
3   everything together and we can look at the list that was
4   sent out, that was collected.
5   Q.  Okay.  And there were certain criteria that the
6   submissions for the contest had to meet, right?
7   A.  Say it again.
8   Q.  There were certain criteria that the submissions
9   for the logo contest had to meet, right?
10  A.  I don't think -- I don't think a criteria was
11  given.  I could be mistaken.  I don't think a criteria
12  was given.  But in the selection process, definitely a
13  criteria was like, okay, we have to -- you know, it has
14  to be -- we have to brand -- we have to find a brand
15  that doesn't look like the seal or we can't do this.
16  You know, we were going off of everything that the
17  school said that we cannot do or cannot produce or
18  cannot have.
19      So in that meeting, it was definitely stated with
20  that.  So the intention to find a new logo or to create
21  a new logo was to make sure that we adhere to the
22  school's response.
23  Q.  Okay.  But it had to have a picture of Dr.
24  Bethune, right?
25  A.  No, no, it didn't.  That just happened to be like

1   that.  And, actually, most of the -- now, thinking back
2   to the submissions, most of them have pictures of
3   Bethune.  That was -- I don't think -- if I remember the
4   flyer, I don't think it said that.  I mean, if you have
5   it, you can pull up and see for yourself what the flyer
6   stated.  I can't remember.
7   Q.  Well, the winning submission, which is on the
8   screen --
9   A.  I'm sorry?
10  Q.  The winning submission -- submission -- excuse
11  me, which is on the screen, has a picture of Dr. Bethune
12  with a black rose with the founding year and the name
13  Dr. Mary McLeod Bethune National Alumni Association.  I
14  think you had indicated --
15  A.  Founding year, okay.  Now that brings back the
16  memory from the first initial question when you asked
17  what does 1932 mean.  And in my mind, I thought that was
18  the founding year but I just didn't want to be wrong.
19  So just answering your question that you asked at the
20  beginning, what does the 1932 mean.
21      MR. ANDERSON:  Ms. Fisher, did you have a
22  question?
23      THE COURT REPORTER:  I tried to get as best as
24  I could with the overlapping speakers.  I don't know
25  if he wants to repeat the whole thing.

1       MR. ANDERSON:  That's okay.  I think we got
2   what we need.
3   BY MR. ANDERSON:
4   Q.  Which is, you understand the 1932 to be the
5   founding year --
6   A.  Yes.
7   Q.  -- from this logo, right?
8   A.  Yes.
9   Q.  And it's the founding year of what?
10  A.  Of Dr. Mary McLeod Bethune establishing an alumni
11  association.
12  Q.  So the university voted to disassociate from any
13  organization in 2001, right?
14  A.  Um-hmm.
15  Q.  And so the organization in its current form
16  didn't exist until 2001, right -- or, sorry, 2021,
17  right?
18  A.  Okay.  Rephrase the question.
19  Q.  The organization as it exists today was
20  established in 2021, after the university voted to
21  disassociate from the prior organization, right?
22  A.  No.  The organization existed from Dr. Mary
23  McLeod Bethune's inception, which is 1932, under the
24  name Bethune-Cookman University National Alumni
25  Association.  In 2021, the school asked to -- the school

Veritext Legal Solutions

Page 234

1 wanted to disassociate, to my understanding, and to
2 change the name.
3    Q.  Right.  So when you changed the name, you became
4 the Dr. Mary McLeod Bethune National Alumni Association,
5 correct?
6    A.  Correct.
7    Q.  In 2021, right?
8    A.  Correct.
9    Q.  This page of the Exhibit 38, which is the brand
10 concept produced by defendants in this case, it
11 identifies the color pallet, right?
12    A.  Um-hmm.
13    Q.  And these are the colors that are supposed to be
14 used for the logo, right?
15    A.  There are three primary brand colors:  Maroon,
16 gold and black.  Secondary colorways also include black
17 and white.
18    Q.  Right.  So same colors as the BC Wildcats, right,
19 maroon and gold?
20    A.  From my understanding, the BC Wildcats is maroon
21 and gold.  So this is maroon, gold, black and white.
22    Q.  And then here, there's some guidance on how to
23 use the logo called logo usage, correct?
24    A.  Correct.
25    Q.  And at the top, there's a black and white version

Page 235

1 with an X next to it, which indicates that the logo
2 should never be used -- I think it says on the left,
3 basically should never be used in that circumstance,
4 right, should never be used in black and white, right?
5    A.  Well, he's created different color schemes, some
6 which were in white, but he did it.  In other words, we
7 can't manipulate it ourself.
8    Q.  Right.  So when you use the logo, it needs to be
9 used in accordance with these criteria, which is maroon
10 and gold, correct?
11    A.  Or white or black.  Correct.
12    Q.  Well, you can't use the black and white one
13 because of the big X next to it, right?
14    A.  Okay.  There were other color schemes, as I
15 stated before, that he was able to -- other color
16 schemes that he presented.  After he -- after, you know,
17 we decided that -- see, see how it's in black, the
18 letters are in white.  So he created it.  We -- in other
19 words, he was just stating that, don't manipulate the
20 logo from his creation.
21    Q.  Um-hmm.  And it's the same one in your background
22 right now, right, the maroon and gold?
23    A.  Yeah.  That's -- that's the logo right there that
24 he created.  Nothing was manipulated from it.
25    Q.  And when creating a new logo or selecting a new

Page 236

1 logo -- let me strike that.  Let me back up.
2        When selecting a new logo, the organization could
3 have chosen any colors in the world, right?
4    A.  Yes.
5    Q.  But it chose the exact same colors used by
6 Bethune-Cookman University, right?
7    A.  Is that a trademark?  The color scheme is a
8 trademark?
9    Q.  Can you answer the question?  I think you've
10 answered the question.  They're both maroon and gold,
11 right?
12    A.  Yeah, they're both maroon and gold, yeah.
13    Q.  Right.
14    A.  Just I didn't -- to my knowledge, the color
15 scheme wasn't a trademark.  It was the seal, it was the
16 cat, it was the Florida Classic, right, it was the BC --
17 the BC hyper, overlapping each other, yeah.  Correct.
18    Q.  Was it just a coincidence that the organization
19 showed the same --
20        (Simultaneous speakers; court reporter
21    interjection.)
22        THE WITNESS:  I'm just -- you know, for
23    clarification, you would agree, right, those were the
24    things that the school had?
25 BY MR. ANDERSON:

Page 237

1    Q.  This isn't my deposition; it's yours.
2        Is it a coincidence that the organization chose
3 the same colors as Bethune-Cookman University?
4    A.  You're asking -- no.  I don't think it's a
5 coincidence.  I think it's more so of understanding what
6 we're able to do, what the association is able to do and
7 what the association is not able to do.
8        So --
9    Q.  I think that's all of my questions --
10    A.  I -- you know, not to make it a little more
11 longer than what it needed to be.  If the school had
12 said all they have said, you can't do this, you can't do
13 this, you can't do this, you can't do this, we took
14 steps to make sure that we are not -- we can't do that.
15 So we made revisions on the things that we are assuming
16 that we can do.
17    Q.  And you landed in a place where you call yourself
18 an alumni association of a university you're not
19 affiliated with using the name of its founder and the
20 exact same colors, right?
21    A.  No.  That's not what the --
22    Q.  No?
23    A.  -- alumni association -- the alumni association
24 is not of the university.  It's --
25    Q.  Then what's it of?

60 (Pages 234 - 237)

Page 238

1   A. Of the founder, the Dr. Mary McLeod Bethune, the
2   person itself.
3   Q. You're the alumni of the person itself?
4   A. We are alumnis. And we are --
5   Q. And you happen to be Wildcats?
6   A. Happen to be an organization, an independent
7   organization that is not affiliated with and does not
8   represent or raise funds for Bethune-Cookman University.
9   Q. If the organization really wanted to distinguish
10  itself from Bethune-Cookman University, it could easily
11  have chosen different colors; wouldn't you agree?
12  A. If it was asked of us to change. If that was one
13  of the things to change, then that's what we have to
14  agree to because --
15  Q. So is it an objective of the organization to
16  appear affiliated with the university?
17  A. No. That is not the objective.
18  Q. But you've got the founder's name, an alumni
19  association with a year, 1932, in which you were not
20  founded, and the same colors as the organization. Do
21  you see the -- that's a lot of coincidences.
22  A. Well, I mean, the --
23  MS. FANIEL: Object to form. This is
24  argumentative. I think he's answered the question.
25  THE WITNESS: Yeah. You know, that's -- that

Page 239

1   date does not correlate with the school's date, one.
2   I've seen elementary schools, I've seen street names
3   that has Dr. Mary McLeod Bethune, too. The colors.
4   FSU has the same colors. Washington Red Skins has the
5   same color. That color scheme is a color scheme. If
6   you would like to address it as coincidence, that's
7   definitely your -- that's definitely something that
8   you can do. But the organization asked to -- the
9   organization was asked to not do certain things and to
10  the best of the organization's ability, we was able to
11  do that.
12  BY MR. ANDERSON:
13  Q. Are you the official alumni association of
14  Bethune-Cookman University?
15  A. Me personally? I can't --
16  Q. No, I'm talking -- you are the representative of
17  the organization right now. Are you the official alumni
18  association of Bethune-Cookman University?
19  A. As a representative -- state your question again.
20  Q. Is the organization that you're testifying on
21  behalf of right now the official alumni association of
22  Bethune-Cookman University?
23  A. I mean, you know that answer to that. No.
24  Q. Can you answer the question? No?
25  A. No.

Page 240

1   Q. So why does it appear that the organization is
2   pretending to be the official alumni association --
3   MS. FANIEL: Object to form.
4   BY MR. ANDERSON:
5   Q. -- of the university?
6   MS. FANIEL: Object to form.
7   MR. ANDERSON: I don't have any further
8   questions. Let me just confer with my counsel. We'll
9   take a five-minute break and make sure there's nothing
10  I need to clean up, but I think that's it for now.
11  THE VIDEOGRAPHER: We're going off the record.
12  The time is 4:00 p.m.
13  (A brief recess was taken.)
14  THE VIDEOGRAPHER: We're going back on the
15  record. The time is 4:07 p.m.
16  BY MR. ANDERSON:
17  Q. Okay, Mr. Barfield. Just a couple of last
18  questions and then we can wrap this up, I promise.
19  So I'm going to share my screen. Can you see
20  this image here?
21  A. Yes.
22  Q. So I'll scroll through this. But this is a
23  capture of the organization's website on August 10,
24  2023. Can you see that there, where I highlighted?
25  A. Yes.

Page 241

1   Q. And just, does this appear to be an accurate
2   reflection of the organization's website at that time?
3   A. Yes. With -- with one mistake, yes.
4   Q. And here on the right is the letter we talked
5   about before from the desk of the president where Mr.
6   McCray signs off as President, Bethune-Cookman
7   University, correct?
8   A. Mistakenly, correct.
9   Q. Right. And so that was August 10, 2023.
10  MR. ANDERSON: I'd like to enter this as
11  Exhibit 39.
12  (Plaintiff's Exhibit No. 39 was marked for
13  identification.)
14  BY MR. ANDERSON:
15  Q. Next page -- I'll scroll up to the top so we can
16  start from there -- is a capture from defendant's
17  website dated a few days later, August 14, 2023. Do you
18  see that there?
19  A. Yes.
20  Q. Does this appear to be an accurate reflection of
21  defendant's website on that date?
22  A. Updated, yes.
23  Q. Updated, right. It was updated in that the
24  letter from Mr. McCray was removed from the website,
25  right?

61 (Pages 238 - 241)

Page 242

1   A. Hidden.
2   Q. Excuse me? I didn't hear your answer.
3   A. Hidden, yes.
4   Q. Hidden from the website. So no longer visible on
5   this main page, right?
6   A. Correct. This pop-up page.
7       MR. ANDERSON: I'd like to enter -- I'd like to
8   enter this exhibit as Exhibit 40.
9       (Plaintiff's Exhibit No. 40 was marked for
10  identification.)
11  BY MR. ANDERSON:
12  Q. So does seeing these two exhibits side by side
13  refresh your recollection as to whether you had any
14  discussions with Mr. McCray after his deposition
15  relating to the presence of the letter on the website
16  wherein he signs off as President, Bethune-Cookman
17  University?
18  A. State the question again or statement.
19  Q. Do you recall having a conversation with Mr.
20  McCray about the presence of this letter on the website
21  in August of 2023 where he signs, President,
22  Bethune-Cookman University?
23  A. Yes. This was the wrong flyer -- the wrong
24  letter. So, of course, just like we updated in Constant
25  Contact.

Page 243

1   Q. So did he contact you to have this letter hidden
2   from the website?
3   A. No. This was -- this was from when he realized
4   he made the mistake. So I didn't update this website.
5   We updated Constant Contact. We didn't update this
6   website, so that's probably the reason why it was still
7   up there, the only reason.
8   Q. I think you're answering the question you want me
9   to ask and not the question I'm asking.
10  A. Oh, I'm --
11  Q. We've established here -- that's okay. No, I'll
12  try to make it more clear and less confusing. My
13  apologies. It's been a long day for all of us and I
14  don't usually talk this much in a week.
15      So the first exhibit, 39, which is stamped
16  August 10, 2023, you indicated was an accurate depiction
17  of the website as it appeared August 10, 2023. And on
18  the right is the letter from Mr. McCray where he signs,
19  President, Bethune-Cookman University. Right?
20  A. Mistakenly, yes.
21  Q. And then the second exhibit, Exhibit 40, is
22  another screen capture of the website dated a few days
23  later on August 14, 2023. Right?
24  A. Uh-huh.
25  Q. And the letter where Mr. McCray signs President,

Page 244

1   Bethune-Cookman University is gone, right?
2   A. Right.
3   Q. Did you remove that letter or hide that letter
4   from the website?
5   A. Yes.
6   Q. And was that action taken in response to a
7   discussion you had with Mr. McCray?
8   A. Okay. Yes. Because that was the wrong letter
9   that should have been updated.
10  Q. Understood. So Mr. McCray --
11  A. Yes.
12  Q. Mr. McCray called you and said, hey, there's a
13  letter on the website, we've got to take it down?
14  A. There probably was a call, but, you know, in the
15  middle of updates from everyone or whatever, it's -- it
16  probably was a call. I can't say yes or no if it wasn't
17  a call. Maybe a call, e-mail, text, whatever.
18  Q. Okay. But it was at Mr. McCray's request that
19  that was removed from the website?
20  A. Yes. Because that was clearly a mistake, you
21  know. Like I said, that was --
22  Q. Sure.
23  A. -- yes, I didn't get that one as well because
24  there was an updated letter that was sent out to
25  Constant Contact and me not following up didn't update

Page 245

1   the website as well.
2   Q. Okay. Well, that's all the questions I have for
3   you today, Mr. Barfield. I really appreciate your
4   patience in answering the questions.
5       MR. ANDERSON: For the record, to the extent
6   the witness was unprepared for any topics, we'll just
7   simply reserve our right to reconvene the deposition.
8   But for now, we'll call it a day.
9       THE WITNESS: All right, Mr. Anderson. Thank
10  you.
11      MS. FANIEL: I don't have any questions.
12      MR. ANDERSON: Okay. Well, thank you so much,
13  Mr. Barfield. I really appreciate it. Happy
14  Thanksgiving. I know it's been a long day. Good luck
15  with the move.
16      THE WITNESS: Thank you.
17      THE VIDEOGRAPHER: We're going off the record.
18  The time is 4:14 p.m. This concludes today's
19  testimony by Anthony Barfield. The total number of
20  media units is five and will be retained by Veritext
21  Legal Solutions.
22      (The deposition was concluded at 4:14 p.m.)
23
24
25

62 (Pages 242 - 245)

Page 246

1         CERTIFICATE OF OATH
2
  STATE OF FLORIDA)
3 COUNTY OF ORANGE)
4
5     I, MAE FISHER, Registered Merit Reporter,
6 Certified Realtime Reporter and Notary Public, State of
7 Florida, certify that ANTHONY BARFIELD II personally
8 appeared before me via videoconference on November 21,
9 2023, and was duly sworn/affirmed and produced a
10 driver's license as identification.
11
12     WITNESS my hand and official seal this 28th day
13 of November, 2023.
14
15
16
17        MAE FISHER, RMR, CRR
          Notary Public - State of Florida
18        Commission GG 913201
          Expires:  January 8, 2024
19
20
21
22
23
24
25

Page 247

1         TRANSCRIPT CERTIFICATE
2 STATE OF FLORIDA)
  COUNTY OF ORANGE)
3
4     I, MAE FISHER, Registered Merit Reporter,
  Certified Realtime Reporter and Notary Public, State of
5 Florida, certify that I was authorized to and did
  stenographically report the deposition of Anthony
6 Barfield II; that a review of the transcript was not
  requested; and the foregoing transcript, pages 5 through
7 245, is a true record of my stenographic notes.
8     I FURTHER CERTIFY that I am not a relative,
  employee, attorney, or counsel of any of the parties,
9 nor am I a relative or employee of any of the parties'
  attorney or counsel connected with the action, nor am I
10 financially interested in the action.
11
      DATED this 28th day of November, 2023, at
12 Orlando, Orange County, Florida.
13
14
15
16
17        MAE FISHER, Notary Public
18        State of Florida
19
20
21
22
23
24
25